# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| 2018 Quadrennial Regulatory Review – Review of | **)** | MB Docket No. 18-349 |
| the Commission's Broadcast Ownership Rules and | **)** | |
| Other Rules Adopted Pursuant to Section 202 of | **)** | |
| the Telecommunications Act of 1996 | **)** | |
| | **)** | |

**REPORT AND ORDER**

**Adopted:  December 22, 2023**                    **Released:  December 26, 2023**

By the Commission:  Chairwoman Rosenworcel issuing a separate statement.  Commissioners Carr and Simington dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                                 Paragraph #

I.    INTRODUCTION ................................................................................................1
II.   BACKGROUND ................................................................................................3
III.  STANDARD OF REVIEW ................................................................................11
      A.  Introduction ................................................................................................11
      B.  Background ................................................................................................12
      C.  Discussion ................................................................................................14
IV.   MEDIA OWNERSHIP RULES ................................................................................27
      A.  Local Radio Ownership Rule ................................................................................27
          1.  Introduction ................................................................................................27
          2.  Background ................................................................................................29
          3.  Discussion ................................................................................................32
      B.  Local Television Ownership Rule ................................................................................66
          1.  Introduction ................................................................................................66
          2.  Background ................................................................................................69
          3.  Discussion ................................................................................................71
      C.  Dual Network Rule ................................................................................................117
          1.  Introduction ................................................................................................117
          2.  Background ................................................................................................118
          3.  Discussion ................................................................................................119
V.    DIVERSITY-RELATED PROPOSALS ................................................................................140
VI.   PROCEDURAL MATTERS ................................................................................148
VII.  ORDERING CLAUSES ................................................................................153
Appendix A – Final Rules
Appendix B – Final Regulatory Flexibility Analysis

Appellate Case: 24-1380    Page: 2    Date Filed: 02/23/2024 Entry ID: 5366849

## I.    INTRODUCTION

1.    With this Report and Order (Order), we bring to a close the 2018 Quadrennial Review proceeding.[1]  In this Order, we retain the existing media ownership rules and adopt minor modifications that better tailor them to the current media marketplace.  The record of this proceeding demonstrates that while the media industry has experienced both unforeseen challenges and substantial changes since the last quadrennial review, broadcasters retain a uniquely important role serving the American public in their local communities.  The COVID-19 pandemic has underscored the importance of readily available and easily accessible news and information at the local community level, for which broadcast outlets remain a critical source.  Despite the proliferation of new forms and sources of programming, broadcast television and radio remain essential to achieving the Commission's goals of competition, localism, and viewpoint diversity.

2.    Based on our careful review of the record, we find that our existing rules, with some minor modifications, remain necessary in the public interest.  Specifically, we retain the Dual Network Rule and the Local Radio Ownership Rule, the latter of which we modify only to make permanent the interim contour-overlap methodology long used to determine ownership limits in areas outside the boundaries of defined Nielsen Audio Metro markets and in Puerto Rico.  We likewise retain the Local Television Ownership Rule with modest adjustments to reflect changes that have occurred in the television marketplace.  The existing Local Television Ownership Rule ensures competition among local broadcasters while allowing for flexibility should the circumstances of local markets justify it.  Accordingly, today we update the methodology for determining station ranking within a market to better reflect current industry practices, and we expand the existing prohibition on use of affiliation to circumvent the restriction on acquiring a second top-four ranked station in a market.  We find that the modifications adopted today will enable the Commission to promote competition, localism, and viewpoint diversity more effectively going forward.

## II.    BACKGROUND

3.    Consistent with the statutory requirement directing the Commission to review its media ownership every four years, the Commission initiated this Quadrennial Review on December 12, 2018, by adopting a Notice of Proposed Rulemaking (*NPRM*).[2]  In the *NPRM*, the Commission sought comment on whether the three media ownership rules subject to this review—the Local Radio Ownership Rule, the Local Television Ownership Rule, and the Dual Network Rule—remain necessary in the public interest in their current forms or whether the rules should be modified or eliminated.[3]

4.    At the time the *NPRM* was released, litigation was still pending as a result of the Report and Order that concluded the 2010 and 2014 Quadrennial Reviews (*2010/2014 Quadrennial Review Order*) and a subsequent Order on Reconsideration (*2010/2014 Quadrennial Review Order on Reconsideration*).[4]  In the *2010/2014 Quadrennial Review Order*, the Commission resolved its 2010 and

---

[1] *See 2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, 33 FCC Rcd 12111 (2018) (*2018 Quadrennial Review NPRM*); *Media Bureau Seeks to Update Public Record in the 2018 Quadrennial Regulatory Review*, Public Notice, 36 FCC Rcd 9363 (MB 2021) (*2021 Update Public Notice*).

[2] *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12111, para. 1.  The NPRM also incorporated comments from the July 2018 Public Notice that sought comment on the status of competition in the marketplace for delivery of audio programming.  These comments are addressed below in our discussion of the Local Radio Ownership Rule. *See id.* at 12120-21, para. 20.  *See also Media Bureau Seeks Comment on the Status of Competition in the Marketplace for Delivery of Audio Programming*, MB Docket No. 18-227, Public Notice, 33 FCC Rcd 7316 (2018).

[3] *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12111-12, para. 1.

[4] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket Nos. 14-50 et al., Second Report and Order, 31 FCC Rcd 9864, 9960-10008, paras. 234-336 (2016) (*2010/2014 Quadrennial Review*

(continued….)

Appellate Case: 24-1380      Page: 3      Date Filed: 02/23/2024 Entry ID: 5366849

2014 proceedings and kept five structural ownership rules largely intact:  the Local Television Ownership Rule, the Local Radio Ownership Rule, the Newspaper/Broadcast Cross-Ownership Rule, the Radio/Television Cross-Ownership Rule, and the Dual Network Rule.  In addition, the *2010/2014 Quadrennial Review Order* reinstated the Commission's previous revenue-based eligible entity standard as a means to promote broadcast ownership by small businesses and new entrants.[5]  Several parties filed Petitions for Reconsideration of the *2010/2014 Quadrennial Review*[6] while others sought judicial review in the D.C. Circuit Court of Appeals and the Third Circuit Court of Appeals.[7]

5.        On November 16, 2017, the Commission responded to the Petitions for Reconsideration and adopted an *2010/2014 Quadrennial Review Order on Reconsideration*, which, among other things, reversed certain elements of the *2010/2014 Quadrennial Review Order*, most notably by repealing the Newspaper/Broadcast Cross-Ownership Rule and the Radio/Television Cross-Ownership Rule and revising the Local Television Ownership Rule.[8]  Specifically, the Commission revised the Local Television Ownership Rule by eliminating the prior Eight-Voices Test and adopting a case-by-case review process for proposed transactions involving new combinations of top-four rated stations in a local market.[9]  Though it declined to revise the market definition relied on in the Local Radio Ownership Rule, the Commission adopted a presumption for certain transactions involving embedded markets.[10]  The Commission also eliminated the Television Joint Sales Agreement Attribution Rule[11] readopted in the

(Continued from previous page) ────────────────

*Order*); *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket Nos. 14-50 et al., Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802 (2017) (*2010/2014 Quadrennial Review Order on Reconsideration*).

[5] Under this standard an "eligible entity" is any entity that qualifies as a small business under revenue-based standards established by the Small Business Administration.  *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9979-84, paras. 279-286.  In turn, the Commission's rules afford such qualified eligible entities additional flexibility, for example, by extending the time required to construct a broadcast facility or raising the threshold at which ownership strictures are triggered.  *See, e.g.*, 47 CFR § 73.3598(a); 73.3555, Note 2(i)(2).

[6] *See* Petition of Connoisseur Media for Reconsideration of the 2010/2014 Quadrennial Review Order, MB Docket Nos. 14-50 et al. (filed Dec. 1, 2016) (Connoisseur Petition); Petition of the National Association of Broadcasters for Reconsideration of the 2010/2014 Quadrennial Review Order, MB Docket Nos. 14-50 et al. (filed Dec. 1, 2016) (NAB Petition); Petition of Nexstar Broadcasting, Inc. for Reconsideration of the 2010/2014 Quadrennial Review Order, MB Docket Nos. 14-50 et al. (filed Dec. 1, 2016) (Nexstar Petition).

[7] *See* Petition for Review of Prometheus Radio Project and Media Mobilizing Project, *Prometheus Radio Project et al. v. FCC*, No. 16-4046, Document No. 003112457854 (3d Cir. Nov. 3, 2016); Petition for Review of Multicultural Media, Telecom and Internet Council and the National Association of Black Owned Broadcasters, *Multicultural Media, Telecom and Internet Council et al. v. FCC*, No. 16-1398, Document No. 1646418 (D.C. Cir. Nov. 15, 2016); Petition for Review of News Media Alliance, *News Media Alliance v. FCC*, No. 16-1395, Document No. 1646214 (D.C. Cir. Nov. 14, 2016); Petition for Review of Bonneville International Corporation, *Bonneville Intl. Corp. v. FCC*, No. 16-1452, Document No. 1653313 (D.C. Cir. Dec. 28, 2016); Petition for Review of The Scranton Times, L.P., *The Scranton Times, L.P. v FCC*, No. 16-451, Document No. 1653302 (D.C. Cir. Dec. 28, 2016).

[8] *See 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9803, para. 2.

[9] *Id.* at 9831, para. 66.

[10] *Id.* at 9841, para. 86.  Embedded markets are smaller markets that are located within the boundaries of a larger Nielsen Audio Metro market.  The *Order on Reconsideration* adopted a narrow presumption in favor of a waiver of the rule in certain circumstances involving the New York City and Washington, DC markets.

[11] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket No. 14-50, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371, 4527-45, paras. 340-72 (2014).  A joint sales agreement (JSA) is an agreement that authorizes one station (the broker or the brokering station) to sell some or all of the advertising time on another station (the brokered station).  The previous rule, adopted in 2014 and then

(continued….)

Appellate Case: 24-1380      Page: 4      Date Filed: 02/23/2024 Entry ID: 5366849

*2010/2014 Quadrennial Review Order*,[12] while retaining the Shared Services Agreement disclosure requirements adopted therein.[13]  Further, the Commission adopted an Incubator Program and sought comment on how to structure and implement the program.[14]

6.        On August 2, 2018, after notice and comment, including consultation with the Commission's Advisory Committee on Diversity and Digital Empowerment (ACDDE), the Commission adopted the *Incubator Order*, which established an incubator program for radio broadcasters designed to increase diversity by addressing the barriers to new and diverse station ownership, in particular lack of access to capital and operational expertise.[15]  The *Incubator Order* provided a structure whereby established AM and FM broadcasters could offer financial, technical, and operational assistance to new and diverse entrants.[16]  In return for successful incubation, established broadcasters could receive a limited waiver of the Local Radio Ownership Rule, allowing them to acquire another station in a market that would otherwise be prohibited by the Local Radio Ownership Rule, provided the market is "comparable" to the market in which the broadcaster successfully incubates another station.[17]

7.        Several parties sought review of the *2010/2014 Quadrennial Review Order on Reconsideration* in the D.C. Circuit and Third Circuit Court of Appeals.[18]  These petitions were consolidated before the Third Circuit Court of Appeals with the previously filed reviews of the *2010/2014 Quadrennial Review Order*.[19]  On September 23, 2019, the Third Circuit vacated and remanded the bulk of the Commission's actions in the *2010/2014 Quadrennial Review Order on Reconsideration*, opining

(Continued from previous page) ───────────────

re-adopted in 2016, stated that television JSAs that involve the sale of more than 15 percent of the weekly advertising time of a station (brokered station) by another in-market station (brokering station) are attributable under the Commission's ownership rules.

[12] In *Prometheus Radio Project v. FCC*, 824 F.3d 33, 60 (3d Cir. 2016) (*Prometheus III*), the Third Circuit vacated the Television JSA Attribution Rule that was adopted in 2014, stating that the Commission first needed to determine whether the Local Television Ownership Rule remained necessary pursuant to Section 202(h).  With its determination in the *2010/2014 Quadrennial Review Order* that the Local Television Ownership Rule remained necessary, the Commission reinstated the Television JSA Attribution Rule that the Third Circuit previously vacated. *See 2010/2014 Quadrennial Review Order, 31 FCC Rcd* at 9888-90, paras. 60-64.

[13] *See 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9846, para. 96.

[14] *See id.* at 9857, para. 121.

[15] *See Rules and Policies to Promote New Entry and Ownership Diversity in the Broadcasting Services*, MB Docket No. 17-289, Report and Order, 33 FCC Rcd 7911 (2018) (*Incubator Order*).

[16] *Id.* at 7913, para. 6.

[17] *Id.* at 7913-14*,* para. 9.  The Commission considered a market to be "comparable" to the market where the incubation relationship occurred "if, at the time the incubating entity seeks to use the reward waiver, the chosen market and the incubated market fall within the same market size tier under our Local Radio Ownership Rule and the number of independent owners of full-service, commercial and noncommercial radio stations in the chosen market is no fewer than the number of such owners that were in the incubation market at the time the parties submitted their incubation proposal to the Commission."  *See id.* at 7938, para. 67.

[18] *See* Petition for Review of Prometheus Radio Project and Media Mobilizing Project, *Prometheus Radio Project and Media Mobilizing Project v. FCC*, No. 18-1092, Document No. 003112828343 (3d Cir. Jan. 16, 2018); Petition for Review of Independent Television Group, *Independent Television Group v. FCC*, No. 18-1050, Document No. 1719478 (D.C. Cir. Feb. 20, 2018); Petition for Review of Multicultural Media, Telecom and Internet Council, Inc. and the National Association of Black-Owned Broadcasters, *Multicultural Media, Telecom and Internet Council and National Association of Black-Owned Broadcasters v. FCC*, No. 18-1071, Document No. 1721291 (D.C. Cir. Mar. 7, 2018); Petition for Review of Free Press et al., *Free Press et al. v. FCC*, No. 18-1072, Document No. 1722268 (D.C. Cir. Mar. 8, 2018).

[19] *See* Order, *Prometheus Radio Project et al. v. FCC*, No. 17-1107, Document No. 003112514755 (3d Cir. Jan. 18, 2017).

that the Commission had failed to consider adequately how the rule changes would impact female and minority ownership.[20]  On December 20, 2019, the Media Bureau issued an Order reinstating the rules as set forth in the *2010/2014 Quadrennial Review Order*.[21]

8.        In the wake of the Third Circuit's decision, the Commission and broadcast industry petitioners filed separate Petitions for Writ of Certiorari before the Supreme Court, each asking the Supreme Court to review and overturn the Third Circuit's decision on different grounds.[22]  On October 2, 2020, the Supreme Court granted the petitions for a writ of certiorari and consolidated the cases, ultimately hearing oral argument on January 19, 2021.  On April 1, 2021, the Supreme Court, in a unanimous opinion, upheld the rules as adopted and eliminated in the Commission's *2010/2014 Quadrennial Review Order on Reconsideration*.  The Supreme Court reaffirmed the Commission's "broad authority to regulate broadcast media in the public interest"[23] and stated that under the Administrative Procedure Act's arbitrary and capricious standard, a court may not substitute its own policy judgment for that of the agency so long as the action is reasonable and reasonably explained.[24]  In this instance, the Supreme Court found that the Commission appropriately analyzed the evidence and data it had before it, and came to a reasonable conclusion that the rules no longer served the public interest.[25]

---

[20] *Prometheus Radio Project v. Federal Communications Commission*, 939 F.3d 567, 584 (3d Cir. 2019) (*Prometheus IV*).  Specifically, the Third Circuit found that the Commission's decision to retain the Local Television Ownership Rule's Top-Four Prohibition in the *2010/2014 Quadrennial Review Order on Reconsideration* was not arbitrary and capricious.  *See id.* at 581.  It also held that the Commission's definition of "comparable markets" in the *Incubator Order* was adequately noticed and not arbitrary and capricious.  *See id.* at 582.  It also declined to hold that the Commission unreasonably delayed action on proposals to adopt a procurement rule to the broadcast industry. *See id. IV* at 582.  However, the Third Circuit held that the Commission had not adequately considered the impact its rule changes could have on female and minority ownership in the *2010/2014 Quadrennial Review Order on Reconsideration*.  *See id.* at 584.  The Third Circuit pointed to the Commission's failure to provide any data on how female ownership would be impacted, identifying this as a failure by the Commission "to consider an important aspect of the problem." *See id.* at 585-86.  The Third Circuit also took issue with the Commission's reliance on Form 323 and NTIA data to conclude that minority ownership would not be impacted by loosening the rules – critiquing the Commission's analysis of the data as "woefully simplistic." *See Prometheus IV*, 939 F.3d at 586.  The Third Circuit was not persuaded by the Commission's argument that it was under no statutory obligation to produce empirical evidence and that it must only "justify its rule with a reasoned explanation."  *See id.* at 587.  Rather, the Third Circuit criticized the Commission for "confin[ing] its reasoning to an insubstantial statistical analysis of unreliable data" without analyzing gender data.  *See id.*  Further, the Third Circuit disagreed with the Commission that female and minority ownership was just one of the competing interests that the Commission must consider, opining that female and minority ownership was "an important aspect of the problem" and that any trade-off between the interests must come with a meaningful evaluation of the effect the change may have on the interests. *See id.*

[21] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket Nos. 14-50 et al., Order, 34 FCC Rcd 12360 (MB 2019).

[22] *See* Petition for a writ of certiorari of the Federal Communications Commission, *Prometheus Radio Project et al. v. FCC,* Docket No. No. 19-1231, at 14-15 filed April 17, 2020 (*Commission Petition*) (arguing that the Commission was entitled to deference and that the Third Circuit was requiring it to meet an imprecise data threshold); Petition for a writ of certiorari of National Association of Broadcasters, et al., *Prometheus Radio Project et al. v. FCC,* Docket No. No. 19-1241, filed April 17, 2020; certiorari granted October 2, 2020 (*Industry Petition*) (arguing that the Third Circuit erred by raising atextual concerns of female and minority ownership above concerns over competition).

[23] *See FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1154 (2021) (*FCC v. Prometheus*).

[24] *Id.* at 1158.

[25] *Id.* at 1159-1160.  The Supreme Court also opined that it is not unusual for agencies to lack perfect empirical and statistical data in their day-to-day decision making and that the "the APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies."  *Id.* at 1160.  The Supreme Court further stated

(continued….)

Appellate Case: 24-1380     Page: 6     Date Filed: 02/23/2024 Entry ID: 5366849

Finally, the Court noted that it did not reach, and therefore left undisturbed, issues regarding whether section 202(h) authorizes or requires the Commission to consider, or prohibits the Commission from considering, minority and female ownership when it conducts its quadrennial reviews.[26]

9.      Accordingly, the Supreme Court upheld the Commission's decision to eliminate the Newspaper/Broadcast Cross-Ownership and Radio/Television Cross-Ownership Rules and revise the Local Television Ownership Rule.  It also upheld the Commission's decision to eliminate the Television Joint Sales Agreement Attribution Rule while retaining the Shared Services Agreement disclosure requirements.  The Court likewise upheld the Commission's decisions on the "eligible entity" definition and the creation of a diversity incubator program.

10.     On June 4, 2021, the Media Bureau adopted an order reinstating the *2010/2014 Quadrennial Review Order on Reconsideration*, the *Incubator Order*, as well as the revenue-based eligible entity definition from the *2010/2014 Quadrennial Review Order*.[27]  Moreover, cognizant of how much time had passed since the original comment period closed, the Bureau released a public notice seeking to refresh the record in the 2018 Quadrennial Review proceeding and received extensive comment.[28]  The Bureau asked commenters to review and comment on any materials that had been filed in the proceeding since the original comment period closed.[29]  The Media Bureau also sought any new and relevant information, including new empirical and statistical evidence, proposals, and detailed analysis.[30]  Additionally, the Bureau sought comment on how the media marketplace had evolved since early 2019 and whether new technological innovations had spurred noticeable trends or changed industry practices,[31] as well as how any trends had impacted how consumers obtain local and national news and information.[32]

---

(Continued from previous page)  ————————————————

that neither the Telecommunications Act nor any other statute requires the Commission to conduct its own studies before exercising its discretion under section 202(h).  *See id.*

[26] *Id.* at 1160 n.3.

[27] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket Nos. 14-50 et al., Order, 36 FCC Rcd 9354 (MB 2021).

[28] *See 2021 Update Public Notice*, 36 FCC Rcd at 9363-64.  A few commenters in the 2022 Quadrennial Review proceeding (MB Docket No. 22-459) also submitted those filings in this proceeding after the official close of the comment cycle.  *See* American Television Alliance (ATVA) Comments, MB Docket No. 22-459 (rec. Mar. 3, 2023); National Association of Black Owned Broadcasters (NABOB) Comments, MB Docket No. 22-459 (rec. Mar. 3, 2023); ATVA Reply Comments, MB Docket No. 22-459 (rec. Mar. 20, 2023); iHeartCommunications, Inc. Reply Comments, MB Docket No. 22-459 (rec. Mar. 20, 2023); Letter from David Oxenford and Keenan Adamchak, Counsel for Joint Commenters, Connoisseur Media, LLC et al., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349 (filed Nov. 9, 2023) (attaching their 2022 Quadrennial Review comments and reply comments).  Nonetheless, we have reviewed those submissions and determined that they do not raise new legal or policy issues within the scope of this proceeding and so do not affect our conclusions in this docket.  We will consider those filings further during the 2022 Quadrennial Review.

[29] *See 2021 Update Public Notice*, 36 FCC Rcd at 9366.

[30] *Id.*

[31] *Id.*

[32] *See id.* at 9367.  The Media Bureau also sought comment on what impact, if any, the completion of the 2017 Incentive Auction and related repack of the television spectrum had on the industry as well as any legal or economic factors that should be considered in the context of its ongoing review.  *Id.* at 9367-68.

Appellate Case: 24-1380     Page: 7     Date Filed: 02/23/2024 Entry ID: 5366849

## III.    STANDARD OF REVIEW

### A.    Introduction

11.    We reaffirm in this proceeding the long-standing framework under section 202(h) of the Telecommunications Act of 1996, pursuant to which we examine the rules subject to the Quadrennial Review to determine if they remain necessary in service of our three traditional policy goals—competition, localism, and viewpoint diversity.  We find that the language of the statute, judicial precedent, and the record in this proceeding support retaining our traditional multi-factor approach, and we reject suggestions that we re-interpret the statute as requiring solely a competition-centric review.[33]  In addition, consistent with past Commission determinations, we find that section 202(h) grants us discretion to make rules more or less stringent to ensure they serve the public interest.  We also conclude that under this approach, and consistent with past reviews, we will consider whether our existing rules are consistent with minority and female ownership and to evaluate potential harms, if any, to minority and female ownership that would result from any changes we make thereto.

### B.    Background

12.    As stated above, the media ownership rules subject to this Quadrennial Review are the Local Radio Ownership Rule, the Local Television Ownership Rule, and the Dual Network Rule.[34]  Section 202(h) of the Telecommunications Act of 1996 requires the Commission to review these rules every four years to determine whether they "are necessary in the public interest as the result of competition" and to "repeal or modify any regulation [the Commission] determines to be no longer in the public interest."[35]  Consistent with the guidance of the Third Circuit, the Commission has previously considered the language "necessary in the public interest" to be a "'plain public interest' standard under which 'necessary' means 'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable.'"[36]  Furthermore, the Commission has applied the principle that there is no "presumption in favor of repealing or modifying the ownership rules,"[37] but rather, that the Commission has the discretion "to make [the rules] more or less stringent."[38]  Accordingly, the Commission's review under section 202(h) focuses on

---

[33] *See, e.g., 2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 9870, para. 16 (reiterating that the Commission's "longstanding policy goals of competition, localism, and diversity represent the appropriate framework within which to evaluate . . . [the] media ownership rules."); *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996,* 18 FCC Rcd 13620, 13627-45, paras. 17-79 (2003) (*2002 Biennial Review Order*) (containing a detailed analysis of the policy goals of competition, localism, and diversity).

[34] These rules are found, respectively, at 47 CFR §§ 73.3555(a), (b), and 47 CFR § 73.658(g).

[35] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) (1996 Act); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (Appropriations Act) (amending sections 202(c) and 202(h) of the 1996 Act).  In 2004, Congress revised the then-biennial review requirement to require such reviews quadrennially.  *See* Appropriations Act § 629, 118 Stat. at 100.

[36] *See Prometheus Radio Project v. FCC,* 373 F.3d 372, 394 (3d Cir. 2004) (*Prometheus I*).  The court also concluded that the Commission is required "to take a fresh look at its regulations periodically in order to ensure that they remain 'necessary in the public interest.'"  *Id.* at 391.

[37] The court in *Prometheus I* determined that section 202(h) does not carry a presumption in favor of deregulation. *See Prometheus I,* 373 F.3d at 395 (rejecting the "misguided" findings in *Fox* and *Sinclair* regarding a "deregulatory presumption" in section 202(h)); *see also Prometheus Radio Project v. FCC,* 652 F.3d 431, 444-45 (3d Cir. 2011) (*Prometheus II*) (confirming the standard of review under section 202(h) adopted in *Prometheus I*).

[38] *Prometheus I,* 372 F.3d at 395; *see also Prometheus II,* 652 F.3d at 445.  *See also 2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 9866-67, para. 6; *2002 Biennial Review Order,* 18 FCC Rcd at 13722-23, para. 269 (noting that irrespective of whether section 202(h) creates a presumption that requires the Commission to justify the retention of a rule, any such presumption does not have the "effect of limiting the types of changes that [the Commission] may conclude are in the public interest").

Appellate Case: 24-1380     Page: 8     Date Filed: 02/23/2024 Entry ID: 5366849

determining whether there is a reasoned basis for retaining, repealing, or modifying each rule consistent with our long-standing public interest goals of competition, localism, and viewpoint diversity.[39]

13.     Parties presented arguments related to the proper interpretation of section 202(h) to the Supreme Court in *FCC v. Prometheus*.[40]   Subsequent to the Supreme Court's decision, in the *2021 Update Public Notice*, the Media Bureau sought comment on various issues, including whether there were any legal factors that the Commission should consider as part of its 2018 Quadrennial Review.[41]   In response, several commenters opine regarding how the Commission should interpret section 202(h) going forward in the wake of *FCC v. Prometheus,* as well as their views regarding the impact of the Supreme Court's decision on the Commission's consideration of minority and female ownership in this proceeding.

### C.    Discussion

14.     As we have many times in the past, and consistent with Congress's directive in section 202(h), we review the rules that are subject to the Quadrennial Review to determine whether they are necessary in the public interest as the result of competition and with the express statutory purpose of repealing or modifying any rule that is no longer in the public interest.  In conducting that review, our determination as to whether the rules remain necessary in the public interest focuses primarily on our longstanding policy goals of competition, localism, and viewpoint diversity.  In addition to those core policy goals, the Commission has also considered whether its rules are consistent with, and the effect, if any, changes to its rules would have on, minority and female ownership of broadcast stations, and we do so as well.

15.     As noted above, the Supreme Court did not consider the Third Circuit's prior conclusions regarding the interpretation of section 202(h)—in fact, the Supreme Court explicitly declined to reach such issues.  Therefore, as an initial matter, the Third Circuit's guidance, as well as the Commission's application of that guidance in past quadrennial reviews, continues to inform our analysis.  Consistent with that precedent, and as discussed in more detail below, we reject calls to depart from precedent or to reinterpret section 202(h) in a manner that would abandon our traditional multi-factor framework in favor

---

[39] *See Prometheus I*, 373 F.3d at 395; *Prometheus II*, 652 F.3d at 445.

[40] *See, e.g.*, National Association of Broadcasters, et al. Petition for Writ of Certiorari, Supreme Court Docket No. 19-1241, at 15-17 (filed Apr. 17, 2020) (arguing that the purpose of section 202(h) is "to continue the process of deregulation" that "Congress set in motion" through the Act and that that the Third Circuit was raising atextual concerns above competition); Prometheus Radio Project, et al. Brief in Opposition, Supreme Court Docket Nos. 19-1231, 19-1241, at 15-16 (filed Jul. 21, 2020) (disagreeing that diversity is an atextual consideration in section 202(h), but rather part of a statutorily mandated analysis of whether the rules remain in the public interest); International Center for Law and Economics Amicus Brief, Supreme Court Docket No. 19-1241, at 4-5 (filed May 22, 2020) (contending that intent of section 202(h) was to establish "a pro-competitive, deregulatory national policy framework"); Southeastern Legal Foundation Amicus Brief, Supreme Court Docket Nos. 19-1231, 19-1241, at 3 (filed Nov. 23, 2020) (arguing Third Circuit erred by concluding that the section 202(h) public interest analysis reached beyond competition); Americans for Prosperity Amicus Brief, Supreme Court Docket Nos. 19-1231, 19-1241, at 8-9 (filed Nov. 23, 2020) (arguing the Third Circuit exceeded their judicial function by raising atextual concerns); Select Members of Congress Amicus Brief, Supreme Court Docket Nos. 19-1231, 19-1241, at 5-7 (filed Dec. 23, 2020) (writing that Congress has long-held that diversity is a crucial part of the public interest analysis and the Third Circuit correctly held section 202(h) should be interpreted broadly to include a review of any impact to female and minority ownership); Former FCC Commissioners Amicus Brief, Supreme Court Docket Nos. 19-1231, 19-1241, at 19-20 (filed Dec. 23, 2020) (arguing ownership diversity is a long-held part of the Commission's public interest analysis and the passage of section 202(h) did not change that analysis); The Leadership Conference on Civil and Human Rights, et al. Amicus Brief, Supreme Court Docket Nos. 19-1231, 19-1241, at 7-8 (filed Dec. 23, 2020) (arguing the Commission has adopted ownership diversity as an important public interest consideration and it cannot analyze based solely on competition).

[41] *2021 Update Public Notice*, 36 FCC Rcd at 9368.

of an approach focused solely on competition or that would permit only the relaxation or elimination of the rules.

16.     First, consistent with the Third Circuit's guidance in *Prometheus I* and Commission precedent, we continue to find that "necessary in the public interest" is a "'plain public interest' standard under which 'necessary' means 'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable.'"[42] The Commission has applied this interpretation repeatedly in its previous quadrennial reviews, and we continue to find that this understanding of "necessary in the public interest" is the most reasonable and logical interpretation.[43]

17.     Second, we decline NAB's invitation to re-interpret section 202(h) in order to find a presumption in favor of deregulation, and we disagree with the assertion that section 202(h) only allows for the repeal or relaxation of a rule.[44]  Rather, as we have concluded in prior quadrennial reviews and the courts have upheld, we find that the Commission may "make [the rules] more or less stringent" after reviewing and considering the state of competition in the media marketplace.[45]  As the Third Circuit held in *Prometheus I,* section 202(h) does not carry a presumption in favor of deregulation, nor is it a "one-way ratchet."[46]  We continue to find that the iterative process established by section 202(h) compels us to "repeal or modify any regulation [the Commission] determines to be no longer in the public interest."[47]  Based on the plain language of this directive, and the use of the word "modify," we reiterate that the Commission is not merely relegated to repealing or relaxing a rule that, over time, has become unnecessary or obsolete.  Instead, where an existing rule as written is "no longer in the public interest," the Commission can modify that rule (for instance, by making it more or less restrictive, changing the structure of the rule, or closing loopholes) to ensure that the rule better serves the public interest.[48]  Contrary to NAB's suggestion, the logic of a deregulatory presumption undercuts the references in section 202(h), in both its text and legislative history, to evaluating the rules in the public interest.  We further believe that it would be counter to the public interest to deregulate by either repeal, relaxation, or

---

[42] *See Prometheus I*, 372 F.3d at 394.  The court also concluded that the Commission is required "to take a fresh look at its regulations periodically in order to ensure that they remain 'necessary in the public interest.'"  *Id.* at 391.

[43] *See, e.g., 2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 23 FCC Rcd 2010, 2017, para. 10 (2008) (*2006 Quadrennial Review Order*) (applying the interpretation that "necessary in the public interest" is a "'plain public interest' standard under which 'necessary' means 'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable'"); *2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 9866-67, para. 6 (reiterating the Third Circuit's determination about the meaning of "necessary in the public interest").

[44] *See* National Association of Broadcasters (NAB) Comments, MB Docket No. 18-349, at 38-55 (rec. Sept. 2, 2021) (NAB Update Comments).  In *Prometheus I*, the Third Circuit also noted the D.C. Circuit's conclusion in *Cellco*, which clarified and contrasted the D.C. Circuit's earlier holdings in *Fox* and *Sinclair* that section 202(h) carries with it with a presumption of deregulation such that the Commission should repeal or modify the rules.  *See Prometheus I*, 373 F.3d at 395 (rejecting the "misguided" findings in *Fox* and *Sinclair* regarding a "deregulatory presumption" in section 202(h)); *see also Prometheus II*, 652 F.3d at 444-45 (confirming the standard of review under section 202(h) adopted in *Prometheus I*).  *See also Cellco Partnership v. Federal Communications Commission,* 357 F.3d 88, 97-99 (D.C. Cir. 2004).

[45] *See Prometheus I*, 372 F.3d at 395; *see also Prometheus II*, 652 F.3d at 445.

[46] *See Prometheus I*, 373 F.3d at 395; *see also Prometheus II*, 652 F.3d at 444-45.

[47] *See, e.g., 2006 Quadrennial Review Order*, 23 FCC Rcd at 2017-18, paras. 10-11.

[48] *See 2006 Quadrennial Review Order*, 23 FCC Rcd 2010, 2018-19, para. 13 (stating that "we make a modest change in the rule that has the primary effect of presuming that certain limited combinations of newspaper and broadcast facilities in the largest markets are in the public interest."); *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13691, para. 185 (choosing to modify local TV ownership restrictions, rather than eliminate them completely, in order to best serve the public interest).

Appellate Case: 24-1380      Page: 10      Date Filed: 02/23/2024 Entry ID: 5366849

inaction (e.g., by ignoring competitive developments that run counter to the public interest) to the point that a few entities may dominate a media market.  There is no indication that it was Congress's intention when it passed the 1996 Telecommunications Act to adopt a presumption in favor of deregulation, or to alter the then established principle under the Administrative Procedure Act (APA) that if there is any presumption, it is not against regulation but against "changes in current policy that are not justified by the rulemaking record."[49]

18.     Third, we agree with commenters who assert that *FCC v. Prometheus* reaffirmed our broad statutory authority to regulate broadcast stations in the public interest.[50]  As the Supreme Court noted, agencies are entitled to deference assuming that they act in a "zone of reasonableness" and have "reasonably considered the relevant issues and reasonably explained the decision."[51]  The Supreme Court held further in *City of Arlington, Tex. v. FCC,* that any statutory ambiguities should be "resolved, first and foremost, by the agency" so long as the agency stays "within the bounds of reasonable interpretation."[52]  Accordingly, we conclude that the Commission has considerable latitude in our interpretation and application of section 202(h), and the Supreme Court's recent decision in *FCC v. Prometheus* only affirms this conclusion by underscoring the Commission's broad discretion.

19.     Accordingly, we reaffirm that our assessment of whether the structural ownership rules remain in the public interest continues to focus on the Commission's longstanding policy goals of competition, localism, and viewpoint diversity.  The Commission has long held that the public interest is furthered by promoting the principles of competition, localism, and viewpoint diversity to ensure that a small number of entities do not dominate a particular media market, a holding we reaffirm in this current Quadrennial Review.[53]  Indeed, as early as the 1998 Biennial Review (the first review required by section 202(h)), the Commission rejected calls by commenters to consider only competition in the context of section 202(h) reviews.[54]  Looking at the statutory language of section 202(h), the Commission noted at the time that the phrases "necessary in the public interest" and "as the result of competition" could not be separated and, read together, the language "appears to focus on whether the public interest basis for the rule has changed as a result of competition, and does not appear to be intended to limit the factors we

---

[49] *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 41 (1983).  As the Court noted, the APA "suggests no difference in the scope of judicial review depending upon the nature of the agency's action," and that ". . . the forces of change do not always or necessarily point in the direction of deregulation."  *Id. See also Prometheus I*, 372 F.3d at 394-95 (noting that the Commission retains its rulemaking authority and that Congress gave no indication in section 202(h) that it intended to strip the Commission of its power to implement a determination that the public interest calls for a more stringent regulation).

[50] *See* iHeartCommunications, Inc. Comments, MB Docket No. 18-349, at 6 (rec. Sept. 2, 2021) (iHeart Update Comments); National Hispanic Media Coalition (NHMC) Reply Comments, MB Docket No. 18-349, at 5-6 (rec. Oct. 1, 2021) (NHMC Update Reply); musicFIRST Coalition and Future of Music Coalition Reply Comments, MB Docket No. 18-349, at 8 (rec. Oct. 1, 2021) (Music Coalition Update Reply).  *See also FCC v. Prometheus* at 1154.  *FCC v. Prometheus* was not the first time the Supreme Court found the Commission has broad authority to regulate in the public interest.  *See FCC* v. *WNCN Listeners Guild*, 450 U.S. 582 (1981) (holding that the Commission could prioritize different aspects of the public interest when it stated that the Commission is "vested with broad discretion in determining how much weight should be given to that goal [diversity] and what policies should be pursued in promoting it"); *FCC* v. *National Citizens Committee for Broadcasting*, 436 U.S. 775 (1978) (finding that "in these circumstances, the Commission was entitled to rely on its judgment based on experience").

[51] *See FCC v. Prometheus*, 141 S.Ct. at 1158.

[52] *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013).

[53] *See FCC v. Prometheus*, 141 S.Ct. at 1155 (citing *FCC* v. *National Citizens Committee for Broadcasting*, 436 U.S. at 780-81, 808; *2002 Biennial Review Order*, 17 FCC Rcd at 18515-27).

[54] *See 1998 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MM Docket No. 98-35*, Biennial Review Report, 15 FCC Rcd 11058, 11063, para. 8 (2000) (*1998 Biennial Review Report*).

should consider."[55]  Further, the Commission noted that, in the legislative history of the 1996 Telecommunications Act, Congress expressed diversity concerns regarding the media marketplace.[56]  For example, the legislative history highlights the national need to promote "diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity" and twice pairs diversity with competition as factors for the Commission's consideration in its decisions regarding the marketplace.[57]

20.    In light of our continued adherence to this approach, and based on the record, our discretion, and the text of section 202(h), we reject calls to revise the Commission's longstanding approach in favor of reading the statute narrowly to focus on, or elevate, either the reference to the "public interest" or the reference to "competition" individually and in the absence of the other.[58]  Instead, we agree with commenters who suggest that we embrace a "'plain public interest' standard" that does not place emphasis on one public interest goal over another and continue to read the phrase "necessary in the public interest as the result of competition" in its entirety and in a manner that we find logically marries the two references.[59]  We continue to find that such an interpretation appropriately recognizes the importance and meaning of the phrase "necessary in the public interest," which Congress affirmatively included and has long been read to encompass several important public policy goals, alongside the distinct term "competition," which is consistent with the larger thematic context of the 1996 Act.[60]  The broader scope of the public interest inquiry is also reflected in the additional language in section 202(h), which defines the inquiry as whether these rules are "no longer in the public interest," a term not limited to a focus on effects on competition.[61]  At some point, then, competition might reach a point where, *as the result of* such competition, certain of our rules would be "no longer in the public interest" to achieve the Commission's stated public interest goals.  Quadrennial review is the forum in which the Commission takes account of that progress in light of all three of these goals.

---

[55] *Id.*

[56] *See* S. Conf. Rep. 104-230, 104th Cong. 2d Sess. 163 (1996).

[57] *Id.*  The Senate Conference Report states that "in the Commission's proceeding to review its television ownership rules generally, the Commission is considering whether generally to allow such local cross ownerships, including combinations of a television station and more than one radio station in the same service.  The conferees expect that the Commission's future implementation of its current radio-television waiver policy, as well as any changes to its rules it may adopt in its pending review, will take into account the increased competition and the need for diversity in today's radio marketplace that is the rationale for subsection (d)."  It also states that "the Commission may also permit VHF/VHF combinations where it determines that doing so will not harm competition and diversity."

[58] *See* NAB Update Comments at 38-41, 47-52 (asserting that competition is the preeminent factor the Commission is required to consider under section 202(h)); Comments of United Church of Christ, OC Inc., et al., MB Docket No. 18-349, at 13 (rec. Sept. 2, 2021) (UCC Update Comments) (emphasizing the references in section 202(h) to the "public interest"); Music Coalition Update Reply at 7 (asserting that "law and long-standing FCC policy require that the public interest is the sole criteria for applying [Section 202(h)]"); NHMC Update Reply at 6 (urging the Commission to "use its discretion to not eliminate or relax existing rules that are necessary to promote diversity for the public interest").

[59] *See* American Television Alliance (ATVA) Comments, MB Docket No. 18-349, at 25 (rec. Sept. 2, 2021) (ATVA Update Comments); *See* UCC Update Comments at 11-13.

[60] *See infra* note 43 (citing Orders supportive of the Commission's customary interpretation of the terms "necessary in the public interest" and "competition").

[61] Thus, throughout Quadrennial Reviews over the years, the Commission has modified and eliminated rules that it deemed to be "no longer in the public interest."  Those inquiries have not been confined to effects on competition, but have included analyses of viewpoint diversity and localism as well.  *See, e.g., 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9806-08, 9824-25, paras. 8-10, 49; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2018-19, para. 13; *2002 Biennial Review Order*, 18 FCC Rcd at 13828, para. 539.

Appellate Case: 24-1380    Page: 12    Date Filed: 02/23/2024 Entry ID: 5366849

21.     Accordingly, we disagree with NAB's interpretation that Congress intended to elevate competition as the "preeminent factor" to guide the Commission's review under section 202(h), and we reject the attempt to revisit this long-resolved issue.[62]  We similarly disagree with NAB's contention that the tenets of statutory interpretation, including the reference to competition in section 202(h) (rather than any other specific public interest factors), support its interpretation that the Commission's section 202(h) review should consider competition as the primary factor in evaluating the rules.[63]  As noted above, the text of section 202(h) requires the Commission to determine whether our rules remain "necessary in the public interest as the result of competition."[64]  Congress envisioned a future where changes in the amount and type of competition could one day render some or all of our structural media ownership rules unnecessary.   The crux of the phrase, and indeed of section 202(h), however, is whether these competitive market forces are satisfying the public interest objectives that our rules are intended to serve, such that our rules are "no longer necessary… *as the result* of competition."[65]  Ultimately, we cannot ignore the fact that Congress included the words "public interest" in section 202(h), and those words need to be treated as prominently and with equal reverence as the mention of competition.[66]  As we discuss in more detail below and with respect to our individual rules, this involves evaluating whether the media marketplace has delivered—and would continue delivering absent our rules—each of the public interest

---

[62] *See* NAB Update Comments at 38-41, 47-52; NAB Reply Comments, MB Docket No. 18-349, at 11-13 (rec. Oct. 1, 2021) (NAB Update Reply); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President Legal and Regulatory Affair, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 3 n.10 (filed Feb. 16, 2022) (NAB Feb. 16, 2022 *Ex Parte*); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President Legal and Regulatory Affair, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 2 (filed Oct. 30, 2023) (NAB Oct. 30, 2023 *Ex Parte*).

[63] *Id.*

[64] In the past, the Commission has consistently interpreted the reference in section 202(h) to the "public interest" as incorporating our traditional policy objectives under that standard, namely, competition, localism, and viewpoint diversity. *See, e.g., 2010/2014 Quadrennial Review Order*, 31 FCC Rcd 9864, 9870, para. 16; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2016-18, paras. 9-11; *2002 Biennial Review Order*, 18 FCC Rcd at 13627-45, paras. 17-79.

[65] *1998 Biennial Review Report*, 15 FCC Rcd at 11063, para. 8 (finding that the Commission's public interest determination under section 202(h) is "based on an examination of both competition and diversity issues in light of competitive marketplace conditions").

[66] For instance, had Congress wished to do so, it could have omitted the phrase "public interest" and simply directed the Commission to review its rules to determine whether "any such rules are necessary as the result of competition." Instead, Congress elected to include the concept of the "public interest" together with that of competition, knowing full well that service to public interest, convenience, and necessity is *the* foundation of the Commission's rules.  And as noted above, it underscored that more general reference to the public interest analysis in describing the inquiry as whether rules are "no longer in the public interest."  We conclude that there was a reason Congress used these references to the public interest, and that it is reasonable to interpret these references in light of all three of the well-established criteria for that public interest analysis.  Similarly, NAB suggests that, had Congress chosen to, it could have omitted the phrase "as the result of competition" and simply instructed the Commission to determine whether a rule remains "necessary in the public interest," thereby making competition co-equal with other public interest goals.  *See* NAB Update Comments at 38-39 n.105 (asserting that the Commission "for decades has included competition as one of the public interest goals of its broadcast ownership rules" and that competition is "already included in [the] use of the term 'public interest'" in the statute).  NAB asserts that Congress's decision to do otherwise and to specifically mention competition was intended to single out one particular element of the public interest analysis. *Id.*  Contrary to NAB's position, however, it does not follow that Congress's inclusion of the phrase "as the result of competition" indicates Congress intended to elevate competition among other traditional public interest goals.  Rather, as we have explained, Congress's inclusion of the phrase "as the result of competition" reflects an ongoing statutory directive to the Commission to account for the results of an evolving competitive landscape in evaluating the continued necessity of its structural ownership rules to fulfill its public interest goals.  This seems perfectly logical given the changes brought about, and envisioned, by the 1996 Act.

benefits of competition, localism, and viewpoint diversity that our rules seek to further. If not—that is, if the competitive marketplace would not deliver these benefits in the absence of our rules—we conclude that our rules still remain "necessary in the public interest," and we cannot conclude that such rules are "no longer in the public interest," even after accounting for the results of competition to date. Contrary to NAB's concerns, then, we do not interpret section 202(h) in a way that would ignore or read the word "competition" out of the statute; instead, we interpret it in a way that gives meaning to that word in context.[67] We find that this interpretation is consistent with how the Commission has applied the standard over time and best reconciles the two phrases within it—"necessary in the public interest" and "as the result of competition."[68] Moreover, despite NAB's interest in relitigating this issue, nothing in the Supreme Court's decision in *FCC v. Prometheus* warrants revisiting the Commission's established interpretation of section 202(h).[69]

22. To be clear, competition has always been, and remains, a key consideration in the Commission's Quadrennial Review process, but it is not the only consideration encompassed by the public interest standard or by section 202(h). As discussed below, we remain committed to examining the media marketplace, acknowledging new and additional forms of competition where they exist, and evaluating whether market forces—as they have evolved—satisfy public interest objectives, such that our rules as currently devised are no longer "necessary in the public interest as the result of competition."[70]

23. Finally, even as we reaffirm here that our traditional policy goals of competition, localism, and viewpoint diversity continue to serve as the lodestars to guide us in our Quadrennial Review

---

[67] *See* NAB Feb. 16, 2022 *Ex Parte* at 2-4; NAB Update Comments at 47-51. By contrast, we find that NAB's interpretation would read out the reference to the "public interest," which even at the time of the 1996 Act, was a longstanding and well-known term in the context of the Commission's media regulation. Over the years, the Commission has further fleshed out that term in the context of the Quadrennial Review to encompass three tangible public interest goals—competition, localism, and viewpoint diversity—which have been further interpreted, articulated, and defined with substantial detail through the Commission's Quadrennial Review notices and orders. *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9870, para. 16; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2016, para. 9; *2002 Biennial Review Order*, 18 FCC Rcd at 13627-45, paras. 17-79. As such, contrary to NAB's arguments, we find that there is no non-delegation problem with our interpretation, because we are not interpreting our public interest mandate to be unmoored from any defined or articulable policy goal. Instead, we have articulated three clear and longstanding policy goals—competition, localism, and viewpoint diversity—that have long been aligned with the public interest standard applicable to the media marketplace. *See* NAB Feb. 16, 2022 *Ex Parte* at 3-4.

[68] Even if, for argument's sake, one accepts NAB's contention that section 202(h) is focused first and foremost on competition, it raises a subsequent question about what the threshold is for *how much* competition is necessary to justify elimination of a rule. Our consistent interpretation essentially speaks to that subsequent question, in that it asks if there is competition sufficient to produce the public interest benefits the Commission has traditionally looked to the rules to foster. Moreover, as we discuss below with regard to particular rules, we find that even under a competition-only standard, loosening our rules and allowing additional consolidation (or, under some proposals, unlimited consolidation) would cause substantial harm to the public interest.

[69] As commenters note, the Supreme Court decided *FCC v. Prometheus* on APA grounds and declined to address, let alone adopt, a competition-centric interpretation of section 202(h) that was proposed by the Industry Petitioners. *See* ATVA Update Comments at 25; iHeart Update Comments at 8-9; iHeartCommunications, Inc. Reply Comments, MB Docket No. 18-349, at 3-5 (rec. Oct. 1, 2021) (iHeart Update Reply); Music Coalition Update Comments at 8.

[70] We note that NAB recommends the Commission review each ownership rule based upon the public interest rationale at the time it was adopted to see if competition had rendered it no longer necessary, and, according to NAB, once a rule is deemed to no longer serve a particular goal, the Commission should no longer test the rule's relationship to that goal. *See* NAB Update Comments at 51-52. We do not think section 202(h) demands such a narrow approach—i.e., its quadrennial nature and the statutory reference to the "public interest" suggest an intent to be flexible in accounting for new, different, or changed rationales over time— and as NAB notes, historically, the rationales for certain rules have evolved over time as part of the quadrennial review process. *See id.* at 52 n.153.

Appellate Case: 24-1380     Page: 14     Date Filed: 02/23/2024 Entry ID: 5366849

proceeding, we note that the Commission has traditionally also considered other aspects of the public interest, including the impact of its ownership rules on minorities and women.[71]  In particular, and as the Supreme Court noted in *FCC v. Prometheus*, "[t]he FCC has also said that, as part of its public interest analysis under section 202(h), it would assess the effects of the ownership rules on minority and female ownership."[72]  While NAB challenges the notion of considering the impact of the media ownership rules on minority and female ownership in our quadrennial reviews, arguing that the Supreme Court did not say that the Commission *has* to consider minority and female ownership as part of the Quadrennial Review proceeding,[73] we continue to find that our public interest standard is broad and that the impact of our rules on broadcast ownership by minorities and women remains an important part of our multi-factor public interest inquiry.[74]  Accordingly, as we have in the past, we continue to consider whether our current rules are consistent with (i.e., do not disserve) opportunities for minority and female ownership and whether any proposed changes to those rules would be likely to result in harm to minority and female ownership.[75]

24.     In this way, consideration of the impact of our rules on minority and female ownership is related to, and consistent with, the broader aim of our structural ownership rules in ensuring the diffuse ownership of broadcast stations.  As the Commission has noted in the past, a general policy goal of diversity may encompass different forms of diversity.[76]  One central goal of our structural ownership rules, in particular, has been, and remains, promoting a diversity of viewpoints.[77]  Our rules do so by limiting the aggregation of stations in any single entity's hands and thereby fostering a multiplicity of speakers.[78]  The Commission, in general, also has recognized the disproportionately low number of stations owned by minorities and women and has embraced the objective of better understanding and addressing this situation.  By limiting the aggregation of stations among a few owners, we continue to conclude that our existing ownership limits preserve ownership opportunities for many different types of owners, including minority and female owners.

25.     As has always been the case in the Commission's application of section 202(h), the public interest analysis required by the statute has been conducted as a multi-factor review in which no one factor is controlling.  To the extent there are conflicts between competing goals (e.g., a rule or rule change would promote one factor while harming another), the Commission weighs the effects and

---

[71] *2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 9894-97, 9911-53, paras. 77-78, 82, 124, 215.

[72] *FCC v. Prometheus*, 141 S.Ct. at 1156; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13627, 13634-37; *2010 Quadrennial Regulatory Review*, Notice of Inquiry, 25 FCC Rcd 6086, 6106 (2010); *Amendment of section 73.3555 [formerly sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, 100 FCC 2d 74, 97 (1985); *Statement of Policy on Minority Ownership of Broadcast Facilities*, 68 FCC 2d 979 (1978).

[73] *See* NAB Feb. 16, 2022 *Ex Parte* at 5 n.19.

[74] Indeed, the Supreme Court did not say we *have* to consider any particular policy goal.  In fact, as NAB notes and discussed above, the Supreme Court did not reach the question of section 202(h) interpretation at all.  *See* NAB Feb. 16, 2022 *Ex Parte* at 4-5.  Under this precedent, we are not bound to consider the three traditional policy goals of competition, localism, and viewpoint diversity.  Moreover, we do not have to consider minority and female ownership as an important part of our larger public interest goal of diversity (which, most notably and historically, includes viewpoint diversity).  Nonetheless, the Supreme Court did not alter the Commission's discretion to consider these factors, in the manner we choose, and we elect in this proceeding, as the Commission has previously, to do so.

[75] *2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 9894-97, 9911-53, paras. 77-78, 82, 124, 215.

[76] *2002 Biennial Review Order*, 23 FCC Rcd at 2021, para. 18 (identifying viewpoint, outlet, program, source, and minority and female ownership as "five types of diversity pertinent to media ownership policy").

[77] *See, e.g., 2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 9865, para. 3; *2002 Biennial Review Order*, 23 FCC Rcd at 2021-30, paras. 19-35.

[78] *See, e.g., 2002 Biennial Review Order*, 23 FCC Rcd at 2021-23, 2025-26, 2032-33, paras. 19-20, 26-27, 39.

Appellate Case: 24-1380     Page: 15     Date Filed: 02/23/2024 Entry ID: 5366849

determines whether, on balance, the rule serves the public interest.  Consideration of minority and female ownership is no exception to that approach.

26.     We conclude that the record in the current proceeding does not establish concrete, affirmative steps the Commission can or should take with respect to our structural ownership rules to address concerns regarding minority and female ownership, but we remain committed to examining barriers to minority and female ownership of broadcast stations and expect that the upcoming 2022 Quadrennial Review proceeding will provide an opportunity to examine more specifically what can or should be done within the context of our structural ownership rules.[79]  In addition, we note that the Commission has taken several actions beyond its quadrennial reviews, such as improving its collection and analysis of broadcast station ownership information on FCC Form 323 and 323-E, and chartering the Communications Equity and Diversity Council (CEDC),[80] that are intended to provide the Commission with more information about the state of minority and female broadcast ownership and to promote the important goal of increasing such ownership.  Moreover, we remain committed, as Free Press suggests, to analyzing how changes to broadcast ownership rules may impact future opportunities for women and minorities.[81]  Indeed, the Commission's Office of Economics and Analytics recently conducted an analysis and released a white paper on minority ownership of broadcast television stations that will continue to inform our understanding of the television market and the diversity of ownership.[82]  And, as discussed below with respect to our rules, we find in this proceeding that our existing rules remain consistent with the objective of improving ownership diversity, including minority and female ownership, and would cause no harm.[83]

---

[79] *See* Free Press Comments, MB Docket No. 18-349, at 20-21 (rec. Sept. 2, 2021) (Free Press Update Comments); UCC Update Comments at 11-12.  We encourage commenters that would prefer for the Commission to consider their comments from this proceeding to update their positions and file them in the record for the 2022 Quadrennial Review to the extent that they have not already done so.

[80] *See* FCC, Communications Equity and Diversity Council, https://www.fcc.gov/communications-equity-and-diversity-council.  Effective June 29, 2021, Chairwoman Rosenworcel chartered the CEDC for a two-year term.  *See* CEDC Charter*,* https://www.fcc.gov/sites/default/files/cedc-charter-06292021.pdf.  The Charter notes that the CEDC is "intended to enhance the Commission's ability to advance equity and diversity in the communications industry and carry out its statutory responsibility to promote policies favoring diversity of media voices, localism, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity." *Id.*  The CEDC is specifically tasked with making recommendations to the Commission on how to accelerate the entry of small businesses, including those owned by women and minorities, into the media, digital news and information, and audio and video programming industries, including as owners, suppliers, and employees. *See FCC Seeks Nominations for Communications Equity and Diversity Council*, Public Notice, 36 FCC Rcd 10391 (2021).  In addition, prior to the current CEDC, the Commission chartered the Advisory Committee on Diversity and Digital Empowerment (ACDDE), tasked with developing recommendations on how to empower disadvantaged communities and accelerate the entry of small businesses, including those owned by women and minorities, into the media, digital news and information, and audio and video programming industries.  *See FCC Seeks Nominations for Membership on Advisory Committee on Diversity and Digital Empowerment*, Public Notice, 34 FCC Rcd 4791 (2019).  Among other work, the ACDDE convened a symposium on access to capital, specifically focused on exploring sources of funding, business strategies, and revenue streams for small and diverse broadcasters.  *See Broadcaster Access to Capital Virtual Symposium November 6, 2020*, Public Notice, 35 FCC Rcd 11866 (2020).

[81] *See* Free Press Update Comments at 20-21.  Free Press also asks that we consider tightening rules to remove barriers to entry for women and minorities.  We decline to do so based on the lack of sufficient evidence in the record of this proceeding to support tightening to achieve such ends.  Nonetheless, we do not foreclose the possibility of exploring such action in the future.

[82] Kim Makuch, Television Station Ownership Diversity, Office of Economics and Analytics Working Paper 54 (January 2023), https://www.fcc.gov/document/television-station-ownership-diversity.

[83] Because we do not retain any of our rules for the express purpose of promoting minority or female ownership, we do not reach NAB's argument that per *FCC v. Prometheus* one would need to show actual statistical proof of a

(continued….)

## IV. MEDIA OWNERSHIP RULES

### A. Local Radio Ownership Rule

#### 1. Introduction

27.     As explained below, we conclude that the Local Radio Ownership Rule—which limits both the total number of radio stations an entity may own within a local market and the number of radio stations within the market that the entity may own in the same service (AM or FM)[84]—remains necessary to promote the Commission's public interest goals of competition, localism, and viewpoint diversity, in accordance with our foregoing analysis.  We therefore retain the current rule.  The only modification we adopt is to make permanent the interim contour-overlap methodology long used to determine ownership limits in areas outside the boundaries of defined Nielsen Audio Metro markets and in Puerto Rico.[85]

28.     We decline commenters' requests to modify our presumption regarding embedded markets adopted in 2017.  Likewise, we reject calls to eliminate or ease the rule's ownership limits in an effort to help station owners stem the loss of listeners and advertising revenues.  We take seriously the challenging circumstances confronting broadcast radio in today's media marketplace, but the record does not persuade us that further consolidation would meaningfully address the problems radio faces.  Rather, additional consolidation within radio markets is not only likely to decrease competition, viewpoint diversity, and localism but also is inconsistent with our statutory mandate to disseminate licenses as widely as possible.[86]  Ultimately, we find that allowing one entity to own more radio stations in a market than currently permitted would harm competition without achieving the benefit sought by some of enabling station owners to compete more effectively with social media companies and national advertising platforms like Google and Facebook.

#### 2. Background

29.     The Local Radio Ownership Rule allows an entity to own:  (1) up to eight commercial radio stations in radio markets with at least 45 radio stations, no more than five of which may be in the same service (AM or FM)[87]; (2) up to seven commercial radio stations in radio markets with 30-44 radio stations, no more than four of which may be in the same service (AM or FM); (3) up to six commercial radio stations in radio markets with 15-29 radio stations, no more than four of which may be in the same service (AM or FM); and (4) up to five commercial radio stations in radio markets with 14 or fewer radio stations, no more than three of which may be in the same service (AM or FM), provided that the entity does not own more than 50% of the radio stations in the market unless the combination comprises not more than one AM and one FM station.[88]  When determining the total number of radio stations within a market, only full-power commercial and noncommercial radio stations are counted for purposes of the

---

(Continued from previous page)  ————————————————

negative impact on female and minority ownership for a rule to be retained for that reason.  *See* NAB Update Comments at 53-55.

[84] *See* 47 CFR § 73.3555(a).

[85] *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12122-23, para. 25.

[86] *See* 47 U.S.C. § 309(j)(3)(B) (directing the Commission to avoid excessive concentration of licenses and to disseminate licenses among a wide variety of applicants); 47 U.S.C. § 307(b) (directing the Commission to distribute "licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same").

[87] The limitation on the number of stations an entity may own in a single service, AM or FM, is typically referred to as the subcap limit.

[88] 47 CFR § 73.3555(a).  Overlap between two stations in different services is allowed if neither of those stations overlaps a third station in the same service.

Appellate Case: 24-1380     Page: 17     Date Filed: 02/23/2024 Entry ID: 5366849

rule.[89]  Radio markets are defined by Nielsen Audio Metros where applicable, and the contour-overlap methodology is used in areas outside of defined and rated Nielsen Audio Metro markets.[90]

30.      In its last quadrennial review, the Commission concluded that local radio ownership limits promote competition,[91] a public interest benefit that the Commission found to be a sufficient basis for retaining the current rule.[92]  Additionally, the Commission affirmed its previous findings that competitive local radio markets help promote viewpoint diversity and localism, and it deemed the rule consistent with the Commission's goal of promoting minority and female broadcast ownership.[93]  Accordingly, the Commission retained the rule without modification, although it provided several clarifications regarding the rule's implementation.[94]  Subsequently, on reconsideration, the Commission adopted a presumption to use in evaluating transactions involving radio stations within embedded markets (i.e., smaller markets, as defined by Nielsen Audio, that are contained within the boundaries of a larger Nielsen Audio Metro market) where the parent market currently has multiple embedded markets (i.e., New York, NY and Washington, DC).[95]  The presumption supports waiving the numerical ownership limits in existing parent markets where an applicant can demonstrate both compliance with the numerical ownership limits in the embedded market, as well as compliance with the ownership limit using the contour overlap method.  The Commission stated that the presumption would apply pending further consideration of embedded market transactions in this 2018 quadrennial review.[96]

31.      The *NPRM* asked generally whether the current Local Radio Ownership Rule remains necessary in the public interest to promote competition, localism, or viewpoint diversity.[97]  It also sought comment on several specific issues regarding the radio rule, including whether to retain the rule's current market definition, market size tiers, numerical limits, and AM/FM subcap limits.[98]  In particular, the *NPRM* sought comment on whether the Commission should make permanent use of the contour-overlap

---

[89] *Id.*

[90] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13724-30, paras. 273-86 (replacing the contour-overlap methodology with Arbitron Metro—now Nielsen Audio Metro—market definitions, where available, and retaining a modified contour-overlap methodology on an interim basis for areas not defined by Nielsen Audio); *2006 Quadrennial Review Order*, 23 FCC Rcd at 2013, 2070-71, 2071-72, paras. 4, 111-12, 114 (affirming the use of Nielsen Audio Metro markets to define geographic markets); *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9898, para. 85 n.234 (finding no basis on which to revisit as part of its ownership review the interim contour-overlap methodology for non-Nielsen Audio Metro areas).  An exception to this market definition approach is Puerto Rico, where the contour-overlap methodology applies even though Puerto Rico is a Nielsen Audio Metro market. *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9907, paras. 111-12.

[91] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9897, 9898-99, paras. 82, 87; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13712-13, para. 239; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2069, para. 110.

[92] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9897, 9898-99, paras. 82, 87.

[93] *Id.*; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13738, 13739, paras. 303, 305-06; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2075, 2077, paras. 124, 127.

[94] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9897, 9898-99, 9905-07, paras. 82, 87, 107-12.

[95] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9841, 9845-46, paras. 86, 94-95.  A transaction would qualify for the presumption if the applicants demonstrated:  (1) compliance with the numerical ownership limits in each embedded market using the Nielsen Audio Metro methodology, and (2) compliance with the ownership limits in the parent market using the contour-overlap methodology applicable to undefined markets in lieu of the Commission's ordinary parent market analysis.  *Id.* at 9842, para. 90 n.262; *see also id.* at 9841, para. 86 n.251.

[96] *Id.* at 9841, 9845-46, paras. 86, 95.

[97] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12118, para. 14.

[98] *Id.* at 12118-25, paras. 14-32.

17

methodology for areas not within Nielsen Audio Metro markets.[99]  In addition, it asked about the treatment of embedded markets and the effect of the rule on minority and female ownership.[100]

### 3.    Discussion

32.    For the reasons discussed below, we find that the Local Radio Ownership Rule remains necessary in the public interest as the result of competition.  There is no question that the broader media environment within which broadcast radio operates has changed dramatically since the radio rule was enacted in 1996.  Consumer choice in audio entertainment has grown with the launch of satellite radio, the introduction of audio streaming services, and the proliferation of podcasts.  There is no consensus in the record, however, regarding whether changes to the Local Radio Ownership Rule would enable radio owners to respond to these developments more effectively, or even, if so, whether those benefits would outweigh potential harms to competition, localism, or viewpoint diversity.  The commenters are deeply divided in their responses to almost every issue raised in the *NPRM*.  As discussed below, after considering the conflicting arguments in the record, and the split that exists even within the radio industry, we agree with those commenters asserting that loosening the rule would harm competition to the detriment of listeners.

33.    *Market Definition.*  As in the past, we continue to find that the relevant market to consider for purposes of the Local Radio Ownership Rule is the radio listening market.[101]  We further find that due to the unique characteristics of broadcast radio, it would not be appropriate to include satellite or non-broadcast audio sources, such as Internet streaming services, in that market at this time.  Notably, this finding is consistent with our findings in prior quadrennial reviews, where we looked at the unique characteristics of broadcast radio and the lack of substitutability with other audio sources, elements that remain fundamentally unaltered in spite of larger marketplace changes.[102]

34.    Moreover, we find that the nature of the larger advertising market, in which advertising dollars have always flowed between different sectors in accordance with advertiser preferences, does not compel us to revise the way we view broadcast radio's unique place within the audio landscape or the distinct market within which radio stations operate.  First, we note that the U.S. Department of Justice (DOJ) consistently has found broadcast radio advertising to constitute a distinct product market.[103]  We recognize that some local businesses may have shifted increasing shares of their advertising budgets to Internet platforms, such as Facebook and Google, while at the same time buying fewer radio

---

[99] *Id.* at 12122-23, para. 25.

[100] *Id.* at 12125-27, paras. 33-37.

[101] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9899, para. 90.

[102] *See id.* at 9899-9901, paras. 88-94.

[103] *See* Competitive Impact Statement, *U.S. v. Entercom Communications Corp. and CBS Corp.*, No. 17-2268 (D.D.C. Nov. 1, 2017), https://www.justice.gov/atr/case-document/file/1008376/download (viewing local broadcast radio stations as the market); *see also* Complaint at 4, *U.S. v. Entercom Communications Corp. and CBS Corp.*, No. 1:17-cv-02268 (D.D.C. Nov. 1, 2017), https://www.justice.gov/atr/case-document/file/1008371/download (stating that the acquisition of CBS Radio, Inc. by Entercom Communications Corporation would substantially lessen competition for the sale of radio advertisements targeting English-language listeners in the Boston, Sacramento, and San Francisco markets); *U.S. v. Entercom Communications Corp. and CBS Corp.*, No. 17-2268, 2018 WL 6684626, at *1 (D.D.C. Jan. 31, 2018) (stating that the "essence of [the] Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants to assure that competition [within the radio market] is not substantially lessened").  We note that our definition of the radio market is consistent also with the positions taken by both the Department of Justice and the Federal Trade Commission in their recent actions against Google and Facebook, respectively, asserting that radio advertising is distinct from advertising offered by those Internet companies. Complaint at 32, *U.S. v. Google*, No. 1:20-cv-03010 (D.D.C. Oct. 20, 2020), https://www.justice.gov/opa/press-release/file/1328941/download; Amended Complaint at 16, *FTC v. Facebook*, No. 1:20-cv-03590-JEB (D.D.C. Aug. 19, 2021), https://www.ftc.gov/system/files/documents/cases/ecf_75-1_ftc_v_facebook_public_redacted_fac.pdf. *See also* iHeart Update Comments at 10-11; iHeart Update Reply at 6-7.

advertisements.[104]  We also note, however, that the broader reach of radio advertising offers different benefits than the targeted advertising offered by Facebook and Google, such that at least some advertisers do not view them as substitutes.[105]  In addition, recent data indicate that broadcast radio dominates listening among ad-supported audio sources.[106]  We find that, within the broader advertising ecosystem, there still remains a distinct broadcast radio advertising market, such that our existing rule promotes competition among local radio stations through competition for advertising dollars, as well as along other dimensions that directly benefit listeners (e.g., quality, choice of offerings, innovation, among others).  Moreover, for the reasons stated below, it is primarily as a result of this competition that broadcast radio stations are spurred continually to look for ways to improve service to the listening public.

35.    Although we acknowledge, as commenters contend, that there is today a broader audio landscape that includes a variety of audio options for consumers, many of which did not exist a decade or two ago, we continue to find that within that broader landscape, free over-the-air broadcast radio maintains a unique place and that radio stations compete primarily with other radio stations for listeners.[107]  Accordingly, we reject commenters' claims that we must revise our market definition to reflect the "expanding universe of content providers"[108] and should include non-broadcast sources of audio content such as Sirius XM/Pandora, Spotify, YouTube Music, Apple Music, and Amazon Music.[109]  As the Commission previously has found, although the broader marketplace for the delivery of audio programming includes satellite and online audio sources, along with traditional broadcast radio, there are significant differences in the availability, reach, consumer engagement, and cost of these services, such that they deliver different value propositions to consumers.[110]  Significantly, of the various options available in the broader audio marketplace, generally speaking, only terrestrial broadcast radio both is

---

[104] Connoisseur Media et al. Comments at 16-21; NAB Comments at 26-28; Connoisseur Media et al. Comments, MB Docket No. 18-349, at 20-28 (rec. Sept. 2, 2021) (Connoisseur Media et al. Update Comments); Connoisseur Media et al. Audio Marketplace Comments, MB Docket No.18-227, at 8-12 (rec. Dec. 21, 2018) (Connoisseur Media et al. Audio Marketplace Comments); NAB Audio Marketplace Comments, MB Docket No.18-227, at 19-23, 25-29 (rec. Dec. 21, 2018) (NAB Audio Marketplace Comments).

[105] *See, e.g.*, iHeart Comments at 11-12; iHeart Reply at 10-12; *but see* Connoisseur Media et al. Reply at 6-7 (arguing that radio also offers targeted advertising in that it provides advertisers access to a specific demographic).

[106] According to Edison Research's Q4 2021 Share of Ear Report, broadcast radio accounted for 76% of daily audio time spent with any ad-supported platform.  Brittany Faison, *Edison Research's "Share Of Ear" Q4 2021: Among Registered Voters, AM/FM Radio Dominates Ad-Supported Listening, Podcasts and AM/FM Radio Streaming Surge, and AM/FM Radio Has an 88% Share in the Car* (Mar. 7, 2022), https://westwoodone.com/blog/2022/03/07/edison-researchs-share-of-ear-q4-2021-among-registered-voters-am-fm-radio-dominates-ad-supported-listening-podcasts-and-am-fm-radio-streaming-surge-and-am-fm-radio-has-a/.

[107] *See* iHeart Comments at 8-12; Urban One Comments at 4-5 (asserting that non-broadcast audio sources are complementary to, and not directly competitive with, broadcast radio); musicFirst/Future of Music Coalition (FMC) Comments at 3-12; Crawford Reply at 1-2; iHeart Reply at 4-12; musicFirst/FMC Reply at 4-5; Free Press Reply at 7-10 (arguing that NAB is trying to have it both ways by claiming that broadcast radio is special enough to save but also that it is substitutable for countless other audio services); Music Coalition Update Reply at 12-15.

[108] NAB Comments at 8.

[109] *See, e.g.*, *id.* at 7; Connoisseur Media et al. Comments at 3, 6-12; Galaxy Comments at 2; Reno Media Comments at 2-3; NAB Reply at 31-34; Connoisseur Media et al. Reply at 3-9; R Street Institute Comments, MB Docket No. 18-349, at 2-5 (rec. Sept. 2, 2021) (R Street Update Comments); NAB Update Comments at 61-63; Connoisseur Media et al. Audio Marketplace Comments at 3-8; Local Community Broadcasters Audio Marketplace Comments, MB Docket No.18-227, at 2-5 (rec. Dec. 21, 2018) (Local Community Broadcasters Audio Marketplace Comments); NAB Audio Marketplace Comments at 4-5, 12-19; NAB Audio Marketplace Reply Comments, MB Docket No.18-227, at 2-5 (rec. Dec. 21, 2018) (NAB Audio Marketplace Reply).

[110] *2022 Communications Marketplace Report*, GN Docket No. 22-203, Communications Marketplace Report, FCC 22-103, at 186, para. 318 (Dec. 30, 2022) (*2022 Communications Marketplace Report)*.

Appellate Case: 24-1380      Page: 20      Date Filed: 02/23/2024 Entry ID: 5366849

available without a paid subscription and does not require access to Internet service.[111] Not only does this accessibility make broadcast radio uniquely and widely available, it also makes it a lifeline for many Americans, especially in times of local emergencies.[112] As commenters observe, radio is a trusted and essential source of public safety information during emergencies and in times of crises.[113]

36.    We also continue to find that the local nature of broadcast radio makes it unique within the broader audio landscape. In particular, we note that broadcast radio is alone within the audio landscape in having an affirmative obligation to serve the needs and interest of the local community.[114] Moreover, there is evidence that being local is *the* defining value proposition that many radio stations see themselves as providing to consumers. As commenters point out, radio programming includes offerings with a community focus, such as program hosts that are known within the locality, music by local bands, reporting on local sports teams, and sponsorship of neighborhood festivals, which other audio services do not provide.[115] As the Commission's *2022 Communications Marketplace Report* states, "promoting a

---

[111] iHeart Comments at 8-11; Free Press Comments at 11-13 (stating that broadcast is "uniquely free" and is relied upon disproportionately by low-income people and people of color); NHMC Comments at 9-10 (asserting that low income and communities of color rely on the free nature of radio); Triangle Access Comments at 1-3; musicFirst/FMC Comments at 9; Crawford Reply at 1; iHeart Reply at 3 (contending that other audio media are not substitutable for radio "based on localism, affordability, accessibility, trustworthiness of content, audience listening and advertising approaches and revenue"); Leadership Conference on Civil and *Human* Rights (LCCHR)Reply, MB Docket No. 18-349, at 4 (rec. Sept. 30, 2021) (LCCHR Update Reply); REC Networks Audio Marketplace Comments, MB Docket No.18-227, at 1-2 (rec. Sept. 24, 2018) (REC Networks Audio Marketplace Comments) (arguing that audio programming through the Internet is not available and/or affordable to many Americans). *But see* NAB Comments at 18-20 (arguing that it is the access to content within a local community that is the relevant factor, and not the local nature of the content); American General Media et al. Reply at 6 (noting that numerous sources of online audio content are free).

[112] In its Fourteenth Broadband Deployment Report, the Commission determined that despite significant gains in delivering access to broadband, in 2019, at least 14.46 million Americans, or about 4% of the population, still lacked access to fixed terrestrial broadband service at a standard speed of 25/3 Mbps. *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, GN Docket No. 20-269, 2021 Broadband Deployment Report, 36 FCC Rcd 836, 854-55, para. 33 (2021) (*2021 Broadband Report*). Additionally, the Commission found that the adoption of fixed terrestrial broadband in the 10/1 Mbps speed tier was 67.2% among households in the quartile with the lowest poverty rate, versus 40.7% among households in the quartile representing the highest poverty rate. *See id.* at 866-67, para. 47. *See also* NHMC Comments at 10-11 (noting the high percentage of Latinos that do not have broadband at home); iHeart Comments at 9-10 (noting that not only is radio programming a free service, but a radio often costs less than $20 and is a one-time purchase that can last years); Triangle Access Comments at 2; Free Press Reply at 7; musicFirst/FMC Comments at 9-10.

[113] *See* iHeart Comments at 18-24, 33; Adams Radio Comments at 1; Salem Media Comments at 10.

[114] As part of their license obligations, each quarter, radio station licensees are required to submit a list of programs that treat issues faced by the local community. *See* 47 CFR §§ 73.3526(e)(12), 73.3527(e)(8). Such programs may include local news and public affairs programming.

[115] *See* iHeart Comments at 10 (stating that "[b]roadcast radio provides a completely different listening experience from other audio services. Broadcast radio provides the listener community and companionship. Broadcast radio is a DJ telling you about a new song and why she likes it; it is a group of personalities riding with you in the car, entertaining and informing you on the way to and from work; it is a voice you know providing critical updates in times of emergency; it is members of the same community who show up to cover a local food drive or festival. Consumers listen to radio for a completely different experience than they receive from other platforms like satellite radio, music streaming services, podcasts, etc."); Urban One Comments at 14 (stating that "[i]t is local news, accurate weather coverage, emergency information, the local appearances by radio personalities, the participation in community fund drives, the support of charity events, and the quality of programming oriented at addressing community issues, which differentiates radio stations to both listeners and advertisers"). Even advocates of a rule change tout the unique local aspect of radio. *See, e.g.*, Connoisseur Media et al. Comments at 22, 26 (acknowledging that "many of the new digital entrants are owned by massive companies like Google and Facebook that . . . do nothing to promote localism" and that "nearly 90% of radio listeners agreed that the primary advantage

(continued….)

local on-air personality as the 'face' of a station may be an important way for a station to distinguish or brand itself from other stations in its market."[116]

37.     In addition, even with the emergence of new audio services and platforms, radio listenership remains strong and dominant within the broader audio marketplace in many key respects.[117] Certainly, commenters provide some evidence that time spent listening to broadcast radio has declined, especially among younger audiences.[118] Nonetheless, in 2018, Edison Research's "Share of Ear" report allocates the share of time spent listening to audio sources for Americans aged 13 years old and over as follows:  46% terrestrial broadcast radio, 14% streaming audio, 12% owned music, 11% YouTube, 7% SiriusXM satellite radio, 5% TV Music channels, 3% podcasts, and 2% other sources.[119]  Similarly, a more recent Share of Ear report indicated that, in 2021, the total share of time spent listening to AM/FM radio remained the highest at 38%, and the share of time spent listening to podcasts had risen to only 5%.[120]  Additionally, while the gap in usage between broadcast and online audio programming has declined over time, terrestrial broadcast radio remains dominant and the number of weekly listeners to broadcast radio in the United States remains relatively stable.[121]  Moreover, historically, easy access to AM/FM radio inside automobiles has been a distinctive characteristic and advantage of broadcast radio, and in-car radio listening has rebounded as people return to their cars following the height of the pandemic.[122]  By contrast, some commenters claim that radio's dominance over in-car listening is fading as Bluetooth and satellite radio capabilities become standard features in new cars.[123]  While there is no question that consumers are increasingly finding new audio sources to consume while driving, broadcast radio remains the clear top choice.[124]  Inside the home, we acknowledge there is a decreasing number of

(Continued from previous page) —————————————————

to listening was 'its local feel,' up from only 77% three years ago"); American General Media et al. Reply at 19 (recognizing that "[l]ocal radio stations tend to have highly engaged audiences attracted by local content").

[116] *2022 Communications Marketplace Report* at 180, para. 305.

[117] Although commenters warn that the decline of radio listening during the pandemic is not likely to rebound to pre-pandemic levels, it is premature to determine whether the pandemic will have long-term effects on local radio.  We find that forecasts of future declines of radio listenership and revenue are speculative, and therefore unreliable for the purposes of this review.  *But see* NAB Update Comments at 75-84; NAB Update Comments at 64-68; Summit Media Reply Comments, MB Docket No. 18-349, at 3-4 (rec. Oct. 1, 2021) (Summit Update Reply); Alpha Media USA Reply Comments, MB Docket No. 18-349, at 2-3 (rec. Oct. 1, 2021) (Alpha Media Update Reply); Connoisseur Media et al. Reply Comments, MB Docket No. 18-349, at 4 (rec. Oct. 1, 2021) (Connoisseur Media et al. Update Reply); NAB Update Reply at 63-70.

[118] NAB Comments at 8-13, 17-18 (providing evidence of the growing popularity of streaming services and the shrinking listening times for radio); Reno Media Comments at 3; *see also* Connoisseur Media et al. Comments at 8-10 (providing data showing that radio listening has declined while internet listening has increased); American General Media et al. Reply at 6-8; Connoisseur Media et al. Update Comments at 6-14; Connoisseur Media et al. Update Reply at 4-5.

[119] *2022 Communications Marketplace Report* at 186, para. 318.

[120] *Id.*

[121] *Id.* at 189, para. 328 (noting also that online audio programming includes AM or FM broadcasts accessed online). iHeart Comments at 1; *see also* musicFirst/FMC Audio Marketplace Comments, MB Docket No.18-227, at 22-23, 25-26 (rec. Sept. 24, 2018) (musicFirst/FMC Audio Marketplace Comments) (asserting that despite its "slow-drip decline," radio listenership remains relatively strong). *But see* Connoisseur Media et al. Update Comments at 7-8 (reporting that Nielsen data found that radio's weekly reach in 2020 was just over 80%); Connoisseur Media et al. Update Reply at 4-5 (arguing that "reach does not tell the whole story").

[122] *See, e.g.,* Brad Adgate, *As the Country Opens Up, Radio Listening is Returning to Pre-Pandemic Levels*, Forbes (June 1, 2021).

[123] Connoisseur Media et al. Comments at 13-15; Connoisseur Media et al. Update Comments at 16-18.

[124] Cumulus Media, Edison Research's "Share of Ear" Q4 2021: How America Listens to Audio at 23-24 (2021)

(continued….)

radios in households with the ubiquity of digital devices, like smartphones and smart speakers, that provide access to an array of audio content.[125]  Nonetheless, evidence further suggests that, even within the evolving marketplace, broadcast radio stations are embracing these new devices and finding additional ways to reach listeners.[126]

38.     Ultimately, we agree with iHeart that "competitive pressures across platforms within the audio ecosystem are not determinative of what is the relevant market" for purposes of our Local Radio Ownership Rule.[127]  We reject NAB's suggestion that the relevant competition is for "the public's attention and time."[128]  Since its inception, radio has competed with other types of entertainment for the public's attention and time.  Television, movies, books, newspapers, magazines, concerts, plays, and all manner of activities present consumers with countless options for how to spend their time or be entertained or informed.[129]  Today's consumers have a broad selection of audio options that can be accessed on an increasing number of devices, but that does not mean competition among local radio stations should be weakened or that consumers and advertisers consider non-broadcast options to be appropriate substitutes for local radio.

39.     As we have acknowledged, in recent years, the audio landscape has seen the growth of streaming music services that have amassed millions of subscribers.  Nonetheless, there is evidence that consumers may be most directly substituting online audio services for what would once have been purchases of recorded music rather than for live, local, free broadcast radio, and that consumers still flock to broadcast radio for elements that other audio sources in the marketplace are not currently providing.  For instance, while advertising dollars may have started to flow to other sources over time, in filings with the Securities and Exchange Commission (SEC), iHeart (the largest radio station owner by revenue, number of stations, and number of markets) suggests that within the broader audio marketplace, there are distinct sectors that vie separately for listeners, and in some respects, serve as complements to one another.  Specifically, iHeart states:

> Within the audio industry, companies operate in two primary sectors: [1] The 'music collection' sector, which essentially replaced downloads and CDs and [2] The '*companionship sector*, [in] which people regard radio and podcasting personalities as their trusted friends and companions on whom they rely to provide news on everything from entertainment, local news, storytelling, information about new music and artists, weather, traffic and more.  *We operate in the second*

---

(finding that AM/FM radio accounts for a 59% share of audio time spent in the car among persons 18 and older); *see also* Edison Research, Infinite Dial 2022 at 44-45 (2022) (finding that 73% of Americans who had driven in a car in the last month had used AM/FM radio).

[125] *See, e.g.*, Connoisseur Media et al. Comments at 13 (stating that almost 30% of Americans over the age of 12, and 50% of Americans aged 18 to 34, do not own an FM or AM radio in their home); NAB Comments at 13-16 (stating that in 2019, 84% of Americans over the age of 12 owned a smartphone, and the rates were higher among younger age groups); Connoisseur Media et al. Update Comments at 14-15; NAB Comments at 69-75.

[126] Inside Radio, *Smart Speaker Ownership Levels Off but Remains Important Part of Radio Listening* (Sept. 22, 2022), https://www.insideradio.com/free/smart-speaker-ownership-levels-off-but-remains-important-part-of-radio-listening/article_329e1af6-38ab-11ed-a908-9f76855e2b99.html.

[127] iHeart Comments at 12.

[128] NAB Comments at 7.

[129] *See* iHeart Comments at 12 (making an analogy to the airline industry and arguing that when there is a competition issue concerning airline carriers, the market is restricted to the airline market, and not the transportation market, even though trains, ships, and vehicles compete with airlines for passengers); Open Markets Institute Reply at 3 (also using a transportation analogy); Triangle Access Comments at 2 (arguing that Internet services should not be included in the radio market definition any more than "cinemas, sports arenas, and other entertainment venues"). *But see* Connoisseur Media et al. Reply at 7-8 (challenging the relevance of iHeart's airline analogy).

*sector and use our large scale and national reach in broadcast radio to build additional complementary platforms.*[130]

As iHeart suggests, in general, broadcast radio continues to serve a distinct role in the marketplace by providing important entertainment, information, and "companionship" to listeners that other forms of audio content likely do not. Moreover, by contrast, online streaming services that offer access to tens of millions of songs and other audio tracks to listeners on demand are perhaps situated more directly as substitutes for traditional purchased music collections.[131]

40. For the reasons stated above, we find that the local radio listening market remains a distinct market for purposes of our Local Radio Ownership Rule analysis. We conclude that allowing further concentration within local radio markets would disserve listeners by jeopardizing the aspects of radio that make it a unique and appealing service.

41. *Market Size Tiers and Numerical Limits.* Based on the record of this proceeding, we find that the Local Radio Ownership Rule as currently designed remains necessary in the public interest as the result of competition, and we reject proposals in the record to modify its market size tiers or numerical limits at this time. For example, NAB urges the Commission to repeal the radio rule entirely, or at a minimum, to loosen restrictions in the top 75 Nielsen Audio Metro markets to allow a single entity to own or control up to eight commercial FM stations, with no cap on AM ownership, and, outside of the top 75 Nielsen markets and in unrated markets, to allow a single entity to own or control an unlimited number of AM and FM stations.[132] NAB also proposes that an owner in the top 75 markets be permitted to own up to two additional FM stations (for a total of 10 FMs) in a market after successfully participating in the Commission's incubator program.[133] As discussed below, we find that the existing rule continues to serve the public interest, that the record does not establish that permitting greater consolidation would benefit either the radio industry or the listening public, and that proposals to loosen the rule would reduce competition among broadcast radio stations to the detriment of listeners.[134]

(Continued from previous page)

[130] *See* iHeartMedia, Inc., Annual Report at 1 (Form 10-K) (Feb. 23, 2022) (emphasis added).

[131] The Recording Industry Association of America's (RIAA) U.S. Sales Database illustrates how revenues for downloaded albums (since 2016) and downloaded songs (since 2014) have sustained significant declines amid increases in subscriptions to music streaming platforms. *See* U.S. Sales Database, RIAA, https://www.riaa.com/u-s-sales-database/ (last visited June 10, 2022). Notwithstanding the economic volatility in the advertising market amid the COVID-19 pandemic, radio advertising revenues have remained stable in recent years with moderate gains projected for the next five years. *See* Justin Nielson, *US TV, Radio Station Ad Projections Update*, S&P Global Market Intelligence (June 12, 2019), https://www.nab.org/documents/about/TVRadioAdvertising ProjectionsFAQ.pdf (noting projections for advertising revenues in radio using data from Kagan estimates).

[132] NAB Comments at 39-40; NAB Update Comments at 68. Commenters are divided in their responses to NAB's proposal. A number of commenters support NAB's proposal. *See, e.g.*, Connoisseur Media, et al. Comments at 26; Alpha Media Comments at 1; West Virginia Radio Comments at 6; Vanguard Media Comments at 2; Galaxy Comments at 1-3; Reno Media Comments at 3-4; Grant Reply at 1-3 (arguing that small owners will improve their ability to obtain investment when capital sources are assured that radio can grow revenue and compete); 25-7 Media Reply at 1 (supporting the lifting of all limits in small, unrated markets); WBOC Reply at 1-3; American General, et al. Reply at 2-4, 19-21; Summit Update Reply at 1-3; Alpha Media Update Reply at 7-8; *see also* Local Community Broadcasters Audio Marketplace Comments at 5-7 (arguing for the removal of all radio ownership limits). Other commenters oppose the proposal. *See, e.g.*, iHeart Comments at 29-32; musicFirst/FMC Comments at 7-8; Urban One Comments at 10-12; Free Press Comments at 4-5; Free Press Reply at 6-7; Multicultural Media, Telecom and Internet Council (MMTC) Reply at 1-2; musicFirst/FMC Reply at 1-3; Mount Wilson Reply at 1-2; iHeart Reply at 3, 6, 8-9, 10-12, 19-24; iHeart Update Comments at 9-11, 21-22, 26-29; Salem Media Group Reply Comments, MB Docket No. 18-349, at 3-4 (rec. Oct. 1, 2021) (Salem Media Update Reply); Music Coalition Update Reply at 5-15.

[133] NAB Comments at 39-40; NAB Update Comments at 68 n.209.

[134] For these reasons, we also reject various other proposals to relax the radio restrictions. For example, Press Communications argues that radio ownership limits should be doubled for Class A radio stations and proposes new

(continued….)

Appellate Case: 24-1380      Page: 24      Date Filed: 02/23/2024 Entry ID: 5366849

42.     We find that the current tiers and limits maintain an appropriate level of competition in the local radio markets to the benefit of listeners and the public.  Ever since Congress established these demarcations more than two and a half decades ago, the Commission consistently "has found that setting numerical ownership limits based on market size tiers remains the most effective method for preventing the acquisition of market power in local radio markets."[135]  We disagree with the notion that changes in the broader audio environment require a restructuring of the rule's market size tiers or numerical limits.  Not only do we find that the current limits promote our policy goals, but, as discussed below we conclude that allowing further consolidation would not ensure that local radio stations retain their listeners and advertisers.  In addition, we note that the market tiers that NAB proposes would be determined by the size of the population in the Nielsen Audio Metro market.  The current rule uses Nielsen markets as a starting point, but its tiers depend on the number of radio stations in the Nielsen market, rather than on how many people live in the market.  Because the rule limits the *number of stations* an entity may own within a local market, we find that the most consistent and relevant measure upon which to base the rule's tiers is the total *number of stations* in the market, a concept that has been applied as part of the rule for many years, is well understood, and provides a degree of certainty to applicants.[136]  Under the rule, if there are more total stations in a market, an entity can own more stations.  In effect, this ensures that a certain number of stations in a market would not be owned by a single entity.  By contrast, NAB's proposal would permit ownership of eight stations in each of the top 75 markets as ranked by population, regardless of the total number of stations (or number of stations available to be owned by other entities) in the market.  NAB's proposal to eliminate all ownership limits in most markets and retain only FM limits in the largest 75 markets would represent a radical departure from the existing numerical limits and would allow an increase in consolidation that would significantly decrease existing competition.

43.     Commenters in favor of loosening radio ownership limits suggest that the broadcast radio industry, in general, is in dire need of relief and contend that its viability may be at stake if additional consolidation is not permitted.[137]  Other commenters, however, assert that the survival of the radio

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

limits for the market tiers.  Press Communications Comments, MB Docket No. 18-349, at 3-5 (rec. Sept. 2, 2021) (Press Communications Update Comments).  Similarly, Galaxy argues that, if the Commission retains the radio ownership limits, it should count a Class A station as half a station for purposes of the rule.  Galaxy Comments at 6-9.  The Commission previously found that decreasing the value assignment for Class A radio stations for the purpose of measuring local ownership could result in "potentially significant consolidation in local radio markets" and that "assign[ing] different values to stations of different classes [would] not account for the possibility of a relatively lower power radio station potentially reaching a larger audience than a station with a larger service contour."  *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9902-03, paras. 98-99.  In addition, Golden Isles argues that all stations in a Nielsen Audio market should be counted for purposes of the rule, even if Nielsen excludes them because they do not subscribe to Nielsen.  Golden Isles Reply Comments, MB Docket No. 18-349, at 3-7 (rec. Oct. 1, 2021) (Golden Isles Update Reply).  Adams Radio suggests lifting the cap only for small group owners and individual market owners outside the top 25 markets.  Adams Radio Comments at 1.  Reno Media supports NAB's proposal but suggests as an alternative the elimination of subcaps and market tiers such that, in all markets, one entity could own eight stations, regardless of whether they were in the AM or FM service.  Reno Media Comments at 3-4.  Finally, as discussed further below, iHeart urges the Commission to retain all limits and subcaps on FM stations but to allow unlimited AM ownership in all markets.  iHeart Comments at 1, 26-28; iHeart Update Comments at 5.

[135] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9901, para. 96 (citing *2006 Quadrennial Review Order*, 23 FCC Rcd at 2072, para. 116; *Prometheus I*, 373 F.3d at 431-32; *2002 Biennial Review Order*, 18 FCC Rcd at 13730-34, paras. 288-91).

[136] *But see* Sinclair Telecable Comments at 1-4 (advocating for a flexible approach that accounts for changes in a market's advertising revenues and population growth).

[137] While there is no question industry trends represent formidable challenges for broadcast radio, we are not convinced by NAB and other industry commenters that allowing station owners to acquire additional stations within their local markets would enable them to combat these trends effectively.  They contend that survival of the radio industry depends on station owners achieving economies of scale that would allow them to spread their fixed costs

(continued….)

24

industry depends on keeping ownership limits in place to prevent massive consolidation that could result in a few national owners buying all or most of the stations in a market and piping in preset programming from distant headquarters.[138]  These commenters contend that relaxing the rule to "save" radio under NAB's plan would have the opposite effect:  destroying what is the very essence of local radio.[139]  We recognize that the record contains evidence showing that broadcast radio has experienced declines in listening shares and in advertising revenues in recent years, while streaming audio has seen growth in both areas.[140]  We further realize that broadcast radio, like other industries, has faced and continues to face challenges as technologies, market dynamics, and consumer behaviors evolve.[141]  Notwithstanding these challenges, we continue to find, as compelled by the instruction of section 202(h), that the current structure of the ownership rule remains necessary to promote the Commission's public interest goals.  Moreover, we note that in any action that affects licensing, the Commission must be mindful of Congress'

over more stations and lower their costs per station.  *See, e.g.*, NAB Comments at 6-7, 35-38; Connoisseur Media et al. Comments at 4-5, 22, 26; West Virginia Radio Comments at 5; Galaxy Comments at 6; NAB Reply at 44-45; Press Communications Reply at 2-3; Golden Isles Update Reply at 1-3; Alpha Media Update Reply at 7-8.  Some broadcasters claim that these cost-savings would enable them to compete with social media companies such as Facebook and Google, to invest more in local programming, and to offer a wider array of programming that would better serve niche audiences.  Connoisseur Media et al. Comments at 22-25; NAB Comments at 38-39; NAB Reply at 37-49; Alpha Media Update Reply at 5-6; Connoisseur Media et al. Update Reply at 8-10.  *But see* Urban One Comments at 14-15 (arguing that the "reduction or spreading out of costs will result in less programming resources per station for local programming").

[138] *See, e.g.*, King City Comments at 1-2; Bristol County Broadcasting/SNE Comments at 1-2; Urban One Comments at 13; WBOC Reply at 2.

[139] *See* King City Comments at 1-2 (asserting that "[e]liminating the ownership cap will hasten the demise of the independent, family-owned broadcast radio station and destroy the localism that is at the center of such stations"); Crawford Comments at 1 (attributing the "generally healthy" state of the radio industry to the fact that "the underlying formula is one that works"); Salem Media Comments at 2 (advising that "it is incumbent upon the Commission to move cautiously and responsibly before changing a formula that has brought an unparalleled amount of success to the radio industry"); Sarkes Tarzian Reply at 2-3 (asserting that "further consolidation will likely be the demise of the 'mom-and-pop radio broadcaster,' a uniquely American feature of the radio industry since its inception"); Redrock Broadcasting Reply Comments, MB Docket No. 18-349, at 1 (rec. Oct. 1, 2021) (Redrock Update Reply) (contending that "a radio station in a community is fundamentally a small local business and not a transmitter for a large national company"); Letter from Matthew Wesolowski, General Manager, SSR Communications, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 1 (filed Nov. 20, 2023) (SSR Nov. 20, 2023 *Ex Parte*) (stating that NAB's proposal could lead to a "disastrous imbalance" of media ownership in smaller radio markets).

[140] *See, e.g.*, Connoisseur Media et al. Comments at 6-10, 16-21; NAB Comments at 17-18, 20-26; West Virginia Radio Comments at 2-4; Galaxy Comments at 3-6; Reno Media Comments at 2-3; NAB Reply at 34-37; American General Media et al. Reply at 8-14; Connoisseur Media et al. Reply at 4-5; Press Communications Reply at 2-3; Alpha Media Update Reply at 3-5; NAB Update Reply at 63-70; Letter from David Oxenford, Counsel, Connoisseur Media and Mid-West Family Broadcasting, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 1-2 (filed Nov. 29, 2023).  *But see* iHeart Reply at 9 (claiming that NAB's analysis ignores the fact that the decline in AM listening is responsible for most of the decline in radio listening).  NAB reports that in 2019, people aged 13 to 24 spent nearly three times as much time streaming audio (125 minutes a day) as they spent listening to radio (53 minutes a day).  NAB Reply at 35; *see also* Connoisseur Media et al. Update Comments at 6-14.  In addition, Connoisseur Media et al. state that, in 2019, more than 50% of all local advertising dollars went to digital media, primarily to companies like Google and Facebook, a figure which they claim is predicted to reach two-thirds by 2023.  Connoisseur Media et al. Comments at 3; Connoisseur Media et al. Update Reply at 5-6; *see also* NAB Reply at 37-45; Connoisseur Media et al. Update Comments at 20-28.

[141] As previously indicated, as subscription-based services for music entered the market, total revenues of digital albums and songs, as well as CD sales, began to shrink.  *See* U.S. Sales Database, RIAA, https://www.riaa.com/u-s-sales-database/ (last visited June 10, 2022); *see also 2022 Communications Marketplace Report* at 179, para. 303 (noting that radio advertising revenue was "virtually flat between 2010 and 2019").

Appellate Case: 24-1380     Page: 26     Date Filed: 02/23/2024 Entry ID: 5366849

directive to avoid excessive concentration of licenses and to disseminate licenses widely.[142] Allowing all radio stations in a market to be licensed to one entity would demand an exceptional justification given this directive. In *FCC v. Prometheus*, the Supreme Court recognized the Commission's longstanding policy of "ensuring that a small number of entities do not dominate a particular media market."[143] In any event, we remain highly skeptical that permitting additional consolidation beyond that currently allowed under our rule is warranted or would address radio's stated woes.

44. For one thing, as we note above, broadcast listenership within the broader audio landscape remains relatively strong despite declines in radio's popularity. In addition, broadcast radio revenue—the lifeblood of the industry—has shown signs of stability over the past decade.[144] As the Commission found in its most recent Communications Marketplace Report, "the primary source of revenue for commercial terrestrial radio stations is advertising" and while "total broadcast radio revenue dropped to $13.7 billion in 2020," revenue then "rose to $14.8 billion in 2021, resulting in a net decline of approximately 17% from 2019 to 2021, due largely to the drop in demand for advertising due to the COVID-19 pandemic."[145] In fact, broadcast radio advertising revenue remained virtually flat from 2010 to 2019, which obviously is not preferable to steep growth, but also is not indicative of a prolonged or pronounced decline.[146] Moreover, as broadcast radio companies expand into other parts of the audio marketplace (streaming, podcasts, etc.), online revenue for broadcast radio has seen substantial growth and stands as an "area of potential growth" going forward.[147] Perhaps tellingly, the total number of broadcast radio stations remained fairly steady, and actually increased slightly, between 2015 and 2020, suggesting there has not been a massive shuttering of radio stations due to financial stress.[148]

45. We understand that radio stations depend on advertising revenues to survive and to provide free, over-the-air programming, as they have since the inception of broadcasting. However, evidence does not appear to show that owning more stations necessarily correlates to being able to attain proportionally more revenue (i.e., the number of owned stations and the net advertising revenue per station vary considerably among the top ten largest radio companies by net advertising revenue).[149] While we recognize that adding more stations to a radio owner's local holdings may offer some benefit to the owner, including the ability to reduce costs, it would come at a tradeoff to the public interest, and we agree, moreover, with those commenters who contend that it would not reverse the overall downward trend in the amount of time that American consumers spend listening to broadcast radio or encourage

---

[142] 47 U.S.C. § 309(j)(3)(B).

[143] *FCC v. Prometheus*, 141 S.Ct. at 1155.

[144] *2022 Communications Marketplace Report* at 179, para. 303.

[145] *Id.* at 178-79, paras. 302-03.

[146] *Id.* at 179, para. 303. Moreover, while not back to pre-pandemic levels across the industry, there is evidence that radio revenue is rebounding following a precipitous drop off during 2020. *See* Justin Nielson, S&P Capital IQ, *U.S. TV and Radio Station Ad Projections 2022-32: Political Offsets Dwindling Core* (July 15, 2022) (showing total U.S. radio station revenue increased 8.2% in 2021 following a 23.0% decline in 2020); Inside Radio, *BIA Forecasts 6% Growth for Radio in Updated Local Ad Forecast* (Dec. 21, 2021), https://www.insideradio.com/free/bia-forecasts-6-growth-for-radio-in-updated-local-ad-forecast/article_5b38f92a-6243-11ec-9eb2-2b8279b869bd.html (reporting BIA forecast for over-the-air radio station revenue increasing to $10.91 billion in 2021 from $9.57 billion in 2020 following a decrease from $12.68 billion in 2019); Inside Radio, *RAB: Local Radio's Digital Revenue Hit $1.5 Billion in 2021 With a "Bountiful" 2022 on Tap* (Feb. 9, 2022), https://www.insideradio.com/free/rab-local-radio-s-digital-revenue-hit-1-5-billion-in-2021-with-a-bountiful/article_278cf4d6-897c-11ec-a457-738b81fb513e.html (reporting information collected by Borrell Associates showing radio local advertising revenue increased to $8.0 billion in 2021 from $6.5 billion in 2020 following a decline from $8.9 billion in 2019).

[147] *2022 Communications Marketplace Report* at 179, para. 304.

[148] *Id.* at 3089, Fig. II.E.1.

[149] *Id.* at 3090, Fig. II.E.2.

local advertisers to increase their radio advertising budgets, both of which our rule cannot address.[150] Although NAB and others provide evidence that broadcast radio is losing advertising revenue to online platforms and digital audio, we find that greater consolidation is unlikely to improve the ability of local radio owners to regain their advertising losses, particularly given the dissimilar value propositions that they and large technology companies offer to advertisers.[151] We agree with those commenters who assert that if further consolidation were allowed, smaller and independent radio stations could be sacrificed needlessly based on an unrealistic premise that ever larger radio owners are the answer to compete for advertising on a level playing field with large technology companies.[152] Or as one commenter put it, radio "will never out-Google Google, or out-Facebook Facebook."[153]

46.    In any event, our conclusion that the current radio rule remains necessary in the public interest as the result of competition rests on the premise that the listening public is the constituency that the rule is intended to serve.[154] The purpose of the rule is to ensure competition among broadcast radio stations within a market so that radio owners are motivated to provide the highest quality of service to the public. Reducing the number of competitors in a local market puts that quality of service at risk, threatens viewpoint diversity, and may reduce the amount of local programming available. Some commenters contend that if an owner is allowed to acquire the competing stations in a market, it will diversify the programming formats on its newly-acquired stations because it will not want to compete with itself.[155] One has to question, however, whether that owner would maintain the same quality of service on its

---

[150] National Association of Black Owned Broadcasters (NABOB) Comments at 11-12; iHeart Reply at 19-24; iHeart Update Reply at 10-12; NABOB Comments, MB Docket No. 18-349, at 12-16 (rec. Sept. 2, 2021) (NABOB Update Comments).

[151] *See* iHeart Reply at 11-12, 19-23 (arguing that adding more stations to an owner's local cluster would not attract more advertising because micro-targeted digital advertising is complementary to, and not substitutable for, mass-targeted radio advertising).

[152] *See* musicFirst/FMC Comments at 11 (quoting independent radio broadcasters Ronald Gordon and Glenn Cherry as saying: "How would buying an additional four or five radio stations in a market allow a broadcaster to take on Google or Facebook? Individually, these big tech companies dwarf the annual revenues of the entire radio industry combined. How exactly would gutting the radio ownership rules drive advertising money away from tech and into radio's pocket? To the advertiser, what difference does it make who owns the station? Horizontal deregulation just shuffles the deck in favor of the big guys; it does nothing to improve radio's ability to compete with big tech.") (citing Glenn Cherry and Ronald Gordon, *The Three Types of Radio Deregulation*, Radio World (July 25, 2018), https://www.radioworld.com/columns-and-views/the-three-types-of-radio-deregulation); *see also* MMTC Comments at 6-9; Urban One Comments at 3, 14; Taxi Productions Reply at 2; Sarkes Tarzian Reply at 5; Salem Media Reply at 3; Free Press Reply at 8. *But see* NAB Reply at 3 (replying that broadcasters "are not attempting to beat Google and Facebook").

[153] musicFirst/FMC Comments at 10-11 (quoting Ron Stone, Chief Executive Officer of Adams Radio Group, disputing the notion that relaxing ownership limits would help radio compete with online platforms and further stating that "[t]hat is not our business. Thinking that way is no different than thinking we can be a television station or newspaper or steel mill for that matter. It's silly. People listen to our stations for three reasons: 1) to hear live and local information about their communities; 2) because they have a relationship with the jocks; and 3) to hear music. . . . If we are live and local and we limit commercials, we can keep our listeners.") (citing Radio Ink, *Ron Stone Fires Up the Opposition* (May 17, 2018), https://radioink.com/2018/05/17/a-strong-argument-against-more-deregulation/); *see also* Open Markets Institute Reply at 3-4 (arguing that radio consolidation is not the answer to large technology companies and that corporate concentration in one sector should not be addressed by allowing corporate concentration in another sector).

[154] *See* musicFirst/FMC Comments at 6-8 (asserting that the Commission should focus on the interests of AM/FM listeners); iHeart Reply at 10-11 (stating that the Commission's role is to regulate broadcast radio, not advertising); musicFirst/FMC Update Reply at 5-12.

[155] Connoisseur Media et al. Comments at 22-23; NAB Reply at 45-49; American General Media et al. Reply at 18; Connoisseur Media et al Reply at 13.

Appellate Case: 24-1380     Page: 28     Date Filed: 02/23/2024 Entry ID: 5366849

stations without facing external competition from other station owners.  Furthermore, evidence in the record suggests that as the radio industry has become more consolidated over time, some types of formats have been reduced.[156]

47.        Notably, the existing rule already allows a generous amount of common ownership within a radio market and does not limit ownership across markets, nor, any longer, across other media such as newspapers, television stations, or cable systems.  For example, in the largest radio markets, one owner may own as many as eight radio stations, and up to five in the same service, and that same owner is permitted to own stations up to the limit in every local market in the country.[157]  Moreover, since the passage of the 1996 Act, considerable consolidation already has taken place within the radio industry, and there is mounting evidence that it has not been without at least some negative effects for consumers.[158]  As some commenters observe, such consolidation has resulted in the homogenization of content; less local programming; fewer market entry opportunities for new or small owners, including minorities and women; employee layoffs; and competitive harm to the smaller station owners striving to remain in the market.[159]  The result is that, even under the current Local Radio Ownership Rule, there are some radio

---

[156] *See* Christopher Terry and Caitlin Ring Carlson Reply Comments, MB Docket No. 18-349, at 9-10, 13-14 (rec. Oct. 1, 2021) (Terry and Carlson Update Reply) (submitting data showing declines in the number of stations carrying, and quantity of, programming targeted at African Americans and women, in particular); Thomas C. Smith Comments at 1-2 (arguing that when six to eight stations are commonly-owned in a market, there will be at least some overlap in programming because large group owners rely on a limited number of basic formats).

[157] In addition, as Mount Wilson notes, large group owners with five FM stations in a market already have the ability to add four HD channels to the main program streams, for a total of 25 FM channels (which would increase to 40 FM channels if the FM limit were raised to eight stations).  Mount Wilson Comments at 3-4; Mount Wilson Reply at 1-2.

[158] Christopher Terry and Caitlin Ring Carlson Comments, MB Docket No. 18-349, at 4-5 (rec. Sept. 2, 2021) (Terry and Carlson Update Comments); Terry and Carlson Update Reply at 3-14.  Notably, there is evidence that over time, local radio stations have made significant reductions in employees devoted to local news, from 4,570 news employees in 2008, to 3,360 news employees in 2020, a decline of approximately 26%.  *See* Pew Research Center, *U.S. Newsroom Employment Has Fallen 26% since 2008* (July 13, 2021), https://www.pewresearch.org/short-reads/2021/07/13/u-s-newsroom-employment-has-fallen-26-since-2008/.

[159] Free Press Comments at 4-5 (disputing the idea that scale necessarily leads to increased production quality and arguing that it usually leads to content homogenization and decreased local coverage); musicFirst/FMC Audio Marketplace Comments at 10-14 (providing data to show that ownership concentration leads to content homogenization); NABOB Comments at 3-5 (arguing that consolidation after the 1996 Act caused a significant loss of African-American owned stations); Triangle Access Comments at 3 (contending that fostering consolidation is "synonymous with fostering a reduction in local content" and it would increase the cost of entry to diverse voices); Stephen Ressel Comments at 3-4; Mount Wilson Comments at 4-5; Bristol County Broadcasting/SNE Comments at 1-2; Thomas C. Smith Comments at 4; Urban One Comments at 3-4, 6, 9, 12-13; musicFirst/FMC Comments at 14-45 (discussing how ownership limits preserve localism, diversity, and competition); Leadership Conference Comments at 8; Writers Guild of America, East, AFL-CIO (WGAE) Comments at 3; MMTC Comments at 5-6 (asserting that lifting ownership limits would benefit "only a tiny handful of broadcasters" to the detriment of others, especially minorities, women, and new entrants); Howard Reynolds Reply at 1-2; Taxi Productions Reply at 1-3; Sarkes Tarzian Reply at 2-5; Free Press Reply at 5-7; Marshall Steinbaum Reply at 1-3; MMTC Reply at 1-8; Open Markets Institute Reply at 2; NABOB Update Comments at 4-8; Screen Actors Guild – American Federation of Television and Radio Artists (SAG-AFTRA) Comments, MB Docket No. 18-349, at 2-5 (rec. Sept. 2, 2021) (SAG-AFTRA Update Comments) (arguing that consolidation leads to fewer jobs); Terry and Carlson Update Comments at 4-5; Leadership Conference Update Reply at 2-3; Redrock Update Reply at 1-2; Media Action Center Reply Comments, MB Docket No. 18-349, at 2-3 (rec. Oct. 1, 2021) (Media Action Center Update Reply) (contending that the current rules already provide inadequate protection for viewpoint diversity); NHMC Update Reply at 4-5 (arguing that the rule should be strengthened to promote minority ownership); Salem Media Update Reply at 3-4, 6-7 (claiming that 1996 showed that consolidation helps only a small number of large group owners and hurts the smaller station groups); musicFirst/FMC Update Reply at 15-21 (disputing the argument that cost-savings leads to investment in local programming); *see also* musicFirst/FMC Comments at 3-5 (arguing that broadcast radio already

(continued….)

28

companies with hundreds of radio stations around the country and many radio markets are already quite concentrated, a fact that the Commission highlighted in the last quadrennial review.[160]

48.     For instance, we find that within local radio markets, the largest station group owners continue to dominate other radio stations in terms of audience and revenue share.  Specifically, evidence shows that the largest owners of commercial stations continue to enjoy substantial advantages in revenue share—on average, the largest station group in each Nielsen Audio Metro market has a 46.7% share of the market's total radio advertising revenue, with the two largest owners accounting for 73.9% of the revenue.[161]  In more than a third of all Nielsen Audio Metro markets, the top two commercial station owners control at least 80% of the radio advertising revenue.[162]  With respect to ratings, the top four station group owners continue to dominate audience share.[163]  Even without accounting for the market shares of station groups beyond the largest, these data reflect the high level of concentration in local radio markets, where on average the top station group owner's advertising revenue share hovers between 40 and 50 percent.[164]  We therefore do not find that the current rule is overly burdensome or unduly restrictive, or that relaxing the existing numerical limits would promote competition in a manner that would be consistent with the public interest.[165]

49.     Indeed, we find that the current rule remains a backstop against further excessive consolidation.  When the Commission repealed the Radio/Television Cross-Ownership Rule in 2017, it reasoned that any negative effects would be mitigated by the continued operation of the Local Radio and Local Television Ownership Rules, which would act as constraints on undue concentration.[166]  There is

---

(Continued from previous page) ————————————————

has a competitive advantage over other audio delivery platforms because it is exempt from paying royalties to music creators).

[160] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9904, para. 105; *2014 Quadrennial Further Notice of Proposed Rulemaking*, 29 FCC Rcd at 4409, para. 92.

[161] *See* BIA/Kelsey MEDIA Access Pro Online Radio Analyzer & Rankers Database as of July 21, 2022 ("BIA Media Access Pro Database July 21, 2022") (evaluating advertising revenue market share data for all Nielsen Audio markets).

[162] According to BIA data, in the 50 largest markets, on average, the top two firms account for 62.3% of radio advertising revenue in the market; in the 100 smallest markets, on average, the top two firms account for 81% of market revenue.  *See id.*

[163] BIA data indicate that the four firm market concentration ratios (i.e., the percentage of audience share attributed to the four largest firms in the market) average 97.2% in smaller markets and 89.7% in the 50 largest markets.  *See id.*

[164] The Herfindahl–Hirschman Index (HHI) is a commonly accepted measure of market concentration.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is $2,600$ ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The U.S. Department of Justice (DOJ) and Federal Trade Commission (FTC) generally consider markets in which the HHI is between 1,500 and 2,500 points to be moderately concentrated and consider markets in which the HHI is in excess of 2,500 points to be highly concentrated.  *See* U.S. DOJ & FTC, *Horizontal Merger Guidelines* § 5.3 (2010).  Under an HHI analysis, in a market where the market share leader has a share in excess of 50%, the market would be considered highly concentrated on the basis of that one firm alone (i.e., $50^2 = 2500$).  In a market where the market share leader has a share in excess of roughly 40%, the market would be considered moderately concentrated on the basis of that one firm alone (i.e., $40^2 = 1600$).  Arithmetically, the addition of other firms' market shares would not make the market any less concentrated under an HHI analysis, as all market shares, no matter the quantity or size, are additive to the total HHI value for the market and that value would only increase with the addition of market share information for other firms.

[165] *See Taxi Productions Reply* at 2-3 (surmising that "today's caps . . . should be sufficient to meet basic economies of scale").

[166] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9829-30, para. 62; *see also* iHeart Comments at 6-7 (noting the Commission's reliance on the local ownership rules to serve as "guardrails" after the

(continued….)

29

some evidence that, although a considerable amount of consolidation has occurred, the rule has prevented further excessive consolidation. For instance, although the market share information cited above reflects a high degree of concentration among the largest firms, it also appears that those numbers have remained fairly stable for the past decade or so under the existing ownership limits.[167]

50.     On the other hand, NAB's proposal of eliminating all limits in most markets and retaining only FM limits in the largest 75 markets would exacerbate the dominance of the larger firms. It would permit consolidation to the level of monopolization or near monopolization in many, if not most, markets.[168] It would mean, for many markets, the potential to move from moderately concentrated today, under traditional antitrust standards, to another level of concentration altogether, and for others that are already highly concentrated, it would mean making them even more so.[169] Practically speaking, this effect could be particularly pronounced in the smallest markets (i.e., those outside the top 75) where NAB's proposal to remove limits altogether would represent a radical departure from the current limits. For instance, most of the 178 markets outside the top 75 would be classified in one of the two smallest tiers per our existing rule (Tier 3 or Tier 4), with the majority (108) being considered Tier 3 and having, on average, 10.3 commercial FM stations.[170] Under NAB's proposal, then, in those 108 markets, an owner could increase its ownership from a maximum of four FM stations today to ten or more FM stations (or all such stations in the market).[171]

51.     Surely, further consolidation could have benefits for certain radio owners, but such benefits are not worth the cost of the real and likely harms that would result to the listening public from a further reduction in competition. In particular, we find that undue consolidation is likely to lead to radio stations becoming less responsive to the needs and interests of their local communities. As the Commission has noted previously, "[b]ecause stations have a duty to serve the needs of their local communities, localism has been a cornerstone of broadcast regulations for decades."[172] We find that the cost pressures and incentives associated with consolidation could be expected to work against the provision of programming responsive to local issues.[173] Specifically, we think the cost incentives in favor of repurposing content on multiple stations—a practice that would be expected to expand with ownership of more stations in local markets—would work against vigorous competition for service responsive to

---

repeal of the cross-ownership rules); iHeart Update Comments at 5-7.

[167] For instance, the average advertising revenue market share of the largest station group in each market increased only slightly from 45% in 2012 to approximately 47% in 2022. Similarly, the combined market share for the top two station owners increased from 73% in 2012 to approximately 74% in 2022. *See 2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4409, para 92.

[168] *See* NAB Comments at 39-40; NAB Update Comments at 68.

[169] For instance, based on 2021 data from BIA Kelsey Media Access Pro, HHIs for advertising revenue share in radio markets finds that there is one market with low concentration, 49 markets that are moderately concentrated, and 203 markets that are highly concentrated. For listening share among commercial stations, there are no markets with low concentration, 40 markets that are moderately concentrated, and 213 markets that are highly concentrated. Under NAB's proposal, every one of these 253 markets would carry the risk of becoming highly concentrated or becoming even more highly concentrated if already so.

[170] BIA Media Access Pro Database July 21, 2022 (providing data on the number of commercial and noncommercial stations in each Nielsen Audio market).

[171] The potential effect on competition inherent in NAB's proposal—which, as noted, is substantial—does not even account for any practical administrative difficulties that could be present with transitioning to a completely new approach to radio limits that sets a size cutoff based on Nielsen ranking (by households) rather than the number of stations in a market.

[172] *Broadcast Localism*, MB Docket No. 04-233, Report on Broadcast Localism and Notice of Proposed Rulemaking, 23 FCC Rcd 1324, 1328, para. 5 (2008).

[173] *See 2022 Communications Marketplace Report* at 180, para. 305.

Appellate Case: 24-1380     Page: 31     Date Filed: 02/23/2024 Entry ID: 5366849

local needs.

52.     In addition, we note that some commenters raise concerns about the effects that loosening limits on FM ownership could have on the AM band.  Specifically, commenters opposing NAB's proposal argue that eliminating the FM limit in the majority of radio markets and raising it from five to eight stations in the largest 75 markets would devalue the AM band by causing the migration of AM station owners to the FM band.[174]  They argue that migrating AM station owners would take audiences, advertising, programming, investment of capital, resources, and talent with them.[175]  They assert that the result would be counterproductive to the Commission's AM revitalization efforts[176] and would undermine the Commission's incubator program by removing or reducing the incentive to participate in the program.[177]  NAB counters that its proposal, in fact, would promote AM revitalization by allowing owners to acquire more AM stations.[178]  It contends that radio stations in smaller markets need the regulatory relief its proposal would provide and that AM stations, in particular, are struggling.[179]  Because we decline to adopt NAB's proposal, we need not reach a determination on whether the proposal would have a deleterious impact on the AM band due to a purported exodus of owners that commenters claim would occur.

53.     We acknowledge that even under the existing rule there may be instances in which smaller owners are increasingly finding it difficult to remain viable in the current radio industry (a fact that is perhaps not surprising given the dominance of the largest firms).  While NAB and others present this as a rationale in favor of further consolidation, i.e., to allow larger firms to buy struggling smaller firms,[180] we disagree.  Rather, we agree with those commenters that assert that loosening the current rule would result in the disappearance of smaller stations from the market entirely, either because they would

---

[174] iHeart Comments at 29-32; Crawford Comments at 2; CRC Comments at 2-3; Salem Media Comments at 3-6; MMTC Comments at 11-12; NABOB Comments at 9-11; Salem Media Reply at 9-10; musicFirst/FMC Reply at 16-20; MMTC Reply at 3-5; iHeart Update Reply at 9-10; Salem Media Update Reply at 4-6.

[175] iHeart Comments at 29-32; Crawford Comments at 2; CRC Comments at 2-3; Salem Media Comments at 3-6 (providing several examples of AM stations migrating to the FM band); MMTC Comments at 11-12; NABOB Comments at 9-11; Salem Media Reply at 9-10; musicFirst/FMC Reply at 16-20; MMTC Reply at 3-5; iHeart Update Reply at 9-10; Salem Media Update Reply at 4-6; *but see* NAB Reply at 54 (stating that denying relief to FM stations in order to protect AM stations is "the regulatory equivalent of cutting off radio's nose to spite its face"); Connoisseur Media et al. Reply at 9-11.

[176] iHeart Comments at 7, 32; Crawford Comments at 2 (contending that "removal or easing of FM subcaps will do far more harm to AM Radio than all the good the Commission has so far achieved in its AM Revitalization efforts"); CRC Comments at 3-4; Salem Media Comments at 2; NABOB Comments at 5-9; Crawford Reply at 1; Salem Media Reply at 3; NABOB Update Comments at 8-12.  *But see* WBOC Reply at 4 (asserting that "if [AM] revitalization rests on artificial FM ownership restrictions, it won't be durable enough to survive the competitive onslaught that local radio now faces").

[177] iHeart Comments at 7-8, 33-35; MMTC Comments at 9-10; iHeart Update Comments at 5-7, 26-29.  iHeart further argues that the AM band should be preserved because AM stations are "a vital component of America's public safety and national security communications infrastructure" that are relied upon by the public during emergencies.  iHeart Comments at 18-24, 33; iHeart Update Comments at 13-22; iHeart Update Reply at 12-17; *see also* Adams Radio Comments at 1; Salem Media Comments at 10.  *But see* NAB Reply at 52-53 (suggesting that there are many sources of emergency information other than AM radio).

[178] NAB Comments at 34-35.

[179] *Id.* at 31-33; *see also* American General Media et al. Reply at 14-15 (arguing that digital competition has had a particularly severe impact on stations in smaller markets).

[180] *See* NAB Update Comments at 80 (stating that "the benefits of permitting additional station combinations are greatest in small markets, where radio stations most struggle to cover their fixed costs"); NAB Comments at 61, n.241 (arguing that "'depriving stations, especially smaller ones, of the ability to engage' in local combinations and joint arrangements could significantly impact 'stations' ultimate financial viability'").

Appellate Case: 24-1380   Page: 32   Date Filed: 02/23/2024 Entry ID: 5366849

be more vulnerable to acquisition or because they would be unable to compete with the larger station groups that would expand their dominance if further consolidation was permitted.[181]  Excessive aggregation through acquisition of stations of any size disserves our policy goals of competition, diversity, and localism.  In any event, we continue to find that there is ample leeway under the current rule for additional consolidation within limits.[182]  What the current rule does constrain, however, is the further aggregation of market share by an already dominant firm in a local market.  Put another way, even if it would be efficient for a struggling firm to exit the market, it does not follow that an in-market competitor has to be, or should be, the one to acquire that firm.  Instead, we find that a new entrant (or at least a new market entrant) would be preferable from the perspective of competition and diversity, and our current rule is conducive to such an outcome.[183]

54.　　　*AM/FM Subcaps.*  We conclude that, like the market tiers and associated ownership limits, the sub-limits on AM and FM ownership within the Local Radio Ownership Rule also remain necessary in the public interest given the current audio marketplace.  The radio rule's AM/FM subcaps limit the number of radio stations from the same service, i.e., AM or FM, that an entity may own in a single market.[184]  Currently, a broadcaster may not own more than five AM or five FM stations in markets in the largest market tier, four AM or four FM stations in markets in the two middle-sized tiers, or three AM or three FM stations in markets in the smallest tier.[185]  These subcaps, which were set by Congress in 1996, are intended to prevent excessive concentration in a particular service, to foster market entry, and to promote competition by accounting for the technological and marketplace differences between AM and FM stations.[186]

55.　　　We find that the AM/FM subcaps continue to serve these purposes.  The subcaps help prevent excessive common ownership of either AM or FM stations in a local market.  Retaining a cap specific to FM stations addresses the concerns of commenters that relaxing or removing the FM subcaps potentially could cause AM stations to migrate to the FM band, resulting in a diminished FM band where lower-cost market entry opportunities for small owners, including minorities and women, are most likely.[187]  Moreover, despite the growing use of FM translators to transmit AM signals and the transition of some AM stations to digital radio, disparities between the AM and FM services persist.[188]  iHeart provides evidence that the number of AM stations has declined while the number of FM stations has increased, and it states that quantitative data for audience listening and advertising revenue demonstrate "a large and increasing competitive gap between AM and FM radio stations" from 2010 to 2018.[189]  In the

---

[181] Crawford Comments at 2; CRC Comments at 2; King City Comments at 1-2; Thomas C. Smith Comments at 3; Urban One Comments at 3-4; musicFirst/FMC Comments at 8-9; Sarkes Tarzian Reply at 1-5; musicFirst/FMC Audio Marketplace Reply at 5-15.

[182] For instance, in looking at the ten largest radio station owners (by net advertising revenue), none has an average of more than five radio stations per market, suggesting there are markets where these companies could acquire additional stations, even under the current rule.  *See 2022 Communications Marketplace Report* at 179, Fig. II.F.2.

[183] The ten largest radio station owners, on average, own stations in 43 markets, suggesting there may be more markets they could enter to pursue cost efficiencies and economies of scale under the current rule.  *See id.*

[184] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12124-25, paras. 30-32.

[185] 47 CFR § 73.3555(a)(1).

[186] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9907-08, paras. 113-14.

[187] MMTC Comments at 11-12 (arguing that migration would especially harm minority broadcasters); NABOB Comments at 9-11 (contending that lifting subcaps would harm African-American AM owners disproportionately).

[188] Crawford Reply at 2; iHeart Update Comments at 22-26.  *But see* Alpha Media Comments at 2 (asserting that the disparities between AM and FM stations no longer exist given online streaming, HD radio, and the use of FM translators).

[189] iHeart Comments at 14-18.

interest of preventing undue concentration among local stations in either band, we reject the proposals in our record aimed at modifying or eliminating the rule's subcaps.[190]

56.     Though iHeart and other commenters contend that elimination of the AM subcap would provide needed relief to the struggling AM band without risk of harming competition, we disagree.[191] iHeart's proposal to remove all limits and subcaps on AM stations while retaining all current limits and subcaps on FM stations[192] would not create a risk of migration of AM owners to the FM band, which is one concern that has been raised regarding FM deregulation.[193]  However, we agree with those commenters who contend that AM deregulation would allow large owners of AM stations to buy up the smaller AM stations in their markets and could lead to excessive concentration within the AM band.[194] iHeart asserts that there is no longer a risk of concentration in the AM band given "increasingly steep declines in audience listening to AM stations and the continuing erosion of advertiser revenue experienced by AM stations, especially when compared to FM stations."[195]  However, we find that although AM stations overall tend not to achieve the ratings or revenues of FM stations, this disparity is by no means a universal truth.  For instance, in each of the top five markets, there is an AM station among the top three stations in revenue.[196]  Additionally, throughout the 253 Nielsen Audio Metro markets, there are 124 AM stations ranked in the top five in terms of all-day audience share, or approximately 10% of all top-five stations in those markets.[197]  Further, four out of the top ten (and seven out of the top twenty) radio stations in the United States (as ranked by net advertising revenue for 2021) are AM stations.[198] Therefore, it cannot be presumed that AM stations would not be targets for acquisition if AM restrictions were eliminated.  Regardless, even in markets where AM stations are not among the highest-ranked stations in the market, the AM limits and subcaps promote a competitive AM band by preventing excessive concentration.

57.     In addition, we find that reduced competition in the AM band would threaten the band's

---

[190] *See, e.g.*, *id.* at 8 (urging the Commission to remove all AM subcaps); NAB Comments at 7 (essentially proposing to retain only the FM subcap in the top 75 markets and raise it to eight stations); Sinclair Telecable Comments at 1 (recommending that the AM/FM subcap limits be raised by one station in each market tier).

[191] iHeart Reply at 13-18; *see also* iHeart Update Reply at 12-17.  *See* Curtis Media Group Comments at 2-3 (arguing that the elimination of all AM ownership limits "would promote investment in AM radio and increase efficiencies and economies of scale . . . [which] would allow AM stations to expand programming diversity, including enhanced local programming and community engagement, so that AM stations can better compete for listeners and advertisers"); CRC Comments at 4 (contending that eliminating AM subcaps would stabilize AM radio valuations by enabling large group owners to increase their presence in a market); SSR Nov. 20, 2023 *Ex Parte* at 1 (proposing removal of any delineations between AM and FM facilities in the radio ownership limits).

[192] iHeart Comments at 1, 26-28; iHeart Update Comments at 5.

[193] *See, e.g.*, iHeart Comments at 29-32; Crawford Comments at 2; CRC Comments at 2-3; Salem Media Comments at 3-6; MMTC Comments at 11-12; NABOB Comments at 9-11; Salem Media Reply at 9-10; musicFirst/FMC Reply at 16-20; MMTC Reply at 3-5; iHeart Update Reply at 9-10; Salem Media Update Reply at 4-6.

[194] *See, e.g.*, Mount Wilson Comments at 2-3; musicFirst/FMC Comments at 44-45; Thomas C. Smith Comments at 3; Mount Wilson Reply at 2-3; Crawford Reply at 2; Taxi Productions Reply at 1-3.

[195] iHeart Comments at 26-28.

[196] *See* BIA Media Access Pro Database July 21, 2022.

[197] *Id.*  Specifically, across all 253 Nielsen Audio Metro markets, there are 1,265 total stations that would be ranked in the top five (discounting any potential ties for the number five ranking), which means that AM stations account for approximately 9.8% percent of the top five stations in these markets.  So although, in general, FM stations may continue to enjoy some competitive advantages over AM stations, there continue to be many strong AM stations and AM remains a vital service.

[198] *See* S&P Capital IQ, Radio Stations by Market and Format as of Aug. 4, 2022.

Appellate Case: 24-1380      Page: 34      Date Filed: 02/23/2024 Entry ID: 5366849

distinctive qualities. Notably, some commenters observe that the AM band, in particular, includes more small broadcasters than the FM band, including minority and female licensees, and that it is important to preserve that diversity of ownership.[199] AM stations also include more Spanish and Ethnic, News, Sports, and Talk formats relative to FM stations.[200] Despite competitive developments that have continued to affect the AM and FM bands, relative to each other, we find that the public interest benefits of maintaining diffuse ownership within the AM and FM bands continue to support retaining the AM and FM subcaps.

58.    *Methodology for Determining Compliance in Non-Nielsen Audio Markets*. We will make permanent the Commission's contour-overlap methodology that has been used on an interim basis to determine compliance with ownership limits in areas that are not within defined Nielsen Audio Metro markets. At the time the Commission adopted the use of Nielsen Audio Markets (formerly Arbitron Metro markets), it acknowledged that not all portions of the country fall into a market area defined by Arbitron or later Nielsen. In fact, a significant portion of the country, both in terms of geography and population is not located in such rated/defined markets, meaning that another method must be employed in those instances to determine the number of stations in a given market.[201] Accordingly, the Commission previously stated that it would continue to use the former "contour-overlap methodology" to determine the relevant geographic market for purposes of ascertaining compliance with the relevant radio ownership market tiers and caps.[202] Under this approach, the relevant geographic market is defined by the cluster of stations with overlapping signal contours of a given strength.[203] Although the Commission was initially critical of the contour-overlap methodology, and indeed abandoned it in favor of using markets defined by Arbitron or Nielsen ratings where such markets exist, it has continued to use the approach now on an "interim" basis for nearly 20 years for those areas that fall outside a rated market. In that time, and in various quadrennial proceedings, the Commission has invited commenters to offer alternatives to the methodology for use in non-rated areas, but ultimately has found no reason to revisit the approach. Rather, it has found previously that the revised contour-overlap methodology appeared to be working

---

[199] *See* Urban One Comments at 7-8; Mount Wilson Reply at 2-3; League of United Latin American Citizens Reply at 1-3 (stating that AM radio is a trusted source of information for Hispanics, who rely on Spanish-speaking radio for local news and health and public safety information); Salem Media Update Reply at 6-7.

[200] *2022 Communications Marketplace Report* at 181, para. 307.

[201] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13729, para. 282 (stating that "Arbitron Metros do not cover the entire country; the 287 Arbitron Metros cover approximately 60% of the commercial radio stations, 30% of the counties, and 78% of the population above the age of 12 in the United States, including Puerto Rico").

[202] *Id.* at 13729-30, paras. 282-86. In adopting the Arbitron Metro (now Nielsen Audio Metro) market definition for purposes of the radio rule in the *2002 Biennial Review Order*, the Commission stated that the contour-overlap methodology would continue to apply to undefined markets on an interim basis while it explored the potential for a better substitute. While the Commission continued to apply the methodology on an interim basis, it adopted changes to the methodology that minimized what it found to be the more problematic aspects of that approach. Specifically, the Commission excluded from the market calculation radio stations that are commonly owned with the stations seeking to be combined and radio stations whose transmitter site is more than 92 kilometers (58 miles) from the perimeter of the mutual overlap area. *Id*.

[203] The contour-overlap methodology for defining radio markets and counting the radio stations that are in those markets uses the principal community contours of the commercial radio stations that a party seeks to own. The relevant radio market is defined as the area encompassed by the principal community contours of the commonly owned radio stations whose contours mutually overlap. Principal community contours also are used to count the number of radio stations in a radio market, that is, to determine the size of the market for purposes of applying the ownership limits. Specifically, in addition to the radio stations whose contours form the market, any station whose principal community contour intersects the market is considered to be in the relevant market. *See id.* at 13729-30, paras. 282-86 and Appendix F for a detailed explanation of the contour overlap methodology.

well.[204]

59.      Seeking to resolve the issue once and for all, and either remove the "interim" label or else find a suitable replacement, the Commission once again called for any potential alternatives to the contour-overlap method in the *NPRM*.[205]  The record neither offers any new alternative to the method, nor any opposition to its continued use in those areas of the country that are outside of a rated Nielsen Audio Market.[206]  Accordingly, because we find that the approach has worked sufficiently well for the past 20 years[207] and is familiar to both radio broadcasters and Commission staff, we will make permanent the Commission's contour-overlap methodology that has been used on an interim basis to determine ownership limits in areas that are not within defined Nielsen Audio Metro markets.  Therefore, going forward, parties proposing a radio station combination involving one or more stations whose communities of license are not located within a Nielsen Audio Market must show compliance with the local radio ownership rule using the contour-overlap methodology.

60.      *Embedded Markets.*  We decline requests from commenters to modify our presumption regarding embedded markets, which was originally adopted in 2017 and made applicable pending further consideration of embedded market transactions in this 2018 Quadrennial Review proceeding.[208]  We now complete our 2018 Quadrennial Review and retain the presumption in its current form.  As described above, embedded markets are smaller markets, as defined by Nielsen Audio, that are contained within the boundaries of a larger Nielsen Audio Metro market.  In general, entities seeking to acquire a radio station in an embedded market must satisfy, separately, the numerical limits of the Local Radio Ownership Rule for both the embedded market and the overall parent market.  In addition, our current policy includes a presumption in favor of waiving the general rule for radio stations in embedded markets where the parent market contains multiple embedded markets, provided two conditions are satisfied:  (1) compliance with the numerical ownership limits using the Nielsen Audio Metro methodology in each embedded market, and (2) compliance with the ownership limits using the contour-overlap methodology applicable to undefined markets—in lieu of evaluating compliance with the numerical limits in the overall parent market.[209]  Currently, the only two markets for which the presumption is relevant—i.e., parent markets

---

[204] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9898, para. 85 n.234.

[205] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12122-23, para. 25.

[206] NAB Comments at 40-41 (supporting the contour-overlap methodology for non-Nielsen Audio markets and observing that "no party has ever suggested a rational, workable alternative").  Arguing that small stations often serve only a portion of a Nielsen Audio market, Curtis Media Group would like to see a return to the contour-overlap methodology for all markets.  Curtis Media Group Comments at 3-5.  We will continue to use the Nielsen Audio market definition where possible.  In selecting the Arbitron (now Nielsen Audio) radio market definition, the Commission pointed to the fact that Arbitron was an "established industry standard" and a "commercially accepted and recognized definition" that represented "a reasonable geographic market delineation within which radio stations compete."  *2002 Biennial Review Order*, 18 FCC Rcd at 13725, paras. 275-76; *see also 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9843-44, para. 92 (stating that "Nielsen Audio's market definitions are recognized as the industry standard and provide for consistency and ease of application in comparison to other possible methods for defining local radio markets"); *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9903-04, para. 102 (recognizing Nielsen Audio market definitions as the industry standard).  We continue to find this approach preferable where we can apply it.

[207] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12122-23, para. 25.

[208] *See* Connoisseur Media Comments at 2-11; NAB Comments at 41-42; Press Communications Update Comments at 4-5.  As promised when the embedded markets presumption was adopted, the Commission sought comment on it in the *NPRM* initiating the 2018 Quadrennial Review proceeding.  *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12125-27, paras. 33-36; *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9841, 9845-46, paras. 86, 95.

[209] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9842, para. 90 n.262; *see also id.* at 9841, para. 86 n.251.

Appellate Case: 24-1380      Page: 36      Date Filed: 02/23/2024 Entry ID: 5366849

that contain multiple embedded markets—are New York, NY, and Washington, DC, and application of the presumption is limited to these markets.[210]

61.     We find that the record, and the lack of applications received to date, supports not making any changes to our embedded markets policies at this time.[211]  In particular, we reject suggestions that we eliminate the policy that counts an embedded market station in both the embedded market and in the parent market in favor of counting embedded market stations only within an embedded market.[212]  In addition, we reject the suggestion that the waiver presumption should be extended to any and all future situations with multiple embedded markets, beyond New York and Washington, DC.[213]  Instead, after evaluating the presumption in the 2018 Quadrennial Review proceeding, we retain the presumption in its current form.[214]  We agree that Connoisseur Media and others have demonstrated evidence in the past that embedded market stations primarily compete for listeners within the confines of their own embedded market, that is, against stations located within their own embedded market and those stations located in the main city of the parent market whose signals reach the embedded market (but not against stations in other embedded markets).[215]  It is precisely for these reasons that the Commission adopted the presumption in 2017.  Nonetheless, we find that the proposal not to count embedded market stations toward an entity's compliance with the limits in the parent market could lead to excessive concentration, allowing a single owner to combine parent market stations together with those in embedded markets in a

---

[210] *See id.* at 9841, 9845-46, paras. 86, 94-95 (limiting the presumption to the two markets with multiple embedded markets (New York and Washington, DC) at the time it was adopted).

[211] *See* Connoisseur Media Comments at 2 (stating that "the Commission's policy to count embedded market stations in both the embedded market and in the parent market should be abolished"); NAB Comments at 42 (contending that stations in an embedded market should "not count toward the group owner's compliance with the local ownership limit in the parent market"); Press Communications Update Comments at 4-5 (requesting that the number of stations counted for an embedded market should include competing stations from adjacent markets, thereby increasing the station count for the embedded market and in turn the number of stations an entity could own in the embedded market).

[212] *See* Connoisseur Media Comments at 2-9; NAB Comments at 42.  Connoisseur Media advocates for such a change by relying on its analysis of the New York, NY, and Washington, DC, markets, claiming that such a change would be consistent with the competitive dynamics in these embedded markets and that embedded market stations compete almost exclusively within the confines of their own embedded markets.  Connoisseur Media Comments at 3-8.  Put another way, Connoisseur Media claims that embedded market stations do not compete in embedded markets other than their own, and therefore, a policy that requires an entity to comply with the overall parent market limit restricts an entity's ability to amass groups of stations in multiple embedded markets in a single parent market.  For instance, if an entity is permitted under the separate limits applicable to three individual embedded markets to own four stations in each (or twelve stations total), it would still run afoul of the overall parent market limit, which permits, at most, ownership of eight stations.  *See* Connoisseur Media Comments at 7-9; *see also* NAB Comments at 42.  As noted above, the Commission already has in place a presumption in favor of waiver of the usual embedded markets policy in markets with multiple embedded markets, pursuant to which a contour-overlap methodology is applied rather than conducting a parent market analysis.  For the reasons discussed above, we find this relief to be sufficient.

[213] *See* Connoisseur Media Comments at 11.  Connoisseur Media suggests that the Commission need not evaluate each subsequent market should new situations arise in the future with multiple embedded markets, but rather it should simply apply the waiver presumption automatically.

[214] *See id.* at 2 (asking the Commission to retain the presumption, which was adopted in 2017 and subject to further review in the 2018 Quadrennial Review proceeding).

[215] *See id.* at 7 (noting that "Connoisseur provided a county-by-county breakdown of the listening of the [New York, NY, and Washington, DC] embedded market stations, showing that virtually all of the listening to those stations comes from listeners in the home counties of the embedded market, not from listeners in the parent market or in other embedded markets"); *see also* Press Communications Update Comments at 4-5 (noting that New York City and out-of-market stations account for 60% of the ratings in the Monmouth-Ocean, New Jersey embedded market).

way that harms competition within the embedded market.[216]  Moreover, absent further experience with the existing presumption in practice, we remain unconvinced that there is a demonstrated need, or that it would be wise, to adopt additional flexibility at this time.[217]  For these same reasons, we decline to automatically extend the waiver presumption to all future situations involving multiple embedded markets.

62.     When the Commission adopted the embedded market presumption in 2017, it stated that the presumption would "give Connoisseur—and other parties—sufficient confidence with which to assess possible future actions."[218]  We find that this continues to be the case, as the presumption favors an entity's ability to invest in multiple embedded markets without the stations it owns in one embedded market counting against its ownership of stations in the other.  Moreover, the Commission anticipated that future transactions utilizing the presumption would "help inform our subsequent review of … the treatment of embedded market transactions."[219]  In fact, however, during the time since 2017 that the presumption has been in effect, no party has filed an application seeking to avail itself of the presumption.  Moreover, the record in this proceeding contains no evidence to indicate that the current presumption is deterring such transactions or that that the presumption would be inadequate to facilitate their successful completion where the criteria of the presumption could be met.  As a result, we find that the Commission is providing sufficient flexibility and certainty to prospective applicants and that we do not have any further experience or information supporting further policy or rule changes at this time.[220]

63.     *Minority and Female Ownership*.  We find that the record provides no reason for the Commission to reevaluate its conclusions in the *2010/2014 Quadrennial Review Order* that the current Local Radio Ownership Rule remains consistent with the Commission's goal of promoting minority and female ownership of broadcast radio stations.[221]  We retain the rule for the reasons stated above, particularly to promote competition among broadcast radio stations in local markets.  The record does not

---

[216] For instance, within the New York, NY parent market, suppose an entity owns eight stations, four in each of two embedded markets.  If those stations do not count toward the limits in the parent market, then the entity would be free to acquire up to eight non-embedded stations in the New York, NY parent market.  If, as Connoisseur Media claims, New York parent market stations compete for listeners in outlying embedded markets, then this change could effectively allow an entity to own a total of sixteen stations, twelve of which, according to Connoisseur Media's claims, would be competing in each of two embedded markets (i.e., the four embedded market stations each competing within their respective embedded markets as well as the eight non-embedded parent market stations that presumably compete in each of the two embedded markets as well).  *See* Connoisseur Media Comments at 5 (stating that "parent market stations compete in the areas encompassed by the embedded markets").

[217] We note that Press Communications argues for a broader rule change on the basis of data supplied for a single embedded market.  Again, without additional data or experience applying the presumption already in place, we decline to make further changes, including those suggested by Press Communications, to our embedded markets policies at this time.  *See* Press Communications Update Comments at 4-5.

[218] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9845-46, para. 95.  This followed statements in the *2010/2014 Quadrennial Review Order* suggesting the Commission's willingness to entertain a waiver in the New York, NY market.  *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9904, para 103.

[219] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9845-46, para. 95.

[220] With regard to Connoisseur Media's suggestion that our policy should apply to all future parent markets with multiple embedded markets, we find that it would be speculative and premature to consider how we will apply the presumption to all such future markets without understanding the particular competitive dynamics of those markets.  *See* Connoisseur Media Comments at 11.  As Connoisseur Media claims, the drawing of embedded markets is, at least in some sense, a function of geography, such that the competitive dynamics of future markets may or may not resemble those of the current two to which the presumption applies.  *See id.* at 4 (noting statements from Nielsen and BIA to demonstrate that the inclusion of an embedded market in a parent market is "simply a statement of geography").  It is possible that, even if applied to other markets, the presumption could be overcome by factors in future markets that we have not observed in the New York, NY or Washington, DC markets.

[221] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9911, para. 125.

Appellate Case: 24-1380      Page: 38      Date Filed: 02/23/2024 Entry ID: 5366849

contain persuasive evidence that relaxing the rule would boost minority or female radio ownership.[222] To the contrary, several commenters contend that loosening ownership restrictions could make it more difficult for minority and women owners to remain and/or to enter the local radio market.[223] For example, NABOB opposes any changes to the local radio ownership rule and notes that increased consolidation of ownership in the broadcast industry reduces opportunities for minorities to enter the business or to grow.[224] In contrast, NAB states that the best way to encourage broadcast ownership by new entrants, including minority and female owners, is to ensure access to capital and argues that the existing rule impedes investment in broadcasting by making other unregulated forms of media more attractive.[225] We note that a balance must be struck between incentivizing investment in broadcasting and ensuring that station-buying opportunities exist for new entrants. We find that the existing rule strikes the appropriate balance, especially considering that investment by new entrants is less likely in a market that is highly concentrated.[226] We note that simply eliminating ownership limits would allow more consolidation. We also share commenters' concerns that allowing greater consolidation could increase the challenges many of these relatively smaller stations face in competing for revenue in the marketplace and could reduce opportunities for new entrants, including minority and women owners, to participate in the market.[227]

64.      In this context, we note, as discussed above, that the Commission has taken several actions, such as improving its collection and analysis of ownership information on FCC Form 323/323-E, exploring access to capital through its re-chartered CEDC,[228] and implementing the radio incubator program, that are intended to provide the Commission with more information about the state of minority and female broadcast ownership, or that seek to further the important goal of increasing minority and female ownership, objectives to which we remain committed.

65.      *Cost-Benefit Analysis*. The *NPRM* asked how the Commission should compare the benefits and costs of retaining, modifying, or eliminating the Local Radio Ownership Rule.[229] As discussed above, commenters disagree regarding whether rule modifications would enable radio owners to respond more effectively to changes in the broader audio environment, or even, if so, whether any such benefits would outweigh potential harms to competition, localism, or viewpoint diversity. For all the reasons explained above, we conclude that any potential benefits that further consolidation might offer

---

[222] *See, e.g.*, Connoisseur Media et al. Reply at 9-12 (arguing that migration of AM stations to the FM band would open up ownership opportunities for minorities and women).

[223] *See, e.g.*; musicFirst/FMC Comments at 23-25; Urban One Comments at 5-8; MMTC Comments at 5-6, 9-12; NABOB Comments at 1-9; Free Press Reply at 5-6; MMTC Reply at 5-8; Taxi Productions Reply at 1; NABOB Update Comments at 1-12; Leadership Conference Update Reply at 2-3; Redrock Update Reply at 2; NHMC Update Reply at 5; Salem Media Update Reply at 6-7.

[224] NABOB Update Comments at 2. NABOB has submitted evidence showing that currently 72% of the 168 Black Owned radio stations generate less than $1 million in annual revenue, and only 2.4% of Black Owned radio stations generate more than $10 million in annual revenue. Letter from James L. Winston, President, NABOB, to Marlene H. Dortch, Secretary, FCC, MB Docket Nos. 18-349, 20-401 and 17-105, at 1 (filed June 6, 2022).

[225] NAB Update Comments at 10-18; NAB Update Reply at 18-19; NAB Oct. 30, 2023 *Ex Parte* at 1-2.

[226] *See* MMTC Reply at 6 (stating that, without ownership caps, small and minority broadcasters would be forced out of business because their investors would be susceptible to purchase offers from larger competitors); Letter from Jonathan Mason, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 1 (filed Oct. 30, 2023) (stating that small station group owners, many of which are minority-owned, cannot compete in a market owned and controlled by the largest station owners).

[227] Urban One Comments at 7-8; MMTC Reply at 1-8; NABOB Update Comments at 8-12; *see also* LCCHR Update Reply at 2-3.

[228] *See* FCC, Communications Equity and Diversity Council, at https://www.fcc.gov/communications-equity-and-diversity-council.

[229] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12127, paras. 38-39.

larger radio owners are outweighed by potential costs to the consumer stemming from such harms as weakened competition within the local broadcast radio market, increased homogenization of content, less local programming, the disappearance of stations from the market, and fewer opportunities for new and diverse market entrants.

### B. Local Television Ownership Rule

#### 1. Introduction

66. In this section, we retain the existing Local Television Ownership Rule subject to minor modifications. As an initial matter, we find that the rule remains necessary to promote the Commission's public interest goals of competition, localism, and viewpoint diversity. Specifically, we find that the Local Television Ownership Rule remains necessary to promote these goals given the unique obligations broadcast licensees have as trustees of the public's airwaves to serve their local communities.

67. In reaching our conclusion, we find that the relevant market for the rule should continue to focus on broadcast television stations, as no other source of video programming provides a substitute for broadcast television, and we retain the current numerical ownership limits. We also retain as a condition of common ownership that a broadcaster cannot acquire two stations ranked in the top four in audience share in a market—known as the Top-Four Prohibition—unless, at the request of an applicant, the Commission finds that such an acquisition serves the public interest, convenience, and necessity on a case-by-case basis.[230] But we modify the methodology of the Top-Four Prohibition to reflect better the current state of broadcast industry practices. Specifically, as detailed further below, under the revised Local Television Ownership Rule adopted herein, a television station's audience share ranking in a Nielsen Designated Market Area (DMA)[231] will be determined based on the combined audience share of all free-to-consumer, non-simulcast[232] multicast programming airing on streams owned, operated, or controlled by that station as measured by Nielsen Media Research or by any comparable audience ratings service. We update the relevant daypart used to make audience share and ratings determinations to the metric that, based on Commission experience and consultation, most accurately reflects a station's true performance given changes in the broadcast industry.[233] We also specify a definite time period over which ratings data should be averaged to minimize the impact of anomalous ratings periods.

68. In addition, we extend a previously adopted measure in order to prevent further circumvention of the Top-Four Prohibition and ensure the efficacy of the Local Television Ownership rule. Pursuant to the changes we adopt herein, an entity will not be permitted to acquire a network affiliation and place it on a station or broadcast signal that is otherwise not counted as a station for purposes of the Local Television Ownership Rule as a way to circumvent the prohibition on such

---

[230] The Top-Four Prohibition does not prohibit a broadcaster from ending up with two top-four stations through organic growth.

[231] The Nielsen Company assigns each broadcast television station to a designated market area (DMA). The DMA boundaries and DMA data are owned solely and exclusively by Nielsen. Nielsen, *Nielsen DMA Maps*, https://markets.nielsen.com/en/contact-us/intl-campaigns/dma-maps/ (last visited Aug. 11, 2022). Each DMA is a group of counties that form an exclusive geographic area in which the home market television stations hold a dominance of total hours viewed. There are 210 DMAs, covering the entire continental United States, Hawaii, and parts of Alaska.

[232] Some station owners simultaneously broadcast the primary programming stream of a second station they own on the nonprimary multicast stream of the other station they own in the same market. A nonprimary multicast stream is typically designated by appending a ".2" or greater digit to the channel number to distinguish such streams from a station's primary stream which usually is designated with a ".1" suffix.

[233] Because the same daypart is also used to make audience share and ratings determinations in the context of failing stations waivers as provided in Note 7 to section 73.3555 of the Commission's rules, we find that our update to the methodology of the Top-Four Prohibition logically leads us to update also the failing station waiver methodology with respect to the daypart used.

affiliation acquisitions adopted in the *2010/2014 Quadrennial Review Order*. We retain the shared service agreement (SSA) disclosure requirement to continue providing transparency regarding the extent of cooperation and coordination between competing stations in a market. We also find that retaining the rule continues to preserve opportunities for a variety of different owners, including minority and female owners, who can contribute to the multiplicity of speakers in a market. Lastly, we find that the public interest benefits achieved by retaining the rule with the adopted changes outweigh the potential economic cost of continued compliance with the rule.

### 2. Background

69. The Local Television Ownership Rule limits the number of full power television stations an entity may own within the same local market. The Local Television Ownership Rule provides that an entity may own up to two television stations in the same Nielsen DMA if: (1) the digital noise limited service contours (NLSCs) of the stations (as determined by Section 73.622(e) of the Commission's rules) do not overlap; or (2) at the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top-four stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service.[234] With respect to the latter provision—the Top-Four Prohibition—an applicant may request that the Commission examine the facts and circumstances in a market regarding a particular transaction, and based on the showing made by the applicant in a particular case, make a finding that permitting an entity to directly or indirectly own, operate, or control two top-four television stations licensed in the same DMA would serve the public interest, convenience, and necessity.[235] The Commission considers showings that the Top-Four Prohibition should not apply due to specific circumstances in a local market or with respect to a specific transaction on a case-by-case basis.[236]

70. The *NPRM* sought comment on the effects of rule changes made in the *2010/2014 Quadrennial Review Order on Reconsideration* and raised several issues for consideration related to changes in the video programming industry.[237] In particular, the *NPRM* sought comment on whether the current version of the Local Television Ownership Rule remained necessary in the public interest as a result of competition.[238] The *NPRM* also sought comment on whether the Local Television Ownership Rule is necessary to promote localism or viewpoint diversity.[239] In response to broadcaster claims in previous quadrennial review proceedings that non-broadcast sources of video should be considered substitutes for broadcast video, the *NPRM* sought comment on whether and to what extent this was true, as well as how to incorporate non-broadcast video into market definition analyses.[240] The *NPRM* then asked whether changes in the video programming industry support modification of the numerical limit of owning up to two television stations in the same market.[241] If the Commission retained the Local

---

[234] 47 CFR § 73.3555(b)(1).

[235] *Id.* § 73.3555(b)(2). As noted below, pursuant to this provision, the Commission has granted three case-by-case applications for flexibility affecting five DMAs.

[236] 47 CFR § 73.3555(b)(2).

[237] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12129-40, paras. 43-77.

[238] *Id.* at 12129, para. 43.

[239] *Id.* at 12129, para. 45.

[240] *Id.* at 12130-31, paras. 49-51. In response, NAB offers a study finding that digital advertising over broadband networks could be considered a direct substitute for local television broadcast advertising. NAB Update Comments at 57; *but see* Writers Guild of America, West (WGAW) Comments at 2-9 (stating that broadcast television offers a distinct and non-substitutable advertising product); Free Press Reply at 7-10 (stating that digital media are not a true substitute for broadcast media).

[241] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12133, para. 55.

Television Ownership Rule and the existing limits, the *NPRM* asked whether the Top-Four Prohibition should be retained or modified.[242] The *NPRM* then sought comment on the prevalence of, and how to account for, broadcast stations placing content from the Big Four broadcast networks (ABC, CBS, NBC, Fox) on multicast streams and low power television stations.[243] As a matter of diligence, the *NPRM* also sought comment on the implications, if any, of the television broadcast incentive auction and of the new broadcast television transmission standard.[244] The *NPRM* also asked if the Commission should continue to require the filing of SSAs.[245] Regarding minority and female television owners, the *NPRM* sought comment on how retaining, modifying, or eliminating the local television rule might affect minority and female ownership including potential entry into the market by these types of owners.[246] Finally, the *NPRM* sought quantifications of the costs and benefits of its proposed changes.[247]

### 3. Discussion

71. We find that the Local Television Ownership Rule remains necessary to promote the Commission's public interest goals of competition, localism, and viewpoint diversity. No other source of video programming serves local communities as broadcast television does, particularly at low, or no, cost to consumers. The rule promotes competition among local broadcast television stations that, to this day, remain the only entities in the video marketplace that are licensed by the Commission with use of the airwaves to provide a broadcast television service, in exchange for a unique obligation to serve the public interest. Furthermore, although primarily focused on competition, as detailed further below, the rule continues to promote localism, as broadcasters have a unique obligation to supply programming of interest to their local communities and stations are likely to be more responsive to those local interests where there are other local competitors.[248] Similarly, the rule promotes viewpoint diversity by preserving opportunities for non-commonly owned stations to air a multitude of viewpoints through independent choices regarding the local news and other local programming on their stations.

72. Accordingly, for these reasons we find that the Local Television Ownership Rule remains necessary in the public interest. We discuss below the various elements of the rule, the goals the rule serves, as well as adopt several key modifications to update application of the rule and to ensure its continued efficacy.

73. *Market definition.* After careful review, we continue to find that broadcast television remains unique and non-substitutable with other sources of video programming, particularly with respect to fulfilling our traditional public interest objectives of competition (e.g., in terms of competition among local broadcast television stations and with respect to local programming), localism (e.g., in terms of supplying locally responsive programming), and viewpoint diversity (e.g., in terms of airing a multitude of viewpoints through local news and other local programming). Although some commenters contend that by defining the market to include only broadcast television the Commission fails to account for the myriad of video programming options now available to consumers, the Commission has acknowledged for some time the availability of other forms of video programming, even while continuing to find that

---

[242] *Id.* at 12133-34, para. 56.

[243] *Id.* at 12137-38, paras. 66-69.

[244] *Id.* at 12138-39, paras. 70-71, 73.

[245] *Id.* at 12139-40, para. 74.

[246] *Id.* at 12138, para. 72.

[247] *Id.* at 12140, paras. 75-76.

[248] The Commission has previously stated that a competition-based rule, while not designed specifically to promote localism, may still have such an effect. *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9870-71, para. 17. The Commission has consistently found that broadcast licensees have an obligation to air programming that is responsive to the needs and interests of their communities of license. *Broadcast Localism*, Notice of Inquiry, 19 FCC Rcd 12425, 12425, para. 1 (2004).

Appellate Case: 24-1380    Page: 42    Date Filed: 02/23/2024 Entry ID: 5366849

broadcast television remains its own distinct market.[249]  Indeed, from video cassette recorders and DVDs, to subscription cable television services, to on-demand streaming services, video programming alternatives to free over-the-air broadcast television have existed for decades in a number of forms.  The critical question in Quadrennial Review has been and continues to be whether and to what extent such video programming options can be considered substitutes to broadcast programming, or put another way, whether competitive market forces alone are proving sufficient to create a video marketplace that satisfies the public interest objectives long associated with broadcast television, such that our Local Television Ownership Rule can be deemed no longer "necessary in the public interest as the result of competition."[250]

74.    Although there are far more sources of video programming available today than there were when the Local Television Ownership Rule was first adopted, most commenters assert that non-broadcast programming is not a substitute to broadcast programming, which remains unique.[251]  We agree.  Notably, cable, satellite, and streaming media all have higher consumer fees as they require an additional service, such as Internet access or cable or satellite service, as well as, often times, a subscription fee, in contrast to broadcast media, which consumers can access freely over the air, a distinction that keeps non-broadcast media from being a comparable alternative to broadcast television, especially for price conscious consumers.[252]  To this point, estimates suggest that 15% of U.S. television households (or 18 million households) use free, over-the-air television, a percentage that has increased in recent years, particularly as the number of consumers subscribing to pay TV alternatives continues to decline significantly.[253]

75.    Moreover, the record reflects that despite its growing prevalence, online video still largely complements, rather than competes with, broadcast television.[254]  While broadcasters assert that they compete with a myriad of sources that now provide video programming,[255] competition from other

(Continued from previous page) ───────────────────

[249] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9874, para. 27.

[250] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996).

[251] Free Press Update Comments at 4, 7; LCCHR Update Reply at 3-4; Free Press Comments at 11-13; LCCHR Comments at 5-8; Free Press Reply at 7-10; *see also* NAB Update Comments at 6-7, 19-23, 92-93; TEGNA Comments, MB Docket No. 18-349, at 6-8 (rec. Sept. 2, 2021) (TEGNA Update Comments); ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates (Network Affiliates) Reply Comments, MB Docket No. 18-349, at 10-11 (rec. Oct. 1, 2021) (Network Affiliates Update Reply); Gray Television (Gray) Reply Comments, MB Docket No. 18-349, at 2 (rec. Oct. 1, 2021) (Gray Update Reply); Nexstar Media Reply Comments, MB Docket No. 18-349, at 4 (rec. Oct. 1, 2021) (Nexstar Update Reply).  The Commission has previously found that the video programming market is distinct from other media markets because consumers do not view non-video media (e.g., audio or print media) as good substitutes for watching video, and there is no evidence in the current record that would disturb this finding.  *See 2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4380, para. 21.

[252] Free Press Update Comments at 4, 7; LCCHR Update Reply at 3-4; Free Press Comments at 11-13 (noting that many people of color and low-income households rely disproportionately on broadcast); LCCHR Comments at 5-8 (stating that internet-based communications are not replacing broadcast content, particularly for communities of color and low-income communities); NHMC Comments at 9-12 (noting that broadcast programming is still essential for American children); WGAW Comments at 2-9; Free Press Reply at 7-10.

[253] Nielsen, *OTA + OTT: The New TV Bundle*, https://www.nielsen.com/insights/2022/ota-ott-the-new-tv-bundle/ (May 2022); Nielsen, *Nielsen Estimates 121 Million TV Homes in the U.S. for the 2020-2021 TV Season*, https://www.nielsen.com/insights/2020/nielsen-estimates-121-million-tv-homes-in-the-u-s-for-the-2020-2021-tv-season/ (August 2020).  *See also 2022 Communications Marketplace Report* at 169, para. 283 (finding that 15% of U.S. TV households watched over-the-air television at the end of 2021).

[254] LCCHR Update Reply at 3-4.  In fact, some streaming services include local broadcast programming as part of their linear channel offerings.

[255] Heritage Broadcasting of Michigan (Heritage) Comments, MB Docket No. 18-349, at 5-7 (rec. Sept. 2, 2021) (Heritage Update Comments); NAB Update Comments at 23-28, 84-93; Nexstar Media Comments, MB Docket No.

(continued….)

video programming sources appears to be mostly focused on advertising revenue, which is but one of the facets of competition among local broadcast television stations. In general, non-broadcast sources of video programming do not compete with broadcasters for retransmission consent fees, network affiliations, or the provision of local programming, which continue to remain largely unique to broadcast television.[256] Moreover, while broadcasters may be seen as participating in various markets or competing along various dimensions (including, among others, the sale of local or non-local advertising; the creation, acquisition, and provision of local, syndicated, or national programming; and the acquisition of on-air talent), the provision of local programming remains a hallmark of broadcast television and an area where viewers directly benefit from competition among local broadcast television stations.[257]

76.     We note that our market definition is also consistent with the Department of Justice's (DOJ's) approach, which considers local broadcast television to be its own market in antitrust analysis.[258] DOJ has rejected the assertions of broadcasters that non-broadcast sources of video programming should be considered competitors to broadcast television in the context of analyzing transactions, focusing on the spot advertising product market in local television markets.[259] Although DOJ's analysis has focused historically on competition for advertising, whereas the Commission's rule considers competition in a number of areas, including audience share, we find DOJ's approach further supports, and is consistent with, our own.[260]

(Continued from previous page) ───────────

18-349, at 3-6 (rec. Sept. 2, 2021) (Nexstar Update Comments); TEGNA Update Comments at 2-6; Network Affiliates Update Reply at 3-10; Gray Update Reply at 8-11, 14-16; Nexstar Update Reply at 3-4, 6; Gray Comments at 9-10; Meredith Comments at 1-2; NAB Comments at 43-49, 54-57; Nexstar Comments at 3-9; *see also* R Street Institute Comments at 2-5; NPG Comments at 2-4; ION Reply at 1-3; NAB Reply at 14-17, 56-64; Nexstar Reply at 2-5; TEGNA Reply at 3-8.

[256] Retransmission consent fees are unique to broadcast stations, and the broadcast content for which MVPDs pay retransmission consent fees has special appeal to television viewers in comparison to any other type of video content to the point where viewers do not consider any other video programming to be substitutes for such broadcast content. *See* FCC, *Cable Carriage of Broadcast Stations*, https://www.fcc.gov/media/cable-carriage-broadcast-stations (last visited July 21, 2022); Competitive Impact Statement at para. 4, *United States v. Gray Television, Inc. and Quincy Media, Inc.*, No. 1:21-cv-02041 (D.D.C. July 28, 2021). The largest national networks (ABC, CBS, Fox, and NBC) affiliate with broadcast stations for over-the-air delivery of their programming.

[257] *See* LCCHR Update Reply at 3-4.

[258] The Department of Justice examines local television broadcasters competing in the spot advertising market and competition for retransmission consent licensing fees in local television markets. *See, e.g.*, Complaint at paras. 15-46, *United States v. Gray Television, Inc. and Quincy Media, Inc.*, No. 1:21-cv-02041 (D.D.C. July 28, 2021) (identifying two product markets in which broadcast television uniquely competes—retransmission consent and broadcast spot advertising); Complaint at paras. 14-22, *United States v. Gannett Co., Inc., et al.*, No. 1:13-cv-01984 (D.D.C. Dec. 16, 2013) (finding the relevant markets for analysis to be broadcast television spot advertising and retransmission consent fees (product market) in the St. Louis DMA (geographic market)); Complaint at paras. 38-44, *United States v. Comcast Corp.*, No. 1:11-cv-00106 (D.D.C. Jan. 18, 2011) (excluding broadcast television from the "video programming distribution" market, which included MVPDs and Online Video Programming distributors (OVDs)); *DOJ Nexstar-Media General Complaint*, 81 FR at 63207, para. 12 (stating that "the licensing of broadcast television programming to MVPDs that retransmit the programming to subscribers in each of the DMA Markets" constitutes a relevant market under Section 7 of the Clayton Act); *see also Application of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc. to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd 183, 196-97, para. 35 (MB 2017) (finding that divestitures required by DOJ resolved any concerns about retransmission consent bargaining leverage within a local market).

[259] *See, e.g.*, Complaint at paras. 14-22, *United States v. Gannett Co., Inc., et al.*, No. 1:13-cv-01984 (D.D.C. Dec. 16, 2013) (finding the relevant product market for analysis to be broadcast television spot advertising).

[260] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9875, para. 29; *2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4383, para. 25 n.62; *see also DOJ Nexstar-Media General Complaint*, 81 FR at 63207-08, paras. 12-21 (stating that radio, newspapers, outdoor billboards, satellite and cable television networks, MVPD interconnects,

(continued….)

Appellate Case: 24-1380     Page: 44     Date Filed: 02/23/2024 Entry ID: 5366849

77.    As we have concluded in previous quadrennial reviews, there are strong public interest reasons for promoting competition among local broadcast television stations.  Promoting competition among local television stations prevents local broadcasters from demanding higher retransmission consent fees and charging higher rates for local businesses seeking to purchase advertising time on local stations, costs that may be passed on to consumers.[261]  Moreover, competition spurs quality improvements by broadcast television stations that benefit consumers, including through reinvestment in stations, expanded programming choices, and technological innovation.

78.    Spurring competition among broadcast television stations also promotes localism, as licensees seek to differentiate themselves while fulfilling their obligation to air programming responsive to the needs and interests of their local communities.  For many stations, that includes local news and information programming.  In contrast to other sources of video programming, broadcast stations are particularly well situated to cover local news, as stations are licensed to local communities to facilitate locally responsive content and information.[262]  Indeed, the record contains numerous assertions from broadcasters that the local programming they provide is unique and unduplicated by any other video programming provider.[263]  The Leadership Conference on Civil and Human Rights (LCCHR) states that 77% of Americans get most of their local news from broadcast sources, while only 23% get local news from online only sources, little of which is actually created by online outlets since much of the news consumed online are uploaded videos of television broadcast news.[264]

79.    Although much local news is undoubtedly cost intensive to produce, we reject the broadcasters' assertions that in order to preserve localism we must allow greater consolidation than is permitted under our current rule.[265]  As an initial matter, there is evidence that despite some declines in audience size over time, there remains significant demand for local television news, and the amount of local news on television has increased over time.[266]  Moreover, contrary to claims that absent consolidation television stations cannot continue to produce local news, Nielsen data shows that the

---

and Internet-based media are not substitutes for broadcast television stations in the spot advertising market).

[261] *See* ATVA Update Comments at 6-8, 15-21.

[262] LCCHR Update Reply at 3-4.

[263] NAB Update Comments at 6-7, 19-23, 92-93; TEGNA Update Comments at 6-9; Network Affiliates Update Reply at 10-11; Gray Update Reply at 2; Nexstar Update Reply at 4; *see also* Free Press Update Comments at 4, 7; LCCHR Update Reply at 3-4; Free Press Comments at 11-13; LCCHR Comments at 5-8; Free Press Reply at 7-10.

[264] LCCHR Update Reply at 3-4.

[265] *See* NAB Update Comments at 6-9, 19-37, 93-95; TEGNA Update Comments at 8-9; Gray Update Reply at 2-6, 8-13; Network Affiliates Update Reply at 10-11; NAB Update Reply at 32-36; Nexstar Update Reply at 2-5; NAB Comments at 59-62; TEGNA Reply at 9-12; *see also* RIDE Television Network, MAVTV Motorsports Network, Cinemoi, and beIN SPORTS (Independent Programmers) Comments at 6-10 (stating that elimination of the Top-Four Prohibition would harm localism and viewpoint diversity); Thomas Smith Comments at 7-9 (arguing that consolidation will not help broadcasters compete with other media); WGAE Comments at 2-3 (stating that further consolidation of local television station ownership would reduce the number and diversity of viewpoints on local issues).

[266] *See, e.g.,* Pew Research Center, *For Local News, Americans Embrace Digital but Still Want Strong Community Connection* (March 26, 2019), https://www.pewresearch.org/journalism/2019/03/26/for-local-news-americans-embrace-digital-but-still-want-strong-community-connection/ (noting that 86 percent of U.S. adults get their local news from television stations with 41 percent preferring to get their local news from television).  Moreover, Pew Research Center compiles and presents data from RTDNA to show that the average number of local TV news hours per weekday has increased over time, including from from 6.3 hours in 2021 to 6.6 hours in 2022.  Pew Research Center, *Local TV News Fact Sheet* (Sept. 14, 2023), https://www.pewresearch.org/journalism/fact-sheet/local-tv-news/.

Appellate Case: 24-1380     Page: 45     Date Filed: 02/23/2024 Entry ID: 5366849

number of stations airing local news actually increased slightly in a four year period from 2017 to 2021.[267] Also, Nielsen data demonstrates that while almost 20% of markets saw an increase in the number of stations airing local news, only 10% of markets saw a decrease and 70% of markets saw no change.[268] Notably, only the top 50 markets saw more decreases than increases in the number of stations airing local news.[269] In markets ranked 51 and lower, where broadcasters argue the need to consolidate is particularly acute, the number of markets that saw increases in stations airing local news outnumbered those that saw decreases.[270] Further, studies by the Radio Television Digital News Association (RTDNA) found that the number of stations originating local news (i.e., the number of stations producing local news) increased slightly from 2017 to 2021.[271] Just as the record does not demonstrate that consolidation, as opposed to competition to meet audience demand, is what drove increases in local news over time, we similarly cannot conclude that additional consolidation is necessary to preserve these gains, much less to preserve the ability of stations to produce local programming at all or to otherwise serve their local communities as required as licensees.

80.     Regarding the *Market Size and Television News* study conducted by OEA that concluded small and mid-sized markets are unlikely to support four independent local news operations,[272] we note that the study itself mentions that it examines but one dimension to consider when determining the desirability of consolidation.[273] We also note that the Local Television Ownership Rule has never been designed to ensure, and does not prescribe markets should or must have, at least four independent news operations. Rather, as discussed below, the rule helps ensure a level of viewpoint diversity so that there is an opportunity for as many independent news operations as a market can support, even if some markets have less independent local news operations and some have more, as they always have. In markets where there may be fewer independent news operations already, greater consolidation would not create new independent news operations and would only decrease the diversity of voices in the providers of local

---

[267] Nielsen Local TV View shows there were 976 stations airing at least one verified local news program in November 2017 and 992 such stations in November 2021.

[268] The Commission examined Nielsen data in all available markets in November 2017 and November 2021 to identify any station that aired at least one program categorized as local news by Nielsen and then used program titles to verify that programming was correctly classified as local news.

[269] According to Nielsen data, all of the top 50 markets have at least four broadcast stations airing local news, and the overwhelming majority of these markets have at least six stations airing local news.

[270] *See supra* note 268.

[271] These studies found that 703 stations originated local news in 2017 and 707 stations originated local news in 2021. Bob Papper, RTDNA, 2018 RTDNA/Hofstra University Newsroom Survey: Local News by the Numbers at 1 (2018); Bob Papper with Keren Henderson. RTDNA, TV, Radio news profits rise, but short of pre-COVID levels at 4 (2022), https://www.rtdna.org/news/tv-radio-news-profits-rise-but-short-of-pre-covid-levels.

[272] In the authors' preferred specification, only markets with more than 615,000 TV households were predicted to support at least four independent local news operations.

[273] *See* Kim Makuch and Jonathan Levy, *Market Size and Local Television News*, OEA Working Paper 52 (Jan. 15, 2021). We carefully reviewed other studies submitted in the record to show that consolidation improves local news coverage or makes production of local programming feasible. *See* Gray Television News Programming Study by Mark Fratrik; "The Value of Cross Ownership to Improving Local News in Small Markets," by Professor Kent S. Collins. We also note the report of Professor Thomas Hubbard whose analysis shows that local news is not declining and has actually increased. *But see* Response to Dr. Thomas Hubbard's Comments on the Gray Television News Programming Study by Mark Fratrik. Although there appears to be agreement that the amount of local news has increased, there remains disagreement on whether this growth is due to consolidation or part of an industry-wide trend to increase local news. We also note disagreement regarding the role of scale economies in the provision of local news relative to the increasing practice of contracting and sharing local news between stations. Finally, we note disagreement around what constitutes local news. We found the empirical studies and arguments helpful to our deliberations and decisions.

Appellate Case: 24-1380     Page: 46     Date Filed: 02/23/2024 Entry ID: 5366849

news.

81. We also find that the rule remains important for helping to ensure viewpoint diversity in a local market.[274] While the Local Television Ownership Rule remains first and foremost competition-focused, our policy goals are not unrelated or mutually exclusive, and the rule continues to promote viewpoint diversity as well.[275] We continue to find that the competition-based rule helps to ensure the presence of a number of independently owned broadcast television stations in the local market, thereby indirectly increasing the likelihood of a variety of viewpoints (including a variety of viewpoints within local programming) and preserving ownership opportunities for new entrants.[276] Numerous commenters agree and state that the rule remains necessary to promote viewpoint diversity.[277] We recognize, as NAB points out, that the Commission concluded in a prior Quadrennial Review that the rule was not necessary to promote viewpoint diversity due to the presence of "other types of media, such as radio, newspapers, cable, and the Internet [that] contribute to viewpoint diversity in local markets."[278] Although it remains true that there are various types of media available to consumers within local markets, we reject the Commission's prior conclusion that the rule is not necessary to promote viewpoint diversity. As we have described herein, the provision of local programming remains a defining characteristic of television stations, one that has grown, even as other sources of local content have disappeared or have repurposed local television content for their own platforms. Moreover, as we have reiterated, our rule serves to maintain diffuse ownership of this key platform—a local television station—among a wide variety of owners and types of owners, thereby promoting the interest in a multiplicity of speakers, particularly with respect to local issues and the needs and interests of local communities.[279]

82. *Numerical Limit*. We find that permitting ownership of up to two stations in a local market continues to strike the appropriate competitive balance of enabling some efficiencies of common ownership while maintaining a level of competition amongst broadcast television stations to ensure that they continue to serve the public interest. No commenter argues that the numerical limit should be tightened to permit ownership of only one station in a market. Indeed, we recognize that common ownership subject to the restrictions of the current rule can create operating efficiencies, which potentially could lead to public interest benefits if a local broadcast station chooses to invest more resources in programming that meets the needs of its local community as a result of those efficiencies. However, such efficiencies come at the expense of reducing competition and diversity and must be balanced accordingly.

83. Given our determination of the relevant market, above, we do not find that the current state of the local television marketplace justifies ownership of a third in-market station. Broadcast commenters suggest that permitting ownership of a third, or additional, in-market station would enable broadcasters to compete more effectively, especially in large markets with a large number of full-power

---

[274] *See* Free Press Update Comments at 3-9; SAG-AFTRA Comments at 3-4; UCC et al. Comments at 2-4; LCCHR Update Reply at 4; NHMC Update Reply at 2-7; Free Press Comments at 13-15; WGAE Comments at 2-3.

[275] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9870-71, para. 17.

[276] *Id.* at 9893-94, para. 75.

[277] LCCHR Update Reply at 1-3; NHMC Update Reply at 2-7; Free Press Update Comments at 3-9; SAG-AFTRA Comments at 3-4; UCC et al. Comments at 2-4; Free Press Comments at 4-11; Independent Programmers Comments at 6-10; WGAE Comments at 2-3.

[278] *2006 Quadrennial Review Order*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2065-66, para. 100 (2008) (citing *2002 Biennial Review Order*, 18 FCC Rcd at 13668, para. 133); NAB Update Comments at 37-38, n.102.

[279] *Compare 2006 Quadrennial Review Order*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2065-66, para. 100 (2008) (concluding that the local television ownership rule is no longer necessary to foster diversity of viewpoint in local markets) *with 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9893-94, para. 75 n.206 (discussing theoretical analyses on how the presence of more independently owned outlets can increase viewpoint diversity in a market).

Appellate Case: 24-1380     Page: 47     Date Filed: 02/23/2024 Entry ID: 5366849

commercial stations.[280]  We do not find adequate support, however, for the notion that allowing ownership of a third station would generate public interest benefits outweighing potential public interest harms.[281]  While greater consolidation may lead to more operating efficiencies for the commonly owned stations, such consolidation also would mean the loss of an independent station operator, to the detriment of competition, localism, and viewpoint diversity.  We find that any such marginal additional efficiency fails to outweigh the countervailing harms to these public interest goals.  Excessive consolidation from a lack of ownership restrictions threatens the Commission's competition and diversity goals by jeopardizing the continued existence and operations of small and mid-sized broadcasters that may be bought out by larger competitors instead of, as broadcast commenters suggest, enabling them to combine to become more effective competitors to the larger stations.[282]

84.     Based on Nielsen viewership data over the period May 2021 to April 2022 and advertising revenue data for 2021 from BIA Kelsey Media Access Pro, the majority of television markets are already highly concentrated according to the 2010 Horizontal Merger Guidelines.[283]  Even taking into account viewership of all noncommercial full-power television, Class A, and LPTV stations and any associated multicast streams in addition to all full-power commercial television stations, 147 of the 210 local television markets have viewership HHIs of greater than 2,500, meaning they are highly concentrated.  Likewise, factoring in advertising revenue from all commercial full-power television, Class A, and LPTV stations and any associated multicast streams, 166 markets have advertising revenue HHIs of greater than 2,500.  Given the current levels of concentration in television markets, we find no grounds to loosen the existing numerical limits.

85.     *Top-Four Prohibition*.  We retain the general prohibition on common ownership of two stations ranked in the top four of audience share in a market, along with the ability to allow such combinations on a case-by-case basis.  At the same time, however, given changes in broadcast industry practice, we update our methodology used to implement this part of our rule.  Specifically, we update the audience share metric used to determine a station's in-market ranking and clarify that ratings data should be averaged over the 12-month period preceding a transaction.  Additionally, we incorporate the ratings of a station's multicast streams, to the extent such streams have measurable ratings, to reflect a station's total audience share more accurately.

86.     Consistent with the Commission's prior decisions, we continue to find that a combination involving two of the top-four stations in a market would be the most detrimental to competition, and thus the public interest.  We continue to find that top-four combinations would often result in a single entity obtaining a significantly larger market share than other entities in the market and that such combinations could create welfare harms such as reduced incentives for local stations to improve their programming, as

---

[280] Meredith Comments at 4 (stating that a number four ranked station in a market with at least nine commercial stations should be able to own two or three non-top-four stations to compete better against the top station); NAB Comments at 77-79 (stating that common ownership of the three lowest ranked stations would create a more viable competitor, especially in large markets with "a dozen full power commercial stations"); ION Reply at 2 (suggesting that the Commission should presume ownership of three or more local television stations in a market is permissible unless the DOJ finds an antitrust violation or a compelling case of specific public interest harms is made).

[281] The hypotheticals cited by commenters do not state why adding a third low-ranked station would grant a combination of two other lower ranked stations efficiencies and benefits above and beyond what a combination of two stations could achieve.

[282] *See* Meredith Comments at 4; NAB Comments at 77-79.

[283] U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines at 19 (2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf.  The guidelines classify market concentration using the Herfindahl-Hirschman Index (HHI).  The Commission examined Nielsen viewership data over the period May 2021 to April 2022 to compute the viewership HHIs.  The Commission examined ad revenue data for 2021 from BIA Kelsey Media Access Pro to compute the advertising revenue HHIs.

Appellate Case: 24-1380     Page: 48     Date Filed: 02/23/2024 Entry ID: 5366849

allowing former rivals to combine would reduce incentives to compete vigorously against one another.[284] Notably, there are still four major broadcast networks (ABC, CBS, NBC, and Fox), and the programming from these networks continues to be the most highly rated.  These top-four broadcast television networks continue to have a distinctive ability to attract large primetime audiences on a regular basis, and generally the top-four stations in any market are affiliated with these highly-viewed networks.[285]  Accordingly, we continue to find that the ability to attract mass audiences distinguishes the top ranked stations in local television markets so that owning two such stations in a market should be prohibited.  We find further that top-four ranked stations are also still the most likely stations to originate local news.[286]  Accordingly, prohibiting top-four combinations helps ensure a diversity of voices among those stations providing such coverage of local issues.  We note that, in the past, the Commission has cited the typical gap in ratings between the fourth and fifth ranked stations in a market as supporting the Top-Four Prohibition.  To the extent there are situations where, for instance, a large gap in ratings occurs between the third and fourth ranked stations in a market (rather than between the fourth and fifth ranked stations), the fact remains that there is substantial concentration of audience share among the top-ranked stations in most markets and such situations may be indicative of the largest stations in a market exploiting loopholes in our rule (which we address today) to increase their market shares.[287]  Accordingly, even if, say, the top three full power stations, rather than the top four full power stations, may dominate audience share in some markets, it certainly does not follow that one of those three stations categorically should be permitted to acquire the fourth ranked station and increase its market share even more.[288]  Rather than eliminating the Top-Four Prohibition, we find that the flexibility of the case-by-case approach to consider combinations of top-four rated stations is better suited to address broadcasters' concerns about the viability of stations in smaller markets or situations in which there may no longer be a clear-cut distinction between the top-four rated stations and the rest of the stations in a market.

87.    We note that the Top-Four Prohibition's case-by-case approach serves an important purpose by affording flexibility to the Commission and licensees to consider combinations of highly ranked stations in unique circumstances.  And we are not persuaded by the sweeping claims that for the broadcast television industry to remain viable, broadcasters must be given greater opportunities to consolidate without reference to such circumstances.[289]  Nor do such claims change our conclusion about

(Continued from previous page) ─────────────────

[284] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9881, para. 44.

[285] *See* Section IV. C. Dual Network Rule, *infra*; *see also 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9952, para. 216.

[286] *See 2022 Communications Marketplace Report*, 36 FCC Rcd at 165, para. 269; LCCHR Update Reply at 3-4; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13695, para. 194.

[287] For instance, our rule was historically premised on the notion that four full power stations in a market corresponded with four Big Four network affiliates.  However, as discussed below, there are now numerous examples where entities have moved programming from what had been top-four rated stations (including Big Four network affiliates) to low power stations or multicast streams, such that what had been top-four rated station programming now may be aggregated on fewer than four full power stations (or among fewer than four separate owners) in a market.

[288] *See* NAB Update Comments at 85-86 (reiterating that the largest ratings gaps in audience share and revenue share are among the top-four ranked stations in a market); Gray Comments at 8 (stating that, in the markets where Gray owns stations, the largest ratings cushion actually occurs after the first-, second-, or third-ranked station); NAB Comments at 71-73 (stating that the largest ratings gaps in most markets are found among the top-four stations, not between the fourth- and fifth- ranked stations).

[289] Broadcast commenters contend that they must be allowed to achieve efficiencies from consolidation or will cease to be viable in the face of continually increasing competition for advertising revenue from MVPDs, streaming services, and tech companies. Heritage Update Comments at 9-15, 17-19; NAB Update Comments at 6-8, 19-37; Nexstar Update Comments at 3-11; TEGNA Update Comments at 6-10; Network Affiliates Update Reply at 3-13; Gray Update Reply at 2-6, 8-13; NAB Update Reply at 32-44; Nexstar Update Reply at 2-5; NAB Comments at 43-

(continued….)

the actual objective of the quadrennial review, which is to review our rules to ensure that they remain necessary in the public interest as a result of competition to promote the Commission's public interest goals of competition, localism, and diversity.  As the record demonstrates, broadcast television stations have multiple streams of revenue that support them.  One stream, advertising revenue, has remained fairly steady in recent years, even while, broadcasters assert, they have lost advertising dollars to other sources of video programming.[290]  Stations increasingly are also generating revenue from digital advertising and the distribution of their programming on digital platforms.  Most importantly, as discussed above, many broadcast television stations also receive per subscriber fees from video programming distributors in exchange for retransmitting their broadcast programming.  Retransmission consent fees remain a significant source of station revenue and one that, at least for now, is expected to continue growing.[291] We note further that technological developments in broadcast television could create opportunities for other revenue sources from new digital services ancillary to ATSC 3.0.[292]

      88.     We find that on the whole, the record does not demonstrate an imminent threat to the viability of broadcast television at this time that would either warrant, or, more importantly, be remedied

---

57; Nexstar Comments at 3-9; Gray Reply at 7-10, 15-17; ION Reply at 1-3; NAB Reply at 10-17, 56-64; TEGNA Reply at 3-12.  MVPD and special interest group commenters state that broadcast television remains a very profitable industry and that broadcasters are overstating their difficulties and repeating the same claims as they have in the past.  ATVA Update Comments at 4-8; ATVA Reply Comments, MB 18-349, at 1-2 (rec. Oct. 1, 2021) (ATVA Update Reply); Independent Programmers Comments at 2-8 (stating that the broadcast industry is thriving under the existing regulatory framework); Free Press Reply at 7-10 (noting that digital media may not necessarily be siphoning away viewers from broadcast outlets, but rather viewers are often using digital tools to consume traditional broadcast programming increasing their overall time spent consuming media).

[290] According to a Pew Research Center analysis of MEDIA Access Pro & BIA Advisory Services data, local television over-the-air advertising revenue follows a cyclical pattern that sees significant increases from political advertising during even-numbered elections years.  Pew Research Center, *Local TV News Fact Sheet* (Sept. 14, 2023), https://www.pewresearch.org/journalism/fact-sheet/local-tv-news/.  By contrast, other industries besides broadcast television (e.g., print advertising, newspaper classifieds, and direct-mail advertising) have seen precipitous and lasting declines in advertising revenue concomitant with the growth of online advertising.  In light of this, it is possible that online advertising is not siphoning advertising dollars only, or even primarily, away from broadcast sources.

[291] NAB contends that advertising revenue is still critical to broadcast television and asserts that retransmission consent revenues represented only 38 percent of television station total revenues, predicting that number will decrease to 36 percent by 2026.  NAB Update Comments at 96.  Nexstar concedes that retransmission consent revenue grew between 2020 and 2021 but states that this growth was short of industry projections and asserts that the raw retransmission consent fee numbers do not show the amount that must be paid back to networks.  Nexstar Update Comments at 14-15.  One commenter states that retransmission consent fee revenue will dry up as traditional MVPD subscriptions decrease while major networks place more content on their own streaming services.  Network Affiliates Update Reply at 10.  In contrast, ATVA refutes the broadcasters' assertions that there is downward pressure on retransmission fees and states that its MVPD members have seen no slowing of retransmission price increases.  ATVA Update Reply at 5-6.  Ultimately, we find assertions regarding the future of retransmission consent fees to be speculative and that retransmission consent fee revenue continues to grow, in spite of predictions that they may flatten out or decrease at some point in the future.  *See generally* Pew Research Center, *Local TV News Fact Sheet* (Sept. 14, 2023), https://www.pewresearch.org/journalism/fact-sheet/local-tv-news/ (projecting that total retransmission fee revenue for U.S. local TV stations will continue to rise through 2027).

[292] *See generally Authorizing Permissive Use of the "Next Generation" Broadcast Television Standard*, GN Docket No. 16-142, Notice of Proposed Rulemaking, 32 FCC Rcd 1670, 1672-73, paras. 3-4 (2017) (noting the "new services and capabilities to be provided" and "innovative technologies and services to consumers" that will be offered by ATSC 3.0).  ATSC 3.0 is a television transmission standard currently being developed by broadcasters with the intent of merging the capabilities of over-the-air broadcasting with the Internet's broadband viewing and information delivery methods while using the same 6 MHz channels presently allocated for digital television.  *Id.* at 1671, para. 1.

by loosening or eliminating the Top-Four Prohibition.[293]  Even if we were to accept broadcasters' arguments that certain broadcast television stations in certain markets (e.g., smaller markets) are struggling to produce local programming due to an inherently limited revenue base and may benefit from consolidation, such a finding would not support relaxing the local television rule in all markets. Broadcasters would have us eliminate all ownership restrictions in all markets to enable consolidation that may only be of some benefit to certain stations in certain markets.[294]  The case-by-case flexibility contained in the current rule is intended to account for the practical challenges some stations may face.[295]

89.    We find that the case-by-case approach has allowed the Commission to maintain the proper balance between ensuring that no market is excessively concentrated and allowing flexibility in particular circumstances.  Although some commenters state that the case-by-case approach offers inadequate relief because of the lack of any defined criteria for granting relief,[296] the Commission previously offered several examples of information that could help establish whether application of the Top-Four Prohibition would be in the public interest, such as (1) ratings share data of the stations proposed to be combined compared with other stations in the market; (2) revenue share data of the stations proposed to be combined compared with other stations in the market, including advertising (on-air and digital) and retransmission consent fees; (3) market characteristics including population and the number and types of broadcast television stations serving the market (including any strong competitors outside the top-four rated broadcast television stations); (4) the likely effects on programming meeting the needs and interests of the community; and (5) any other circumstances impacting the market, particularly

---

[293] Broadcast commenters argue for the Top-Four Prohibition to be repealed because they claim it prevents consolidation that is crucial for broadcasters to continue serving the public interest.  Heritage Update Comments at 2-5, 13-16; NAB Update Comments at 34-35; Nexstar Update Comments at 17-19; TEGNA Update Comments at 2-3; Network Affiliates Update Reply at 10-13; Gray Update Reply at 11-13, 17-23; NAB Update Reply at 44-51; Nexstar Update Reply at 2-7; Gray Comments at 2-18; Meredith Comments at 2-4; NAB Comments at 70-76; Nexstar Comments at 10-14; ION Reply at 2-3; NAB Reply at 64-76; Nexstar Reply at 5-9; TEGNA Reply at 11-12. Conversely, ATVA and NCTA assert that the rule must be retained to protect consumers from rising costs due to pass through of retransmission consent fee increases that result when broadcasters are able to negotiate retransmission consent fees for two top-four stations jointly in a market.  ATVA Update Comments at 12-18; NCTA - The Internet & Television Association (NCTA) Comments, MB Docket No. 18-349, at 1-6 (rec. Sept.2, 2021) (NCTA Update Comments); ATVA Comments at 2-13; NCTA Comments at 2-8; *see also* Independent Programmers Comments at 6-10 (stating that elimination of the Top-Four Prohibition would harm localism and viewpoint diversity); WTA Reply at 2-5 (agreeing with ATVA that common ownership of two stations is effectively the same as a joint negotiation by two stations in their effects on retransmission consent prices and stating that increasing retransmission consent fee rates represents a consumer harm in rural America as rural local exchange carriers have been forced to exit the video marketplace, thus leaving rural consumers with few options for video since most rural households rely on MVPDs to access broadcast programming).  *But see* Gray Reply at 2-15, TEGNA Reply at12-15 (contending that combinations of Big-Four network affiliates in a local market do not result in artificially high or supra-competitive retransmission consent fees and that retransmission consent fees simply reflect the value of broadcast television programming).

[294] *See* Gray Update Reply at 2-8; NAB Update Comments at 93-96; Gray Comments at 2-18.  Some commenters support relaxation of the rules only for smaller markets.  Heritage Update Comments at 2-5; Meredith Comments at 2-4 (stating that the two station cap should not be uniformly applied in all markets); NPG Comments at 4-5 (stating that ownership of two stations, regardless of rank or affiliation, should be permitted in all but the top 74 DMAs).  As discussed below, we find that the local television rule's case-by-case approach allows for the Commission to address the challenges faced by small and other uniquely situated markets.

[295] 47 CFR § 73.3555(b)(2).

[296] *See* Heritage Update Comments at 13-16 (stating that the case-by-case approach is inadequate because the Commission has never stated what the criteria are for a successful showing); Meredith Comments at 2-4; Letter from Robert M. McDowell, Counsel, Gray Television, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 2 (filed Dec. 13, 2023) (Gray Dec. 13, 2023 *Ex Parte*) (stating that the case-by-case process does not create the certainty necessary for planning transactions).

Appellate Case: 24-1380    Page: 51    Date Filed: 02/23/2024 Entry ID: 5366849

any disparities primarily impacting small and mid-sized markets.[297]  Variations in local markets and specific transactions make it impractical to provide an exhaustive set of criteria for the case-by-case analysis, but we will continue to monitor transactions and the marketplace in the course of further reviews and identity additional factors as it is useful to do so.[298]  Moreover, we note that pursuant to the previously articulated factors and even in the absence of rigid criteria, the Commission granted three case-by-case requests for flexibility affecting five DMAs before the provision was temporarily vacated and subsequently restored by the courts, demonstrating the utility of the case-by-case approach under appropriate circumstances.[299]

90.     We decline to adopt presumptions in favor of top-four combinations at this time and based on the current record as recommended by some commenters.[300]  As the Commission has stated, we find that most combinations of top-four ranked stations would result in a single entity obtaining a significantly larger market share than others in the market and that such combinations would create public interest harms.[301]  Furthermore, the impact of top-four station combinations could vary greatly depending on factors such as the relative strength of the stations in the market, which would weigh against creating a presumption based on other factors.[302]  Therefore, we find it preferable to allow for exceptions to the prohibition rather than to presume such combinations should be allowed.

91.     Finally, we adopt two modifications to elements of the Top-Four Prohibition to better reflect current broadcast industry practices.  While commenters for the most part either support retaining

---

[297] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9838-39, para. 82.

[298] *See id.* at 9838, para. 82.

[299] *See Consent to Assign Certain Licenses from Red River Broadcast Co., LLC to Gray Television Licensee, LLC*, Memorandum Opinion and Order, 34 FCC Rcd 8590 (MB 2019) (*Red River/Gray Order*); *Applications of Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee) et al.*, Memorandum Opinion and Order, 34 FCC Rcd 8436 (MB 2019); *Consent to Transfer Control Licenses to Gray Television, Inc. and Associated Divestiture License Assignments*, Memorandum Opinion and Order, 33 FCC Rcd 12349 (MB 2018).

[300] Gray suggests that the Commission should adopt presumptions in favor of top-four combinations where an entity commits to improving local news.  *See* Gray Update Reply at 22-23; *see also* Gray Dec. 13, 2023 *Ex Parte* at 2 (arguing that the Commission should create clear standards that encourage the expansion of local news in small markets and adopt a presumption in favor of combinations in markets outside of the top 50 DMAs).  Although the Commission has considered additional local programming to be a factor in previous requests, we find that creating a presumption in all such requests may detract from examining the unique circumstances of a market, such as the level of local programming already present or the relative strength of the stations in the market, as intended by the case-by-case approach.  Also, ION Media argues that top-four combinations should be presumed to comply with the rules, and the burden should be on opponents of a proposed top-four combination to show that it would violate the Commission's policies.  ION Reply at 2-3.  We do not find that there is adequate record support for changing the Commission's previous conclusion regarding the anticompetitive nature, in general, of combinations of top-four ranked stations in the same market.

[301] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9881, para. 44.  The Commission made these findings based on the research of Froeb, Werden, and Tardiff, which found that mergers pose little risk of competitive harm when they do not create a significant increase in the market share of the largest firm in a market, but a merger of the second and third largest firms, which would significantly overtake the largest firm in size, would create welfare harms.  Luke M. Froeb, Gregory J. Werden and Timothy J. Tardiff, *The Demsetz Postulate and the Effect of Mergers in Differentiated Product Industries*, Working Paper EAG 93-5 Economic Analysis Group, Antitrust Division, U.S. Department of Justice (Aug. 1993). *See also* Gregory Werden and Luke M. Froeb, *The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy*, 10(2) J. L. ECON ORG. 407-16 (1994).

[302] *See Red River/Gray Order*, 34 FCC Rcd at 8594-95 (observing the unique characteristics of the market at issue where the top ranked station had a substantial majority of the revenue and audience share compared to the stations that were seeking to combine).

Appellate Case: 24-1380     Page: 52     Date Filed: 02/23/2024 Entry ID: 5366849

the Top-Four rule as-is or repealing it completely,[303] we find that it is appropriate to update the methodology used to determine whether a station is ranked among the top-four stations in a Nielsen DMA to comport with current market realities.[304]  The first modification updates the audience share metric used to determine a station's in-market ranking and specifies that ratings data must be averaged over a 12-month period preceding any transaction.  The second modification clarifies that, because the rule only references "stations," the ratings of multicast streams will be aggregated with the ratings of all non-simulcast programming airing on streams owned, operated, or controlled by the same station, provided that such streams have measurable ratings reported by an audience measuring service and are not the simulcast stream of another in-market station.[305]

92.     First, we modify the provision in the current rule that determines market ranking to use the Sunday to Saturday, 7AM to 1AM daypart in order to reflect more accurately a station's performance in terms of audience share.[306]  Previously, the rule determined market ranking "based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service."[307]  The *NPRM* sought comment on whether this data point is still the most useful for accurately determining a station's ranking for purposes of the Top-Four Prohibition.[308]  As Gray and Nielsen indicate, that daypart, which is also used for evaluating failing station waiver requests, does not accurately reflect a station's full performance in light of programming changes over the years, including the addition of early morning programming.[309]  In particular, we expect that expanding the daypart will capture more local news, an important part of a station's programming and a driver of viewership that stations have begun airing earlier in the day than in the past.[310]  Moreover, using the 7AM to 1AM daypart, as opposed to a 24-hour reporting period, avoids "minor fluctuations" in ratings during nighttime hours when some stations may not transmit video programming.[311]  Lastly, given that the existing 9AM to midnight daypart is also used for determining audience share for purposes of evaluating failing station waiver requests, we find that using the new 7AM to 1AM daypart in the failing station waiver context going forward makes sense logically for the same reasons discussed above and to maintain consistency in the Commission's methods.[312]

---

(Continued from previous page) ————————————————

[303] The record is practically devoid of any discussion regarding updating specific elements or mechanisms of the rule.  *See generally* ATVA Update Comments at 12-18; Heritage Update Comments at 2-5, 13-16; NAB Update Comments at 34-35; NCTA Update Comments at 1-6; Nexstar Update Comments at 17-19; TEGNA Update Comments at 2-3; Network Affiliates Update Reply at 10-13; Gray Update Reply at 17-20; NAB Update Reply at 44-51; ATVA Comments at 2-13; Gray Comments at 2-18; NAB Comments at 70-76; Nexstar Comments at 10-14; Independent Programmers Comments at 6-10; ION Reply at 2-3; NAB Reply at 64-76; Nexstar Reply at 5-9; TEGNA Reply at 11-12.

[304] We retain the language in the rule that allows for consideration of other comparable audience measuring services in addition to Nielsen to keep flexibility in the rule.

[305] *See* 47 CFR § 73.3555(b).

[306] *See* Letter from Michael Nilsson, Counsel, The Nielsen Company (US), LLC to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 1-2 (filed Feb. 16, 2022) (Nielsen *Ex Parte*).  In addition, we delegate to the Media Bureau the authority to update the relevant FCC forms to conform with the changes we adopt today.

[307] *See* 47 CFR § 73.3555.

[308] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12136, para. 63.

[309] *See* Nielsen *Ex Parte* at 2; Gray Update Reply at 23 (proposing that we use the midnight-to-midnight daypart be used for determining audience share for purposes of failing station waiver requests).

[310] Nielsen *Ex Parte* at 1-2.

[311] *Id.* at 2.

[312] We find that making this change is the logical outgrowth of updating the Top-Four Prohibition since the use of audience measurements in both contexts serves the same purpose in allowing the Commission to evaluate a station's

(continued….)

93. We also specify that, for purposes of determining a station's in-market ranking under the Local Television Ownership Rule, the rule will require submission of ratings averaged from available data over a 12-month period immediately preceding the date of application rather than an average over a shorter ratings period or a snapshot of a single such data point (i.e., ratings at the time an assignment of license or transfer of control application is filed with the Commission). Also, where the station or stations at issue have changed network affiliations within the preceding 12 months, the ratings should be averaged for the period since the affiliation change took place so as to most accurately reflect the ratings position of the station or stations at the time of application. While the *NPRM* sought comment on whether the Commission should clarify the phrase "at the time the application to acquire or construct the station(s) is filed" with respect to the appropriate ratings data applicants submit for consideration, we received no comments responsive to this question.[313] We note that ratings data have become available on a more frequent (and more frequently updated) basis than in the past and are now accessible for many different time periods. We find that replacement of the phrase "most recent" in favor of establishing a defined time period in this manner will enable a more complete understanding of the market and the competition among stations within it. Such information will in turn better inform the Commission and public as to whether a proposed transaction is in the public interest. In particular, such an approach will provide a more accurate assessment of a station's true market position by minimizing the impact of seasonal or one-off monthly ratings anomalies (typically the result of sporting events or seasons) and also reduce opportunities for gamesmanship based on the lack of a clearly established timeframe in the rule's language. For example, applicants would have less incentive to time a transaction or application filing to correspond with a period where a station experiences abnormally low ratings. Finally, the consideration of ratings averaged over a 12-month period will apply to all instances that involve determinations of whether stations are ranked in the top-four, including applications of Note 11 to section 73.3555 and its extension as described below.

94. Second, going forward we will aggregate the audience share of all free-to-consumer non-simulcast multicast programming airing on streams owned, operated, or controlled by a single station to determine the station's audience share and ranking in a market (to the extent that such streams are ranked by Nielsen or a comparable professional, accepted audience ratings service). The *NPRM* sought comment on whether and how the Commission should evaluate multicast streams for purposes of the Local Television Ownership Rule.[314] The existing rule does not specify that it includes multicast streams, but we find that ignoring such streams when evaluating a station's in-market audience share is no longer appropriate given the proliferation of such programming and the industry trend toward carriage of major network affiliate programming on such streams. To the extent that a nonprimary multicast stream has measurable audience ratings, not accounting for such ratings when evaluating a station's performance would seem to ignore a potentially significant portion of the station's service and competitive strength within the market.[315] The use of multicasting has grown in prevalence over the years and is expected to continue to grow as a way for broadcasters to expand their offerings and distribution.[316] Although

---

performance in its local market, and the same measurement has historically been used for both.

[313] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12136, para. 64 (asking if ratings data should be submitted for the most recent month, week, or sweeps period in relation to the application date and whether the data should be for a longer period of time, such as over a three-year period).

[314] *Id.* at 12137, para. 67.

[315] Some multicast streams have ratings reported by audience ratings services while others do not. We find that, to the extent Nielsen or a comparable professional, accepted audience ratings service reports ratings for a multicast stream, such a stream is significant enough to be included in its station's audience ratings measurement.

[316] *See* Brad Adgate, *TV Stations are Launching Multicast Networks as an Opportunity to Reach Cord Cutters* (June 10, 2021), https://www.forbes.com/sites/bradadgate/2021/06/10/tv-stations-are-launching-multicast-networks-as-an-opportunity-to-reach-cord-cutters/?sh=3bc99b587136 (noting that many multicast networks are available in over half the country with some reaching upwards of 90% of all U.S. television homes).

Appellate Case: 24-1380     Page: 54     Date Filed: 02/23/2024 Entry ID: 5366849

accounting for nonprimary multicast streams may not have affected a station's ratings significantly in the past, such streams may have an impact on ratings now and in the future, and thus including them in ratings should provide a better indicator of the competitive strength and health of a station than simply focusing on a single stream. As noted, some stations are even placing programming affiliated with major broadcast networks on nonprimary multicast streams, making it all the more important to consider in our analysis when possible.

95. We limit aggregation to free-to-consumer programming airing on streams owned, operated, or controlled by a station because stations make such streams available to consumers over the air as part of their broadcast signal. We also do not count simulcast streams airing the programming of another station, because, based on Commission experience, the ratings for such streams typically are measured by audience ratings services as part of the ratings for their originating stations. Accordingly, because the multicast stream's ratings are not separately reported, we do not aggregate the programming's ratings in order to avoid double counting ratings already attributed to another station. In other words, if a station utilizes one of its nonprimary multicast streams to simulcast the primary programming stream of another station, the ratings of that simulcast stream will not be aggregated in determining the overall ratings of the station. Through these limitations, we find that aggregation will capture a station's true ratings by focusing on programming originating from that station and broadcast in the same manner as traditional television signals.

96. Similarly, we are aware that some broadcast stations may be hosting programming of other stations on a temporary basis during the transition to ATSC 3.0.[317] We clarify that only the ratings of programming owned or controlled by a station and airing on the station's multicast streams will be aggregated. Consistent with the way such streams are licensed, we do not find that hosting the ATSC 1.0 signal of another station for purposes of the transition amounts to operating the signal's programming.[318] In other words, if Station A is hosting Station B's ATSC 1.0 signal on one of its multicast streams, Station B's ATSC 1.0 ratings will not be aggregated with Station A's multicast streams (which are airing programming belonging to Station A). Rather, Station B's ATSC 1.0 ratings will be aggregated with those of Station B's streams depending on how audience ratings services choose to incorporate ATSC 1.0 and 3.0 ratings into their measurements.

97. *Anti-Circumvention Measures*. Note 11 to section 73.3555 of the Commission's rules prohibits certain types of acquisitions of a network affiliation by one station from another station in the same market that the Commission has found to be the functional equivalent of an assignment or transfer of control from the standpoint of our Local Television Ownership Rule. For example, since the last quadrennial review, the Commission has taken action against certain affiliation acquisitions that violate Note 11.[319] Today we take further action to expand the measure contained in Note 11 to prevent other means of circumventing the Top-Four Prohibition. In response to the *NPRM's* questions about entities

---

[317] *Authorizing Permissive Use of the "Next Generation" Broadcast Television Standard*, MB Docket No. 16-142, Second Further Notice of Proposed Rulemaking, FCC 21-116, at 1 (Nov. 5, 2021).

[318] *Authorizing Permissive Use of the "Next Generation" Broadcast Television Standard*, Report and Order and Further Notice of Proposed Rulemaking, 32 FCC Rcd 9930, 9953-54, para. 48 & n.140 (2017) ("The companion channel aired on a partner host station will be considered part of the guest station's license and may not be separately assigned to a third party.")

[319] *See Gray Television, Inc., Parent of Gray Television Licensee, LLC, Licensee of Stations KYES-TV, Anchorage, AK and KTUU-TV, Anchorage, AK*, Notice of Apparent Liability for Forfeiture, 36 FCC Rcd 10856, 10859, para. 8 (2021) (explaining that the scope of the Note 11 prohibition has never been limited to "swaps" of affiliations between two stations); *see also Gray Television, Inc., parent of Gray Television Licensee, LLC, Licensee of Stations KYES-TV, Anchorage, AK and KTUU-TV, Anchorage, AK*, Forfeiture Order, FCC 22-83, at paras. 8-25 (Nov. 1, 2022) (affirming the conclusions in the Notice of Apparent Liability and further explaining that Note 11 does not allow a broadcaster with two existing top-four rated stations unfettered ability to acquire additional network affiliations of top-four rated stations through agreements for non-license assets).

Appellate Case: 24-1380     Page: 55     Date Filed: 02/23/2024 Entry ID: 5366849

placing major network affiliations on multicast streams and LPTV stations,[320] parties have raised in the record, and the Commission has observed itself, that some station owners appear to be circumventing the prohibition on network affiliation acquisitions—and hence the Top-Four Prohibition—by acquiring the network-affiliated programming of another top-four full power station in the DMA, either alone or in conjunction with other tangible and non-tangible assets and then placing that programming on the multicast stream of an existing full power station or on an LPTV station in the same DMA, neither of which is counted for purposes of the Local Television Rule.  Because we view such actions as undermining our Local Television Rule, we revise the language in Note 11 to extend the existing prohibition on certain network affiliation acquisitions to prohibit such behavior in the future and ensure the efficacy of our rule.

98.    We take this action to preserve the efficacy of the Top-Four Prohibition because we find it necessary to prevent further exploitation of unintended ambiguities or gaps in the rule.  Such exploitation harms competition and denies consumers the benefits of competition.  Therefore, we find that our actions are consistent with the statutory mandate of section 202(h) to modify a rule so that the rule continues to serve the public interest.[321]

99.    The record demonstrates that there are two methods through which parties have been able to achieve results that are inconsistent with the policy objectives and intent of the Top-Four Prohibition rule's Note 11 provision.  Although different in certain respects, the two methods both avoid acquisition of another full-power station in the same local market and instead rely on use of broadcast facilities or transmissions that have not been subject to the ownership limitations placed on full-power facilities.  For the sake of clarity, we employ hypothetical examples to illustrate the methods in operation.  Accordingly, consider situations involving two independently owned, full-power stations among the top four stations (as measured by ratings) in the same local market.  Station A is affiliated with Network YYY and Station B is affiliated with Network ZZZ.

- Under the first scenario, the licensee of Station A acquires Station B's Network ZZZ affiliation but, stymied by the ownership rules from also buying Station B outright, instead places the Network ZZZ affiliation on an LPTV station that the licensee of Station A already owns in the market.[322]  This action comports with the Commission's regulations to date because LPTV stations have been exempt from the Local Television Ownership Rule's restrictions.[323]

- Under the second scenario, the licensee of Station A still acquires Station B's Network ZZZ affiliation but simply places it on one of Station A's own digital multicast streams.  This action also comports with the Commission's regulations to date because the agency has not treated a licensee's multiple programming streams on a single station (e.g., a primary  and one or more multicast stream) to be the functional equivalent of operating two stations.[324]

100.    However, the use of an LPTV station or multicast stream in these manners to air top-four rated programming acquired from an in-market competitor results in the acquiring party's obtaining the equivalent of a second top-four rated station in terms of audience and revenue share in the local market. In this manner, parties have obtained the programming and non-license assets of a competing, in-market

---

[320] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12137-38, paras. 67, 69.

[321] *See* Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996).

[322] NCTA Comments at 9; ATVA Comments at 15-16.

[323] *See* 47 CFR § 74.732(b) ("Low power TV and TV translator stations are not counted for purposes of § 73.3555, concerning multiple ownership.").

[324] *See* NCTA Comments at 8; ATVA Comments at 14-16; *see also 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9892, para. 72.

Appellate Case: 24-1380     Page: 56     Date Filed: 02/23/2024 Entry ID: 5366849

full power television station, typically without the need or opportunity for any review by the Commission, as no broadcast station license is being transferred. Further, by acquiring the network affiliation and most valuable non-license assets from the former station, these machinations typically result in the removal of a commercial full power competitor from the market. Therefore, such actions are inconsistent with the Top-Four Prohibition because they allow excessive aggregation of viewers and revenue among top stations in the market, which harms competition and the competitive benefits that flow to consumers.

101. While some broadcast commenters characterize the placing of major network (e.g., ABC, CBS, NBC, Fox) content on non-primary multicast streams and LPTVs as legitimate efforts to improve their stations' programming and to increase the availability of quality programming in local markets,[325] that does not always appear to be the case. Instead, rather than representing genuine attempts by stations to compete better through organic growth, such transactions often appear to be intentionally manufactured to skirt the prohibitions on excessive market concentration. Commenters have identified instances, and we are aware of others that, if not clearly intentional, at least appear to be deliberately exploiting these loopholes.[326] For example, ATVA identifies six markets where Sinclair put a newly acquired network affiliation and programming on a multicast stream where the existing prohibitions would have prohibited Sinclair from putting the programming on separate full-power stations.[327] ATVA also characterizes Gray's use of LPTV and multicasting to cure an apparent Note 11 violation as a "form over substance" move since the end result is still the same accumulation of top-four affiliations and programming by one entity.[328]

102. We note that, in the past, placing major network affiliations on LPTV stations or multicast streams happened relatively rarely and often enabled broadcasters to bring such network programming to so-called "short markets," that is markets that do not have enough full power commercial stations to accommodate all of the major networks on their own individual full power stations.[329] Indeed, the Commission has considered previously the prevalence of dual Big-Four network affiliations on multicast streams and expressed its intent to monitor the issue.[330] While in the past such situations were relatively limited, circumstances have changed. ATVA and NCTA state that such network affiliation arrangements and acquisitions are increasingly being used to circumvent the Top-Four Prohibition and its ban on using an agreement or series of agreements to effectuate an acquisition of another station's programming (i.e., affiliation acquisitions or swaps) by enabling entities to acquire affiliations and non-license assets and placing them on multicast streams or LPTV stations to avoid running afoul of the existing ban.[331] ATVA identifies 121 instances of this perceived rule circumvention, 46 of which have

(Continued from previous page)
[325] NAB Update Comments at 99-106; Gray Update Reply at 17-22, 34-36; see TEGNA Update Comments at 12-13; NAB Update Reply at 55-57; Nexstar Update Reply at 12-15; Letter from Timothy Nelson, Counsel, ABC Television Affiliates Association and the NBC Television Affiliates, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 1-2 (filed Nov. 29, 2023) (Network Affiliates Nov. 29, 2023 Ex Parte); Letter from Matthew S. DelNero, Counsel, Fox Corporation, Paramount Global, and The Walt Disney Company, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 1-2 (filed Dec. 6, 2023) (Network Representatives Dec. 6, 2023 Ex Parte); Letter from Jeffery A. Liberman, President and Chief Operating Officer, Entravision Communications Corporation, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 2-3 (filed Dec. 6, 2023) (Entravision Dec. 6, 2023 Ex Parte).

[326] ATVA Update Comments at 8-15; ATVA Comments at 14-21; NCTA Comments at 8-12.

[327] ATVA Update Comments at 14-15.

[328] Id. at 12-13.

[329] 2010/2014 Quadrennial Review Order, 31 FCC Rcd at 9892, para. 72.

[330] See e.g., id.; 2010/2014 Quadrennial Review FNRPM, 29 FCC Rcd at 4396, 4398, paras. 61, 66.

[331] ATVA Update Comments at 8-15; ATVA Comments at 14-21; NCTA Comments at 8-12; Thomas C. Smith Comments at 5-6 (contends that the Commission should examine the legality of top-four duopolies through workarounds such as affiliation swaps or subchannels); Letter from Mary Beth Murphy, Vice President and Deputy
(continued….)

occurred in true short markets as determined by ATVA.[332]  ATVA also notes that several such affiliation arrangements occur in the top 100 Nielsen DMAs, further indicating that they are not limited to the smallest markets where the number of full power stations would be more limited.[333]  We agree with ATVA and NCTA that the number of instances where top-four rated programming appears on nonprimary multicast streams or low power stations now vastly outnumber the occurrence of actual "short markets" where there are an inadequate number of full power stations to host each major network on its own full power station.[334]

103.    The Commission has encountered similar circumvention of the Top-Four Prohibition in the past and adopted Note 11 in response.  However, because Note 11's language concerns only stations within the meaning of the Local Television Ownership Rule (full power stations), the existing prohibition does not currently restrict the use of LPTV stations or multicast streams for the reasons discussed above.  Therefore, we expand Note 11 by adding the following language in order to address some of the new affiliation acquisition practices described above:

> Further, an entity will not be permitted through the execution of any agreement (or series of agreements) to acquire a network affiliation, directly or indirectly, if the change in network affiliation would result in the affiliation programming being broadcast from a television facility that is not counted as a station toward the total number of stations an entity is permitted to own under paragraph (b) of this section (e.g., a low power television station, a Class A television station, etc.) or on any television station's video programming stream that is not counted separately as a station toward the total number of stations an entity is permitted to own under paragraph (b) of this section (e.g., non-primary multicast streams) and where the change in affiliation would violate this Note were such television facility counted or such video programming stream counted separately as a station toward the total number of stations an entity is permitted to own for purposes of paragraph (b) of this section.

104.    With the above expansion of Note 11, the Commission going forward will not permit an entity to acquire the network affiliation of another in-market station and then place that affiliation on "a television facility that is not counted as a station toward the total number of stations an entity is permitted to own under [the Local Television Ownership Rule contained in] paragraph (b) of [section 73.3555]" such as an LPTV station or any other class of television station exempted from the ownership rules, if the affiliation could not be placed on a station that is counted "toward the total number of stations an entity is

General Counsel, NCTA, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 2 (filed Dec. 6, 2023) (NCTA Dec. 6, 2023 *Ex Parte*).

[332] ATVA Update Comments at 11-12, Exhibit B; NCTA Dec. 6, 2023 *Ex Parte* at 2 (stating that there are 114 instances, across 92 markets, in which a broadcaster controls the programming of two or more top-four networks using an LPTV station or multicast stream).  *But see* Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President of Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 3-7 (filed Dec. 1, 2023) (NAB Dec. 1, 2023 *Ex Parte*) (stating that the list of instances submitted by ATVA is full of errors and is overinclusive); Letter from Michael Nilsson, Counsel, ATVA, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 4 (filed Dec. 6, 2023) (ATVA Dec. 6, 2023 *Ex Parte*) (conceding that there are less markets where the rule circumvention occurs than ATVA listed, but maintaining that such circumvention still occurs in 109 markets); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President of Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349, at 2 (filed Dec. 19, 2023) (NAB Dec. 19, 2023 *Ex Parte*) (noting that NCTA's list suffers the same deficiencies as ATVA's and identifying additional flaws with ATVA's filings).  ATVA defines short markets as markets with fewer than four total commercial stations.  ATVA Update Comments at 11.  *But see* NAB Dec. 19, 2023 *Ex Parte* at 3-5 (pointing out that stations currently airing independent or non-English language programming may not be interested in affiliating with any of the four largest broadcast networks).

[333] ATVA Update Comments at 11-12.

[334] *See* ATVA Update Reply at 3-5; NCTA Dec. 6, 2023 *Ex Parte* at 2; ATVA Dec. 6, 2023 *Ex Parte* at 4.

permitted to own for purposes of [the Local Television Ownership Rule contained in] paragraph (b) of [section 73.3555]," namely, a full-power commercial station. The Commission also will not permit an entity to acquire the network affiliation of another in-market station and then place that affiliation on "any television station's video programming stream that is not counted separately as a station toward the total number of stations an entity is permitted to own under [the Local Television Ownership Rule contained in] paragraph (b) of [section 73.3555]" be it a .2, .3, or .4 multicast stream, if the affiliation could not be placed on a station that is counted "toward the total number of stations an entity is permitted to own for purposes of [the Local Television Ownership Rule contained in] paragraph (b) of [section 73.3555]." This restriction applies to streams that an entity owns, operates, or controls even when those streams are being hosted by another station in which the entity has no cognizable interest. We believe these changes will suffice to resolve the loopholes identified above and to ensure the efficacy of the Top-Four Prohibition and the public interest benefits that flow therefrom. As with Note 11 when adopted in the *2010/2014 Quadrennial Review Order*, the extension adopted today will apply on a prospective basis.[335] The extension will apply to all applications filed after the release date of this Order and transactions entered into after the release date of this Order.[336]

105.    We find that our approach today closes loopholes to Note 11 and the Top-Four Prohibition while continuing to support legitimate uses of both LPTV and multicast streams. We note that our amendment to Note 11 narrowly targets actions by which broadcast stations effectively seek to circumvent application of the Top-Four Prohibition and the need for the Commission's transaction review, actions that typically result in the elimination of an in-market competitor station. The rule change we adopt today does not inhibit organic growth, expansion, or changes in station programming, nor does it impact affiliation changes initiated by a network itself. For example, where a network, absent any undue direct or indirect influence from a broadcast entity, chooses to move its affiliation from one station to another in the market (perhaps because the network is no longer satisfied with the existing affiliate station and the other station has demonstrated superior operation and thus earned the affiliation on merit),

---

[335] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9885, n.142. Where their actions have not otherwise violated current rules, parties that prior to the release of this Order had acquired the affiliation of a top-four rated television station and placed it on a multicast stream and/or a low power television station in a manner that would violate Note 11 as revised herein will not be subject to divestiture. All future transactions will be required to comply with the Commission's rules then in effect. Such grandfathered arrangements will not be transferable or assignable. Instead, proposed sales involving such grandfathered station arrangements in existence as of this Order's release date will be subject to Commission review upon application to transfer or assign the license or licenses of the station or stations involved. Consistent with prior applications of Note 11, entities may seek case-by-case examination of such proposed transactions and seek Commission approval to transfer or assign the grandfathered arrangement. *See Consent to Transfer Control Licenses to Gray Television, Inc. and Associated Divestiture License Assignments*, Memorandum Opinion and Order, 33 FCC Rcd 12349, 12360-61, para. 28 (MB 2018). Just as with pre-existing combinations of top-four stations that applicants seek to transfer intact, this approach will enable the Commission to weigh potential harms and benefits of permitting the arrangement to continue, including any unique circumstances of the market and potential effects related to service disruption to viewers. *See generally* NAB Oct. 30, 2023 *Ex Parte* at 4-6 (suggesting potential circumstances where the harms and benefits of prohibiting a dual affiliation arrangement from transferring should be examined); Network Affiliates Nov. 29, 2023 *Ex Parte* at 2 (stating that any constraints on broadcasters with multiple affiliations would have negative effects on their investment and growth); ATVA Dec. 6, 2023 *Ex Parte* at 2 (noting that the Commission's case-by-case process can address situations in markets where there are an insufficient number of stations to carry certain programming).

[336] Our revision of Note 11 to prevent other means of circumventing the Top-Four Prohibition is not a content-based restriction on speech. *See* NAB Oct. 30, 2023 *Ex Parte* at 6-7. The prohibition on affiliation acquisitions involving two top-four stations does not consider content but rather market concentration. *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9884, paras. 49-50 ("The rule is predicated entirely on content-neutral objectives, primarily the public interest goal of promoting competition in local markets."). *See also Cablevision Sys. Corp. et al. v. FCC*, 649 F.3d 695, 718 (D.C. Cir. 2011) (Commission rule limiting cable operators from withholding their "regional sports networks" from competitors was "due to that programming's economic characteristics, not to its communicative impact" and therefore was a "content-neutral" regulation).

Appellate Case: 24-1380     Page: 59     Date Filed: 02/23/2024 Entry ID: 5366849

such a change in affiliation is not a circumvention of Note 11.[337]

106.    In adopting this approach, we reject suggestions that the Commission should eliminate the exemption of LPTV stations for purposes of the Top-Four Prohibition, except in markets without at least four full-power stations.[338]  That approach would effectively eliminate the existing provision in our rules exempting LPTV stations from the local television ownership restrictions.[339]  When the Commission adopted its rules exempting LPTV stations from the ownership restrictions, it found that LPTVs were limited by their coverage, operation, and secondary status, and that such limitations weighed in favor of "permitting experienced participants in the market to pioneer the low power service."[340]  It found further that pioneering the creation of such low power service outweighed the Commission's traditional concerns regarding multiple ownership.[341]  Accordingly, LPTV stations have never been subject to the Commission's multiple ownership rules, nor seen as entirely equivalent to full power television stations.  At this time, we do not find that the record supports completely abandoning this previous determination or fully extending the local television ownership restriction to LPTV.[342]

107.    Similarly, we reject ATVA's suggestion that the Commission prevent a station in a market with four or more full-power or LPTV stations from multicasting two or more streams of top-four network affiliated programming.[343]  As the Commission has found in the past, a significant benefit of the multicast capability is the ability to bring more local network affiliates to smaller markets, thereby increasing access to popular network programming and local news and public interest programming tailored to the specific needs and interests of the local community, and we do not wish to constrain this ability unnecessarily.[344]  However, the record does contain indications that some entities currently may be using the fact that multicast streams and LPTV stations are exempt from the ownership rules to circumvent the Commission's local television ownership restrictions, indications that are corroborated by

---

[337] *See id.* at 9883, n.128.  A broadcast commenter points out that the Commission declined to restrict instances where a station acquired a multicast affiliation with a major network through direct negotiations with the network rather than with the existing local affiliate.  TEGNA Update Comments at 12-13.  The Commission did state that Note 11 would not apply in situations where a network offers an existing duopoly owner a top-four-rated affiliation (perhaps because the network is no longer satisfied with the existing affiliate station and the duopoly owner has demonstrated superior station operation and thus earned the affiliation on merit) because such a circumstance represents organic growth of the station and not a transaction that is the functional equivalent of an assignment or transfer of control from the standpoint of our Local Television Ownership Rule.  *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9883, n.128.  In contrast, circumstances where a station induces an existing local affiliate to terminate its affiliation with its network so that the station can then affiliate with the same network clearly falls outside of the situation described by the Commission.

[338] ATVA Comments at 14-21; NCTA Dec. 6, 2023 *Ex Parte* at 2-3.

[339] 47 CFR § 74.732(b) ("Low power TV and TV translator stations are not counted for purposes of § 73.3555, concerning multiple ownership.").

[340] *An Inquiry Into the Future Role of Low Power Television Broadcasting and Television Translators in the National Telecommunications System*, 47 FR 21468, May 18, 1982.

[341] *Id.*

[342] *See* HC2 Comments at 1-3; NPG Comments at 5-6; NAB Comments at 79-81; NAB Reply at 70-74; ION Reply at 3; NPG Reply at 2-4; Nexstar Reply at 9-12; TEGNA Reply at 15-17; WBOC Reply at 4-6 (opposing the inclusion of LPTV in the ownership rules); NAB Oct. 30, 2023 *Ex Parte* at 2-6; Network Affiliates Nov. 29, 2023 *Ex Parte* at 1-2; NAB Dec. 1, 2023 *Ex Parte* at 2-3; Network Representatives Dec. 6, 2023 *Ex Parte* at 1-2; Entravision Dec. 6, 2023 *Ex Parte* at 2-3.

[343] ATVA Comments at 14-21; *see also* NCTA Dec. 6, 2023 *Ex Parte* at 2-3 (arguing for the Top-Four Prohibition to be extended to multicast streams).

[344] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9892, para. 72.  *See also* NAB Oct. 30, 2023 *Ex Parte* at 2-6; Network Affiliates Nov. 29, 2023 *Ex Parte* at 1-2.

the Commission's own aforementioned experience.[345] Such circumvention runs directly against the intended purpose of exempting LPTV and multicast streams, which was expected to benefit competition in the form of new programming alternatives and increasing the availability of network programming respectively.[346] Therefore, although we do not change the Top-Four Prohibition's methodology with respect to LPTV and multicast streams in general, we nevertheless find our action today appropriate to address when entities seek to exploit the exemption in ways that circumvent our rules and result in market concentration, considering both the exemptions' original pro-public interest purposes and the clear intent of the Top-Four prohibition.

108. We recognize that in the future licensees may devise other ways to read our rules narrowly or to manufacture transactions that circumvent the intended purpose of the Top-Four Prohibition. At this time, the Commission will not prohibit conduct other than that which we have observed to be circumventing the purpose of established rules, as there remain compelling reasons for low power and satellite television stations to remain transferable and otherwise exempt from our ownership rules.[347] However, we stress that this should not be interpreted as an invitation for licensees to invent creative ways to circumvent the clear intent of our ownership rules, and the Commission stands ready to take further action as necessary. Finally, we note that if an entity believes the Top-Four Prohibition and Note 11 should not apply to its plan to place on a low power station or multicast stream an affiliation or affiliated programming acquired from another top-four station in the same market, the entity may seek case-by-case consideration under the Local Television Ownership Rule.[348]

109. *Broadcast Spectrum Auction and Next Generation Broadcast Television Transmission Standard*. We conclude that neither the television broadcast incentive auction, conducted in 2016, nor the related repack of the television spectrum, concluded in late 2020, had any significant effects on local television ownership or implications for retention or modification of the Local Television Ownership Rule.[349] Nor do we find that the adoption and deployment of the new broadcast television transmission standard should have any effect on the Local Television Ownership Rule.[350]

(Continued from previous page) ───────────────

[345] *See* ATVA Update Comments at 8-15; ATVA Comments at 14-21; NCTA Comments at 8-12; NCTA Dec. 6, 2023 *Ex Parte* at 2; ATVA Dec. 6, 2023 *Ex Parte* at 4.

[346] In adopting the LPTV exemption, the Commission believed that excluding LPTV from ownership restrictions would "foster a low power service that can grow to provide program alternatives to full service stations and cable systems in a manner that increases competition in the marketplace and thus enhances the telecommunications service available to the public." *An Inquiry Into the Future Role of Low Power Television Broadcasting and Television Translators in the National Telecommunications System*, 47 FR 21468, May 18, 1982.

[347] Although the *NPRM* sought comment on satellite stations as another type of television station exempted from ownership restrictions through which an entity could air multiple major network-affiliated programming, the record does not indicate that satellite stations are being misused in such a way. *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12137-38, para. 68. In any case, the language of the modification to Note 11 includes any station that is not counted for purposes of the local ownership restriction and is not limited to LPTV or multicast streams as the only possible methods for circumvention.

[348] Put another way, just as entities may seek case-by-case review of a top-four combination that would otherwise violate the Top Four Prohibition, entities may also seek case-by-case consideration of an affiliation acquisition that we would consider effectively equivalent to a top-four acquisition and that would otherwise violate Note 11 of our rule. In small markets, the Commission may look favorably upon a request for consideration where, if Note 11 were to be applied, the result would be fewer programming streams in the market than there were before (e.g., an assignment or transfer of control of a grandfathered combination where coming into compliance with Note 11 would result in the loss of an existing top four stream from the market).

[349] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12139, para. 73.

[350] *Id.* at 12138, para. 70-71. Indeed, no commenter contends that either the broadcast spectrum auction or the voluntary transition to ATSC 3.0 provides any reason for retaining or tightening the rules. *See* NAB Update Comments at 106-11; NAB Comments at 82-83. One commenter calls upon the Commission to study the impact of

(continued….)

Appellate Case: 24-1380 Page: 61 Date Filed: 02/23/2024 Entry ID: 5366849

110. First, we find that the auction and resulting repack did not significantly affect the ownership ranks or our consideration of the ownership rules. As we noted in the Public Notice seeking to update the record of this proceeding, only 41 television stations permanently discontinued operations as a result of the auction.[351] All other stations involved in the auctions are still available to their viewers because they chose to implement channel sharing arrangements or moved from the UHF to the VHF band.[352] The 41 television stations that surrendered their licenses represented less than 2% of the 2,148 full power and Class A stations that existed at the time.[353] Furthermore, only 19 of the 41 stations that surrendered their licenses and terminated service were full power commercial stations, which represents a reduction of 1.38% of the 1,373 full power commercial stations counted in the most recent broadcast station totals.[354] In sum, we find the impact of the incentive auction and resulting repack of the television spectrum on ownership to be negligible.

111. Second, the record does not indicate that the broadcasters' voluntary transition to the ATSC 3.0 transmission standard has any immediate or direct implication for the ownership rules.[355] There is no evidence in the record that use of 3.0 allows anyone to own more or less stations, creates any loopholes to our rules, or affects any of the conclusions underlying our actions in this proceeding. We will continue to monitor any innovations and developments that could affect television industry practices or otherwise call into question the premises under which the ownership restrictions were adopted.

112. *Shared Service Agreements*. We conclude that the SSA disclosure requirement should be retained to maintain transparency as to the extent of common operation between broadcast stations. We agree with the only commenter who mentions the SSA disclosure requirement in the record, who contends that the rule should be retained because SSA disclosure facilitates the Commission's analysis of the broadcast industry and allows the public to analyze ownership diversity in the industry, recognizing that consolidation of operations could limit competition and diversity.[356]

113. No commenter provides a reason for eliminating this requirement, and so in the interest of maintaining transparency, we conclude that the disclosure of SSAs should continue. As when the Commission adopted the SSA disclosure requirement six years ago, we find that the requirement continues to be useful for the public and the Commission to monitor the content, scope, and prevalence of SSAs, as well as to evaluate the impact of these agreements on the Commission's public interest policy goals.[357] Despite calls from some commenters for greater oversight or action by the Commission, we note that the *NPRM* in this proceeding did not seek comment on attributing SSAs, Joint Sales Agreements, or any other contractual relationships between stations in the same market, and we therefore do not have an

---

the incentive auction as part of developing the record for the upcoming 2022 quadrennial review. UCC et al. Update Comments at 8.

[351] *2021 Update Public Notice*, 36 FCC Rcd at 9367, n.32.

[352] *Incentive Auction Task Force and Media Bureau Report on the Status of the Post-Incentive Auction Transition and Reimbursement Program*, Public Notice, 34 FCC Rcd 304, 308, para. 11 (MB/WTB 2019).

[353] *See* Broadcast Station Totals as of Dec. 31, 2018, News Release (Jan. 2, 2019).

[354] *See* Broadcast Station Totals as of Mar. 31, 2022, Public Notice (Apr. 5, 2022); NAB Update Comments at 110-11, n.390.

[355] Although we noted above that new digital services ancillary to ATSC 3.0 could create revenue opportunities for broadcast stations that belie a bleak outlook of the broadcast industry, we do not find that the benefits of ATSC 3.0 have been actualized to the point where we could draw any more direct implications until the new transmission standard becomes more widely deployed.

[356] LCCHR Update Reply at 2, n.2; LCCHR Comments at 8-9.

[357] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 10009-10, para. 341.

adequate record to take further action in this order with respect to such agreements.[358]

114. *Minority and Female Ownership.* We find that retaining the existing ownership limits continues to preserve opportunities for ownership diversity, including minority and female ownership. As in past quadrennial reviews, we retain the existing Local Television Ownership Rule for the reasons stated above, primarily to promote competition among broadcast television stations in local markets. Nevertheless, we also find that retaining the existing rule can promote opportunities for diversity in local television ownership.[359] Broadcast commenters state that the best way to encourage broadcast ownership by new entrants, including minority and female owners, is to ensure access to capital by removing rules that impede investment and by incentivizing existing broadcast owners to provide capital to new entrants.[360] As stated earlier with regard to radio,[361] we find that the existing rule strikes the appropriate balance between incentivizing investment in broadcasting and ensuring that station-buying opportunities exist for new entrants in a market, particularly since investment by new entrants is less likely in a market that is highly concentrated.[362] We share the concerns of commenters such as LCCHR, Free Press, NABOB, NHMC, and UCC et al. that media consolidation could further increase entry barriers for ownership by people of color and women by decreasing the likelihood that television stations would be sold to a new entrant.[363] In addition, the Commission has observed some evidence that divestitures and other transactions made to comply with the existing ownership limits have resulted in new entrants, including minority and female owners, entering into local television markets.[364]

115. Ultimately, we find there is no basis to conclude that retaining the Local Television Ownership Rule with the slight modifications we adopt above will harm minority and female ownership. If anything, we believe that retention and modification of the rule will maintain a level of competition and multiplicity of speakers that could allow room for entry into the market, including by minority or female

(Continued from previous page) ——————————

[358] *See* Nexstar Update Reply at 15-16. The Commission eliminated attribution for television JSAs and did not seek comments on reestablishing attribution in the NPRM. Several commenters nevertheless call on the Commission to attribute sharing arrangements, which they perceive as a loophole to the ownership restrictions. ATVA Update Comments at 21-24; Free Press Update Comments at 9-20; NHMC Update Reply at 6-7; ATVA Comments at 21-25; LCCHR Comments at 9.

[359] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9893-94, para. 75.

[360] NAB Update Comments at 10-18; TEGNA Update Comments at 9-10; NAB Update Reply at 18-19; Nexstar Update Reply at 11-12; NAB Oct. 30, 2023 *Ex Parte* at 1-2.

[361] *See supra* para. 63.

[362] *See* Allen Media Group (AMG) Update Comments at 9 (noting AMG's difficulty in competing with investment firms to purchase broadcast television stations); AMG Update Reply at 4 (stating that consolidation of television station ownership and increased purchases by large investment funds have decreased the prospect of minority television station ownership).

[363] These commenters also state that the Commission must retain and enforce its existing rules and adopt measures specifically targeted at promoting minority and female ownership. Free Press Update Comments at 3-9, 20-23; NABOB Update Comments at 7-8; UCC et al. Comments at 2-4; LCCHR Update Reply at 1-3, 4; NHMC Update Reply at 2-7; LCCHR Comments at 2-5.

[364] *See Assignment of Broadcast Television Licenses from Meredith Corporation to Gray Television Licensee, LLC*, Letter, DA 21-1426 (MB Nov. 12, 2021) (granting divestiture to Allen Media Holdings) ; *Applications of Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee) et al.*, Memorandum Opinion and Order, 34 FCC Rcd 8436 (MB 2019) (granting divestiture to Circle City Broadcasting); *see also* Michael Malone, *Gray TV Lines Up Minority/Female Owners for Six Stations* (Aug. 27, 2014), https://www.nexttv.com/news/gray-tv-lines-minorityfemale-owners-six-stations-133481; Carl Marcucci, *Gray Gets Approvals for Hoak Media Buys, Spinoffs*, (Apr. 4, 2014), https://www.rbr.com/gray-gets-approvals-for-hoak-media-buys-spinoffs/ (describing an acquisition by Mission Broadcasting).

owners.[365]  As the Commission has stated in the past, ensuring "the presence of independently owned broadcast television stations in the local market [indirectly increases] the likelihood of a variety of viewpoints and preserving ownership opportunities for new entrants."[366]  We continue to believe this to be the case.  Accordingly, we find that retaining the Local Television Ownership Rule as modified furthers the public interest by ensuring the potential for new and diverse entrants.

116.　　*Cost-Benefit Analysis.*  In light of the lack of record on the specific costs or benefits of this rule, and the limited nature of the modifications we adopt today, we believe that the public interest benefits achieved by retaining the rule as so modified outweigh the potential economic cost of complying with this long-standing structural ownership rule.  While the *NPRM* sought quantifications of the costs and benefits of its proposed changes,[367] we note that commenters did not provide such quantifications in the record.[368]  For all the reasons explained in the discussion above, we conclude that the public interest benefits promoted by the rule outweigh the cost of compliance with the rule.  Also, any potential benefits that further consolidation might offer television station owners are outweighed by potential public interest costs to the consumer in the form of harms resulting from weakened competition within the local broadcast television market, less viewpoint diversity in the only entities producing local programming, and fewer opportunities for new market entrants.

### C.　　Dual Network Rule

#### 1.　　Introduction

117.　　We find that the Dual Network Rule, which effectively prohibits a merger between the Big Four broadcast networks (specifically, ABC, CBS, Fox, and NBC),[369] remains necessary in the public interest to protect and promote both competition and localism.  With regard to competition, we find that the Big Four broadcast networks have a unique ability to regularly attract large, national audiences, which separates them from other broadcast and cable networks.  And given their large audience shares, the Big Four broadcast networks earn higher rates from advertisers seeking to consistently reach mass audiences than other networks are able to earn.  We find that loosening the rule to allow a combination between Big Four broadcast networks would lessen competition for advertising revenue and likely subsequently result in the remaining networks paying less attention to viewer demand for innovative, high-quality programming.  With regard to localism, we find that the Dual Network Rule increases the bargaining power of local broadcast affiliates and enables them to influence Big Four broadcast network programming decisions in ways that better serve the interests of their local communities.

#### 2.　　Background

118.　　The Dual Network Rule states:  "A television broadcast station may affiliate with a person or entity that maintains two or more networks of television broadcast stations unless such dual or

---

[365] We do not find that our modifications to the Top-Four Prohibition will have a negative impact on minority and female ownership as the modifications simply support the competitive purposes of the overall television ownership rule.  In addition, the modifications will apply on a prospective basis, and the case-by-case approach provides the opportunity for flexibility in application of the Top-Four Prohibition should it prove necessary.

[366] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9893-94, para. 75.

[367] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12140, paras. 75-76.

[368] Free Press states that the Commission was wrong to suggest in the NPRM that economic benefits could serve as "tradeoffs" to the traditional public interest standards of competition, localism, and diversity.  Free Press Comments at 13-15.  We recognize that as commenters focus on particular discrete issues, the cost or benefits from the rule may not be easy to quantify or balance in any empirical way.  Certainly, we do not want to imply that such weighing of costs and benefits in a Quadrennial Review would replace—as opposed to complement—our evaluation of the traditional public interest standards of competition, localism, and diversity.

[369] *See* 47 CFR § 73.658(g).

multiple networks are composed of two or more persons or entities that, on February 8, 1996, were 'networks' as defined in § 73.3613(a)(1) of the Commission's regulations (that is, ABC, CBS, Fox and NBC)."[370] Therefore, the rule allows common ownership of multiple broadcast networks, but effectively prohibits a merger between or among the Big Four broadcast networks, ABC, CBS, Fox and NBC. The Dual Network Rule has existed since the 1940s and has remained largely unchanged except for a revision in response to the Telecommunications Act of 1996.[371] In the *NPRM*, the Commission sought comment on whether the Dual Network Rule remained necessary in the public interest to protect competition and localism as the Commission previously held in its *2010/2014 Quadrennial Review Order*.[372] Specifically, the Commission sought comment on whether broadcast networks still participated in the video marketplace by 1) assembling and distributing a collection of programming suitable for large, national audiences, and 2) selling advertising based on this programming to large, national advertisers.[373] The Commission further asked if the Big Four broadcast networks still outperform their broadcast and cable counterparts in terms of viewership and advertising revenue such that they represent a "strategic group" within the marketplace.[374] The Commission also asked how online video distributors and digital advertisers have affected competition for national broadcast television advertising.[375] Finally, the Commission sought comment on whether the rule still promotes an important and sufficient balance between the national interests of the Big Four broadcast networks and the local interests and obligations held by their local affiliates.[376] The Commission received little comment focused on the Dual Network Rule in response to the *NPRM* and the *2021 Update Public Notice*.[377] In the record, there appears to be nominal interest in changing the rule[378] while a handful of other commenters call for the Commission to retain the rule without modification.[379]

---

[370] *Id.* Section 73.3613(a)(1) in turn defines "network" as "any person, entity, or corporation which offers an inter-connected program service on a regular basis for 15 or more hours per week to at least 25 affiliated television licensees in 10 or more states; and/or any person, entity, or corporation controlling, controlled by, or under common control with such person, entity or corporation." 47 CFR § 73.3613(a)(1).

[371] In the Telecommunications Act of 1996 Congress permitted common ownership of two or more broadcast networks, but not a merger among ABC, CBS, Fox or NBC, or between one of these networks and the two largest emerging networks, UPN or WB. 1996 Act, § 202(e); *see also* S. Rep. No. 230, 104th Cong., 2d Sess. at 163; *2002 Biennial Review Order*, 18 FCC Rcd at n. 1240. In 2001, after concluding in its 1998 Biennial Review that the rule as applied to UPN and WB might no longer be in the public interest (*1998 Biennial Regulatory Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 Of the Telecommunications Act of 1996,* Order, 15 FCC Rcd 11058, 11098, para. 77 (2000)), the Commission further modified the dual network rule to permit a Big Four network to merge with or acquire UPN or WB. *Amendment of Section 73.658(g) of the Commission's Rules—The Dual Network Rule*, Report and Order, 16 FCC Rcd 11114 (2001); *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13848, para. 594.

[372] *See 2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12140, para. 80.

[373] *Id.*

[374] *Id.* at 12142, para. 82.

[375] *Id.*

[376] *Id.* at 12142-44, paras. 85-86.

[377] As described below, the record contains a total of five Comments and three Reply Comments that discuss the Dual Network Rule.

[378] No parties filed comments or reply comments in support of loosening or repealing the rule in response to the *2018 Quadrennial Review NPRM*. However, three of the Big Four broadcast networks filed comments in response to the *2021 Update Public Notice*. *See* ViacomCBS Inc., Fox Corp., and NBCUniversal Media, LLC Comments, MB Docket No. 18-349 (rec. Sept. 2, 2021) (Networks Update Comments).

[379] *See* WGAW Comments at 3; WGAE Comments; Thomas C. Smith Comments at 7; LCCHR Update Reply at 4; ABC Television Affiliates Association and NBC Television Affiliates Reply at 3 (ABC and NBC Affiliates Reply);

(continued….)

### 3. Discussion

119. After careful review, we find that the Dual Network Rule remains necessary in the public interest despite marketplace changes, as it continues to foster our core policy goals of competition and localism. Consistent with our findings in the past, we find that the rule promotes competition in the provision of programming suitable for large, national audiences and the sale of national advertising time and furthers localism by maintaining a balance among the Big Four broadcast networks and their affiliate groups.[380]

120. *Competition*. The Big Four broadcast networks continue to hold a unique position in the video marketplace. They earn higher and more consistent ratings on linear television than other broadcast and cable networks. With their high ratings, the Big Four broadcast networks in turn are highly sought after by advertisers seeking to reach large, national audiences. The Big Four broadcast networks largely compete amongst themselves for such advertising revenue, and to differentiate themselves, they attempt to produce programming that will generate the highest ratings possible from the widest audiences. We find that such competition for revenue and audience share serves the public interest by spurring the networks to compete to develop and deliver programming that is innovative, high-quality, and of interest to the viewers. If two of the networks were to merge, competition for this advertising revenue would lessen and the networks would be less incentivized to compete for viewers by providing a national television product that is desired by viewers. Accordingly, we find that the Dual Network Rule remains necessary in the public interest to promote competition in the provision of programming suitable for large, national audiences and the sale of national advertising time.

121. This conclusion is supported by data that show the Big Four broadcast networks are in a class of their own when it comes to producing national programming and selling national advertising time such that a merger among these networks would reduce competition and would be likely to increase these networks' ability to create barriers to entry. As demonstrated by the data below, a review of both the total primetime ratings of the networks and the primetime ratings of individual shows reveals that, in general, the Big Four broadcast networks consistently attract the largest audiences, greatly exceeding the ratings of their broadcast and cable counterparts. Over the last several years, cable networks, as well as some online services, have produced some high-quality television series that can draw high ratings comparable to the Big Four broadcast networks or reach sizeable audiences. These shows are the result of significant investments and many are critically acclaimed and garner media attention.[381] However, as discussed below, this programming still does not achieve the sort of consistent audience share and advertising revenue that the programming of the Big Four broadcast networks generate. And we continue to find that the Big Four broadcast networks form a unique and discrete group within the video marketplace.

122. For example, the most popular show outside of National Football League programming in the 2021-2022 television season was *Yellowstone* airing on the basic cable channel Paramount Network

(Continued from previous page) ————————————————
Network Affiliates Update Reply at 14; Independent Programmers Comments at 10.

[380] *See 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, MB Docket Nos. 02-277, et al, 18 FCC Rcd 13620, 13858, para. 621 (2003); *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2083-84, para. 141, (2008); *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9952, *para* 216.

[381] *See, e.g.,* Tony Maglio, *From Disney to Peacock: Here's What the Top 7 Streamers Will Spend on Content in 2022*, Mar. 8, 2022, https://www.indiewire.com/2022/03/streaming-wars-content-spend-disney-netflix-hbo-paramount-1234703867/ ("From Disney to Peacock, we estimate that the major streamers will spend well over $50 billion on programming this year."); Dan Snierson, *Emmy Awards 2021: See the full list of winners*, Sept. 20, 2021, https://ew.com/awards/emmys/emmy-awards-2021-winners-list/.

Appellate Case: 24-1380      Page: 66      Date Filed: 02/23/2024 Entry ID: 5366849

(formerly SpikeTV), which averaged 11.312 million total viewers across its fourth season.[382]  This cable network show has surged in popularity since its premiere in 2018.[383]  However, Nielsen ratings data reveal that *Yellowstone* is not only the only program aired by Paramount Network to make it on the annual list of the 100 most-popular shows judged by average total viewers, but also is the only non-NFL affiliated program from any cable network that makes it into the top 70 most-watched shows.  The next highest rated show aired by a cable network is the cable network History's *Curse of Oak Island*, which ranks 72nd with a 3.611 million total viewers average.  In contrast, the non-sports programming of the Big Four broadcast networks dominates the list with 25 of the top 30 shows averaging at least 7 million total viewers in the 2021-2022 season.[384]  Notably, CBS had 14 of those shows; NBC had seven; and Fox and ABC each had two.  Further, of the 39 non-sports telecasts on the list of 100 most-watched telecasts, all but two aired on a Big Four broadcast network.[385]

123.    Further indicating the unique status of the Big Four broadcast networks, sports leagues seeking to reach the largest audiences generally seek to enter into rights agreements with those networks in part because of their proven ability to reach a mass audience.[386]  Nielsen ratings data for 2021shows that the Big Four broadcast networks carried sports programming from the NFL, MLB, NBA, the Olympics, and NCAA that dominated the list of highest rated telecasts, representing 40 of the top 50 and 51 of the top 100 telecasts.[387]  Moreover, based on the same data, sports programming on the Big Four

(Continued from previous page) ───────────────

[382] *See* Michael Schneider, *100 Most-Watched TV Series of 2021-22: This Season's Winners and Losers*, May 31, 2022, https://variety.com/2022/tv/news/most-popular-tv-shows-highest-rated-2021-2022-season-yellowstone-1235275680/.

[383] *Id.*; Nielsen ratings data.  Ratings data are for average total viewers (live plus seven day viewing) for individual shows across the 2021-2022 season.  As WGAW also notes, the networks had 85% of the 100 highest rated series during the 2017-2018 season.  We agree with WGAW, which observes that the programming on the Big Four broadcast networks remains the most popular during prime time and that new online video platforms are not adequate substitutions for programming on the Big Four broadcast networks.  *See* WGAW Comments at 3, 5-6.

[384] *See* Michael Schneider, *100 Most-Watched TV Series of 2021-22: This Season's Winners and Losers*, May 31, 2022, https://variety.com/2022/tv/news/most-popular-tv-shows-highest-rated-2021-2022-season-yellowstone-1235275680/; FCC staff analysis of Nielsen ratings data.  Ratings data are for average total viewers (live plus seven day viewing) for individual shows across the 2021-2022 season.

[385] *See* Michael Schneider and Mónica Marie Zorrilla, *Top 100 Telecasts of 2021: 'NCIS,' 'Yellowstone,' NFL Dominate, as Oscars Fail to Make the Cut*, Dec. 29, 2021, https://variety.com/2021/tv/news/top-rated-shows-2021-ncis-yellowstone-squid-game-1235143671/; Nielsen ratings data.  Ratings data are for total viewers (live plus seven day viewing) during individual telecasts.

[386] Due to the revenues they are able generate by packaging and distributing sports programming alongside other highly rated network programming, the Big Four broadcast networks are also in a unique position to pay substantial fees to control the television rights for sports leagues.  In return, sports programming historically has generated, and continues to generate, high advertising revenues for the networks in return.  For example, the networks airing NFL programming during the 2021-2022 season (CBS, Fox, NBC, and ESPN) brought in $3.4 billion in advertising revenue.  *See* Andy Gibs, *NFL TV Ad Revenue up to $3.4 Billion in 2020/2021 Season*, https://www.standardmediaindex.com/insights/nfl-tv-ad-revenue-up-to-3-3-billion-in-2020-2021-season/ (last accessed June 4, 2022); *See also* Ken Belson and Kevin Draper, *N.F.L. Signs Media Deals Worth Over $100 Billion*, May 26, 2021, https://www.nytimes.com/2021/03/18/sports/football/nfl-tv-contracts.html?smid=url-share.

[387] Ratings data are for total viewers (live plus seven day viewing) during individual telecasts.  Meanwhile, sports programming airing on cable networks represented only 3 of the top 50 telecasts and 10 of the top 100.  Although cable networks air sports programming from the major sports leagues and organizations, the U.S. Department of Justice has found that broadcast network sports programming and cable network sports programming constitute separate product markets, further highlighting the difference between dedicated full-time cable sports networks and the periodic highly rated sports programming that appears on the Big Four broadcast networks.  *See* Competitive Impact Statement, *U.S. v. The Walt Disney Company and Twenty-First Century Fox, Inc.*, No. 1:18-cv-05800 (S.D.N.Y. June 27, 2018), https://www.justice.gov/atr/case-document/file/1075201/download (stating that

(continued….)

Appellate Case: 24-1380      Page: 67      Date Filed: 02/23/2024 Entry ID: 5366849

broadcast networks represented 39 of the top 50 telecasts watched by the highly sought after 18-49 demographic.[388]  We agree with WGAW that sports leagues have significant incentives to prefer to negotiate programming rights with the Big Four broadcast networks given their proven ability to reach the largest audiences with fewer of the technical issues sometimes associated with online platforms and, in return, have the potential to draw the largest advertising revenues.[389]  While we recognize that some leagues are experimenting with shifting some programming online, most notably, the NFL moving Thursday Night Football to Amazon Prime, it appears that airing programming on a Big Four broadcast network continues to be the most reliable way to reach the largest, most consistent audience possible.[390]  The continued dominance of the Big Four broadcast networks in offering the premier sports leagues and events demonstrates further that these four networks remain distinct from other programming channels or networks in the video marketplace.

124.    Comparing data regarding the average primetime rating of the Big Four broadcast networks to the top cable networks further demonstrates the strength of the Big Four broadcast networks.  Despite some individual cable network programs earning high ratings, the average primetime rating of the Big Four broadcast networks has remained larger than the audience size for even the most popular cable networks.  In 2016, the average primetime rating for the Big Four broadcast networks was 3.78, while the average primetime rating of the four highest-rated cable networks (Fox News Channel, ESPN, TBS, and HGTV) was 1.45 – roughly a 62% difference.[391]  Moreover, the Big Four broadcast networks' average primetime rating was more than four times larger than that of the next-highest rated English-language broadcast network (The CW).[392]  At first glance, more recent data show the gap in primetime ratings between the Big Four broadcast networks and either the top cable networks or the next largest broadcast network is tightening.  For example, in 2020, the Big Four broadcast networks averaged a primetime rating of 2.54 while the four highest rated cable networks (Fox News Channel, MSNBC, ESPN, and CNN) average a 1.88 rating, which is approximately a 26 percent difference.[393]  The average primetime

_____

"[b]roadcast networks and their affiliates aim to have broad appeal by offering a variety of highly-rated programming content including primetime entertainment shows, syndicated shows, and local and national news and weather in addition to sports, with marquee sports events making up a small percentage of a broadcast network's airtime").

[388] Sports programming airing on cable networks represented only 9 of the top 50 telecasts for the 18-49 demographic.

[389] WGAW Comments at 5-6.

[390] In 2021, Amazon acquired the rights to the NFL's Thursday Night Football program for eleven years at $1 billion per year; *See* Alex Sherman, *Amazon's exclusive 'Thursday Night Football' package will begin in 2022 instead of 2023*, May 3, 2021, https://www.cnbc.com/2021/05/03/amazons-thursday-night-football-package-will-begin-in-2022-instead-of-2023.html.

[391] *See* S&P Global Market Intelligence, 2016 TV Network Summary, Broadcast Networks by Average Prime Time Rating as of June 5, 2022 (S&P Global Market Intelligence Broadcast Networks by Average Prime Time Rating June 5, 2022); S&P Global Market Intelligence, 2016 TV Network Summary, Basic Cable Networks by Average Prime Time Rating as of June 5, 2022 (S&P Global Market Intelligence Basic Cable Networks by Average Prime Time Rating June 5, 2022).  Because Spanish-language networks reach a different audience (i.e., those viewers who speak Spanish), only English-language cable networks are included in these averages.  We note that if Spanish-language networks were included, it would not greatly impact the analyses or lead us to change our ultimate conclusions.

[392] *Id*.  Per S&P Global Market Intelligence, The CW's average primetime audience was a 0.84 in 2016.

[393] *See* S&P Global Market Intelligence, 2020 TV Network Summary, Broadcast Networks by Average Prime Time Rating as of June 5, 2022 (S&P Global Market Intelligence Broadcast Networks by Average Prime Time Rating June 5, 2022); S&P Global Market Intelligence, 2020 TV Network Summary, Basic Cable Networks by Average Prime Time Rating as of June 5, 2022 (S&P Global Market Intelligence Basic Cable Networks by Average Prime Time Rating Delivery June 5, 2022).

rating of the Big Four broadcast networks was nearly three times the size of the next highest broadcast network, ION.[394]  While smaller than in the past, the percentage differences between the Big Four broadcast networks and all other networks remain significant.

125.     Moreover, it should be noted that much of the increased cable network ratings in 2020 were the result of cable news programming that surged in popularity during the election season on Fox News Channel, MSNBC, and CNN.[395]  If Fox News Channel, MSNBC, and CNN, which are categorized as more specialty news networks rather than general/variety networks, are removed and one adds the three next highest rated cable networks (Hallmark Channel, HGTV, and TLC), the average of the top four cable networks is reduced to a 1.15 rating, which is roughly a 55 percent difference with the Big Four broadcast networks.[396]  We also note that sports and cable news programming is often produced for a more niche audience rather than for a national, mass audience, the type of competition which the Dual Network Rule seeks to promote.  If one considers only broadcast and cable networks that S&P Global categorizes as "General/Variety," the four highest rated, English-language networks in 2020 were TBS, ION, Investigation Discovery, and USA with an average primetime rating of 0.77 – less than a third of the Big Four broadcast networks.[397]

126.     Beyond just the primetime hours, the Big Four broadcast networks also still boast a significant advantage in terms of the 24-hour average ratings, despite an increase for cable networks' ratings in recent years.  In 2020, the average 24-hour rating for the Big Four broadcast networks was a 1.97 compared to a 1.15 for the four highest rated cable networks (Fox News Channel, MSNBC, CNN, and Hallmark Channel).[398]

127.     In addition to the disparity in ratings, there continues to be a wide disparity in the advertising rates charged by the Big Four broadcast networks and the advertising rates charged by other broadcast and cable networks, supporting our view that the Big Four broadcast networks retain distinct characteristics and pursue distinct business interests and strategies, such that they remain a separate strategic group within the larger video marketplace.[399]  Recent data show that the Big Four broadcast

(Continued from previous page) ─────────────

[394] *Id.*  Per S&P Global Market Intelligence, ION's average primetime audience was a 0.78 in 2020.

[395] *See* Rick Porter, *Pandemic, Election Push Cable News Channels to Peak in 2020*, Dec. 22, 2022, https://www.hollywoodreporter.com/tv/tv-news/pandemic-election-push-cable-news-channels-to-peak-in-2020-4108610/.  In 2021, weekday primetime viewership saw a sharp decline after the 2020 election season. Nielsen states that CNN dropped 38 percent; Fox News Channel dropped 34 percent; and MSNBC dropped 25 percent.  *See* David Bauder, *Cable news lost plenty of viewers in 2021*, Dec. 27, 2021, https://www.bostonglobe.com/2021/12/27/business/cable-news-lost-plenty-viewers-2021/.

[396] *See* S&P Global Market Intelligence, 2020 TV Network Summary, Broadcast Networks by Average Prime Time Rating as of June 5, 2022 (S&P Global Market Intelligence Broadcast Networks by Average Prime Time Rating June 5, 2022); S&P Global Market Intelligence, 2020 TV Network Summary, Basic Cable Networks by Average Prime Time Rating as of June 5, 2022 (S&P Global Market Intelligence Basic Cable Networks by Average Prime Time Rating Delivery June 5, 2022).  We also note that the differences become much greater when one excludes all vertically integrated cable networks (i.e. cable networks that share the same parent company as a Big Four broadcast network).  In 2020, the average primetime rating for the four highest rated non-vertically integrated cable networks (CNN, Hallmark Channel, HGTV, and TLC) was 1.16, which is roughly a 55 percent difference with that of the Big Four.  *Id.*

[397] *Id.*

[398] *See* S&P Global Market Intelligence, 2020 TV Network Summary, Broadcast Networks by 24 Hour Average rating as of June 5, 2022 (S&P Global Market Intelligence Broadcast Networks by 24 Hour Average Rating June 5, 2022); S&P Global Market Intelligence, 2020 TV Network Summary, Basic Cable Networks by 24 Hour Average Rating as of June 5, 2022 (S&P Global Market Intelligence Basic Cable Networks by 24 Hour Average Rating June 5, 2022).

[399] *See Amendment of Section 73.658(g) of the Commission's Rules – the Dual Network Rule,* MM Docket No. 00-108, Report and Order, 16 FCC Rcd at 11114, 11122-23, *para*. 20 n.45 (2001) (Dual Network Order) (finding that a
(continued….)

Appellate Case: 24-1380     Page: 69     Date Filed: 02/23/2024 Entry ID: 5366849

networks generally charge higher advertising rates than cable networks.[400]  According to S&P Global Market Intelligence data for 2020, the average advertising rate among the Big Four broadcast networks, as estimated in cost per thousand views (referred to as cost per mille or CPM), was approximately $23.68.[401]  By contrast, the four highest CPMs among cable networks for the same period (ESPN, MTV, Discovery Channel, and Bravo) had an average of approximately $19.39, which is approximately 19 percent less than that of the Big Four broadcast networks.[402]  This gap increases if one excludes ESPN, which is owned by Disney, the parent company of broadcast network ABC, and a network with a uniquely high CPM as a result of its sports programming.  Without ESPN, the Big Four cable networks (MTV, Discovery Channel, Bravo, and Food Network) average $15.40, a 35 percent difference as compared to the CPM garnered by the Big Four broadcast networks.[403]  Data from 2017 reveal that this gap in advertising rates has stayed steady in recent years.  In 2017, the Big Four broadcast networks earned an average CPM of $21.43 and the four highest CPMs among cable networks (ESPN, MTV, Bravo, and Discovery Channel) averaged $17.46 – a difference of approximately 19 percent.[404]  If one was to exclude ESPN (and replace with next highest, TNT), the CPM average of the top four cable networks drops to $14.32, which is approximately a 33 percent difference.[405]

128.  Data on net advertising revenues earned by the various top networks provide additional evidence that the Big Four broadcast networks have a definite appeal to advertisers seeking consistent, large national audiences.  In these data as well, we find a wide disparity between the net advertising revenue of the Big Four broadcast networks and the comparable top four cable networks.  For example, in 2021 the Big Four broadcast networks earned an average of $3.102 billion.[406]  In comparison, the four

(Continued from previous page) ───────────────

"strategic group" refers to a cluster of independent firms within an industry that pursue similar business strategies.  For example, the top-four networks supply their affiliated local stations with programming intended to attract mass audiences and advertisers that wish to reach such large, nationwide audiences); *2002 Biennial Review Order*, 18 FCC Rcd at 13850, paras. 601 n.1251 (finding that Big Four broadcast networks remained a "strategic group" as a cluster of independent firms within an industry that pursue similar business strategies); *2006 Quadrennial Review Order*, 23 FCC Rcd at 2013, 2082-83, para. 140 n.439 (finding that Big Four broadcast networks remained a "strategic group"); *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9857-58, para. 228 (finding the Big Four broadcast networks remained a "strategic group").

[400] *See* S&P Global Market Intelligence, 2020 TV Network Summary, Basic Cable Networks by Calculated CPM ($) as of Oct. 5, 2022 (S&P Global Market Intelligence Basic Cable Networks by Calculated CPM Oct. 5, 2022); See S&P Global Market Intelligence, 2020 TV Network Summary, Broadcast Networks by Calculated CPM ($) as of Oct. 5, 2022 (S&P Global Market Intelligence Broadcast Networks by Calculated CPM Oct. 5, 2022).  We also note that the Big Four broadcast networks have much higher CPMs than the other broadcast networks with the exception of the CW, which has a uniquely high CPM as a result of its young adult targeted programming.  In 2020, the CW's CPM was 40.91.

[401] *Id.*

[402] *Id.*

[403] *Id.*  Of note, the *2010/2014 Quadrennial Review Order* stated there was a 44% gap in CPMs between the Big Four broadcast networks and the four highest CPMs among non-sports cable networks in 2014.  While one may contend that the gap is lessening, we still find a 36% gap to be significant.  *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9957, para. 227.

[404] *See* S&P Global Market Intelligence, 2017 TV Network Summary, Basic Cable Networks by Calculated CPM ($) as of June 5, 2022 (S&P Global Market Intelligence Basic Cable Networks by Calculated CPM June 5, 2022); See S&P Global Market Intelligence, 2017 TV Network Summary, Broadcast Networks by Calculated CPM ($) as of June 5, 2022 (S&P Global Market Intelligence Broadcast Networks by Calculated CPM June 5, 2022).

[405] *Id.*

[406] *See* S&P Global Market Intelligence, TV Network Summary, Broadcast Networks by Net Advertising Revenue ($000) as of Oct. 5, 2022 (S&P Global Market Intelligence Broadcast Networks by Net Advertising Revenue Oct. 5, 2022); S&P Global Market Intelligence, TV Network Summary, Basic Cable Networks by Net Advertising Revenue

(continued….)

Appellate Case: 24-1380    Page: 70    Date Filed: 02/23/2024 Entry ID: 5366849

cable networks with the highest net advertising revenue totals (ESPN, Fox News Channel, HGTV, and TBS) averaged $1.242 billion in estimated net advertising revenues.[407]  This represents close to a third of the average amount received by the Big Four broadcast networks.[408]  The difference is even wider when comparing the net advertising revenues of the Big Four broadcast networks to the next best performing English-language broadcast network.  In 2021, ION earned $463 million in net advertising revenue – nearly a seventh of the average earned by the Big Four broadcast networks.

129.    In sum, we find that the data support our conclusion that that the Big Four broadcast networks retain distinct characteristics and strategies that drive competition among this group and warrant retention of the Dual Network Rule.  We find that these four broadcast networks continue to be uniquely capable of attracting large audiences of a size that individual cable networks and other broadcast networks cannot consistently replicate.  For advertisers seeking to reach a national audience, and for sports leagues seeking to reach the largest audiences, the Big Four broadcast networks remain the outlets able to guarantee them a consistent, large national audience.  We thus agree with WGAW that the Big Four broadcast networks still operate as a strategic group and their programming is a distinct non-substitutable advertising product for those attempting to reach mass audiences.[409]  While on certain occasions, a cable network may compete with the Big Four broadcast networks for high ratings, cable networks have not been shown to replicate the same ratings success sustained by the Big Four broadcast networks.

130.    While we recognize that there have been significant changes in technology and media consumption in the video marketplace since our last quadrennial review, most notably from the continued growth of online video options, we disagree with the Network Commenters that the Dual Network Rule is no longer in the public interest as a result of these newer outlets.[410]  As described above, we continue to find that the mass appeal of Big Four broadcast programming sets it apart in the video marketplace.  With respect to online programming, although not directly comparable to ratings for traditional television, lists are routinely published identifying the most streamed series and movies, the overwhelming majority of which appear on services best described as subscription video-on-demand (or SVOD) services.[411]  Although SVOD services offer notable original content and garner many millions of subscribers, as their descriptive moniker implies, these services pursue different strategies and offer different value propositions as compared to the Big Four broadcast networks.[412]  For instance, the Big Four broadcast networks offer live or linear programming intended to garner mass audiences and funded in large part through advertising revenues.  Such network programming is available for free and over-the-air from broadcast television stations (i.e., without requiring Internet access or a paid subscription) as well as on pay TV (i.e., MVPDs) and streaming online.  Conversely, SVODs offer individual, on-demand programming for their customers – generally not live or linear national programming.[413]  Further, SVODs

($000) as of Oct. 5, 2022 (S&P Global Market Intelligence Cable Networks by Net Advertising Revenue Oct. 5, 2022).

[407] *Id.*

[408] *Id.* This gap widens if one excludes vertically integrated cable networks (leaving HGTV, CNN, TBS, and Food Network).  Those four cable networks averaged $981 million in revenue.

[409] WGAW Comments at 7-8.

[410] *See* Networks Update Comments at 4.

[411] *See, e.g.,* Todd Spangler, Variety, *Surprise! Criminal Minds Was 2021's Most-Streamed TV Show in the U.S.* (Jan. 21, 2022), https://variety.com/2022/digital/news/most-streamed-tv-shows-movies-2021-criminal-minds-1235159626/ (listing top streaming titles from various SVODs and noting that many of the most popular were older licensed shows that had originally aired on Big Four broadcast networks); Nielsen, *Tops of 2020: Nielsen Streaming Unwrapped* (Jan. 2021), https://www.nielsen.com/insights/2021/tops-of-2020-nielsen-streaming-unwrapped/ (listing Netflix and Disney+ titles as the top streaming content of 2020 for original series, acquired series, and movies).

[412] *See 2022 Communications Marketplace Report* at 158-59, paras. 256-57.

[413] *Id.* at 3058, para. 179.

are primarily subscription based models, charging viewers fees for access, and with programming intended to drive subscriptions to the service and to retain existing subscribers.  Moreover, as subscription-based services, SVODs do not compete with the Big Four broadcast networks for national advertising revenue.[414]  As previously stated, the goal of the Dual Network Rule is to foster competition in the provision of primetime entertainment programming and the sale of national advertising time.[415]  We find that retention of the rule continues to incentivize the Big Four broadcast networks to compete for viewers by producing a national television product that is desired by viewers.  Allowing a merger between two of the Big Four broadcast networks, either based on competition from cable networks or the perceived competition from SVODs, would not promote the creation of more national programming, but instead, could lead to less national programming with wide audience appeal.  In addition, we also agree with WGAE that the Dual Network Rule has not prevented the networks' parent companies from creating their own SVOD platforms that compete in the video marketplace.[416]

131.    In reaching our conclusion that the rule remains in the public interest, we also disagree with the Network Commenters that new competition for advertising revenue from digital platforms and social media companies, supports eliminating the Dual Network Rule at this time.[417]  Instead, as described above, we find that the Big Four broadcast networks offer a unique advertising product that reaches the largest audience possible, something that is not routinely matched by either cable networks or SVODs.  Indeed, we find that there is still a market for advertisers trying to reach a national audience via linear television.  Media buyer Magna states that national broadcast and cable television generated $39 billion in 2021, which marked a 7% increase over the previous year.[418]  Moreover, advertising over television is

(Continued from previous page) ──────────────────────

[414] *Id.*

[415] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9955, para 221.

[416] *See* WGAE Comments at 2.  In recent years, network-affiliated SVOD platforms such as Disney+ (ABC), Paramount+ (CBS), Peacock (NBC), Hulu (ABC and NBC) have all launched and appear to be growing in subscriptions.  For example, Disney+ ended 2021 with 129.8 million paid subscribers globally, which represented a 37 percent growth over the previous year.  In the United States and Canada, Disney reported having 42.0 million Disney+ subscribers, which was an 18 percent increase.  As of May 2022, Paramount+ has 40 million subscribers gaining 6.8 million subscribers in the first quarter of 2022. Peacock ended the first quarter of 2022 with 28 million monthly active accounts and 13 million paid subscribers, which was an increase from 24.5 million at the end of 2021. Hulu had 45.3 million subscribers at the end of 2021, including 4.3 million users on its live television service. While Netflix with 220.67 million global subscribers  (73.28 million in the United States and Canada) still has far more than any of these platforms individually, these new platforms have added competition to the market as Netflix recently reported its first loss of subscribers in a quarter since 2011.  *See* Brent Lang and Todd Spangler, *Disney Plus Ends 2021 With Nearly 130 Million Subscribers, Smashing Growth Forecasts*, Feb 9, 2022, https://variety.com/2022/biz/news/disney-plus-subscribers-2021-earnings-1235175715/; Emma Roth, *Paramount Plus subscriber count has grown to nearly 40 million*, May 3, 2022, https://www.theverge.com/2022/5/3/23055121/paramount-plus-subscriber-count-40-million; Jennifer Maas, *Peacock Hits 28 Million Monthly Active U.S. Accounts, 13 Million Paid Subscribers*, April 28, 2022, https://variety.com/2022/tv/news/peacock-subscribers-users-q1-1235242891/; Todd Spangler, *Hulu Adding Unlimited DVR For All Live TV Subscribers At No Extra Charge*, Mar. 11, 2022, https://variety.com/2022/digital/news/hulu-live-tv-unlimited-dvr-1235201117/; Peter Kafka, Why Netflix is suddenly losing subscribers, April 29, 2022, https://www.vox.com/recode/23032705/netflix-subscriber-loss-streaming-wars; Emma Roth, *Netflix subscriber count in the US and Canada dropped by 1.3 million over the last three months*, July 19, 2022, https://www.theverge.com/2022/7/19/23268626/netflix-q2-2022-earnings-subscribers-ads-stranger-things.

[417] Network Commenters Comments at 6-7.

[418] *See* Brad Adgate, *Agencies Agree; 2021 Was A Record Year For Ad Spending, With More Growth Expected In 2022*, Dec. 8, 2021, https://www.forbes.com/sites/bradadgate/2021/12/08/agencies-agree-2021-was-a-record-year-for-ad-spending-with-more-growth-expected-in-2022/?sh=5734f7e77bc6.  Further, as WGAW notes, the growth of online advertising does not appear to have come at the expense of national advertising.  *See* WGAW Comments at 9. We note further that some consider digital advertising to be an "add on" as part of a traditional marketing campaign,

(continued….)

71

often viewed as unique in that it can protect brand safety by allowing brands to choose when they want an ad to be aired in contrast with less controllable digital advertising where a brand may appear in circumstances beyond the control of the corporation placing the ad.[419]

132.     Accordingly, the Dual Network Rule remains necessary in the public interest to promote competition in the provision of programming suitable for large, national audiences and the sale of national advertising time.

133.     *Localism*.  We find that the Dual Network Rule also remains necessary to foster the Commission's goal of localism.  Viewers benefit from localism when an affiliate station is able to preempt national, network programming without fear of repercussion so that the affiliate station can air programming it feels is of preeminent importance to the local viewer.  Eliminating the rule would increase the bargaining power of the Big Four broadcast networks over the local affiliates, which would then reduce the ability of the affiliates to influence network programming decisions or exert their own independence from their affiliated network in a manner that best serves the needs of their local communities.  This balance is important because the networks and the local affiliates have differing incentives and obligations.  Broadcast networks design their programming to reach the largest audience possible as well as to maximize advertising revenue.[420]  Local affiliates, by contrast, have obligations and incentives to serve their local communities by offering local news and other programming.[421]  Thus, while local affiliates typically want the most popular programming a network has to offer, an affiliate, nonetheless, may wish to offer input to a network on its programming so that it better serves the specific needs and interests of its specific local community or preempt network programming for programming that is important for its local community.

134.     We agree with the Network Affiliates that the reduction in the number of networks resulting from a Big Four network merger would reduce the bargaining power for affiliates.[422]  With fewer networks, affiliates would be less able, if at all, to use the availability of other top, independently owned networks as a bargaining tool to exert influence on the programming decisions of its network, including with regard to program content and scheduling.  For similar reasons, we also find that the existence of other networks gives affiliates more leeway to raise locally oriented concerns with network programming or decide to preempt network programming in favor of programming that may better fit the

and thus complementary to advertising on broadcast networks, not a substitute.  *See id.* (citing Michael Nathanson, et al., U.S. Advertising: A False Dichotomy?, Apr. 5, 2019, MoffettNathanson Media & Telecom); *see also* Commentary of Mark Lieberman, President and CEO, Viamedia, Inc., while on panel titled "*Television Advertising: the Nuts and Bolts of Broadcast and Cable*" during a public workshop produced by the Antitrust Division of the United States Department of Justice at p. 45, transcript available here: https://www.justice.gov/atr/page/file/1202076/download.

[419] *See* Oriana Schwindt, *MAGNA Predicts a Roaring Recovery for U.S. Ad Market*, Oct. 25, 2021, https://www.mediavillage.com/article/magna-predicts-a-roaring-recovery-for-us-ad-market/print/.  WGAW notes that only broadcast advertising with a Big Four broadcast network can reach a national mass audience at once with a guarantee of brand safety and without the pitfalls of advertising online.  *See* WGAW Comments at 8.

[420] *See supra*, para. 121.

[421] The 2022 Communications Marketplace Report notes that "[d]espite COVID-related budget cuts, in 2020, 1,116 television stations aired local news."  *See 2022 Communications Marketplace Report* at 165, para. 269.

[422] Initially the ABC and NBC Affiliates filed comments, and subsequently all Big Four broadcast network affiliates (Network Affiliates) filed reply comments, in response to the *NPRM* and the *2021 Update Public Notice* respectively that a combination of two of the Big Four broadcast networks would create a competitive imbalance in the video programming industry in favor of the networks at the expense of local affiliates.  *See* ABC and NBC Affiliates Reply at 3; Network Affiliates Update Reply at 14.  We also find support in the record from the Independent Programmers who echoed these concerns stating that elimination of the rule would undermine the balance of bargaining power and lead to greater consolidation causing harm to the Commission's public interest goals.  *See* Independent Programmers Comments at 10.

Appellate Case: 24-1380      Page: 73      Date Filed: 02/23/2024 Entry ID: 5366849

local needs of their communities.  We also find that the dual network rule potentially provides a local affiliate with an additional affiliation option should it come to an affiliation negotiation impasse with a network.

135.    In addition, we find that the increases in affiliation fees paid by the local affiliates to the Big Four broadcast networks in recent years are evidence of the considerable leverage the Big Four broadcast networks already hold in their negotiations with affiliates.  And we conclude that eliminating the Dual Network Rule would upset the existing balance between networks and affiliates to the detriment of local viewers.  As the Network Affiliates note, networks originally provided content to the local affiliates for free or in exchange for advertising availabilities.[423]  However, the Big Four broadcast networks now draw significant sums of revenue via reverse compensation from the local affiliates.[424]  Notably, much of this revenue is derived from retransmission consent revenue, at least some of which could otherwise be expected to flow back into local station operations but is instead redirected towards national programming produced by the networks.  According to one estimate, total industrywide reverse compensation payments paid by affiliates to broadcast networks have increased from roughly $300 million in 2010 to $2.9 billion in 2017.[425]  The Affiliates report that some pay as much as 70% of their retransmission consent revenue to the network,[426] and S&P Global estimates that nearly 50% of all retransmission consent revenue of the Big Four affiliated stations went back to the networks in 2019.[427]  We find that eliminating or loosening the Dual Network Rule would only increase the leverage of the networks at the potential expense of local affiliates and their commitment to the needs and interests of local viewers.[428]

136.    For these reasons, we agree with the Network Affiliates that the Dual Network Rule is a "reinforcing mechanism" that helps maintain the balance between the national goals of the networks and the local commitments of the affiliates,[429] and it thus remains necessary to foster localism.  If two of the Big Four broadcast networks were to merge, local broadcast affiliates would have fewer options to re-affiliate with a national network and would have a reduced ability to influence the programming decisions of the networks – at a detriment to their local communities.  Accordingly, we find the rule also continues to be necessary in the public interest to promote localism, and we retain the rule without modification.[430]

137.    Finally, we disagree with the Network Commenters that traditional antitrust protections would sufficiently protect the public interest if we modified the Dual Network Rule to be no longer an *ex*

---

[423] Network Affiliates Update Reply at 15-16.

[424] *Id.*

[425] *See 2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12143-4, *para.* 86. (citing SNL Kagan, Media Census (June 2017)).

[426] *See* Network Affiliates Update Reply at 16.

[427] *See* Justin Nielson, *Broadcast Investor Retrans Projections Update: Sub Rates Continue To Rise*, July 25, 2019, https://www.spglobal.com/marketintelligence/en/news-insights/research/retrans-projections-update-sub-rates-continue-to-rise.

[428] The Big Four Affiliates also raise direct-to-consumer platforms such as CBS's Paramount +, NBC's Peacock and ABC/Disney's Disney+ as evidence that their role in distributing content is diminishing and their leverage would only worsen with consolidation among the Big Four broadcast networks.  The commenters further raise what they call "take-it-or-leave-it" deals negotiated by the Big Four broadcast networks for distribution of affiliate stations on virtual Multichannel Video Programming Distributors as evidence as to why the Dual Network Rule remains important.  *See* Network Affiliates Update Reply at 16-18.

[429] *See* Network Affiliates Update Reply at 14.

[430] We also find support in the record from Thomas C. Smith and The Leadership Conference on Civil and Human Rights who both oppose modification of the rule.  *See* Thomas C. Smith Comments at 7; LCCHR Update Reply at 4.

Appellate Case: 24-1380     Page: 74     Date Filed: 02/23/2024 Entry ID: 5366849

*ante* prohibition.[431]  As we have stated previously, a traditional antitrust analysis does not consider the harms the Dual Network Rule protects against, namely, that a merger may "restrict the availability, price, and quality of primetime entertainment programming and the bargaining power and influence of network affiliate stations, harming consumers and localism."[432]  In addition, while a fact-specific public interest review by the Commission would remain, the information and data already before us provide a general picture of what a merger between two of the Big Four broadcast networks may look like, and we find that such a merger would harm competition and localism such that the *ex ante* prohibition remains appropriate.

138.    *Minority and Female Ownership*.  In the *NPRM*, we sought comment on how, if at all, the Dual Network Rule impacts female and minority ownership of broadcast stations; however, no commenters responded to the issue.  Due to the rule's focus on mergers between the Big Four broadcast networks rather than the ownership of broadcast stations in local markets, and the absence of relevant comment in the record, we find that the rule likely does not have a meaningful impact on female and minority ownership of broadcast stations.

139.    *Cost Benefit Analysis*.  In the *NPRM*, we sought comment on the costs and benefits of retaining, modifying, or eliminating the Dual Network Rule with an emphasis on data regarding the economic impact any decision may have.[433]  While commenters provided data about the relative market strength of the Big Four broadcast networks, no commenters addressed data as to the rule's costs and benefits.  Ultimately, for the reasons explained in the discussion above, we find that the benefits of maintaining the Dual Network Rule outweigh the costs.  Specifically, we find that the benefits consumers receive by keeping the Big Four broadcast networks intact (e.g., the increased quality and quantity of national programming; maintenance of balance between networks and affiliates) outweigh the potential costs of the rule, which might include preventing the increased economy of scale that two merged networks could attain.

## V.    DIVERSITY-RELATED PROPOSALS

140.    Consistent with commitments made by the Commission in the *2010/2014 Quadrennial Review Order*,[434] the *NPRM* sought comment on three long-pending proposals that had previously been put forward by the Multicultural Media, Telecom and Internet Council (MMTC), only one of which continues to receive support for review in a rulemaking and each of which we decline to adopt today.[435]  The first proposal, extending cable procurement requirements to broadcasters, is one we will continue to consider outside of this proceeding.  We decline to pursue the other proposals—developing a model for market-based tradeable "diversity credits" to serve as an alternative method for adopting ownership limits and adopting formulas aimed at creating media ownership limits that promote diversity—given the lack of current support for them and the lack of detail in the record about how they would be implemented.

---

[431] *See* Networks Update Comments at 8-10.

[432] *See 2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 9959-60, para. 231 n.710; *see also 2006 Quadrennial Review Order*, 23 FCC Rcd at 2083, para. 141 n.451 (finding that antitrust enforcement would not protect against certain harms addressed by the Dual Network Rule:  "reduce[d] program output, choices, quality, and innovation to the detriment of viewers, and with reduced affiliate power and influence").

[433] *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12145, paras. 91-92.

[434] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 10006-07, paras. 331-32.  In the *2010/2014 Quadrennial Review Order*, the Commission stated that it would evaluate the feasibility of extending cable procurement type rules to the broadcast industry and also consider further the ideas of tradeable diversity credits and two formulas related to broadcast diversity.  The Commission committed to soliciting input on these particular ideas in the document initiating the next quadrennial review of the media ownership rules.  *Id*.  *See also 2018 Quadrennial Review NPRM* at 33 FCC Rcd at 12145, para. 93 (describing the history behind these proposals).

[435] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12145-12155, paras. 93-120.

Appellate Case: 24-1380      Page: 75      Date Filed: 02/23/2024 Entry ID: 5366849

141. While, for reasons discussed below, we do not adopt these specific proposals at this time, we continue to look for ways to address the lack of diversity in media ownership and the broader media ecosystem. For example, we recognize the calls in this proceeding to reinstate the tax certificate program in order to foster ownership of broadcast stations by minorities and women, and we urge Congress to heed these requests from both broadcasters and public interest groups alike.[436] Indeed, the Commission has long-supported reinstatement of the tax certificate program, recognizing its proven ability to broaden the diversity of media ownership.[437] In addition to seeking ways to enhance ownership diversity within the broadcast sector, we continue to search for and develop more accurate information about the level of diversity within the broadcast sector.[438] In this regard, as mentioned above, the Commission's Office of Economics and Analytics recently released a white paper on minority ownership of broadcast television stations that will continue to inform our understanding of the television market and the diversity of ownership.[439] As another example, we note that the Media Bureau recently sought public comment on a petition for rulemaking filed by FUSE, LLC, and other public interest groups regarding the establishment of an annual report on the diversity of video programming content vendors.[440] We turn below to the proposals raised in the NPRM.

142. *Extension of Cable Procurement Regulation.* First, we determine that the issue of whether to extend the cable procurement requirement to other Commission regulatees should be reviewed outside the context of the quadrennial review, which per statutory mandate focuses on our media ownership rules. As part of the 1992 Cable Act, Congress established the so-called cable procurement requirement, which directs operators of cable systems to: "encourage minority and female entrepreneurs

---

[436] *See, e.g.,* Allen Media Group Comments, MB Docket No. 18-349, at 7-10 (rec. Sept. 2, 2021) (requesting that, in lieu of the diversity proposals contained in the *NPRM*, which Allen Media acknowledges may take years or even decades to come to fruition, the Commission engage in a concerted and continuing effort to achieve two remedies -- the previously successful minority tax certificate program and a program to make capital available to minority investors); Letter from Robert Branson, et al., President and CEO, MMTC, to Sanford Williams, Special Advisor to the Chairwoman, FCC, MB 18-349, at 6 (filed Aug. 4, 2021) (MMTC *Ex Parte*) (urging the Commission to request that Congress reinstate the tax certificate program); NAB Update Reply at 16-18 (asking the Commission to do everything possible to encourage the 117th Congress to approve tax certificate legislation); Music Coalition Update Reply at 26 (stating that Congress should pass a bill reinstating the minority tax certificate program). *See also* FCC Communications Equity and Diversity Council, Enhancing Media Ownership and Entrepreneurial Opportunities for Minorities and Women at 12 (2023), https://www.fcc.gov/sites/default/files/cedc-diversity-equity-wg-media-ownership-diversity-report-06152023.pdf (recommending that the Commission encourage Congress to reinstate the Minority Tax Certificate policy with safeguards and updates to increase minority broadcast ownership).

[437] *See, e.g., Section 257 Triennial Report to Congress*, Report, 31 FCC Rcd 12037, 12078, para. 139 (2016) (*Fifth Section 257 Report*); *see also 2010/2014 Quadrennial Review Order*, 31 FCC Rcd 9864, at 9966, para. 244 (stating that the Commission's then most recent *Section 257 Report* included a recommendation that Congress pass tax deferral legislation). *See also* Press Release, Statement of Acting Chairwoman Jessica Rosenworcel on Release of the Fifth Annual Biennial Ownership Report (Sept. 3, 2021) (stating that "it is essential that we identify ways we can encourage more diversity in this market, including reinstatement of the Minority Tax Certificate Program."); Press Release, Statement of Commissioner Geoffrey Starks on Release of Fifth Broadcast Station Ownership Report (Sept. 8, 2021) (strongly supporting Congressman G.K. Butterfield's bill to reestablish the Minority Tax Certificate Program and noting this will provide opportunities for diversity in broadcast ownership and viewpoints).

[438] *See, e.g., Review of the Commission's Broadcast Equal Employment Opportunity Rules and Policies*, Further Notice of Proposed Rulemaking, 36 FCC Rcd 12055 (2021) (seeking to reinstate FCC Form 395-B so as to gather workforce composition data from broadcasters based on race, ethnicity, and gender).

[439] *See supra* para. 26.

[440] *See Media Bureau Seeks Comment on Petition for Rulemaking to Establish Vendor Diversity*, Public Notice, DA 22-567, MB Docket No. 22-209, at para. 1 (May 23, 2022). *See also* Petition for Rulemaking of FUSE, LLC, Common Cause, National Hispanic Media Coalition, Public Knowledge, and United Church of Christ Media Justice Ministry, MB Docket No. 22-209 (filed May 5, 2022).

Appellate Case: 24-1380     Page: 76     Date Filed: 02/23/2024 Entry ID: 5366849

to conduct business with all parts of its operation; and . . . analyze the results of its efforts to recruit, hire, promote, and use the services of minorities and women and explain any difficulties encountered in implementing its equal employment opportunity program."[441]  Based on this statutory requirement, the Commission promulgated section 76.75(e), which provides that a cable system must:  "[e]ncourage minority and female entrepreneurs to conduct business with all parts of its operation."[442]  The rule explains that "[f]or example, this requirement may be met by: (1) Recruiting as wide as possible a pool of qualified entrepreneurs from sources such as employee referrals, community groups, contractors, associations, and other sources likely to be representative of minority and female interests."[443]

143.     In response to MMTC's proposal, the *NPRM* sought comment on the Commission's statutory authority to extend the cable procurement requirement to broadcasters, given that the cable requirement flows directly from the statutory mandate pertaining to the cable industry contained in the 1992 Cable Act.[444]  In addition, the Commission sought comment on whether by specifically identifying minority and female entrepreneurs, the proposed rule would classify those entrepreneurs differently from others such as to trigger heightened judicial scrutiny,[445] and, if so, whether such a proposed rule could be modified in some way to avoid legal impediments.[446]  The *NPRM* also sought data demonstrating whether the cable procurement rule had in fact had a beneficial impact on minority and female participation, as well as input on the likelihood of similar impacts in the broadcast sector if the requirement was extended, given the differences between the cable and broadcast industries.[447]

144.     This proposal garnered extremely limited comment, with sparse support.[448]  In particular, commenters failed to address the substantive statutory authority and constitutional issues the Commission set forth in the *NPRM*.  Moreover, MMTC, which initially proposed the extension of the cable procurement requirement to broadcasters, has over the course of this proceeding broadened its request to now suggest an extension of the requirement to *all* Commission regulated entities, not just broadcast licensees.[449]  Further, MMTC now recommends that the Commission consider the broader request in the context of a new docket.[450]

145.     In light of this, we determine today to terminate review of this issue in the context of our quadrennial review of the structural ownership rules applicable to broadcasting.  Rather, we defer to a later date whether to commence a separate proceeding regarding extension of the cable procurement requirement to other Commission regulated entities.  While we will continue to consider this proposal, we note that substantively the issue of procurement does not fall within the ambit of our quadrennial review

---

[441] 47 U.S.C. § 554(d)(2)(E)-(F).

[442] 47 CFR § 76.75(e).

[443] 47 CFR § 76.75(e).

[444] *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12146, para. 96 (citing 47 U.S.C. § 554(d)(2)(E)).

[445] *Id.* at 12146-7, para. 97.

[446] *Id.* at 12147, para. 98.

[447] *Id.* at 12147-8, para. 99-100.

[448] *See, e.g.,* MMTC Reply at 9-14 (supporting extension of cable procurement requirement to broadcasters); *but see* NAB Comments at 85-90 (asserting that the Commission lacks statutory authority to extend the cable procurement to broadcasters and that any such extension might also run afoul of court precedent interpreting constitutional equal protection requirements).

[449] *See* MMTC *Ex Parte* at 5-6 (urging the Commission to commence a proceeding considering extension of the cable procurement requirement to all Commission regulatees); *see also* MMTC Comments, MB Docket No. 18-349, at 2-3 (rec. Aug. 31, 2021) (MMTC Update Comments).

[450] *See* MMTC Update Comments at 3 (urging the Commission to issue a notice of proposed rulemaking in a "new general docket, encompassing the industries regulated by the Wireline, Wireless, and Media Bureaus").

proceedings, which are conducted pursuant to the statutory requirement to review our broadcast ownership rules every four years to determine whether they remain "necessary in the public interest as the result of competition."[451]  Nevertheless, because the Commission's prior commitment to seek comment on the extension of the cable procurement requirement stemmed from previous litigation before the Third Circuit involving the broadcast ownership rules, the Commission found it appropriate to seek comment on this proposal in the context of the 2018 Quadrennial Review proceeding.[452]  Given the limited comment on the extension of the cable procurement requirement in the instant proceeding, the significant remaining open issues, and the specific request to broaden the scope of this issue to all FCC-regulated industries and entities in a separate proceeding, we decline to pursue the issue further in the context of the quadrennial review proceedings.

146.    *Other Diversity Proposals.*  In addition to the cable procurement proposal, the Commission also committed in the *2010/2014 Quadrennial Review Order* to seek comment on two other diversity-related proposals floated in prior proceedings, both of which we decline to adopt for lack of support.  These proposals were described as:  1) developing a model for market-based tradeable "diversity credits" to serve as an alternative method for adopting ownership limits;[453] and 2) adopting a "tipping point" formula[454] and/or a "source diversity formula."[455]  Because many details associated with these proposals had never been developed when the ideas were presented previously, the *NPRM* sought to unpack these dormant issues and asked many specific questions about the proposals.[456]  The Commission

[451] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) (1996 Act); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (Appropriations Act) (amending Sections 202(c) and 202(h) of the 1996 Act).  In 2004, Congress revised the then-biennial review requirement to require such reviews quadrennially.  *See* Appropriations Act § 629, 118 Stat. at 100.

[452] *2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12145, para. 93.

[453] While the concept of diversity credits was not well-defined when initially proposed to the Commission in 2002, the general idea appears to be that a system of "diversity credits" could be created that could be traded in a market-based system and redeemed by the buyer of a broadcast station to offset any increased concentration that would result from the proposed transaction.  *2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12148-9, para. 101.  The diversity credits concept was further refined in 2004, with the idea being that the number of diversity credits attached to each license would be commensurate with the extent to which the licensee of the station was considered to be "socially and economically disadvantaged."  *2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12149, para. 102.  The diversity credits proposal suggested that when a transaction occurred that was deemed to promote diversity (and here the proponents suggested a transaction that would result in the breakup of a local radio ownership cluster, or the sale of a station to a socially and economically disadvantaged business), the Commission would award the seller additional diversity credits "commensurate with the extent to which the transaction promotes diversity."  *Id.*  Similarly, when a transaction reduced diversity (perhaps by creating an ownership combination or expanding an ownership cluster), the Commission would require the submission of a certain number of diversity credits from the buyer, commensurate with the extent to which the transaction reduced diversity.  *Id.*

[454] In 2002, MMTC proposed the "tipping point formula" as an alternative to the approach the Commission used at the time of flagging radio station transactions that, based on an initial analysis, would result in a level of local radio concentration implicating public interest concerns for maintaining diversity and competition.  *See 2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12152-54, para. 113.  MMTC's tipping point formula was based on the premise that "platforms . . . [should] not control so much advertising revenue that well run independents cannot survive or offer meaningful local service."  *2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12152-54, para. 113.

[455] The source diversity formula appears to seek to measure the level of consumer welfare derived from viewpoint diversity in the broadcast market.  *2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12154-5, para. 118.  It was suggested that the source diversity formula could be used as a "thermometer" to determine whether "a national or local market manifest[s] strong diversity, moderate diversity, or slight diversity."  *Id.*  It was proposed that the Commission conduct a negotiated rulemaking to determine what significance to accord to various "temperature readings" on the HHI for a Diversity thermometer.  *Id.*  For example, what temperatures would reflect "poor health," versus measurements indicative of strong health.  *Id.*

[456] *2018 Quadrennial Review NPRM,* 33 FCC Rcd at 12149-55, paras. 101-21.

Appellate Case: 24-1380     Page: 78     Date Filed: 02/23/2024 Entry ID: 5366849

sought to elicit answers about threshold matters such as statutory authority, key definitions, feasibility, and the continued relevance of the proposals given the significant passage of time since they were initially put forth.

147.　There was extremely limited comment on these proposals, with most commenters either opposing the ideas[457] or finding the proposals themselves to lack sufficient specificity.[458]  MMTC, the chief proponent of these ideas, itself notes that perhaps the proposals are not well-suited for review in a notice and comment rulemaking and might be more appropriately considered in some other forum.[459]  Given the sparse record on these proposals and the lack of any additional guidance in the record about how they would operate in practice and integrate into the Commission's structural ownership rules, we decide today to terminate further review of these proposals.

## VI.　PROCEDURAL MATTERS

148.　*Final Regulatory Flexibility Analysis*.  As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[460] the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) of the possible significant economic impact on small entities of the policies and rules addressed in the Report and Order.  The FRFA is set forth in Appendix B.

149.　*Final Paperwork Reduction Act Analysis*.  This document does not contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. In addition, therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. 3506(c)(4).This document may contain non-substantive modifications to approved information collection(s).  Any such modifications will be submitted to OMB for review pursuant to OMB's non-substantive modification process.

150.　*Congressional Review Act*.  The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of the *Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

151.　*People with Disabilities*.  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

152.　*Additional Information*.  For additional information on this proceeding, contact Ty Bream, Assistant Division Chief, Industry Analysis Division, Media Bureau at Ty.Bream@fcc.gov or 202-418-0644.

## VII.　ORDERING CLAUSES

---

[457] *See, e.g.*, NHMC Comments at 12-14 (urging the Commission to abandon the tradeable diversity credits proposal on the basis that such an approach will encourage license owners "to use superficial definitions to check a 'diversity box.'"); Free Press Comments at 15 (stating that the diversity proposals were "vague and underdeveloped.").

[458] *See, e.g.*, Free Press Comments at 15 (stating that the diversity proposals were "vague and underdeveloped"); NAB Comments at 91-94 (raising questions about how the proposals would operate and noting that many key concepts remain undefined, such as whether the Diversity Credits proposal defines "diversity" in terms of ownership or viewpoints).

[459] MMTC Update Comments at 4 (stating: "[o]ur three basic concepts do not lend themselves to development in a notice-and-comment rulemaking.  What these concepts need at the outset is not legal analysis but economic analysis, because each concept immediately presents questions of economic policy whose answers are the predicates to whether its formula, or some other formula, is the best one.").

[460] *See* 5 U.S.C. § 603.

Appellate Case: 24-1380　　Page: 79　　Date Filed: 02/23/2024 Entry ID: 5366849

153.     Accordingly, **IT IS ORDERED**, that pursuant to the authority contained in Sections 1, 2(a), 4(i), 303, 307, 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303, 307, 309, 310, and 403, and Section 202(h) of the Telecommunications Act of 1996, this Report and Order **IS ADOPTED**.  The Report and Order and rule modifications attached hereto as Appendix A shall be effective thirty (30) days after publication of the text or summary thereof in the Federal Register, except that any non-substantive changes to Commission Forms required as the result of the rule amendments adopted herein **WILL NOT BECOME EFFECTIVE** until approved by the Office of Management and Budget.

154.     **IT IS FURTHER ORDERED**, that, should no petitions for reconsideration or petitions for judicial review be timely filed, the proceeding MB Docket No. 18-349 **IS TERMINATED**.

155.     **IT IS FURTHER ORDERED**, that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

156.     **IT IS FURTHER ORDERED**, that the Office of the Managing Director, Performance Evaluation and Records Management **SHALL SEND** a copy of this Report and Order in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION



Marlene H. Dortch
Secretary

## APPENDIX A

## Final Rules

Part 73 of Title 47 of the Code of Federal Regulations is amended as follows:

PART 73—RADIO BROADCAST SERVICES

1.      The authority citation for Part 73 continues to read as follows:

AUTHORITY:  47 U.S.C. 154, 303, 334, 336 and 339.

2.      Amend § 73.3555 by revising paragraph (b)(1)(ii), (b)(2), and Note 11:

**§ 73.3555 Multiple ownership.**

* * * * *

(b) * * *

(1) * * *
(ii) At the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the Sunday to Saturday, 7AM to 1AM daypart audience share from ratings averaged over a 12-month period immediately preceding the date of application, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service.  For any station broadcasting multiple programming streams, the audience share of all free-to-consumer non-simulcast multicast programming airing on streams owned, operated, or controlled by a single station shall be aggregated to determine the station's audience share and ranking in a DMA (to the extent that such streams are ranked by Nielsen or a comparable professional, accepted audience ratings service).

(2) * * *
Paragraph (b)(1)(ii) (Top–Four Prohibition) of this section shall not apply in cases where, at the request of the applicant, the Commission makes a finding that permitting an entity to directly or indirectly own, operate, or control two television stations licensed in the same DMA would serve the public interest, convenience, and necessity. The Commission will consider showings that the Top–Four Prohibition, including Note 11 to section § 73.3555, should not apply due to specific circumstances in a local market or with respect to a specific transaction on a case-by-case basis.

* * * * *

**Note 11 to § 73.3555:**  An entity will not be permitted to directly or indirectly own, operate, or control two television stations in the same DMA through the execution of any agreement (or series of agreements) involving stations in the same DMA, or any individual or entity with a cognizable interest in such stations, in which a station (the "new affiliate") acquires the network affiliation of another station (the "previous affiliate"), if the change in network affiliations would result in the licensee of the new affiliate, or any individual or entity with a cognizable interest in the new affiliate, directly or indirectly owning, operating, or controlling two of the top-four rated television stations in the DMA at the time of the agreement.  Parties should also refer to the Second Report and Order in MB Docket No. 14-50, FCC 16-107 (released August 25, 2016).

Further, an entity will not be permitted through the execution of any agreement (or series of agreements) to acquire a network affiliation, directly or indirectly, if the change in network affiliation would result in

the affiliation programming being broadcast from a television facility that is not counted as a station toward the total number of stations an entity is permitted to own under paragraph (b) of this section (e.g., a low power television station, a Class A television station, etc.) or on any television station's video programming stream that is not counted separately as a station toward the total number of stations an entity is permitted to own under paragraph (b) of this section (e.g., non-primary multicast streams) and where the change in affiliation would violate this Note were such television facility counted or such video programming stream counted separately as a station toward the total number of stations an entity is permitted to own for purposes of paragraph (b) of this section.

Appellate Case: 24-1380    Page: 82    Date Filed: 02/23/2024 Entry ID: 5366849

**APPENDIX B**

**Final Regulatory Flexibility Act Analysis**

1.	As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an initial Regulatory Flexibility Act Analysis (IRFA) was incorporated in the *Notice of Proposed Rulemaking* (*NPRM*), released in December 2018.[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  The Commission received no comments addressing the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

**A.	Need for, and Objectives of, the *Report and Order***

2.	The *Report and Order* (*Order*) concludes the 2018 Quadrennial Review of the broadcast ownership rules, which were initiated pursuant to Section 202(h) of the Telecommunications Act of 1996 (1996 Act).[4]  The Commission is required by statute to review its media ownership rules every four years to determine whether they "[a]re necessary in the public interest as the result of competition"[5] and to "repeal or modify any regulation it determines to be no longer in the public interest."[6]

3.	The media ownership rules that are subject to this quadrennial review are the Local Radio Ownership Rule, the Local Television Ownership Rule, and the Dual Network Rule.[7]  Ultimately, while the Commission acknowledges the impact of new technologies on the media marketplace, it concludes that some limits on broadcast ownership remain necessary to safeguard and promote the Commission's policy goals of fostering competition, localism, and diversity.  Based on our careful review of the record, we find that our existing rules, with some minor modifications, remain necessary in the public interest.

4.	Specifically, we retain the Dual Network Rule and the Local Radio Ownership Rule, which we modify only to make permanent the interim contour-overlap methodology long used to determine ownership limits in areas outside the boundaries of defined Nielsen Audio Metro markets and in Puerto Rico.  We likewise retain the Local Television Ownership Rule with modest adjustments to reflect changes that have occurred in the television marketplace.  The existing Local Television Ownership Rule ensures competition among local broadcasters while allowing for flexibility should the circumstances of local markets justify it.  Accordingly, today we update the methodology for determining station ranking within a market to better reflect current industry practices, and we extend the existing prohibition on circumventing the ownership of two top-four ranked stations in a market.  We find that the modifications

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).  The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

[2] *See 2018 Quadrennial Regulatory Review—Review the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, 33 FCC Rcd 12111, Appx. (2018) (*NPRM*).

[3] *See* 5 U.S.C. § 604.

[4] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) (1996 Act) (codified as amended at 47 U.S.C. § 303 note); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (Appropriations Act) (amending Sections 202(c) and 202(h) of the 1996 Act).

[5] 1996 Act § 202(h).  The Supreme Court has recognized the Commission's broad statutory authority to regulate in the public interest.  *See FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1154 (2021).

[6] 47 U.S.C. § 303 note (Section 202(h) of the 1996 Act as amended).

[7] These rules are found, respectively, at 47 CFR §§ 73.3555(a), (b) and 73.658(g).

Appellate Case: 24-1380     Page: 83     Date Filed: 02/23/2024 Entry ID: 5366849

adopted today will enable the Commission to promote competition, localism, and viewpoint diversity more effectively going forward.

5.     *Local Radio Ownership Rule.*  The Commission determines that the Local Radio Ownership Rule remains necessary in the public interest as the result of competition.  The purpose of the rule is to ensure competition between broadcast radio stations within a market so that radio owners are motivated to provide the highest quality of service to the public.  In addressing the public interest, the Commission notes that competition stems from the premise that the listening public, not the advertising industry, is the constituency that the rule is intended to serve.  If radio owners were allowed to acquire more radio stations than allowed by the rule, the Commission expresses skepticism whether owners would be able to maintain the same level of service on their stations given reduced competition.  Further, the Commission states that allowing one entity to own more radio stations in a market than currently permitted would threaten the viability of smaller stations.  In the Order, the Commission articulates that the rule already allows a generous amount of common ownership within a market and does not limit ownership across markets.

6.     The *Order* leaves the market definition in place because it reflects the type of competition that the rule was intended to promote—competition between local radio stations.  The *Order* also preserves the existing market size tiers and numerical limits.  The Commission finds that the current tiers and limits prevent consolidation to the level of monopolization or near monopolization in many, if not most, markets.  As to the Commission's AM/FM subcaps, the *Order* leaves in place the existing limits, and notes that lifting them would have deleterious impacts on the AM band, including excessive, undue concentration of ownership.  The *Order* declines to revise the presumption for certain embedded markets because the existing presumption sufficiently addresses concerns regarding stations in embedded markets.

7.     *Local Television Ownership Rule.*  The Commission finds that the Local Television Ownership Rule remains necessary to promote competition among broadcast television stations in local markets as there are still market characteristics unique to broadcast television.  The Commission also finds that ensuring broadcast television stations remain independently owned and competitive in providing programming that serves the interests and needs of local communities promotes localism goals more effectively than permitting greater consolidation.

8.     The Commission observes that the numerical limits set under the rule continue to strike the appropriate balance of enabling some efficiencies of common ownership while maintaining a level of competition amongst broadcast television stations to ensure that they continue to serve the public interest.  Likewise, the *Order* holds that the Top-Four Prohibition, and its case-by-case approach, strikes a reasonable balance between preserving and supporting enhancements of the public interest standards of competition, localism, and diversity with occasional incidences of acquisitions under special circumstances that warrant an exception to the prohibition.  Reflecting the Commission's commitment to accurate measurements of the industry for purposes of this rule, the *Order* revises the Commission's methodology used to determine market ranking and performance of stations.  To preserve the intended purpose of the prohibition, the *Order* seeks changes to the rule that would effectively close loopholes used by some broadcast stations to acquire affiliations from top-four rated full-power stations and moving such affiliations to multicast streams or low power stations.

9.     The Commission finds that the rule is consistent with the objective of fostering minority and female ownership within the industry.  Thus, retaining the existing ownership limits preserves opportunities for greater ownership diversity.  Media consolidation, which the Commission believes would increase were the rule to be relaxed or eliminated, would result in additional entry barriers and decrease the likelihood that television stations would be sold to a new entrant, including a minority or female owner.  As the Commission observes, evidence shows that divestitures and other transactions

Appellate Case: 24-1380     Page: 84     Date Filed: 02/23/2024 Entry ID: 5366849

made to comply with the existing ownership limits have resulted in new entry, including by minority and female owners, into local television markets.[8]

10.    *Dual Network Rule.*  In the *Order*, the Commission finds that the Dual Network Rule remains necessary in the public interest to protect and promote competition in the provision and creation of primetime entertainment programming and the sale of national advertising time.  Based on the record collected in the 2018 Quadrennial Review, the Commission finds that the Big Four broadcast networks (ABC, CBS, Fox, and NBC) have a unique ability to regularly attract large primetime audiences, which separates them from other broadcast and cable networks.

11.    The Big Four broadcast networks comprise a strategic group in the national advertising marketplace and compete mostly amongst themselves for advertisers that seek to reach large, national audiences consistently and are willing to pay a premium to reach that audience.  The Commission finds that the Big Four broadcast networks invest in and create innovative high-quality programming particularly during primetime that will draw advertisers and thus bring in the highest advertising revenues.  The merger of two of the Big Four broadcast networks would subsequently decrease that competition, leaving advertisers with fewer options to reach a mass audience, and would also reduce the remaining networks' need to produce the innovative programming desired by viewers.

12.    The *Order* also determines that the Dual Network Rule is necessary to foster the Commission's goal of localism.  Specifically, the Commission finds that eliminating the rule would increase the bargaining power of the networks over the local affiliates, which would then reduce the ability of the affiliates to influence network programming decisions or exert their own independence from their affiliated network in a manner that best serves their local communities.[9]

### B.    Summary of Significant Issues Raised by Public Comments in Response to the IRFA

13.    There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

### C.    Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

14.    Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA) and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[10]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

---

[8] *See Assignment of Broadcast Television Licenses from Meredith Corporation to Gray Television Licensee, LLC*, Letter, DA 21-1426 (MB Nov. 12, 2021) (granting divestiture to Allen Media Holdings) ; *Applications of Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee) et al.*, Memorandum Opinion and Order, 34 FCC Rcd 8436 (MB 2019) (granting divestiture to Circle City Broadcasting); *see also* Michael Malone, *Gray TV Lines Up Minority/Female Owners for Six Stations* (Aug. 27, 2014), https://www.nexttv.com/news/gray-tv-lines-minorityfemale-owners-six-stations-133481; Carl Marcucci, *Gray Gets Approvals for Hoak Media Buys, Spinoffs*, (Apr. 4, 2014), https://www.rbr.com/gray-gets-approvals-for-hoak-media-buys-spinoffs/ (describing an acquisition by Mission Broadcasting).

[9] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket Nos. 14-50 et al., Second Report and Order, 31 FCC Rcd 9864, 9959, para. 230 (2016).

[10] 5 U.S.C. § 604(a)(3).

Appellate Case: 24-1380     Page: 85     Date Filed: 02/23/2024 Entry ID: 5366849

D. **Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

15.     The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[11]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[12]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[13]  A small business concern is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[14]

16.     *Television Broadcasting.*  This industry is comprised of "establishments primarily engaged in broadcasting images together with sound."[15]  These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[16]  These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule.  Programming may originate in their own studio, from an affiliated network, or from external sources.  The SBA small business size standard for this industry classifies businesses having $41.5 million or less in annual receipts as small.[17]  2017 U.S. Census Bureau data indicate that 744 firms in this industry operated for the entire year.[18]  Of that number, 657 firms had revenue of less than $25,000,000.[19]  Based on this data we estimate that the majority of television broadcasters are small entities under the SBA small business size standard.

---

[11] 5 U.S.C. § 603(b)(3).

[12] 5 U.S.C. § 601(6); *see infra* note 7 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[13] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)(1)).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  *Id.*

[14] 15 U.S.C. § 632(a)(1)-(2)(A).

[15] *See* U.S. Census Bureau, *2017 NAICS Definition, "515120 Television Broadcasting,"* https://www.census.gov/naics/?input=515120&year=2017&details=515120.

[16] *Id.*

[17] *See* 13 CFR § 121.201, NAICS Code 515120.

[18] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017, Table ID: EC1700SIZEREVFIRM, NAICS Code 515120, https://data.census.gov/cedsci/table?y=2017&n=515120&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[19] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

Appellate Case: 24-1380     Page: 86     Date Filed: 02/23/2024 Entry ID: 5366849

17.     As of June 2023, there were 1,375 licensed commercial television stations.[20]  Of this total, 1,256 stations (or 91.3%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on April 7, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates as of June 2023, there were 383 licensed noncommercial educational (NCE) television stations, 381 Class A TV stations, 1,902 LPTV stations and 3,123 TV translator stations.[21]  The Commission, however, does not compile and otherwise does not have access to financial information for these television broadcast stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard.  Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of these television station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

18.     *Radio Stations*.  This industry is comprised of "establishments primarily engaged in broadcasting aural programs by radio to the public."[22]  Programming may originate in their own studio, from an affiliated network, or from external sources.[23]  The SBA small business size standard for this industry classifies firms having $41.5 million or less in annual receipts as small.[24]  U.S. Census Bureau data for 2017 show that 2,963 firms operated in this industry during that year.[25]  Of this number, 1,879 firms operated with revenue of less than $25 million per year.[26]  Based on this data and the SBA's small business size standard, we estimate a majority of such entities are small entities.

19.     The Commission estimates that as of June 30, 2023, there were 4,463 licensed commercial AM radio stations and 6,675 licensed commercial FM radio stations, for a combined total of 11,138 commercial radio stations.[27]  Of this total, 11,136 stations (or 99.98 %) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Database (BIA) on April 7, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates that as of June 30, 2023, there were 4,236 licensed noncommercial (NCE) FM radio stations, 1,989 low power FM (LPFM) stations, and 8,935 FM translators and boosters.[28]  The Commission however does not compile, and otherwise does not have

---

[20] *Broadcast Station Totals as of June 30, 2023*, Public Notice, DA 23-582 (rel. July 14, 2023) (*June 2023 Broadcast Station Totals PN*), https://docs.fcc.gov/public/attachments/DA-23-582A1.pdf.

[21] *Id.*

[22] *See* U.S. Census Bureau, *2017 NAICS Definition, "515112 Radio Stations*," https://www.census.gov/naics/?input=515112&year=2017&details=515112.

[23] *Id.*

[24] *See* 13 CFR § 121.201, NAICS Code 515112.

[25] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 515112, https://data.census.gov/cedsci/table?y=2017&n=515112&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.  We note that the US Census Bureau withheld publication of the number of firms that operated for the entire year.

[26] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue in the individual categories for less than $100,000, and $100,000 to $249,999 to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in these categories).  Therefore, the number of firms with revenue that meet the SBA size standard would be higher that noted herein.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[27] *June 2023 Broadcast Station Totals PN*, DA 23-582 at 1.

[28] *Id.*

access to financial information for these radio stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard. Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of radio station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

20.    We note, however, that in assessing whether a business concern qualifies as "small" under the above definition, business (control) affiliations[29] must be included. Our estimate, therefore, likely overstates the number of small entities that might be affected by our action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, another element of the definition of "small business" requires that an entity not be dominant in its field of operation. We are unable at this time to define or quantify the criteria that would establish whether a specific radio or television broadcast station is dominant in its field of operation. Accordingly, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and is therefore possibly over-inclusive. An additional element of the definition of "small business" is that the entity must be independently owned and operated. Because it is difficult to assess these criteria in the context of media entities, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and similarly may be over-inclusive.

**E.    Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

21.    The *Order* requires modification of several FCC forms and their instructions: (1) FCC Form 301, Application for Construction Permit for Commercial Broadcast Station; (2) FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License; and (3) FCC Form 315, Application for Consent to Transfer Control of Corporation Holding Broadcast Station Construction Permit or License. The change will involve replacing instructions on the forms for the Local Television Ownership Rule, which stated that "among the top four stations in the DMA, based on the most recent all-day (9:00 a.m.-midnight) audience share as determined by Nielsen or a comparable professional survey organization . . ." The instruction's will be modified to incorporate the new standard measurement of "Sunday to Saturday, 7AM to 1AM daypart" in order to more accurately reflect a station's performance in terms of audience share. In addition, ratings data submitted will now need to be averaged over the 12-month period preceding a transaction. The impact of these minor changes will be the same on all entities, and we do not anticipate that compliance will require the expenditure of any additional resources or place additional burdens on small businesses.

22.    As a result of these modified reporting requirements, we do not believe that small businesses will need to hire additional professionals (e.g., attorneys, engineers, economists, or accountants) to comply with the updated standard under the Local Television Ownership Rule's Top-Four Prohibition. Further, the *Order* delegates to the Media Bureau the authority to update FCC forms to conform with the rule changes adopted therein.

**F.    Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

23.    The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the

---

[29] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has the power to control both." 13 CFR § 21.103(a)(1).

other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[30]

24.     In conducting the quadrennial review, the Commission has three chief alternatives available for each of the Commission's media ownership rules—eliminate the rule, modify it, or, if the Commission determines that the rule is "necessary in the public interest," retain it.  The Commission finds that the rules adopted in the *Order*, which are intended to achieve the policy goals of competition, localism, and diversity, will continue to benefit small entities by fostering a media marketplace in which small entities are better able to compete and sustain services to their communities.  The Commission discusses below several ways in which the rules may benefit small entities as well as steps taken, and significant alternatives considered, to minimize any potential burdens on small entities.

25.     In consideration of the burdens that paperwork can place especially on small entities with limited resources, this *Order* proposes no new reporting requirements, performance standards or other compliance obligations, although, as discussed above, it modifies, as necessary, certain existing reporting forms.

26.     *Local Radio Ownership Rule.*  In the *Order*, the Commission finds that the Local Radio Ownership Rule remains necessary in the public interest.  The Commission finds that retaining the rule will foster the ability of all stations, large and small alike, to operate in a competitive environment.  Without the rule, the Commission finds that the competitive and business environment for smaller stations could deteriorate due to consolidation among dominant firms, such that many smaller stations may be forced to exit their respective markets.  By preserving the rule in the *Order*, the Commission states that opportunities for diffuse ownership are preserved.

27.     In the *Order*, the Commission preserves the AM/FM subcap limits.  The *Order* preserves the subcaps, finding that they contribute necessary support to the public interest factors of competition, localism, and diversity.  As to commenters' recommendation that the Commission should dispense with the subcaps altogether,[31] the Commission expresses concern that without the rule, smaller stations could face an influx of larger station-group acquisitions, which would lead to increased concentration of ownership and a race to the bottom for purposes of competition and local content.

28.     *Local Television Ownership Rule.*  The *Order* retains the Local Television Ownership Rule subject to some small modifications.  Notably, the Commission ends the loophole for the Top-Four Prohibition's limit on certain broadcast network affiliation acquisitions through some broadcasters' use of multicast streams and LPTV stations.  The Commission modifies the provision in the current rule that determines market ranking and performance according to Nielsen or other substitutable data.  The *Order* adopts a "Sunday to Saturday, 7AM to 1AM daypart" to determine audience share "from ratings averaged over a 12-month period immediately preceding the date of application" as the new standard for the Top-Four Prohibition (and in concert with it, adopts the 7AM to 1AM daypart for failing station waivers as well).  Further, to accurately measure a station's audience share and ranking, the *Order* establishes a new methodology by which the Commission will aggregate the audience share of all free-to-consumer non-simulcast multicast programming airing on streams owned, operated, or controlled by a station.  The Commission believes that this adjustment will better equip the agency to measure stations' performance and competitive strength within a given market.  In the Commission's analysis of the Local Television Ownership Rule, detailed consideration is given in analyzing the effects on consumers and broadcasters of the rule's preservation, the rule's absence, or the rule's modification.  The Commission's evaluation of small business involvement in the local television marketplace ultimately favors a preservation of a modified version of the rule, as further explained below.

---

[30] 5 U.S.C. § 604(a)(6).

[31] *Id.*

Appellate Case: 24-1380     Page: 89     Date Filed: 02/23/2024 Entry ID: 5366849

29.     The Commission finds that the rule, as modified, will help to ensure that ownership structures and concentrations within local television markets do not pose obstacles to entry for small entities.  The Commission finds that leaving the rule in place will actually allow for more firms, including those falling under the definition of small entity, to gain entry into or to preserve their already existing involvement within local markets as well as to compete effectively against other stations.  Preserving the rule helps to mitigate and minimize those negative economic impacts resulting from enlarged market concentration, and in turn minimized competition, were broadcast station groups allowed to acquire stations within markets without reasonable limitation.  The modifications established in the *Order*, which close affiliation loopholes, work to ensure the integrity of the rules necessary for the maintenance of business environments in which small stations can seek entrance and growth.  Likewise, modifications to the provisional standard for the measurement of market ranking and performance will promote the interests of small entities because the new standard will offer a clearer snapshot of what market competition exists among broadcasters in a given DMA.

30.     *Dual Network Rule.*  The *Order* preserves the Dual Network Rule, which effectively prohibits a merger between the Big Four broadcast networks (specifically, ABC, CBS, Fox, and NBC).  By keeping the rule in place, the Commission finds that the bargaining power of local broadcast affiliates, including many small entities, is promoted by enabling such entities to better influence top-four network programming decisions in ways that better serve the interests of local communities.  Unlike the Big Four broadcast networks, which design their shows with the goal of producing the largest national audience possible, small broadcast affiliates typically design their programming to serve niche audiences.  Such design is indicative of local broadcasters' independence from their affiliated network.  Such independence often times is reflective of local content that best serves the particular and localized needs of individual communities.  The Commission finds that the bargaining power of affiliates would diminish were there to be a reduction in the number of the Big Four broadcast networks.  The lasting economic impacts from the retreat of such bargaining power may diminish local broadcasters' abilities to provide the type of local programming that the Commission believes increases competition for local audiences. Thus, by eliminating the Dual Network Rule, local affiliates would be further displaced from the networks in terms of their negotiating power.

31.     In summary, the Commission agrees with the local affiliates that the Dual Network Rule is a "reinforcing mechanism" that helps maintain local commitments of the affiliates,[32] and it thus remains necessary to foster localism and the health of affiliates, including many small entities.[33]  If two of the Big Four broadcast networks were to merge, affiliates would have fewer options to re-affiliate with a national network and would have a reduced ability to influence the programming decisions of the networks—at a detriment to both the affiliate networks and their local communities.

### G.     Report to Congress

32.     The Commission will send a copy of the *Order*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[34]  In addition, the Commission will send a copy of the *Order*, including the FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.

---

[32] *See* ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates Reply Comments, MB Docket No. 18-349, at 14 (rec. Oct. 1, 2021).

[33] In the *NPRM*, the Commission also sought comment on whether antitrust laws and our public interest standard are sufficient to address any harms to competition or localism that might result from a Big Four network merger.  *See NPRM*, 26 FCC Rcd at 17543-44, paras. 144, 146.  As discussed above, our concern here is that a merger of two or more Big Four networks would restrict the availability, price, and quality of primetime entertainment programming and the bargaining power and influence of network affiliate stations, harming consumers and localism.  Because these harms to consumers and localism are not typically considered in a structural antitrust analysis, we do not believe that antitrust enforcement would adequately protect against these harms.

[34] 5 U.S.C. § 801(a)(1)(A).

A copy of the *Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[35]

---

[35] *See id*. § 604(b).

Appellate Case: 24-1380     Page: 91     Date Filed: 02/23/2024 Entry ID: 5366849

**STATEMENT OF**
**CHAIRWOMAN JESSICA ROSENWORCEL**

Re: *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 18-349, Report and Order.

For decades, the Federal Communications Commission has had rules that limit the number of broadcast stations a single entity can own. This approach is a product of the Communications Act and the values in the law that have always informed our approach to media policy—support for localism, competition, and diversity of ownership. These values support jobs and journalism. They are important.

Even as times change, these values remain. So does the law. Our approach here is consistent with the Communications Act and other laws that Congress has passed to address media markets, including the Consolidated Appropriations Act of 2004, which limits the number of television stations a single entity can own nationwide.

To be clear, at this point only three core rules remain. No entity can own all the television stations in a single market, with a case specific request necessary to own more than one of the top four stations. No entity can own all the radio stations in a single market. There is also a restriction on the national combination of two of the four big television networks—ABC, CBS, Fox, and NBC.

This decision updates the application of these rules. With respect to radio, it clarifies our approach to subcaps and the contour-overlap methodology used to asses stations. With respect to television, it closes a loophole that involves the transfer of station affiliation to a multicast stream or low-power station that can be used to evade rules and exceed the limits in the Consolidated Appropriations Act of 2004.

While the ways we consume news and content in the digital age have changed, this approach is consistent with our longstanding values. It helps ensure that entities—both big and small—play by the same rules when they seek to build a station and audience in local markets.

Appellate Case: 24-1380    Page: 92    Date Filed: 02/23/2024 Entry ID: 5366849

## DISSENTING STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:    *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 18-349, Report and Order.

Newton's first law of motion states that an object at rest remains at rest, and an object in motion remains in motion unless acted upon by a sufficient force. Of course, the laws of physics do not constrain the laws of regulation. Indeed, regulatory inertia is a power that has no analog in the physical world. The FCC's media ownership rules at issue here are a case in point.

The FCC has every reason to update this outdated set of broadcast radio and television rules. The law compels us to do so. The facts tell us to do so. And the public interest in promoting local news and information counsel in favor of doing so. Yet the rules will remain in place—impervious to those compelling forces.

Congress passed a law in 1996 that specifically directed the FCC to review these rules every four years and to eliminate them if they become unnecessary as a result of competition. How much has the market evolved in the intervening years? Hulu, Netflix, Disney+, ESPN+, Amazon Prime Video, Sling TV, Apple TV, YouTube, YouTubeTV, Tubi, Vudu, Freevee, Crackle, Pluto TV, NBC News Now, CBS News Streaming Network, CBS Sports HQ, Peacock, The Roku Channel, Paramount+, Max (nee HBO Max), BritBox,DIRECTV Stream, AT&T Now, FuboTV, Pandora, Spotify, SiriusXM, Apple Music, Amazon Music, and other online audio and video streaming services too numerous to quantify or recount have all emerged and fundamentally altered the competitive landscape.

Unfortunately, the Commission has taken an ostrich-like approach to this requirement in nearly every one of its quadrennial reviews, including the instant review. Indeed, the Commission has consistently ignored Congress's deregulatory mandate under the statute, the realities of the modern media marketplace, and the many ways that Americans now consume news, information, and entertainment programming. This failure does not serve anyone's interest, as a broad range of stakeholders have made clear in this record—once again. But despite a record bursting with evidence of a vibrant media marketplace, the Commission continues to advance the fiction that broadcast radio and broadcast television stations exist in markets unto themselves.

It is past time for the FCC to confront the harms that its own media ownership policies have caused. For decades, the FCC prohibited someone from owning a newspaper and a broadcast station in the same market. This restriction was born in an era when newspapers and broadcasters were the only games in town for local news and information. Back then, Americans got their news in the morning when a newspaper clunked onto the front doorstep and in the evening when they tuned into one of three nightly newscasts. But over time, the FCC failed to acknowledge the titanic changes taking place in the news business, particularly with the rise of the Internet. Our prohibition on newspaper-broadcast cross-ownership only made it harder for them to gain the scale needed to compete with the Internet giants. When we finally eliminated the prohibition in 2017, it was too late for much of the industry—1,800 newspapers had gone out of business since 2004 alone. They were facing competition from market segments that the FCC refused even to recognize. The result? Communities across the country lost access to local news and information at least in part because the FCC failed to react quickly enough to changes in the marketplace.

I've seen the impacts of our backwards-looking policies firsthand. During a visit to Powell, Wyoming, a town of about 6,000 people that sits in the northwest corner of the Cowboy State, I stopped

by a local radio station, only to find its doors locked.  After we were finally able to rouse someone to let us inside, I got a good look at the operations—effectively a Dell laptop playing music pumped in from some big city somewhere else.

A couple of miles away in Cody, there was a local broadcast company that was investing in their community and the types of local news and entertainment programming that are attuned to the needs of their listeners.  This company wanted to invest in the Powell station and originate live and local programming for this underserved community.  But they couldn't.  Not because they lacked the capital or a willing seller, but because the FCC wouldn't let them.  Our ownership rules—which are supposed to promote competition, a diversity of viewpoints, and localism—were keeping that laptop powered up while preventing actual investment in local newsgathering and the local jobs that come with it.

These are the very same rules that the FCC votes to retain in this item.  What's worse, the FCC is actually tightening the Local Television Ownership Rule, though it attempts to characterize this action as closing a loophole, even though the resulting combinations would not violate any ownership restriction.

This doesn't make much sense to me.  In a diverse and growing media marketplace, we need to do everything we can to promote investment in trusted local news and information.  Maintaining the regulatory status quo is not going to cut it.  The FCC must enact significant reforms to help promote competition and increase access to the local news and information that is so vital yet is too often out of reach for those in rural and other underserved communities.

None of this will happen, however, if we continue to view the market as it was and not where it is going.  But this fundamental error taints the entire 2018 quadrennial review and fatally undermines the basis for the rules we adopt today.  Because of this, I dissent.

Appellate Case: 24-1380    Page: 94    Date Filed: 02/23/2024 Entry ID: 5366849

## DISSENTING STATEMENT OF
## COMMISSIONER NATHAN SIMINGTON

Re:　　*2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 18-349, Report and Order.

I dissent from this item, which represents poor policy and an illegal reading of our statute and rules.

Let us start with the illegal portion. Section 202(h) of the Act requires that the Commission, *as the result of competition*, repeal or modify any rule that is no longer in the public interest. What this does not mean, and what this cannot mean, is that the Commission properly may wedge in new, burdensome rules on broadcasters who are, at present, being *outcompeted* in the video marketplace under the guise of "loophole closing" in the so-called public interest. It cannot. By not merely ignoring the competitive realities of the modern video marketplace, but indeed turning them on their head, this Commission, yet again, fails to understand the meaning of the word "result." Section 202(h) requires that a competitive analysis *drive* the "repeal or modification" of rules, not sit along for in the back seat for the ride.

Speaking of being taken for a ride, the American people, at the hands of the so-called public interest groups, yet again lose. The item is at pains to point out that local news production has actually *increased* in recent years in small DMAs. Tabling the truth of the issue, let us stipulate to it for the purposes of argument. The increase would be a direct result of station groups recognizing that local news is one of their two competitive advantages (the other being sports), and consequently *investing* in its production. And, *as a result of competition*—the very competition *driving* the production of local content—the Commission will now *undercut* those gains in localism by making investing in small DMAs a less attractive commercial proposition? And this, as we are admonished in the item, is in the public interest, actually? Given that the Commission is, in this item, transporting itself back in time to the age of broadcast tycoons, perhaps a "Hello, McFly?" is warranted.

The fully novel application of this item's approach to extending the Local Television Ownership Rule to multicast streams and low power stations (which will impact principally smaller DMAs where it is not even arguable that broadcasters are "winning" in the video marketplace) is without factual foundation and flies in the face of the essentially de-regulatory precedent of the Quadrennial Review. This decision is anti-localism and hastens the death of local news in small markets, and it does so on the thinnest of gruels supplied in the factual record. The item tells a just-so story about viewpoint diversity and public interest while, at the same time, destroying the asset value of the very small market stations providing what limited viewpoint diversity remains. The Commission did not kill local print journalism, but it prepaid its ticket across the Styx, and today's decision is a second punch in the loyalty card.

Briefly, the Commission *also* should have eliminated or loosened the Local Radio Ownership Rule, as the factual record regarding the competitive environment in the audio marketplace clearly supports that conclusion. Yet it is not to be. The Commission here, in the name of public interest, viewpoint diversity, and *competition*, valiantly relies on the national industry incumbent—whose commercial dominance in the radio marketplace would be hurt by elimination of the rule—to make its arguments for it. Just so.