## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

ZIMMER RADIO OF MID-MISSOURI, INC., *et al.*,

*Petitioners*,

ABC TELEVISION AFFILIATES ASSOCIATION, *et al.*,

*Intervenors*.

v.

FEDERAL COMMUNICATIONS COMMISSION, *et al.*,

*Respondents,*

NCTA-THE INTERNET & TELEVISION ASSOCIATION, *et al.*,

*Intervenors*.

On Petition for Review from the
Federal Communications Commission
FCC 23-117, MB Docket No. 18-349

## BRIEF FOR INTERVENORS, CBS TELEVISION NETWORK AFFILIATES ASSOCIATION, ABC TELEVISION AFFILIATES ASSOCIATION, NBC TELEVISION AFFILIATES, AND FBC TELEVISION AFFILIATES ASSOCIATION IN SUPPORT OF PETITIONERS

Eve Klindera Reed
 *Counsel of Record*
Jeremy J. Broggi
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
ereed@wiley.law

*Counsel for Television Affiliates
Intervenors*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

The Petitioners and Petitioner-side Intervenors challenge a Federal Communications Commission Order that purports to conduct the regulatory review required by Section 202(h) of the Telecommunications Act of 1996. The preamble to that statute provides that its aim is to "promote competition and reduce regulation." Section 202(h) provides that the Commission "shall repeal or modify" its television ownership rules that are no longer "necessary in the public interest as the result of competition." In the Order under review, the Commission defies this deregulatory mandate by leaving in place decades-old ownership rules and piling on new ones. The Order is unlawful because it applies an agency-manufactured "plain public interest standard" instead of the deregulatory standard enacted by Congress. It is also unlawful for the independent reason that the Commission's rationales under its misguided approach are arbitrary and capricious.

The Television Affiliates Intervenors believe that oral argument would assist the Court and respectfully request 30 minutes per side to be split between the principal parties and their respective Intervenors.

i

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1.A, the Television Affiliates Intervenors state as follows:

1.    CBS Television Network Affiliates Association states that it has no parent corporation and that no publicly held company owns 10 percent or more of its stock because it is a non-stock corporation.

2.    ABC Television Affiliates Association states that it has no parent corporation and that no publicly held company owns 10 percent or more of its stock because it is a non-stock corporation.

3.    NBC Television Affiliates states that it has no parent corporation and that no publicly held company owns 10 percent or more of its stock because it is a non-stock corporation.

4.    FBC Television Affiliates Association states that it has no parent corporation and that no publicly held company owns 10 percent or more of its stock because it is a non-stock corporation.

July 15, 2024                                       */s/ Eve Klindera Reed*
                                                          Eve Klindera Reed

ii

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT .................................................................................i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES ..............................................................iv

INTRODUCTION ..............................................................................1

STATEMENT OF THE CASE..............................................................2

SUMMARY OF ARGUMENT ..............................................................5

STANDARD OF REVIEW ..................................................................6

ARGUMENT ....................................................................................6

    I.    The Commission's Retention Of The Local Television Rule Is Unlawful. ...................................................................6

        A.    The Commission Disregards Section 202(h)'s Deregulatory Standard. ...........................................6

        B.    The Commission's Market Definition Is Arbitrary. ..................9

        C.    The Commission's Viewpoint-Diversity Justification Is Arbitrary. .............................................14

    II.    The Commission's New Television Regulations Are Unlawful.........16

        A.    The Rule Expansions Violate Section 202(h)...........................17

        B.    The "Anti-Circumvention" Measures Are Arbitrary................17

        C.    The New Audience Share Methodology Is Arbitrary..............23

CONCLUSION ................................................................................24

Appellate Case: 24-1380     Page: 4     Date Filed: 07/16/2024 Entry ID: 5414128

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Telcom, Inc. v. FCC*,
  38 F.3d 576 (D.C. Cir. 1994)................................................................12

*ALLTEL Corp. v. FCC*,
  838 F.2d 551 (D.C. Cir. 1988)................................................................22

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018)................................................18, 23

*AT&T Wireless Services, Inc. v. FCC*,
  270 F.3d 959 (D.C. Cir. 2001)................................................................20

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)................................................................9

*Carlson v. Postal Regulatory Commission*,
  938 F.3d 337 (D.C. Cir. 2019)................................................................19

*DHS v. Regents of the University of California*,
  591 U.S. 1 (2020)................................................................10, 21

*Dubin v. United States*,
  599 U.S. 110 (2023)................................................................7

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)................................................................15

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)................................................................1, 3, 7

*Fischer v. United States*,
  144 S. Ct. 2176 (2024)................................................................8

*Fox Television Stations, Inc. v. FCC*,
  280 F.3d 1027 (D.C. Cir. 2002)................................................................2, 3

iv

*Genuine Parts Co. v. EPA*,
   890 F.3d 304 (D.C. Cir. 2018)..........................................................................15

