# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

ZIMMER RADIO OF MID-MISSOURI, INC., ET AL.,

*Petitioners*,

ABC TELEVISION AFFILIATES ASSOCIATION, ET AL.,

*Intervenors*,

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,

*Respondents*,

NCTA – THE INTERNET AND TELEVISION ASSOCIATION, ET AL.,

*Intervenors.*

---

Petitions for Review of an Order of the Federal Communications Commission

---

**OPENING BRIEF FOR INTERVENORS CONNOISSEUR MEDIA, LLC, MID-WEST MANAGEMENT, INC., MIDWEST COMMUNICATIONS, INC., SUN VALLEY RADIO, INC., EAGLE COMMUNICATIONS, INC., AND LEGEND COMMUNICATIONS OF WYOMING, LLC IN SUPPORT OF PETITIONERS**

Jennifer Tatel
  *Counsel of Record*
David Oxenford
Graham Stevenson
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com

*Counsel for Connoisseur Media, LLC, Mid-West Management, Inc., Midwest Communications, Inc., Sun Valley Radio, Inc., Eagle Communications, Inc., and Legend Communications of Wyoming, LLC ("Radio Intervenors")*

July 15, 2024

## SUMMARY OF THE CASE

The consolidated petitions challenge, among other things, the Federal Communications Commission's ("Commission") unlawful retention of the decades-old "Local Radio Rule," which caps the number of radio stations that a single entity may own in markets of certain sizes. The Local Radio Rule was initially promulgated when radio was the only mass-market audio service. In 1996, Congress tasked the Commission to review its broadcast ownership rules and to repeal or modify any of the rules no longer necessary in the public interest "*as the result of competition*," fully aware of the emerging and future competition that broadcasters did and would face in the broader "media marketplace." Congress required that the Commission consider the effects of this competition as the rationale for its deregulatory review. Yet despite overwhelming evidence of significant new competition in the media marketplace faced by radio broadcasters from myriad competitors for listenership and revenue, the Commission rejected its mandate to level the playing field for radio broadcasters and retained the strict Local Radio Rule in the same form it has held for nearly three decades.

The Radio Intervenors join the Petitioners in respectfully submitting to this Court that oral argument would be beneficial to resolve the issues presented in this case. An allocation of 30 minutes per side would be adequate to address the issues.

Appellate Case: 24-1380     Page: 2     Date Filed: 07/16/2024 Entry ID: 5414139

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eighth Circuit Rule 26.1A:

**Connoisseur Media, LLC** is a Delaware limited liability company. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Mid-West Management, Inc.** is a Wisconsin corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Midwest Communications, Inc.** is a Wisconsin corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Sun Valley Radio, Inc.** is a Utah corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Eagle Communications, Inc.** is a Kansas corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Legend Communications of Wyoming, LLC** is a Wyoming limited liability company. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Appellate Case: 24-1380    Page: 3    Date Filed: 07/16/2024 Entry ID: 5414139

# TABLE OF CONTENTS

SUMMARY OF THE CASE .................................................................... i

CORPORATE DISCLOSURE STATEMENTS ...................................... ii

TABLE OF AUTHORITIES ............................................................. iv

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES..........................................................1

STATEMENT OF THE CASE...............................................................1

SUMMARY OF ARGUMENT .............................................................1

ARGUMENT .......................................................................................3

    I.    The Order's Retention of the Local Radio Rule Contravenes the Deregulatory and Competition-Centric Mandate of Section 202(h).....3

    II.    The Order's Retention of the Local Radio Rule is Arbitrary and Capricious.......................................................................................5

CONCLUSION ..................................................................................21

Appellate Case: 24-1380     Page: 4     Date Filed: 07/16/2024 Entry ID: 5414139

# TABLE OF AUTHORITIES

**CASES**

*Carlson v. Postal Reg. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019).................................................................20

*Chamber of Com. of U.S. v. SEC*,
85 F.4th 760 (5th Cir. 2023)...............................................................12, 20

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ................................................................................3

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...............................................................................20

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) ...............................................................................20

*Home Box Off., Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977).....................................................................19

*Ill. Pub. Telecommc'ns Ass'n v. FCC*,
117 F.3d 555 (D.C. Cir. 1997)................................................................18

*Loper Bright Enters., Inc. v. Raimondo*,
144 S.Ct. 2244 (2024) ..............................................................................3