*Loper Bright Enterprises v. Raimondo*,
   144 S.Ct. 2244 (2024)...............................................................................2, 6, 7

*Motor Vehicle Manufacturers Association v. State Farm Mutual
   Automobile Insurance Co.*,
   463 U.S. 29 (1983)..........................................................10, 13, 18, 21

*National Fuel Gas Supply Corp. v. FERC*,
   468 F.3d 831 (D.C. Cir. 2006) (Kavanaugh, J.) ..........................................6, 24

*Office of Communication of United Church of Christ v. FCC*,
   707 F.2d 1413 (D.C. Cir. 1983)..........................................................21

*Ohio v. EPA*,
   144 S. Ct. 2040 (2024)...............................................................11, 12

*Rudisill v. McDonough*,
   601 U.S. 294 (2024)..............................................................................7

*Spirit Airlines, Inc. v. FAA*,
   997 F.3d 1247 (D.C. Cir. 2021)..........................................................11

*United States v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)..............................................................................9

*Yellen v. Confederated Tribes of the Chehalis Reservation*,
   594 U.S. 338 (2021)..............................................................................8

**Statutes**

5 U.S.C. § 706 ..............................................................................6

47 U.S.C. §154 ..............................................................................7

47 U.S.C. § 303 ..............................................................................7

47 U.S.C. § 325 ..............................................................................12

Pub. L. No. 104-104, § 202, 110 Stat. 56 (1996).............................................*passim*

Pub. L. No. 108-199, § 629, 118 Stat. 3 (2004)....................................................2

v

**Regulatory Materials**

47 C.F.R. § 73.3555 ..................................................................3, 16, 17, 23

*2014 Quadrennial Regulatory Review*,
    Second Report and Order, 31 FCC Rcd. 9864 (2016)........................................16

*2014 Quadrennial Regulatory Review*,
    Order on Reconsideration, 32 FCC Rcd. 9802 (2017) .......................................15

Broadcast Television Station Totals as of December 31, 2023, Public
    Notice, DA 24-17 (rel. Jan. 8, 2024) ....................................................................3

**Other Authorities**

*Cable Carriage of Broadcast Stations*, FCC,
    https://tinyurl.com/zfmmm8ur (last updated Sept. 27, 2021).............................13

Appellate Case: 24-1380    Page: 7    Date Filed: 07/16/2024 Entry ID: 5414128

# INTRODUCTION[1]

In the early days of television, Americans' choices for news, information, sports, and entertainment were limited to just three major broadcast networks. But times changed. By 1996, an explosion of new media technologies was revolutionizing the communications landscape, ending broadcast's dominance. The burgeoning cable industry provided 24-hour news, with Fox News Channel and MSNBC joining CNN that year. Netflix, Hulu, and Amazon Prime were yet to follow; but the internet was already delivering news, entertainment, and other information directly to American homes. Convinced market forces could promote viewpoint diversity better than top-down regulation, Congress "require[d] the FCC to keep pace with industry developments" by "regularly reassess[ing] how its rules function in the marketplace" and removing unnecessary restrictions. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 419 (2021).

Congress began the process itself. The Telecommunications Act of 1996 repealed specific prohibitions on broadcast and media ownership and overrode other regulatory restrictions. So that the FCC would continue Congress's deregulatory effort, Section 202(h) directs the FCC to evaluate, every four years, the need for its broadcast ownership rules and "repeal" or "modify" any rule no longer "necessary

---

[1] Television Affiliates Intervenors adopt Petitioners' Jurisdictional Statement, Statement of the Issues, and Addendum. Television Affiliates Intervenors support Petitioners' arguments with respect to Section 202(h) and the Local Television Rule.

1

in the public interest as the result of competition." Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 ("1996 Act"), *amended by* Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004). Congress thus "set in motion a process to deregulate the structure of the broadcast and cable television industries." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1033 (D.C. Cir. 2002), *modified*, 293 F.3d 537 (D.C. Cir. 2002).

The FCC's Order violates the statutory mandate. Instead of eliminating the archaic Local Television Rule, the Order expands it. The Order misinterprets Congress's deregulatory command as a license to regulate, invoking out-of-context statutory snippets and deference the Supreme Court rejected. *See Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024). The Order is also arbitrary, overlooking important issues, ignoring record evidence, and relying on fundamentally inconsistent rationales.

## STATEMENT OF THE CASE

Congress enacted the 1996 Act to "promote competition and reduce regulation." 1996 Act, Preamble. To that end, Congress repealed statutes prohibiting cross ownership, § 202(i), and directed the FCC to "eliminat[e]" the nationwide television station ownership limit, § 202(c)(1)(A), "increas[e] the national audience reach limitation for television stations," § 202(c)(1)(B), and "relax[]" its "one-to-a-market ownership rules," § 202(d), among other deregulatory

2

changes, *e.g.*, §§ 202(e)-(f).  And in Section 202(h), Congress "establishe[d] an iterative process," *Prometheus* 592 U.S. at 419, for the Commission "to continue the process of deregulation," *Fox*, 280 F.3d at 1033.