*MCI WorldCom, Inc. v. FCC*,
209 F.3d 760 (D.C. Cir. 2000)................................................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..............................................................................7, 20

**STATUTORY PROVISIONS**

Pub. L. No. 104-104, § 202(h), 110 Stat. 56 (1996)..............................3, 4

**REGULATIONS**

47 C.F.R. § 73.3526(e)(12) .......................................................................7

47 C.F.R. § 73.3527(e)(8).........................................................................7

iv

**OTHER MATERIALS**

86 Fed. Reg. 35089 (July 1, 2021)................................................................16

*Communications Marketplace Report*, 37 FCC Rcd 15514 (2022) ..........................9

H.R. REP. 104-204 (1995)........................................................................4

*Office of Economics and Analytics Seeks Comment on the State of Competition in the Communications Marketplace*, 37 FCC Rcd 6180 (2022)..............................10

Appellate Case: 24-1380    Page: 6    Date Filed: 07/16/2024 Entry ID: 5414139

## JURISDICTIONAL STATEMENT

The Radio Intervenors agree with the Petitioners' jurisdictional statement. Pet'rs' Brief 4.

## STATEMENT OF THE ISSUES

The Radio Intervenors agree with the Petitioners' statement of the issues. Pet'rs' Brief 4-6.

## STATEMENT OF THE CASE

The Radio Intervenors agree with the Petitioners' statement of the case. Pet'rs' Brief 7-17.

## SUMMARY OF ARGUMENT

Every four years, the Commission is required by statute to review its local ownership rules to "determine whether any of such rules are necessary in the public interest *as the result of competition.*" The current limits on the number of radio stations in a geographical market that one party can own have remained unchanged since they were adopted, despite massive changes in the competitive landscape for both listeners and advertising dollars. How does the Commission justify retention of these rules despite competition from out-of-market digital giants? It accomplishes this feat only by casting aside its mandate to review *competition* by defining the relevant market to exclude any other competitors.

The quadrennial review, mandated by Section 202(h) of the Telecommunications Act of 1996 ("Act"), is intended to "promote competition and

1

reduce regulation" and charges the Commission with evaluating the need for its rules solely "as the result of competition." The legislative history confirms Congress's mission to "depart from the traditional notions of broadcast regulation and to rely more on competitive market forces," including by assessing the impact of new marketplace competitors on traditional over-the-air broadcasters. But the Commission thwarts this mission by insisting on a market definition that excludes all other competitors and looking solely at the rule's impact on competition between radio stations.

Furthermore, in the process of discarding its statutory mandate to assess competition from new market entrants, the Commission fails to engage with record evidence that undermines its market definition and ignores the evidence of how relaxation of the ownership restrictions is in the public interest as the result of substantial new competition. The Administrative Procedure Act ("APA") requires the Commission to articulate a cogent explanation for its decision by linking the facts it found to the choice it made. Yet the Commission ignores significant data-driven arguments submitted by the Radio Intervenors, the National Association of Broadcasters ("NAB"), and others to reach an implausible conclusion that the radio market is an island unto itself—a conclusion contrary to the record and the law.

For these reasons and those articulated by the Petitioners, the Radio Intervenors respectfully ask this Court to vacate the Order.

2

## ARGUMENT

**I.** **THE ORDER'S RETENTION OF THE LOCAL RADIO RULE CONTRAVENES THE DEREGULATORY AND COMPETITION-CENTRIC MANDATE OF SECTION 202(h).**

The plain language, statutory context, and legislative history of Section 202(h) expose an unambiguous deregulatory mandate. Pet'rs' Brief 21-24. Furthermore, Section 202(h) requires the Commission to focus foremost on competition—specifically by considering the impact on broadcast of non-broadcast companies in the media marketplace—and the Commission has failed this charge. *Id.* 25-26, 28-30.

The Radio Intervenors emphasize that this Court is no longer bound to defer to the Commission's interpretation of any ambiguities it finds in Section 202(h). Instead, a reviewing court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters., Inc. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024) (overruling *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Unfettered from *Chevron*, the Court may look directly to Section 202(h)'s directive for the Commission to "determine whether any of such rules are necessary in the public interest *as the result of competition*" and "repeal or modify any regulation it determines to be no longer in the public interest." Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 112 (1996) (emphasis added).