The Order purports to review the Local Television Rule under Section 202(h). With origins in the early 1940s, the Local Television Rule precludes an entity from owning more than two television stations in the same local market.  47 C.F.R. § 73.3555(b)(1).  And under the "Top Four Prohibition," only one of those stations can be "ranked among the top four stations in the" local market, as determined by "audience share." *Id.* § 73.3555(b)(1)(ii).

The Order does not deregulate.  It not only "retain[s] the existing Local Television Ownership Rule," App.__ (Order ¶ 66), it *expands* it.  Before the Order, the Local Television Rule covered only the primary signal of approximately 1,750 full-power television stations.  *See* Broadcast Television Station Totals as of December 31, 2023, Public Notice, DA 24-17 (rel. Jan. 8, 2024).  After the Order, the Rule encompasses more than 2,000 low-power and Class A stations ("LPTV") and all multicasts.[2]  App.__ (Order ¶ 103).  And it imposes more regulatory burdens by counting "multicast programming" on streams that are ranked to assess a station's audience share.  App.__ (Order ¶ 94); 47 C.F.R. § 73.3555(b)(1)(ii).

---

[2] Multicasting occurs where a television station broadcasts multiple streams of programming over one channel.

The Commission justifies maintaining and expanding its decades-old Rule by continuing to define "broadcast television" as the "relevant market" to assess competition—deeming it "non-substitutable" with innumerable other "sources of video programming available today." App.__-__ (Order ¶¶ 73-76). It also claims that the Rule still "help[s] to ensure viewpoint diversity," App.__ (Order ¶ 81), and that television stations' "advertising revenue … has remained fairly steady," App.__ (Order ¶ 87). According to the Commission, additional restrictions were necessary because parties were using LPTV stations and multicast streams to increase their audience reach. App.__ (Order ¶ 99).

Commissioners Carr and Simington dissented. Commissioner Carr faulted the agency for "advanc[ing] the fiction that broadcast radio and broadcast television stations exist in markets unto themselves." App.__ (Carr Dissent 92). Even worse, Commissioner Carr explained, "the FCC is actually tightening" the Local Television Rule, notwithstanding its attempt "to characterize this action as closing a loophole." App.__ (Carr Dissent 93). Commissioner Simington agreed that the Commission not only "ignor[ed] the competitive realities of the modern video marketplace," but "turn[ed] them on their head." App.__ (Simington Dissent 94). He also explained that expanding the Local Television Rule "flies in the face of the essentially de-regulatory precedent of the Quadrennial Review." *Ibid.*

# SUMMARY OF ARGUMENT

I.       Retention of the Local Television Rule is unlawful.  The Order violates Section 202(h) because it applies a "plain public interest standard" developed by the Commission, App.__ (Order ¶ 16), instead of the deregulatory standard mandated by Congress through the text, structure, history, and purpose of the statute.

The FCC's reasons for retaining the Rule are also arbitrary and capricious.  Its market-substitution analysis ignores unrebutted record evidence of substitutability and declining revenues, and the Commission's "uniqueness" analysis is both irrelevant and substantively deficient.  Finally, the Commission's viewpoint-diversity rationale disregards unrebutted record evidence and is irrational.

II.       Expansion of the Local Television Rule is unlawful.  Section 202(h) prohibits such action, and the FCC's rationale for adopting so-called "anti-circumvention measures" flatly contradicts its rationale for retaining the Local Television Rule.  The Commission's anti-circumvention measures are also faulty because they fail to adequately assess record evidence and competition.  And the Order's amended audience-share methodology fails to explain why it treats multicasting inconsistently across its new rule provisions and fails to consider data limitations.

Appellate Case: 24-1380     Page: 12     Date Filed: 07/16/2024 Entry ID: 5414128

## STANDARD OF REVIEW

The Court shall "hold unlawful and set aside agency action" that is "arbitrary," "capricious," or "in excess of statutory jurisdiction, authority or limitations." 5 U.S.C. § 706. Where an agency "has relied on multiple rationales (and has not done so in the alternative)," a court "will ordinarily vacate the order" if "at least one of the rationales is deficient." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (Kavanaugh, J.).

## ARGUMENT

## I. THE COMMISSION'S RETENTION OF THE LOCAL TELEVISION RULE IS UNLAWFUL.

### A. The Commission Disregards Section 202(h)'s Deregulatory Standard.

The Commission went astray by replacing the deregulatory standard enacted by Congress with its own "plain public interest standard." App.__ (Order ¶ 16). The Supreme Court made clear last month that this Court "must exercise [its] independent judgment" in interpreting a statute and "may not defer to an agency interpretation of the law simply because a statute is ambiguous," *Loper Bright*, 144 S. Ct. at 2273. That forecloses the FCC's plea for deference, App.__ (Order ¶ 18), and makes this Court the first to exercise independent judgment in interpreting Section 202(h).