3

The Preamble to the Act confirms that the Quadrennial Review is intended to "promote competition and reduce regulation." *Id.*, Preamble, 110 Stat. at 56. The legislative history makes clear that Congress meant for this review to assess competition in the broader media marketplace, of which broadcasters are only one part. The House Committee considering the legislation explained: "The audio and video marketplace . . . has undergone significant changes over the past fifty years and the scarcity rationale for government regulation no longer applies." H.R. REP. 104-204, at 54 (1995). It went on to cite myriad technologies, new at the time of the legislation, as examples of the competitive forces faced by broadcasters that warranted the quadrennial review. *See id.* at 54-55.

While the technologies described by Congress were principally video technologies (probably because most of today's audio competition did not yet exist in 1996), the recognition of new and future competitors led the drafters to a conclusion equally applicable to audio:

> To ensure the industry's ability to compete effectively in a *multichannel media market*, Congress and the Commission must reform Federal policy and the current regulatory framework to reflect the *new marketplace realities*. To accomplish this goal, *the Committee chooses to depart from the traditional notions of broadcast regulation and to rely more on competitive market forces*. In a competitive environment, arbitrary limitations on broadcast ownership . . . are no longer necessary.

*Id.* at 55 (emphasis added). This history confirms that the appropriate market in which to review competition is the overall media marketplace. Pet'rs' Brief 25. It

Appellate Case: 24-1380    Page: 10    Date Filed: 07/16/2024 Entry ID: 5414139

would make no sense for Congress to require the Commission to regularly conduct updated assessments of competition if that competition was limited to the fixed universe of broadcast stations. *Id.* at 29-30. Section 202(h) cannot be squared with a Commission decision—such as the Order—that adheres to "traditional notions of broadcast regulation" in a transformed marketplace.

As the Petitioners explain, the Commission's rejection of the unambiguous directive of Section 202(h) is unlawful, and the Court should reject its unsupported reading of the statute that the rules are meant only to preserve competition in a narrow market of broadcast stations. *Id.* Instead, the Court should take this opportunity to confirm what Congress intended: that the required analysis is a deregulatory one based on competition in the broader media marketplace. Any such analysis compels change in rules that were adopted decades ago in an entirely different competitive landscape. *See id.* at 27.

## II.  THE ORDER'S RETENTION OF THE LOCAL RADIO RULE IS ARBITRARY AND CAPRICIOUS.

As explained above, Section 202(h) directs the Commission to evaluate competition to determine whether the existing rules remain necessary in the public interest. Establishing the scope of the relevant "marketplace" was a crucial threshold inquiry to determine the extent of competition and conduct the public interest review. The legislative history of Section 202(h) makes clear that Congress meant for this evaluation of competition to encompass all forms of media that compete with

traditional broadcast companies and not be rooted in "traditional notions of broadcast regulation."

Yet despite ample record evidence that vigorous competition to radio exists for both listeners and advertising dollars, the Commission concludes that the appropriate marketplace in which to evaluate the continuing need for the ownership rules is the market for broadcast radio alone. Order ¶ 40 (App.___). While in some instances the Commission recognizes that other media exist and are having a growing impact in the media marketplace, *see, e.g.*, *id.* ¶ 35 (App.___), it ignores record evidence of the enormity of such competition. In doing so, it arbitrarily contorts its analysis to minimize the impact of this competition and decrees that the broadcast radio marketplace exists in a separate universe somehow insulated from the competition that Congress recognized would arise.

How does the Commission reach its conclusion that radio is a unique market justifying retention of the current rules? In substance, it provides three reasons. First, that broadcast radio has certain "unique" attributes that prevent other audio sources from serving as substitutes for it. *Id.* ¶ 33 (App.___). Second, that radio still has "strong and dominant" listenership and freedom of access, even if that listenership is declining. *Id.* ¶¶ 35-37 (App.___-___). And third, that there is a "distinct product market" for broadcast radio advertising. *Id.* ¶ 34 (App.___). Upon review of the record evidence presented, none can be deemed a rational and plausible conclusion for a

Appellate Case: 24-1380     Page: 12     Date Filed: 07/16/2024 Entry ID: 5414139

finding that the relevant market for the quadrennial review is broadcast radio alone. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that an agency decision may be set aside where the agency "offered an explanation for its decision that runs counter to the evidence . . . [or is] so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