6

The "single best, meaning" of Section 202(h) is clear. *Loper Bright*, 144 S.

Ct. at 2266. The text provides that the FCC "shall" regularly evaluate its broadcast

ownership rules and "shall repeal or modify" those no longer "necessary in the public

interest as the result of competition." This text requires the Commission to

"regularly reassess how its rules function in the marketplace," and places the burden

on the agency to justify retention rather than allowing the rules to "remain in place

simply through inertia," *Prometheus*, 592 U.S. at 419. The provision thus

establishes a deregulatory standard.

Structure confirms the text. When the Communications Act (which the 1996

Act amended) authorizes the Commission to "make … rules," 47 U.S.C. §§ 154(i),

303(r), it does not use Section 202(h)'s retrospective "repeal or modify" language.

Because "differences in language like this convey differences in meaning," *Rudisill*

*v. McDonough*, 601 U.S. 294, 308 (2024) (quotations omitted), Section 202(h)'s

backwards-looking formulation and focus on competition confirms deregulation is

the default.

Section 202(h) follows a series of subsections that "eliminat[ed]," "revise[d],"

and "relax[ed]" rules. 1996 Act, § 202(a)-(f). It is entitled "*Further* Commission

Review." (emphasis added). Thus, the provision's "title and place in the statutory

scheme" each confirm that it continues these deregulatory efforts. *Dubin v. United*

*States*, 599 U.S. 110, 120-21 (2023) ("the heading of a section" resolves "doubt

7

about the meaning of a statute" (cleaned up)); *accord Fischer v. United States*, 144 S. Ct. 2176, 2184 (2024) ("phrase can be given a more focused meaning by the terms linked to it"). Any other interpretation would be absurd, allowing the FCC to have used the first biennial review in 1998 to tighten the rules Congress had instructed the agency to loosen in Subsections (a)-(f) just two years earlier. And as Petitioners explain in their brief, that outcome would undermine Congress's purpose "to promote competition and reduce regulation." 1996 Act, Preamble.

The FCC's contrary interpretation emphasizes words out of context. The Commission claims "modify" and "public interest" defeat "the logic of a deregulatory presumption." App.__ (Order ¶ 17). But a statute's "language cannot be construed in a vacuum." *Yellen v. Confederated Tribes of the Chehalis Rsrv.*, 594 U.S. 338, 359 (2021) (quotations omitted). Section 202(h)'s retroactive scope, its unique phrasing, and its location in a deregulatory section of a deregulatory statute must inform the meaning of the few words the Commission selects. By ignoring context, the Order misinterprets the statute to apply the wrong standard.

This error was dispositive. The record showed a fundamentally altered competitive landscape with broadcast television stations facing competition from "online … video streaming services too numerous to quantify or recount." App.__ (Carr Dissent 92). As two Commissioners recognized, these and other "realities of the modern media marketplace" ought to have "compel[led]" the FCC under Section

202(h) "to update [its] outdated" Local Television Rule. App.__ (Carr Dissent 92); *see* App.__ (Simington Dissent 94) ("broadcasters … are, at present, being *outcompeted* in the video marketplace"). That the agency reached a different result under its misguided "plain public interest standard" is reversible error.

**B.    The Commission's Market Definition Is Arbitrary.**

Regardless of the correct standard, the FCC's proffered justifications for retaining the Local Television Rule are arbitrary. The Commission primarily argues "broadcast television remains *unique* and *non-substitutable* with other sources of video programming." App.__ (Order ¶ 73) (emphasis added). It is wrong on both counts.

1.    *The Commission's Substitutability Analysis Is Arbitrary.*

Goods and services are substitutes when they are "reasonably interchangeable by consumers for the same purposes." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "[R]easonable interchangeability" is assessed by "the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Thus, reasonable interchangeability exists where an increase in the price of *A* causes an increase in the demand for *B*.

The unrebutted record evidence shows viewers consider broadcast and non-broadcast video programming reasonably interchangeable. The record reflects that

9

broadcasters face immense competition for viewers from non-broadcast sources. *See, e.g.*, App.__-__ (2021 Nexstar Comments 4-6). And broadcasters are losing audience share to these sources. App.__-__ (NAB 2021 Comments 87-92). Indeed, the Order agrees "*price conscious* consumers" sometimes choose "free, over-the-air television" in lieu of "subscribing to pay TV *alternatives*." App.__ (Order ¶ 74) (emphases added). So, if the "price" of non-broadcast "alternatives" increases, the demand for broadcast will also increase—strong evidence of substitutability. Yet, in assessing market definition, the Order "entirely failed to consider" viewer substitutability—an "important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This "alone renders" the "decision arbitrary and capricious." *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020).