*Uniqueness.* The Commission's discussion of radio's unique attributes is perhaps best summed up by one line in the Order: "broadcast radio is alone within the audio landscape in having an affirmative obligation to serve the needs and interest of the local community." Order ¶ 36 (App.__). For support, the Commission cites its own reporting obligations for broadcast licensees. *Id.* ¶ 36 n.114 (App.__) (citing 47 C.F.R. §§ 73.3526(e)(12), 73.3527(e)(8), which require radio station licensees to quarterly "submit a list of programs that treat issues faced by the local community"). In other words, the Commission concludes that *regulation itself* makes the radio market unique in its localism focus—thereby justifying the ownership regulations not based on their impact on competition, but instead on the fact that radio stations *are already regulated*. This circular reasoning does not provide the analysis needed to support the Commission's conclusions.

The Commission's additional discussion about these unique attributes merely recites aspects of radio that may give it a competitive advantage over some other

7

audio competition, such as local content, local emergency information, and free access for listeners. *Id.* ¶¶ 35-36 (App.__-__); *see also* Pet'rs' Brief 39-40. But nothing cited by the Commission supports the idea that these attributes make radio immune to competition from other forms of digital media, which is supposed to be the crux of the Commission's analysis. *See supra* Section I. As detailed below, there is extensive record evidence, minimized or ignored in the Order, that this competition exists and is rapidly siphoning the listenership and advertising revenue that radio stations need to provide the benefits that the Commission describes.

*Listenership Market.* The Commission's justification that radio continues to have a significant audience similarly cannot support a finding that radio is its own unique market. *Contra* Order ¶ 37 (App.__-__). The record does not support this pillar of the Commission's decision, but instead demonstrates that radio listenership is declining and flowing directly to digital media competitors.

The record shows that radio has been losing audience share to digital media for a decade. Consider the Order's brief reference to Edison Research's 2018 and 2021 "Share of the Ear" surveys,[1] intended to show that radio listening levels remain

---

[1] Edison Research has conducted "Share of Ear" surveys routinely since 2014, analyzing listening habits in the audio marketplace. While the Commission cites Edison, it cherry-picks specific datapoints in third parties' interpretations of this data over the detailed data-filled exhibits from Edison itself, with analysis by Edison's President, Larry Rosin, provided by the Radio Intervenors. *See, e.g.*, Order ¶¶ 34 n.106, 37 & n.120 (App.__, __). In the portion of the 2022 Communications

Appellate Case: 24-1380     Page: 14     Date Filed: 07/16/2024 Entry ID: 5414139

"dominant." *Id.* ¶ 37 & nn.119-20 (App.___). The Commission cites a 2018 "Share of Ear" survey showing that radio captures 46% of the share of listening time by Americans 13 years old and above and a 2021 survey showing radio's share at 38%, noting that this was the highest share of listening time for any medium. *Id.* ¶ 37 (App.___).[2]

Putting aside that this data shows radio's share of listening dropped by 8% in three years, the Commission ignores the thorough analysis of *more recent* Share of Ear findings provided by Radio Intervenors, including Mr. Rosin's declaration.[3] This

---

Marketplace Report regurgitated in the Order, *id.* ¶ 37 (App.___), the Commission admits that it relied on third-party sources for 2021 Edison since the complete data were not available free of cost. *Communications Marketplace Report*, 37 FCC Rcd 15514, 15699 ¶ 318 n.933 (2022). Yet, when provided with that and more recent data, the Commission ignored it. And curiously, when citing 2021 "Share of Ear" data, the Communications Marketplace Report (and the Order) omits mention of streaming audio listening other than podcasting. *Id.* at 15699 ¶ 318; Order ¶ 37 (App.___).

[2] The Commission's radio listening computations lump together over-the-air and AM/FM digital streaming. *Compare* Order ¶ 37 (App.___) (citing a 46% share for radio in 2018) *with* Connoisseur Media, LLC, et al. Letter, Ex. C to Attach. A, at 1 (Nov. 9, 2023) (App.___) ("Q4 2022 Share of Ear Data") (showing the 46% figure includes over-the-air (42.0%) plus digital streams (3.7%)). It is internally inconsistent for the Commission to weigh radio's digital streams and simultaneously exclude the impact of other digital audio on radio. Nonetheless, even including AM/FM streams does not change the fact that digital audio has reduced and now overtaken radio's share.