The record contains equally strong evidence that advertisers treat broadcast and non-broadcast media as reasonably interchangeable. *See, e.g.*, App.__-__ (Television Affiliates 2021 Reply Comments 7-10); App.__ (NAB 2021 Comments 58); App.__-__ (Nexstar 2021 Comments 3-15). The Order even acknowledges broadcasters face "competition from other video programming sources … on advertising revenue." App.__-__ (Order ¶ 75). And the record shows television stations derive more revenue from advertising than from any other source. *See, e.g.*, App.__ (NAB 2021 Comments 96).

10

The Commission fails to grapple with this evidence. Despite acknowledging the substitutability of broadcasters' largest revenue source, the Commission waves it away as just "one of the facets of competition." App.__-__ (Order ¶ 75). That "single sentence" observing a glaring flaw with the agency's market definition and then dismissing it "falls well short of what is needed to demonstrate the agency grappled with an important aspect of the problem before it." *Spirit Airlines, Inc. v. FAA*, 997 F.3d 1247, 1255 (D.C. Cir. 2021).

The Commission's truncated discussion also conflicts with the record. The Order claims "advertising revenue[] has remained fairly steady in recent years." App.__ (Order ¶ 87). But broadcasters submitted a study showing their "advertising revenues have declined by 37.3 percent in real terms since 2000," with further drops projected. App.__-__ (NAB 2021 Comments 95-97). A double-digit drop is hardly "steady" and confirms intense competition from non-broadcast video sources. Yet the Commission "offered no reasoned response" to the study. *Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024). That is arbitrary.

2. *The Commission's Uniqueness Analysis Is Arbitrary.*

The Commission also errs in claiming the broadcast-television market is "unique" because "non-broadcast sources of video programming do not compete with broadcasters for retransmission consent fees" or "network affiliations." App.__-__ (Order ¶ 75).

11

To begin, products with "unique" attributes may still be market substitutes. For example, sneakers from Adidas may be reasonably interchangeable with those from Nike although one has stripes and the other a swoosh. And Apple competes with Microsoft even though only the latter offers Windows. So too, broadcasters compete with non-broadcast sources even though broadcasters produce "local programming." App.__ (Order ¶ 75). The "FCC must do more than enumerate factual differences" to show non-substitutability; it must "explain the relevance of those differences." *Adams Telcom, Inc. v. FCC*, 38 F.3d 576, 581 (D.C. Cir. 1994) (quotations omitted). By instead focusing on superficial aspects of broadcast television and labeling them "unique," the agency "fail[s] to supply a satisfactory explanation," *Ohio*, 144 S. Ct. at 2054 (quotations omitted). And its resort to this superficial analysis shows it lacks bona fide competition-based rationales for its antiquated market definition.

The Commission's uniqueness analysis also fails even on its own terms. Retransmission consent fees are not "unique to broadcast stations." *Contra* App.__ (Order ¶ 75 n.256). These are fees paid by cable and satellite companies to "retransmit the signal of a broadcasting station." 47 U.S.C. § 325(b)(1). Looking past technical jargon, such fees are merely the price broadcast stations charge for the right to distribute their content.

12

Broadcasters are hardly the only companies that sell their content. Major television networks deliver their content directly to consumers online *and* sell it for a fee to other distributors. App.__-__ (Television Affiliates 2021 Reply Comments 4-5). Cable channels also license their content to distributors. As the Commission's own source explains, "allowing broadcasters to receive compensation for carriage of their content … treats broadcasters *the same as non-broadcast programming services carried by cable systems*." *Cable Carriage of Broadcast Stations*, FCC, https://tinyurl.com/zfmmm8ur (last updated Sept. 27, 2021) (emphasis added) (cited in App.__ (Order ¶ 75 n.256)). And "more programming competing for viewers' eyeballs and attention" places "marketplace pressures" on retransmission consent compensation because the amounts distributors pay to broadcasters "are keyed to the number of subscribers in a station's market," and subscriber count decreases when viewers opt for alternative distribution platforms. App.__, __ (Television Affiliates 2021 Reply Comments 6, 10).

Thus, retransmission consent compensation is neither "unique" to broadcasters nor immune from non-broadcast market forces. The Commission's contrary conclusion elevates labels over substance and, as a result, "entirely fail[s] to consider an important aspect of the problem" and relies on a rationale that "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

13

The Commission's conclusory assertion that "non-broadcast sources of video programming do not compete with broadcasters" for "network affiliations," App.__ (Order ¶ 75), suffers from the same deficiency. Network affiliations occur when "[t]he largest national networks" contract "with broadcast stations for over-the-air delivery of their programming." App.__ (Order ¶ 75 n.256). But non-broadcast streaming platforms—like Paramount+, Peacock, Hulu, and Amazon—*also* transmit major-network programming. App.__-__ (Television Affiliates 2021 Reply Comments 4-6). That these platforms do not compete for affiliations is irrelevant because they compete directly with broadcasters to distribute the same network programming. *Ibid.* By limiting its analysis to the artificially narrow term "network affiliations"—rather than all arrangements involving network contracts to deliver their content—the Commission again elevates labels over substance and arbitrarily overlooks important record evidence.