[3] The Commission rejects consideration of the Radio Intervenors' November 9, 2023 letter because it "do[es] not raise new legal or policy issues within the scope of this proceeding." Order ¶ 10 n.28 (App.___). As shown herein, the data contained within that filing had significant policy bearing on the Commission's conclusions in the

data showed that by the end of 2022, the **total share of listening captured by streaming audio services unrelated to radio exceeded the share of listening captured by radio**.[4] Between 2014 and 2022, average time spent listening to AM/FM over-the-air broadcasts decreased by 35%.[5] Q4 2022 Share of Ear Data, at 1 (App.__). Within the 13 to 24 age demographic, daily minutes spent with radio *decreased* by nearly 50% since 2014—correlated with a more than 50% *increase* in time spent listening to streaming audio. *Id.* at 2 (App.__). This cannot be characterized as "dominan[ce]." *Contra* Order ¶ 37 (App.__).

The Commission similarly minimizes findings that "consumers are increasingly finding new audio sources to consume while driving," and that there

---

Order and was improperly rejected under the APA, particularly given that the Commission addressed other filings from the same timeframe. *See, e.g.*, *id.* ¶ 43 n.140 (App.__) (citing a November 29, 2023 letter from the Radio Intervenors). The Commission also relies on its December 2022 Communications Marketplace Report, which it did not seek comment on until more than seven months after update comments were due in this proceeding. *See Office of Economics and Analytics Seeks Comment on the State of Competition in the Communications Marketplace*, 37 FCC Rcd 6180, 6180 (2022).

[4] Q4 2022 Share of Ear Data, at 1 (App.__) (subtracting the share of listening to AM/FM digital streams (5.1%) from the total share of all streaming audio (43.3%) yields 38.2%, higher than the share of listening to AM/FM over-the-air (32.8%) *plus* the share of AM/FM streams (5.1%)).

[5] The Commission rejects as "speculative" the comments opposing its conclusion that the drop in radio listenership can be largely attributed to the COVID-19 pandemic. Order ¶ 37 & n.117 (App.__). As explained by Mr. Rosin, this trend has been consistent since 2014 and shows no sign of reversing. *See* Connoisseur Media, LLC, et al. Letter, Ex. A to Attach. A, at 1 (App.__) ("Rosin Declaration").

Appellate Case: 24-1380     Page: 16     Date Filed: 07/16/2024 Entry ID: 5414139

are a "decreasing number of radios in households" given the proliferation of digital devices offering other audio content. *Id.* (App.__-__). It paints a rosy picture that in-car listening was rebounding post-pandemic and that broadcasters were finding new ways to reach listeners even if home radios were less common. *Id.* (App.__-__).[6] However, Edison Research data showed that minutes listened to radio in the car has steadily decreased by 29% from 2014 through 2022. Q4 2022 Share of Ear Data, at 4 (App.__) (table misstates "2021" instead of "2022"). The Commission relegates to a footnote the fact that 30% of Americans over age 12 (and 50% between 13 and 34) do not even have a radio in their home. Order ¶ 37 n.125 (App.__). And it inexplicably minimizes the fact that 91% of Americans have a smartphone—the preferred way of listening to audio—and less than 4% do not have internet access. Connoisseur Media, LLC, et al. Letter, Ex. A to Attach. B, at 5 (App.__); Order ¶ 35 n.112 (App.__).[7]

The Commission also concludes, without any analysis, that digital media listening is more akin to listening to one's own music than to radio listening. Order ¶ 39 (App.__-__). This ignores the clear correlation between the decrease in radio

---

[6] For support, the Commission cites a single trade press article. Order ¶ 37 n.126 (App.__).

[7] The Commission again ignores the most recent smartphone ownership data in the record. *Compare* Order ¶ 37 n.125 (App.__) (84% in 2019) *with* Connoisseur Media, LLC, et al. Letter, Ex. A to Attach. B, at 5 (App.__) (91% in 2023).

Appellate Case: 24-1380    Page: 17    Date Filed: 07/16/2024 Entry ID: 5414139

listening and the rise in listening to digital sources identified in the Edison reports. As summarized in the record in 2023 by Mr. Rosin (and ignored in the Order), Edison's studies show:

> [A] decrease in time spent listening to radio among those 13 and above over the 9-year period of our study, and the corresponding increase in listening to audio streaming services. [The results] also show the more pronounced effects of this listening shift among younger demographics, as well as the continuing downward trend in AM/FM over-the-air listening since 2019.