## C. The Commission's Viewpoint-Diversity Justification Is Arbitrary.

The Commission asserts the Local Television Rule "help[s] to ensure viewpoint diversity in a local market." App.__ (Order ¶ 81). That rationale is arbitrary for at least three reasons.

*First*, it ignores over a dozen studies in the record debunking any link between station ownership and viewpoint diversity. *Compare* App.__-__ (NAB 2021 Reply Comments 24-25 n.66), *with* App.__ (Order ¶ 81). Overlooking studies that

14

contradict the FCC's position renders its action arbitrary. *See, e.g.*, *Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir. 2018).

*Second*, the Commission inexplicably reverses its 2017 conclusion that there are many "independent digital-only news outlets with no print or broadcast affiliation, many with a local or hyperlocal focus," with this "trend continu[ing] to gain momentum." *2014 Quadrennial Regulatory Review*, Order on Reconsideration, 32 FCC Rcd. 9802, ¶ 19 (2017). The Order's unsupported claim that online outlets are not independent and simply "repurpos[e] local television content," App.__ (Order ¶ 81), fails to "display awareness that [the agency] *is* changing position," let alone offer "good reasons" for its contrary view, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

*Third*, even if these sources merely repurposed local-television content, the Commission overlooks that these platforms still offer viewpoint diversity—for example, by coupling repurposed news with user commentary. *See* App.__-__ (NAB 2021 Comments 36-37 n.100). By improperly conflating *newsgathering* with *viewpoint*, the Order arbitrarily ignores the viewpoint-diversity contributions of online media.

15

## II. THE COMMISSION'S NEW TELEVISION REGULATIONS ARE UNLAWFUL.

While the Commission's decision to *retain* the Local Television Rule disregards Congress's deregulatory direction, its decision to adopt *new* regulations turns the statute on its head.

The Order tightens the Rule primarily by revising Note 11 to 47 C.F.R. § 73.3555 with so-called "anti-circumvention measures." Adopted in 2016, Note 11 prohibited affiliation swaps resulting in ownership of two top-four full-power television stations in the same market, which the agency deemed the "functional equivalent" of a direct acquisition. *See 2014 Quadrennial Regulatory Review*, Second Report and Order, 31 FCC Rcd. 9864, ¶¶ 45-52 (2016). But the Commission expressly "decline[d] to regulate dual affiliations via multicast," given the public-interest benefits of multicasting's "ability to bring more local network affiliates to smaller markets" and because "a multicast stream does not typically produce the cost savings and additional revenue streams" of a full-power television station. *Id.* ¶¶ 68-72. The Order completely reverses course, sweeping both multicasting and LPTV stations within the ambit of Note 11, App.__-__ (Order ¶ 97), even though neither are the equivalent of a full-power station. This expansion of Note 11 is a sharp break from FCC precedent, contravenes Section 202(h), and is neither reasonable nor reasonably explained.

Appellate Case: 24-1380     Page: 23     Date Filed: 07/16/2024 Entry ID: 5414128

The Order also revises the methodology used to evaluate audience share under the Top Four Prohibition to consider viewership from multicast streams "to the extent that such streams are ranked." App.__, __-__ (Order ¶¶ 85, 94-96); *see* 47 C.F.R. § 73.3555(b)(1). This change is also unlawful.

## A. The Rule Expansions Violate Section 202(h).

On its face, Section 202(h) permits the FCC to "modify" a regulation *only* after it has "determine[d]" a rule "to be *no longer in the public interest*." 1996 Act, § 202(h) (emphasis added); *see supra* Section I.A. However, the Order, adopted "under Section 202(h), App.__ (Order ¶ 11), finds that the Local Television Rule *remains* necessary to promote its public-interest goals. *See, e.g.*, App.__ (Order ¶¶ 71-72). Having reached that determination, the Commission lacked power to tighten the Rule in this proceeding. The anti-circumvention measures and audience share methodology changes should be vacated for this reason alone.

## B. The "Anti-Circumvention" Measures Are Arbitrary.

The Order's rationale for adopting "anti-circumvention" changes to Note 11 is incoherent, overlooks record evidence, and underestimates competition.