Rosin Declaration, at 2 (App.___). The Commission's contrary conclusions defy reality. It is irrational for the agency to bury its head in the sand and ignore or cherry-pick reputable data in the record that it "did not want to consider," *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023), and hamstring broadcast radio in its competition against massive, well-financed digital competitors simply so the Commission can maintain a set of outdated rules. Pet'rs' Brief 54-55.

***Advertising Market.*** The Commission's conclusion that radio is a distinct market also belies the voluminous record on the impact of digital media advertising on radio revenues. Hundreds of pages were devoted to this topic, including three reports from Borrell Associates ("Borrell")—which has been studying the local advertising market for over 20 years—as well as reports from BIA Consulting ("BIA"), another long-term analyst of media markets. But once again, rather than engage with the data and expert analysis of these reports, the Commission skates by

Appellate Case: 24-1380    Page: 18    Date Filed: 07/16/2024 Entry ID: 5414139

them. *See, e.g.*, Order ¶¶ 34 & n.104, 43 & n.140 (App.__-__, __-__) (collapsing hundreds of pages of data and analysis into two sentences).

The Borrell data show the crippling effect of digital advertising's "meteoric rise," Connoisseur Media, LLC, et al. Comments, Ex. B, at B-2 (Apr. 29, 2019) (App.__) ("Joint Comments"), on the local radio advertising market that worsened throughout the proceeding.[8] The vast majority of radio revenue comes from ad sales to local businesses, and this local advertising revenue has been rapidly flowing to digital competitors. In 2018, Borrell concluded that "local advertisers see radio and digital advertising as substitutes," *id.* at B-4 (App.__), citing data showing that advertising in digital media accounted for 53% of all local advertising, while radio accounted for "single digits," *id.* at B-2 (App.__), and that more local radio advertising buyers planned to *increase* their social media advertising expenditures than did not, while more of those buyers planned to *decrease* their spending on radio advertising. *Id.* at B-4 (App.__). By 2022, Borrell's data showed that nearly 68% of local advertising dollars went to digital media and less than 15% went to local radio, television, and cable *combined*. Connoisseur Media, LLC, et al. Letter, Ex. F to Attach. A, at 3 (App.__) (showing that of the $142.8 billion spent in 2022, only

---

[8] In fact, the aggressive encroachment of digital advertisers into the local advertising space *exceeded* Borrell's 2018 forecast. *Compare* Joint Comments, Ex. B, at B-2 (App.__) (projecting digital media to account for 63% of local advertising by 2023) *with* Connoisseur Media, LLC, et al. Letter, Ex. F to Attach. A, at 2 (App.__) (showing digital media accounted for 67% of local advertising *by 2022*).

13

$21.2 billion (14.8%) went to radio, TV, and cable). Borrell concluded that no locally based media entity would have a 6% share of local advertising, with individual radio stations controlling less than a 1% share in almost every market. *Id.* at 2 (App.___).

In contrast, two-thirds of local digital advertising dollars were split by out-of-market companies, with Amazon, Google, and Facebook controlling 53% of local advertising. *Id.* (App.___). Borrell also found that between 2013 and 2022, the radio advertising budgets of local businesses dropped 46% and the percentage of businesses that bought radio advertising decreased 14% between 2017 and 2022. *Id.* at 4 (App.___).

BIA similarly found a strong negative impact on radio advertising revenues caused by incursion of digital advertisers into the local advertising space. For example, BIA estimated that "local radio [over-the-air] advertising revenue in 2019 w[ould] be approximately $12.9 billion, representing just 8.7% of total local advertising in the U.S." NAB Comments, at 11 (Apr. 29, 2019) (App.___). Meanwhile, BIA estimated "'pure play' online/interactive local advertising at $20.4 billion (13.8%) and local mobile advertising at $20.7 billion (14.0%)." *Id.* at 11-12 (App.___-___). BIA concluded that "[f]aced with increased competition for audiences and advertisers, local radio stations collectively have experienced notable decreases in their overall listening and real decreases in their over-the-air advertising revenue."