### 1. *The Commission's Purported Justification Is Incoherent.*

The Order retains the Local Television Rule because the Commission finds that broadcasters have been able to maintain "fairly steady" revenues and viewers despite robust competition from other media sources. *See* App.__-__, __-__ (Order

17

¶¶ 87, 79).  As explained above, this claim to "steady revenues" and viewers is patently incorrect and thus arbitrary.  *See supra* Section I.B.1.  But the claim is also arbitrary because it flatly contradicts the Commission's rationale for adopting the changes to Note 11—i.e., to prevent broadcasters from using multicast streams and LPTV stations to retain viewers and revenues.  *See* App.__-__ (Order ¶ 100); *see also* App.__-__ (Order ¶ 86) (contending that purported "loopholes" have allowed stations to increase audience shares).

The contradiction is obvious.  By eliminating some tools broadcasters have used to retain revenues and viewers, the Commission directly undermines the allegedly steady revenues and viewership that supposedly justified retaining the Local Television Rule in the first place.  This overlooks "an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

The Commission's conflicting rationales also render the Order "internally inconsistent."  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).  That is, the retention rationale (incorrectly) assumes revenues and viewership are steady under the Local Television Rule.  But the modification rationale assumes that broadcasters have been "achiev[ing] results that are inconsistent with" the Rule and attempts to shut them off.  App.__ (Order ¶ 99).  This contradiction is "arbitrary and capricious."  *ANR Storage*, 904 F.3d at 1028.

18

### 2. *The Commission Ignores Crucial Record Evidence.*

The Commission also ignores crucial information in the record that contradicted the agency's position.

*First*, the Commission is wrong that broadcasting "top-four rated programming" on "an LPTV station or multicast stream" is "the equivalent of a second top-four rated station in terms of audience and revenue share." App.__ (Order ¶ 100). Commenters explained that LPTV stations and multicast streams typically "generate only a tiny fraction of the revenue a full-power station earns" and "do not qualify for mandatory carriage on cable or [Direct Broadcast Satellite] systems." App.__-__, __ (NAB 2021 Comments 100-01, 104). Further, unlike full-power stations, LPTV stations "must accept interference from full-service stations" and "have limited coverage areas." App.__ (NAB 2021 Comments 104 & n.366). Thus, LPTV stations and multicast streams are *not* equivalent to full-power stations. The Commission finds otherwise only by arbitrarily ignoring record evidence and "comments" that "challenge a fundamental premise" of its "decision." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344-48 (D.C. Cir. 2019).

*Second*, the Commission errs in assessing how broadcasters generally use LPTV stations and multicast streams. Record evidence shows that broadcasters use these media to offer programming in smaller markets that "cannot support four full-power television stations" or otherwise lack stations affiliated with one or more top-

19

four networks.  App.__-__ (Television Affiliates Dec. 21, 2023 Ex Parte 1-2); *see* App.__-__ (NAB 2021 Comments 101-05 & n.350).

The Order rejects this evidence in a conclusory and unsupported fashion.  The Commission discredits broadcasters' evidence, instead relying heavily on data from broadcast *competitors* with a vested interest in weakening the broadcast-television industry: the American Television Alliance and NCTA – The Internet & Television Association.  App.__-__ (Order ¶¶ 101-02).  But Petitioners submitted comments demonstrating methodological errors in these commenters' data.  *See, e.g.*, App.__-__ (NAB 2021 Reply Comments 53-57); App.__-__ (NAB Dec. 19, 2023 Ex Parte 1-8).  The Commission observes these "deficiencies," but then inexplicably credits the deficient data anyway.  *See* App.__ (Order ¶ 102 n.332).  Such "[c]onclusory" analysis about a "matter[ ] involving a central factual dispute where there is considerable evidence in conflict do[es] not suffice."  *AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001).

*Third*, the Commission ignores the significant public-interest benefits of LPTV stations and multicasting.  The record shows that LPTV stations and multicasting increase programming in underserved markets.  App.__-__ (Television Affiliates Dec. 21, 2023 Ex Parte 1-2).  These media thus provide underserved viewers with "access to the programming" of additional "Big 4 Networks."  *Ibid.* These arrangements also generate "economic and operational efficiencies for

20

broadcasters" that "allow[ ]" them "to increase the amount of local news programming they provide, expand the reach of their programming, and air news, critical information and other programming in foreign languages, among other things." *Ibid.* Both the Commission and Congress have thus recognized that multicasting and LPTV stations provide "significant benefit[s]" and encouraged their use. App.__, __-__ (NAB 2021 Comments 101 & n.349, 104-05 & n.369).

The Commission now says LPTV stations and multicasting "do[] not always" produce the benefits it previously recognized. App.__ (Order ¶ 101). Always or not, the Commission had to explain why it chose to deprive broadcasters and the public of benefits that often result from using these media. Its failure to consider this important aspect of the problem is arbitrary. *State Farm*, 463 U.S. at 43; *see also Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1441-42 (D.C. Cir. 1983) (holding arbitrary decision that "failed to give adequate consideration to the vital" policy it sought to eliminate).