14

*Id.*, Attach. A, at 18 (App.___); *see also* Pet'rs' Brief 57-58 (discussing BIA's analysis). In 2021, NAB submitted fresh BIA data showing that radio stations' nominal over-the-air advertising revenue dropped 44.9% and total radio advertising revenues—both over-the-air and digital—dropped 39.8% between 2005 and 2020. NAB Update Comments, at 77 & n.252 (Sept. 2, 2021) (App.___).

The Radio Intervenors also submitted fourteen declarations describing the real-world impact on radio of the trends identified by Borrell and BIA. These declarations came from the owners of radio stations in markets of all sizes across every major region of the country. Each recounted the same dire situation: digital advertisers siphoning away the critical advertising revenue that these radio stations need to sustain their provision of local content.

For example, the president of one of the Radio Intervenors recounted the departure of a radio advertising client who claimed that "even though they have loved radio advertising over the years, they are trying 'new media' to be more competitive with others in the market." Joint Comments, Ex. C, Decl. of M. Kent Frandsen, at 1 (App.___). The Chief Operating Officer of another wrote that "[w]e have lost over $500,000 in local dealer advertising from the automobile industry alone." *Id.*, Ex. C, Decl. of Michael Wright, at 1 (App.___). The Founder of a third Radio Intervenor explained that hundreds of thousands of local advertiser dollars in his company's markets were shifting from radio to digital advertising. *Id.*, Ex C.,

Appellate Case: 24-1380   Page: 21   Date Filed: 07/16/2024 Entry ID: 5414139

Decl. of Jeffrey D. Warshaw, at 1 (App.___). And in response to the Commission's 2021 request for new "information regarding the broadcast industry's evolution since early 2019 and its current trajectory," 86 Fed. Reg. 35089, 35091 (July 1, 2021), one of the owners explained that "the market since 2019 has only grown more desperate and in need of station ownership cap reform." Connoisseur Media, LLC, et al. Comments, Ex. C, at 5 (Sept. 1, 2021) (App.___).

Shockingly, *not once* does the Commission directly address these sources in its discussion of radio's place in the broader advertising ecosystem. Had it done so, the Commission could not have waved away the enormous incursion by digital advertising giants into local advertising markets. Indeed, clear acknowledgement and discussion of this material would have unequivocally undermined the Commission's conclusion that there still exists some "distinct product market" for broadcast radio advertising that is the only "market" it should consider. Order ¶ 34 (App.___-___).

Instead, the Commission hides behind iHeartRadio's claims that acquiring more stations would not deliver the revenue needed to sustain the radio industry. Pet'rs' Brief 60-61. The NAB lays bare the Commission's "astounding" credibility determination favoring "conclusory assertions" of the country's largest radio broadcaster over the rigorous Borrell and BIA studies and "first-hand experiences" of radio owners contained in the declarations. *Id.*

16

Beyond the crucial threshold question of the relevant market, these same reports and declarations detailed the benefits of relaxed ownership rules, from allowing owners to eliminate the duplicative formats that now exist with multiple owners in a market (thus providing a wider choice of programming to the public) to shoring up the economics of stations that cannot currently be held by larger radio groups and thus cannot afford to do local programming. According to BIA:

> [T]he economics of the modern audio marketplace and the weak competitive position of many stations suggest that radio broadcasters need to achieve greater economies of scale to remain effective competitors. If local ownership rules were relaxed and some of the weaker stations were combined with other local radio groups, they could be placed on a sounder financial footing, become more vibrant competitors in their local markets, and offer improved service to local audiences.

NAB Comments, Attach. A, at 35-36 (App.__). These analytical conclusions are borne out by the experiences described in the Radio Intervenors' declarations. *See, e.g.*, Connoisseur Media, LLC, et al. Letter, Ex. B to Attach. B, at 2-3 (App.__-__) ("Our [scale] has allowed us to provide a diverse array of locally oriented programming[.] . . . With greater scale, we would be able to inject localism into the 'dumb jukeboxes' that . . . offer little or no service to the community.").

The Commission glosses over the declarations as to the benefits of relaxed ownership rules. As to the concept of more program diversity and localism stemming from relaxation of the rules, the best rebuttal the Commission musters is that "[o]ne has to question . . . whether [an] owner [who acquires a station and eliminates

17

duplicative formats] would maintain the same quality of service on its stations without facing external competition from other station owners." Order ¶ 46 (App.__-__).