*Fourth*, the Commission disregards broadcasters' "reliance interests" and practical implementation problems with its amendments to Note 11. *Regents*, 591 U.S. at 30. For example, "if the licensee of a Big Four-affiliated full power television station and a Big Four-affiliated LPTV station [or multicast stream] were planning to assign or transfer this same-market combination to a new licensee, it would have to either divest one of the stations as part of the transaction or terminate the existing

21

affiliation of one of the stations and secure other programming." App.__ (NAB 2021 Reply Comments 56). This would subject the seller to "costly renegotiations with programmers to exit those agreements," which could ultimately deny "the affected market" the "full complement of major network affiliates." App.__ (NAB 2021 Reply Comments 57). The Commission arbitrarily ignores these adverse impacts.

*Finally*, in the face of these deficiencies, the FCC says broadcasters may "seek case-by-case consideration" of circumstances that would be inconsistent with revised Note 11. App.__ (Order ¶ 108 & n.348); *see* App.__ (Order ¶ 104 n.335). But an agency cannot save an irrational rule "by tacking on a waiver procedure." *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988). Case-by-case review does not cure the Order's deficiencies.

### 3. *The Commission Fails To Adequately Assess Competition.*

Even if Section 202(h) permits the Commission to "modify" a rule by imposing additional regulation (which it does not), the statute could conceivably allow such a result only under a *competition*-focused analysis. 1996 Act, § 202(h); *accord* App.__ (Order ¶ 22) (conceding "competition" is "a key consideration").

Yet, in purporting to assess competition in its Note 11 modifications, the Order overlooks an important aspect of the problem. The Commission claims (i) its Top-Four Prohibition is good for competition, and thus (ii) closing "loopholes" in the Prohibition is good for competition. App.__ (Order ¶ 98). This analysis suffers

22

from a glaring flaw: while the FCC "characterize[s] this action as closing a loophole," the conduct it covers did not previously "violate any ownership restriction." App.__ (Carr Dissent 93). Thus, the Commission cannot rest on the proposition that the status quo is justified by competition; it must show that its *modification* of that status quo is justified by competition. Its failure to do so is arbitrary.

### C.    The New Audience Share Methodology Is Arbitrary.

The Order alters the audience-share metric used to determine a station's in-market ranking to "incorporate the ratings of a station's multicast streams," but only "to the extent such streams have measurable ratings." App.__ (Order ¶ 85).

This new methodology makes the Order "internally inconsistent." *ANR Storage*, 904 F.3d at 1028. For purposes of calculating a station's audience share, the Order treats measurable multicast streams as part of the *same* station. 47 C.F.R. § 73.3555(b)(1). But under its "anti-circumvention" language, multicast streams are treated as a *separate* station. App.__ (Order ¶ 103). The Commission does not acknowledge—let alone explain—the inconsistent treatment of multicasts in its Rule modifications.

The new methodology is also arbitrary because the Commission fails to acknowledge that it will systematically overestimate the audience share of stations hosting popular multicast streams. Audience share is an estimate of the size of a

23

television audience relative to all television viewers, expressed as a percentage. By attributing the viewers of popular multicast streams (i.e., those with measurable ratings) to a station's audience while excluding the viewers of less popular multicast streams (i.e., those that lack measurable ratings) from the overall number of television viewers, the Commission will artificially inflate the audience share of stations hosting popular multicast streams. The Commission is using one method to calculate the numerator and a different method to calculate the denominator. Its failure to consider the impact of this data limitation is arbitrary, particularly when the goal is "to reflect a station's total audience share *more accurately*." App.__ (Order ¶ 85) (emphasis added).

## CONCLUSION

Because the Commission violated Section 202(h) and "at least one of the rationales [for the Order] is deficient" under the APA, this Court should "vacate the order." *Nat'l Fuel Gas Supply*, 468 F.3d at 839.

24

July 15, 2024                    Respectfully Submitted,

                                /s/ Eve Klindera Reed
                                Eve Klindera Reed
                                  *Counsel of Record*
                                Jeremy J. Broggi
                                Boyd Garriott
                                **WILEY REIN LLP**
                                2050 M Street NW
                                Washington, DC 20036
                                (202) 719-7000
                                ereed@wiley.law

                                *Counsel for Television Affiliates*
                                *Intervenors*

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations imposed by this Court's Order of May 3, 2024 because this brief contains 4,987 words, and the additional Petitioner-side Intervenor brief will contain 5,000 words or less.

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6). It has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses and is virus-free.

July 15, 2024

*/s/ Eve Klindera Reed*
Eve Klindera Reed

**CERTIFICATE OF SERVICE**

I certify that on July 15, 2024, I electronically filed the foregoing brief with the Clerk of the Court by using the CM/ECF system, and that the CM/ECF system will accomplish service on all parties represented by counsel who are registered CM/ECF users.

*/s/ Eve Klindera Reed*
Eve Klindera Reed