The Commission's rhetorical "gotcha!" makes no sense. The Commission's suggestion is only even conceivable under the arbitrary and contrived market definition the Commission conveniently adopted for its review. But given the obvious competition for audience and advertisers described above, broadcasters have no incentive to provide anything but their best product to stem the erosion from digital media. The Commission rejects out of hand legitimate, supported arguments without adequately addressing the lived experience of the owners who submitted declarations, which cannot be the level of expert analysis that is demanded of the agency under the APA. *See Ill. Pub. Telecommc'ns Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997) ("[An] *ipse dixit* conclusion, coupled with [a] failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking").

In place of discussing these reasoned, evidence-backed descriptions of how relaxation of the Local Radio Rule could help promote the radio industry, the Commission selectively references soundbite-style statements from a few radio owners who claim that radio "will never out-Google Google, or out-Facebook Facebook," Order ¶ 45 (App.__-__) (citation omitted), as if the goal of relaxing the

Appellate Case: 24-1380    Page: 24    Date Filed: 07/16/2024 Entry ID: 5414139

Rule is to allow radio to somehow become a carbon copy of social media. Not so: the goal of the quadrennial review is to promote marketplace competition by allowing each competitor to fully exercise its medium's competitive advantage. In a sense, the Commission is correct in that radio's survival depends on its key competitive attributes—localism and community focus—and not on its becoming Google or Facebook. But in deciding how to promote that localism, the Commission's conclusion runs contrary to the evidence that radio owners need to scale to secure revenue streams sufficient to maintain their important product.

The Commission's failure to engage with the record—and its subsequent failure to develop rational explanations for its decisions regarding the relevant market and obvious competition—warps natural competitive forces and hastens the growth of audio competitors by depriving radio of the regulatory relief it needs to compete. These failures are clear examples of arbitrary and capricious decision-making.

The Commission failed by abdicating its responsibility to engage in a "dialogue" with the record. *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public." (citation omitted)). The Commission is obligated to review the record compiled and respond in good faith to significant points and data—particularly those that would undermine its conclusions,

19

which the submissions made by the Radio Intervenors and NAB plainly do. *See Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("[A]n agency must respond to comments 'that can be thought to challenge a fundamental premise' underlying the proposed agency decision.") (quoting *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000)); *see also Chamber of Com. of U.S.*, 85 F.4th at 776 ("[*Prometheus*] offers no support for [an agency's] decision to ask for—and then ignore—already-existing data it did not want to consider.") (discussing *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)).

Even assuming its findings were adequate foundation for retaining the Local Radio Rule, the Commission "has not rendered an opinion which, by the route suggested, links its findings and its conclusions." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 248 (1972). The reasoning underlying the Order abandons common sense—let alone expertise—on all three of the proposed pillars for the Commission's chosen market definition and its ultimate conclusion that loosening the Local Radio Rule would harm the public interest. *State Farm*, 463 U.S. at 43 ("[A]n agency rule [is] arbitrary and capricious if [it] . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). In sum, the Commission's decision falls well outside the "zone of reasonableness" permitted by the Supreme Court and should not be upheld. *Cf. Prometheus*, 592 U.S. at 423.

## CONCLUSION

For the foregoing reasons, the Radio Intervenors respectfully request this Court to vacate the Order.

Respectfully submitted,

Jennifer Tatel
  *Counsel of Record*
David Oxenford
Graham Stevenson
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
doxenford@wbklaw.com
gstevenson@wbklaw.com

*Counsel for Connoisseur Media, LLC, Mid-West Management, Inc., Midwest Communications, Inc., Sun Valley Radio, Inc., Eagle Communications, Inc., and Legend Communications of Wyoming, LLC*

July 15, 2024

21

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5000 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

*/s/ Jennifer Tatel*
Jennifer Tatel
  *Counsel of Record*
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com

*Counsel for Connoisseur Media, LLC, Mid-West Management, Inc., Midwest Communications, Inc., Sun Valley Radio, Inc., Eagle Communications, Inc., and Legend Communications of Wyoming, LLC*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on July 15, 2024, I electronically filed the foregoing Brief for Intervenors Connoisseur Media, LLC, Mid-West Management, Inc., Midwest Communications, Inc., Sun Valley Radio, Inc., Eagle Communications, Inc., and Legend Communications of Wyoming, LLC in Support of Petitioners with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jennifer Tatel*
Jennifer Tatel