IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

————

NOS. 24-1380, 24-1480, 24-1493, 24-1516

————

ZIMMER RADIO OF MID-MISSOURI, INC., ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

————

ON PETITIONS FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

————

JONATHAN S. KANTER
ASSISTANT ATTORNEY GENERAL

ROBERT B. NICHOLSON
ROBERT J. WIGGERS
ATTORNEYS

UNITED STATES
   DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

P. MICHELE ELLISON
GENERAL COUNSEL

JACOB M. LEWIS
DEPUTY GENERAL COUNSEL

JAMES M. CARR
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

# SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Section 202(h) of the Telecommunications Act of 1996 directs the Federal Communications Commission to review its media ownership rules every four years to "determine whether any of such rules are necessary in the public interest as the result of competition," and to "repeal or modify any regulation it determines to be no longer in the public interest." *See* Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996). In the order on review, which completed the FCC's latest quadrennial review under section 202(h), the Commission concluded that its rules restricting ownership of multiple radio and television stations in local markets remain "necessary in the public interest" and should be retained. The Commission also amended a note to its rules to prevent circumvention of the rule restricting local television station ownership. *2018 Quadrennial Regulatory Review*, FCC 23-117, 2023 WL 9021989 (released December 26, 2023) (App.___) (*Order*). Several broadcasters and their trade association challenge the *Order* on various grounds. As we explain below, none of their arguments has merit.

Given the complexity of this case, we believe that oral argument would assist the Court. We respectfully request that the Court afford respondents and their supporting intervenors time to present oral argument equal to the total time allocated to petitioners and their supporting intervenors.

i

# TABLE OF CONTENTS

Summary Of The Case And Request For Oral Argument ................................. i

Table of Contents .................................................................................... ii

Table of Authorities.................................................................................v

Introduction ...........................................................................................1

Jurisdiction ............................................................................................2

Questions Presented ...............................................................................3

Statutes and Regulations ........................................................................4

Counterstatement....................................................................................4

    A.   Statutory And Regulatory Background .................................................4

    B.   The FCC's Local Broadcast Ownership Rules ....................................6

        1.   The Local Radio Ownership Rule.....................................................6

        2.   The Local Television Ownership Rule .............................................7

    C.   The 2018 Quadrennial Review Proceeding............................................9

    D.   The Order On Review .......................................................................11

        1.   Retaining The Local Radio Ownership Rule ...................................12

        2.   Retaining The Local Television Ownership Rule...........................15

        3.   Modifying Note 11 ........................................................................20

Summary of Argument...........................................................................21

Standard of Review ...............................................................................28

Argument...............................................................................................30

I.  The Commission Reasonably Determined That The Local
    Radio Ownership Rule Remains Necessary In The Public
    Interest ........................................................................... 30

    A.  The Commission Reasonably Explained Why It Retained
        The Rule. ............................................................... 30

    B.  In Deciding To Retain The Rule, The Commission Made
        A Reasonable Choice Between Conflicting Record
        Evidence. ............................................................... 38

II. The Commission Reasonably Determined That The Local
    Television Ownership Rule Remains Necessary In The
    Public Interest ................................................................ 42

    A.  The Commission Reasonably Explained Why It Retained
        The Rule. ............................................................... 42

    B.  The Commission Reasonably Explained Why It Retained
        The Two-Station Limit. ......................................... 47

    C.  The Commission Reasonably Explained Why It Retained
        The Top-Four Prohibition. ..................................... 50

III. The Commission Reasonably Decided To Modify Note 11 .............. 57

    A.  The Commission Reasonably Explained Why It Modified
        Note 11. ................................................................. 59

    B.  The Modification Of Note 11 Does Not Violate The
        Communications Act Or The First Amendment. ........ 63

IV. In Assessing Whether Its Ownership Rules Should Be
    Retained, The Commission Adopted Reasonable Definitions
    Of The Relevant Markets ............................................... 67

V.  The Commission Complied With Section 202(h) ........................ 73

    A.  Section 202(h) Does Not Require Deregulation When
        Not In The Public Interest. .................................... 74

    B.  The Commission Did Not Violate Section 202(h) By
        Modifying Note 11. ................................................ 78

Conclusion......................................................................................81

# TABLE OF AUTHORITIES

## CASES

*Alliance for Cmty. Media v. FCC*, 529 F.3d 763 (6th Cir. 2008).................................................................49

*Allied-Signal, Inc. v. NRC*, 988 F.2d 146 (D.C. Cir. 1993)...................................................................................81

*Am. Family Ass'n, Inc. v. FCC*, 365 F.3d 1156 (D.C. Cir. 2004)...............................................................64

*Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490 (1981) ...............................................................................29

*AT&T Corp. v. FCC*, 220 F.3d 607 (D.C. Cir. 2000) ...................49

*AT&T Servs., Inc. v. FCC*, 21 F.4th 841 (D.C. Cir. 2021)...................................................................................81

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ..........................80

*Carter Mountain Transmission Corp. v. FCC*, 321 F.2d 359 (D.C. Cir. 1963) ................................... 4, 65

*Cellco P'ship v. FCC*, 357 F.3d 88 (D.C. Cir. 2004)...................75

*Citizens Telecomms. Co. v. FCC*, 901 F.3d 991 (8th Cir. 2018)............................... 3, 28, 29, 33, 38, 39, 49, 51

*Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235 (3d Cir. 2010) ...................................................................62

*Dolgencorp, LLC v. NLRB*, 950 F.3d 540 (8th Cir. 2020)............................................................. 3, 29, 39

*FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 (1978) ............... 3, 5, 21, 26, 33, 51, 64, 66, 76, 77

*FCC v. Pottsville Broad. Co.*, 309 U.S. 134 (1940)......................76

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ........................... 3, 4, 5, 6, 10, 21, 22, 26, 28, 30, 42, 63, 66, 76, 77

*FCC v. WNCN Listeners Guild*, 450 U.S. 582 (1981) ........................................................... 4, 21, 76

*FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016) ...............................................................................28

v

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002)................................................................. 64, 74

*GoJet Airlines, LLC v. FAA*, 743 F.3d 1168 (8th Cir. 2014)..................................................................................29

*Great Lakes Commc'n Corp. v. FCC*, 3 F.4th 470 (D.C. Cir. 2021)..............................................................................62

*Huey v. Sullivan*, 971 F.2d 1362 (8th Cir. 1992) ...................................... 4, 79

*Ill. Bell Tel. Co. v. FCC*, 911 F.2d 776 (D.C. Cir. 1990).....................................................................................57

*Iyawe v. Garland*, 28 F.4th 875 (8th Cir. 2022)........................................28

*JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011 (9th Cir. 1983) ............................................................71

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ......................................................................................77

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of Interior*, 95 F.4th 573 (8th Cir. 2024) .................................... 4, 70

*Minn. Pub. Util. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007) .................................................................................57

*Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796 (D.C. Cir. 2002)............................................................... 66, 67

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)............................................................28

*Mt. Mansfield Television, Inc. v. FCC*, 442 F.2d 470 (2d Cir. 1971) ................................................................................62

*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) ......................................................................................64

*Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413 (D.C. Cir. 1983)........................................65

*Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455 (8th Cir. 2018)...............................................28

*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) ...................................... 4, 6, 32, 49, 64, 75, 77, 80

*Prometheus Radio Project v. FCC*, 652 F.3d 431
(3d Cir. 2011) .............................................................. 3, 64, 65, 66

*Prometheus Radio Project v. FCC*, 939 F.3d 567
(3d Cir. 2019), *rev'd in part*, *FCC v. Prometheus
Radio Project*, 592 U.S. 414 (2021)............................ 3, 10, 48, 55, 56, 75

*Securitas Critical Infrastructure Servs. v. NLRB*,
817 F.3d 1074 (8th Cir. 2016) ..................................................29

*Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148
(D.C. Cir. 2002) .....................................................................65

*Sw. Bell Tel. Co. v. FCC*, 153 F.3d 523 (8th Cir.
1998) ............................................................................. 33, 51

*Telocator Network v. FCC*, 691 F.2d 525 (D.C. Cir.
1982) ...................................................................................5

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622
(1994) .................................................................................64

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180
(1997) .................................................................................16

*United States v. Conn. Nat'l Bank*, 418 U.S. 656
(1974) .................................................................................71

*United States v. Phila. Nat'l Bank*, 374 U.S. 321
(1963) .................................................................................71

*United States v. Storer Broad. Co.*, 351 U.S. 192
(1956) ......................................................................... 5, 26, 66

*United States v. Trimble*, 2 F.4th 771 (8th Cir.
2021).................................................................................29

*Vinson v. Washington Gas Light Co.*, 321 U.S. 489
(1944) .................................................................................57

*Vonage Holdings Corp. v. FCC*, 489 F.3d 1232,
1242 (D.C. Cir. 2007).............................................................49

*Wide Voice, LLC v. FCC*, 61 F.4th 1018 (9th Cir.
2023).................................................................................62

*WorldCom, Inc. v. FCC*, 238 F.3d 449 (D.C. Cir.
2001).......................................................................... 3, 49, 56

**STATUTES**

5 U.S.C. § 706(2)(A) .......................................................28

7 U.S.C. § 5674(b) ..........................................................79

28 U.S.C. § 2342(1) ..........................................................3

28 U.S.C. § 2344 ...............................................................3

42 U.S.C. § 8144(e) ..........................................................79

44 U.S.C. § 2108(a) ..........................................................79

47 U.S.C. § 161 ................................................................75

47 U.S.C. § 303 ............................................... 4, 6, 63, 76

47 U.S.C. § 303 note ........................................ 73, 78, 80

47 U.S.C. § 309(a) .............................................................4

47 U.S.C. § 325(b)(1)(A) ..................................................16

47 U.S.C. § 326 ................................................................65

47 U.S.C. § 402(a) .............................................................3

47 U.S.C. § 405(a) ............................................................57

49 U.S.C. § 31137(d)(1) ...................................................79

Departments of Commerce, Justice, and State, the
   Judiciary, and Related Agencies Appropriations
   Act, 2004, Pub. L. No. 108-199, 118 Stat. 3
   (2004) ...........................................................................6

Telecommunications Act of 1996, Pub. L. No. 104-
   104, 110 Stat. 56 (1996) ..................................... 5, 6, 74

**REGULATIONS**

47 C.F.R. § 1.3 ................................................................54

47 C.F.R. § 1.4(b)(1) ..........................................................3

47 C.F.R. § 73.3555(a) ....................................................6, 7

47 C.F.R. § 73.3555(b) ........................ 6, 8, 9, 19, 47, 50, 53, 54

47 C.F.R. § 73.3555 Note 11 ........................................ 9, 57

47 C.F.R. § 76.64 .............................................................16

## ADMINISTRATIVE MATERIALS

*2002 Biennial Regulatory Review*, 18 FCC Rcd
    13620 (2003) ..............................................................52

*2006 Quadrennial Regulatory Review*, 23 FCC Rcd
    2010 (2008) ................................................................45

*2014 Quadrennial Regulatory Review*, 31 FCC Rcd
    9864 (2016) .................................................. 9, 20, 52, 57, 60, 65

*2014 Quadrennial Regulatory Review*, 32 FCC Rcd
    9802 (2017) .......................................... 8, 31, 33, 46, 52, 54, 56

*2014 Quadrennial Review*, 36 FCC Rcd 9354
    (Media Bur. 2021) ................................................ 10, 55

*Communications Marketplace Report*, 33 FCC Rcd
    12558 (2018) ..............................................................44

*Communications Marketplace Report*, 37 FCC Rcd
    15514 (2022) ..............................................................35

*Elimination of Main Studio Rule*, 32 FCC Rcd 8158
    (2017) ......................................................................36

## OTHER MATERIALS

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH
    LANGUAGE (4th ed. 2000) ............................................79

BLACK'S LAW DICTIONARY (5th ed. 1979) ....................................79

Complaint, *United States v. Gray Television, Inc.
    and Quincy Media, Inc.*, No. 1:21-cv-02041
    (D.D.C. July 28, 2021) ..............................................70

ERIC KLINENBERG, FIGHTING FOR AIR: THE BATTLE
    TO CONTROL AMERICA'S MEDIA (2007) .............................. 35, 36

Final Brief of Industry Intervenors in Support of
    Respondents, *Prometheus Radio Project v. FCC*,
    3d Cir. No. 18-3335 (filed May 3, 2019) ....................................54

KNIGHT FOUNDATION, LOCAL TV NEWS AND THE
    NEW MEDIA LANDSCAPE: PART 1, THE STATE OF
    THE INDUSTRY (2018) ..................................................46

Matthew Lasar, *Clear Channel still haunted by
    Minot toxic spill disaster*, ARS TECHNICA, May
    24, 2010 ..................................................................................36

RANDOM HOUSE DICTIONARY OF THE ENGLISH
    LANGUAGE SECOND ED. UNABRIDGED (1987)............................................79

WEBSTER'S II DICTIONARY (1984) ..................................................................79

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

————————

NOS. 24-1380, 24-1480, 24-1493, 24-1516
————————

ZIMMER RADIO OF MID-MISSOURI, INC., ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

————————

ON PETITIONS FOR REVIEW OF AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION
————————

BRIEF FOR RESPONDENTS
————————

## INTRODUCTION

Section 202(h) of the Telecommunications Act of 1996 directs the Federal Communications Commission to review its media ownership rules every four years to "determine whether any of such rules are necessary in the public interest as the result of competition" and to "repeal or modify any regulation it determines to be no longer in the public interest." In an order issued in December 2023, the FCC completed its latest quadrennial review under section 202(h) by concluding that its ownership rules remain "necessary in the public interest" and should be retained. *2018 Quadrennial*

1

*Regulatory Review*, FCC 23-117, 2023 WL 9021989 (released December 26, 2023) (App.___) (*Order*).

In the *Order*, the FCC reasonably found that although broadcasters face competition from a variety of non-broadcast providers of audio and video programming in certain respects, such competition has not diminished the need for the agency's rules limiting ownership of multiple radio and television stations in local markets. The Commission explained that its ownership rules remain necessary to promote its longstanding public interest goals of competition, localism, and viewpoint diversity. The agency also revised a note to its rules to prevent circumvention of the rule restricting local television station ownership.

Petitioners—the National Association of Broadcasters (NAB) and several individual broadcasters—challenge the *Order* on various grounds. None of petitioners' claims warrants reversal of the *Order*. The FCC fully complied with the requirements of section 202(h), and its actions in this case were reasonable and reasonably explained.

## JURISDICTION

The *Order* was published in the Federal Register on February 15, 2024. 89 Fed. Reg. 12196 (2024). Petitioners timely filed petitions for review

within 60 days thereafter.  *See* 28 U.S.C. § 2344; 47 C.F.R. § 1.4(b)(1).  This

Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).

## QUESTIONS PRESENTED

I.  Whether the Commission reasonably determined that its rule

limiting ownership of multiple broadcast radio stations in the same local

market remains necessary in the public interest.

- *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)
- *Citizens Telecomms. Co. v. FCC*, 901 F.3d 991 (8th Cir. 2018)
- *Dolgengorp, LLC v. NLRB*, 950 F.3d 540 (8th Cir. 2020)

II.  Whether the Commission reasonably determined that its rule

limiting ownership of multiple broadcast television stations in the same local

market remains necessary in the public interest.

- *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)
- *Citizens Telecomms. Co. v. FCC*, 901 F.3d 991 (8th Cir. 2018)
- *Prometheus Radio Project v. FCC*, 939 F.3d 567 (3d Cir. 2019), *rev'd in part*, *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)
- *WorldCom, Inc. v. FCC*, 238 F.3d 449 (D.C. Cir. 2001)

III.  Whether the Commission's decision to prohibit certain practices

that circumvent its local television ownership rule was reasonable and

permissible under the Communications Act and the First Amendment.

- *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)
- *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 (1978)
- *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011)

- *Carter Mountain Transmission Corp. v. FCC*, 321 F.2d 359 (D.C. Cir. 1963)

IV.  Whether, in conducting its public interest analysis of its ownership rules, the Commission reasonably defined the relevant markets.

- *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of Interior*, 95 F.4th 573 (8th Cir. 2024)

V.  Whether the Commission's *Order* complied with section 202(h).

- *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)
- *FCC v. WNCN Listeners Guild*, 450 U.S. 582 (1981)
- *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004)
- *Huey v. Sullivan*, 971 F.2d 1362 (8th Cir. 1992)

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum to this brief.

## COUNTERSTATEMENT

### A.   Statutory And Regulatory Background

"Under the Communications Act of 1934, the Federal Communications Commission possesses broad authority to regulate broadcast media in the public interest."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 416 (2021) (*FCC v. Prometheus*); *see also FCC v. WNCN Listeners Guild*, 450 U.S. 582, 593-94 (1981) (*WNCN*); 47 U.S.C. §§ 303, 309(a).  The FCC has exercised this authority by limiting the number of media outlets that a single entity may own, operate, or control.  *See, e.g.*, *FCC v. Nat'l Citizens Comm.*

*for Broad.*, 436 U.S. 775, 779 (1978) (*NCCB*) (restricting cross-ownership of a newspaper and broadcast station in the same local market); *United States v. Storer Broad. Co.*, 351 U.S. 192, 202-05 (1956) (*Storer*) (limiting the number of broadcast radio and television stations that an entity may own nationwide). "The FCC has long explained that" its media "ownership rules seek to promote competition, localism, and viewpoint diversity by ensuring that a small number of entities do not dominate a particular media market." *FCC v. Prometheus*, 592 U.S. at 418.

Historically, the FCC has reviewed its regulations periodically to ensure that they continue to serve the public interest, revising them as necessary in response to changing circumstances. *See Telocator Network v. FCC*, 691 F.2d 525, 550 n.191 (D.C. Cir. 1982) (noting the Commission's "ongoing obligation to monitor its regulatory programs and make adjustments in light of actual experience"). In section 202(h) of the Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996), Congress regularized the Commission's review of its broadcast ownership rules. As amended, section 202(h) directs the Commission to reevaluate those rules "quadrennially" to "determine whether any of such rules are necessary in the public interest as the result of competition" and to "repeal or

modify any regulation it determines to be no longer in the public interest."

*See* 47 U.S.C. § 303 note.[1]

"Section 202(h) establishes an iterative process that requires the FCC to keep pace with industry developments and to regularly reassess how its rules function in the marketplace." *FCC v. Prometheus*, 592 U.S. at 419. At the conclusion of each quadrennial review, the Commission must decide whether to "retain, repeal, or modify" each particular rule under review, based on the agency's assessment of how best to promote the public interest in the current media marketplace. *Prometheus Radio Project v. FCC*, 373 F.3d 372, 395 (3d Cir. 2004) (*Prometheus I*).

## B. The FCC's Local Broadcast Ownership Rules

This case concerns two FCC rules restricting ownership of broadcast stations in local markets: the Local Radio Ownership Rule, 47 C.F.R. § 73.3555(a), and the Local Television Ownership Rule, *id.* § 73.3555(b).

### 1. The Local Radio Ownership Rule

The Local Radio Ownership Rule "limits both the total number of radio stations an entity may own within a local market and the number of stations

---

[1] Section 202(h) originally required review "biennially," *see* 110 Stat. at 111, but was later amended to require review "quadrennially." *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-199, Div. B, Tit. VI, § 629(3), 118 Stat. 3, 100 (2004).

within the market that the entity may own in the same service (AM or FM)."

*Order* ¶ 27 (App.___).  Under this rule, the limits on station ownership vary

depending on the number of full-power radio stations in each local market.  A

single entity may own:

- no more than 8 commercial radio stations in total and no more than 5 commercial stations in the same service (AM or FM) in a market with 45 or more full-power stations;

- no more than 7 commercial radio stations in total and no more than 4 commercial stations in the same service in a market with between 30 and 44 full-power stations;

- no more than 6 commercial radio stations in total and no more than 4 commercial stations in the same service in a market with between 15 and 29 full-power stations; and

- no more than 5 commercial radio stations in total and no more than 3 commercial stations in the same service in a market with 14 or fewer full-power stations.

47 C.F.R. § 73.3555(a)(1)(i)-(iv).

## 2. The Local Television Ownership Rule

"The Local Television Ownership Rule limits the number of full power

television stations an entity may own within the same local market."  *Order*

¶ 69 (App.___).  For purposes of this rule, the local market is the Designated

Market Area (or DMA) to which stations are assigned by Nielsen Media

Research.  *See* 47 C.F.R. § 73.3555(b)(1).[2]  Under the rule, "an entity may

own up to two television stations" in the same DMA if one of two conditions

exists:  (1) there is no "overlap" in the "digital noise limited service contours"

of the two stations (as calculated under FCC rules); or (2) "at the time the

application to acquire or construct the station(s) is filed, at least one of the

stations is not ranked among the top-four stations in the DMA" by Nielsen or

any comparable audience ratings service.  *Order* ¶ 69 (App.___); *see* 47

C.F.R. § 73.3555(b)(1)(i)-(ii).   The second of these conditions is known as

"the Top-Four Prohibition."  *Order* ¶ 69 (App.___).

    In 2017, the FCC amended the rule to "allow applicants to request a

case-by-case examination of a proposed combination that would otherwise be

prohibited by the Top-Four Prohibition."  *2014 Quadrennial Regulatory

Review*, 32 FCC Rcd 9802, 9837-38 ¶ 81 (2017) (*2017 Order*).   Under the

amended rule, the Top-Four Prohibition "shall not apply in cases where," at

the applicant's request, "the Commission makes a finding that permitting" the

---

  [2] The Nielsen Company assigns each broadcast television station to a
Designated Market Area (or DMA)—"a group of counties that form an
exclusive geographic area in which the home market television stations hold a
dominance of total hours viewed.  There are 210 DMAs, covering the entire
continental United States, Hawaii, and parts of Alaska."  *Order* n.231
(App.___).

applicant to own two top-four stations "in the same DMA would serve the public interest." 47 C.F.R. § 73.3555(b)(2).

To prevent circumvention of the Top-Four Prohibition, the Commission in 2016 added Note 11 to section 73.3555 of its rules. *2014 Quadrennial Regulatory Review*, 31 FCC Rcd 9864, 9882-83 ¶¶ 47-48 (2016) (*2016 Order*). Note 11 bars any entity from acquiring the network affiliation of another station "if the change in network affiliations would result" in the entity owning two top-four stations in a DMA at the time the new affiliation agreement is executed. *Id*. at 10027-28 (Appendix A); 47 C.F.R. § 73.3555 Note 11. Before the *Order* under review, Note 11 did not prohibit the owner of a top-four station from acquiring the network affiliation of a competing top-four station and airing the newly obtained network programming on a "multicast stream," that is, a channel other than the station's primary channel, or on a low power television station in its DMA.

### C.  The 2018 Quadrennial Review Proceeding

In December 2018, the FCC issued a notice of proposed rulemaking to initiate the 2018 Quadrennial Review of its media ownership rules under section 202(h). *2018 Quadrennial Regulatory Review*, 33 FCC Rcd 12111 (2018) (App.____) (*NPRM*). The Commission sought comment "on whether, given the current state of the media marketplace," it "should retain, modify,

or eliminate" several of its rules, including the Local Radio Ownership Rule and the Local Television Ownership Rule. *NPRM* ¶ 1 (App.___).

In the midst of this proceeding, the Third Circuit vacated the rule changes that the FCC had adopted in 2017 on reconsideration of the previous Quadrennial Review. *Prometheus Radio Project v. FCC*, 939 F.3d 567 (3d Cir. 2019) (*Prometheus IV*), *rev'd in part*, *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021). Two years later, the Supreme Court reversed that decision. *FCC v. Prometheus*, 592 U.S. at 422-28.

In response to the Supreme Court's ruling, the FCC's Media Bureau reinstated the rule changes that the Third Circuit had vacated, including the elimination of restrictions on newspaper/broadcast and radio/television cross-ownership and the relaxation of limits on local television station ownership. *2014 Quadrennial Review*, 36 FCC Rcd 9354 (Media Bur. 2021) (*Reinstatement Order*). Since the comment period for the 2018 Quadrennial Review had closed two years earlier, the Bureau solicited further public comment in June 2021 to update the record in this proceeding. *Media Bureau Seeks to Update the Record in the 2018 Quadrennial Regulatory Review*, 36 FCC Rcd 9363 (Media Bur. 2021) (App.___).

In the course of this proceeding, dozens of interested parties—including consumers, owners of radio and television stations, and trade

associations representing broadcasters, the cable television industry, and the music business—submitted comments to the FCC.

### D. The Order On Review

In an order issued in December 2023, the FCC concluded its 2018 Quadrennial Review. *Order* ¶ 1 (App.___). After "careful review" of the extensive record in this proceeding, the Commission determined that its "existing rules, with some minor modifications, remain necessary in the public interest." *Id.* ¶ 2 (App.___). Therefore, it decided to retain the Local Radio and Local Television Ownership Rules, making "modest adjustments" to Note 11 to "expand the existing prohibition on use of affiliation to circumvent" the Top-Four Prohibition. *Ibid.*

In assessing the continuing need for the local broadcast ownership rules, the FCC considered the impact of competition from non-broadcast sources on the current media marketplace. It explained that for purposes of the Quadrennial Review, "[t]he critical question" in analyzing the effect of competition is "whether competitive market forces alone are proving sufficient to create a [media] marketplace that satisfies the public interest objectives long associated with" broadcasting, "such that" the broadcast ownership rules "can be deemed no longer 'necessary in the public interest as the result of competition.'" *Order* ¶ 73 (App.___). The Commission

recognized that broadcast radio and television stations face increasing competition from a variety of non-broadcast audio and video services in some respects. *See id*. ¶¶ 32, 74 (App.___, ___). Nonetheless, it found that "[d]espite the proliferation of new forms and sources of programming, broadcast television and radio remain essential to achieving the Commission's goals of competition, localism, and viewpoint diversity." *Id.* ¶ 1 (App.___). The FCC concluded that it could not effectively achieve these goals without retaining its local ownership rules.

## 1. Retaining The Local Radio Ownership Rule

The FCC first determined that the Local Radio Ownership Rule "remains necessary to promote the Commission's public interest goals of competition, localism, and viewpoint diversity." *Order* ¶ 27 (App.___). Specifically, the Commission found that the rule's "current tiers and limits maintain an appropriate level of competition in the local radio markets to the benefit of listeners and the public." *Id.* ¶ 42 (App.___).

The Commission reached this conclusion after determining that "the local nature of broadcast radio makes it unique within the broader audio landscape." *Order* ¶ 36 (App.___). The record showed that broadcast "radio programming includes offerings with a community focus" that "other audio services do not provide"—for example, "program hosts … known within the

locality, music by local bands, reporting on local sports teams, and sponsorship of neighborhood festivals." *Ibid*.  In addition, unlike other audio services, "radio is a trusted and essential source of public safety information during [local] emergencies." *Id*. ¶ 35 (App.___).

The FCC explained that "[t]he purpose" of the radio ownership rule "is to ensure competition among broadcast radio stations within a market" so that station owners "are motivated to provide the highest quality of service to the public," including the local programming that sets broadcast radio apart from other audio services.  *Order* ¶ 46 (App.___).  In the Commission's judgment, it is "primarily" because of "competition among local radio stations" that those "stations are spurred continually to look for ways to improve service to the listening public." *Id*. ¶ 34 (App.___).  The agency concluded that repeal or relaxation of the limits on station ownership would "[r]educ[e] the number of competitors in a local [radio] market," putting the "quality of [radio] service" and viewpoint diversity "at risk" and potentially "reduc[ing] the amount of local programming available." *Id*. ¶ 46 (App.___).[3]

_____

[3] For similar reasons, the Commission decided to retain the "subcaps" on ownership of radio stations in the same service, *i.e.*, AM or FM.  *See Order* ¶¶ 54-57 (App.___-___).  It found that "the public interest benefits of maintaining diffuse ownership within the AM and FM bands" justify retention of the subcaps.  *Id*. ¶ 57 (App.___).

The radio industry was "deeply divided" as to whether the FCC should permit more consolidation. *Order* ¶ 32 (App.___). Some broadcasters advocated "loosening radio ownership limits," arguing that the "viability" of the radio industry "may be at stake if additional consolidation is not permitted." *Id*. ¶ 43 (App.___). Other station owners, however, maintained that "the survival of the radio industry depends on keeping ownership limits in place to prevent massive consolidation." *Ibid*. (App.___-___). In their view, relaxing the ownership limits could "destroy[ ]" the "essence of local radio" by allowing "a few national owners" to "buy[ ] all or most of the stations in a market and pip[e] in preset programming from distant headquarters." *Ibid*. (App.___).

"[A]fter considering [these] conflicting arguments," *Order* ¶ 32 (App.___), the Commission found that "the record does not establish that permitting greater consolidation" would improve the radio industry's financial condition. *Id*. ¶ 41 (App.___). It also concluded that loosening radio ownership limits "would reduce competition among broadcast radio stations to the detriment of listeners." *Ibid*.

While the FCC understood that "further consolidation could have benefits for certain radio [station] owners," it determined that "such benefits are not worth the cost of the real and likely harms" to "the listening public"

that would result from a "reduction in competition" among radio stations. *Order* ¶ 51 (App.\_\_\_). The Commission cited "mounting evidence" that the "considerable consolidation" that had already "taken place within the radio industry" under the current rule had yielded "negative effects for consumers," including "less local programming," "the homogenization of content," and "competitive harm to the smaller station owners striving to remain in the market." *Id*. ¶ 47 (App.\_\_\_). In addition, the agency found that "the cost pressures and incentives associated with" further consolidation—including incentives to cut costs by "repurposing content on multiple stations"—would likely "lead to radio stations becoming less responsive to the needs and interests of their local communities." *Id*. ¶ 51 (App.\_\_\_).

Given the continuing need to prevent the significant harms associated with reduced competition in local radio markets, the Commission found that "the current rule remains a backstop against further excessive consolidation." *Order* ¶ 49 (App.\_\_\_).

### 2. Retaining The Local Television Ownership Rule

The FCC also found that "the Local Television Ownership Rule remains necessary to promote the Commission's public interest goals of competition, localism, and viewpoint diversity." *Order* ¶ 71 (App.\_\_\_).

The Commission concluded that the rule "promotes competition among local broadcast television stations," *ibid*., and that there were "strong public interest reasons for promoting" such competition. *Id*. ¶ 77 (App.___). The agency explained that "viewers directly benefit from competition among local broadcast television stations" because it improves the quality of local news and other "local programming"—programming that remains "largely unique to broadcast television." *Id*. ¶ 75 (App.___). Such competition "spurs quality improvements" by local stations, such as "expanded programming choices" and "technological innovation." *Id*. ¶ 77 (App.___). It also reduces costs for consumers by "prevent[ing] local broadcasters from demanding higher retransmission consent fees"[4] or "charging higher rates for local businesses seeking to purchase advertising time on local stations." *Ibid*.

In addition, the Commission determined that the television ownership rule "promotes localism" by "[s]purring competition among broadcast television stations." *Order* ¶ 78 (App.___). "[T]he record contains numerous assertions from broadcasters that the local programming they provide is

_____

[4] Multichannel video programming distributors (such as cable systems) may not retransmit the signal of a broadcast television station without the station's consent. 47 U.S.C. § 325(b)(1)(A); *see also* 47 C.F.R. § 76.64. Popular stations typically "charge" these distributors "for carriage of [their] signals." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 191 (1997).

unique and unduplicated by any other video programming provider." *Ibid*.
The Commission found that television stations in the same market "seek to differentiate themselves" from each other by producing the most popular "programming responsive to the needs and interests of their local communities," including "local news and information programming." *Ibid*.

The Commission rejected "broadcasters' assertions" that "greater consolidation" is needed to "preserve localism." *Order* ¶ 79 (App.___). "[C]ontrary to claims" that "television stations cannot continue to produce local news" without further consolidation, the Commission cited "data show[ing] that the number of stations airing local news actually increased slightly" from 2017 to 2021. *Ibid*. (App.___-___). The data indicated that even in the smaller markets "where broadcasters argue the need to consolidate is particularly acute, the number of markets that saw increases in stations airing local news outnumbered those that saw decreases." *Ibid*. (App.___). The agency also found evidence that notwithstanding substantial changes in the media marketplace in recent years, there is still "significant demand for local television news." *Ibid*. (App.___).

Finally, the FCC found that the television ownership rule "continues to promote viewpoint diversity." *Order* ¶ 81 (App.___). It explained that the rule's ownership limits help to "ensure the presence of a number of

independently owned broadcast television stations in the local market," "increasing the likelihood of a variety of viewpoints" and "preserving ownership opportunities for new entrants." *Ibid*. The rule thus promotes the public "interest in a multiplicity of speakers, particularly with respect to local issues and the needs and interests of local communities." *Ibid*.

The Commission found that the rule's two-station limit on ownership in local markets "continues to strike the appropriate competitive balance of enabling some efficiencies of common ownership while maintaining a level of competition amongst broadcast television stations to ensure that they continue to serve the public interest." *Order* ¶ 82 (App.___). Although some commenters asserted that "permitting ownership of a third … in-market station would enable broadcasters to compete more effectively," the FCC was not persuaded that "allowing ownership of a third station would generate public interest benefits outweighing potential public interest harms." *Id*. ¶ 83 (App.___-___). The agency explained that "[w]hile greater consolidation may lead to more operating efficiencies for the commonly owned stations," it "also would mean the loss of an independent station operator, to the detriment of competition, localism, and viewpoint diversity." *Ibid*. (App.___). Citing record evidence that "the majority of television markets are already highly

concentrated," the Commission saw no reason "to loosen the existing numerical limits." *Id*. ¶ 84 (App.___).

The FCC also decided to retain the Top-Four Prohibition, finding that "a combination involving two of the top-four stations in a market would be the most detrimental to competition" and "the public interest." *Order* ¶ 86 (App.___). The Commission concluded that such combinations generally "should be prohibited" because they reduce competition among local stations by "allowing former rivals to combine" to form a single entity that typically garners "a significantly larger market share than other entities in the market." *Ibid*. (App.___-___).

Broadcasters argued that the Top-Four Prohibition prevents stations that "are struggling to produce local programming" in "smaller markets" from entering into combinations that would benefit viewers. *Order* ¶ 88 (App.___). The Commission concluded, however, that it could "address broadcasters' concerns about the viability of stations in smaller markets" under the current rule, which provides for "case-by-case" consideration of proposed combinations at an applicant's request. *Id*. ¶ 86 (App.___); *see* 47 C.F.R. § 73.3555(b)(2). The agency found that the availability of this "case-by-case" review process strikes "the proper balance between ensuring that no

market is excessively concentrated and allowing flexibility in particular circumstances." *Order* ¶ 89 (App.___).

### 3. Modifying Note 11

At the conclusion of the 2014 Quadrennial Review, the FCC added Note 11 to section 73.3555 of its rules to prevent broadcasters from circumventing the Top-Four Prohibition through affiliation agreements that result in a single entity owning two top-four stations in a market. *See 2016 Order*, 31 FCC Rcd at 9881-85 ¶¶ 45-52, 10027-28 (Appendix A). At that time, the agency declined to prohibit "dual affiliations via multicasting involving multiple Big Four networks" because such affiliations were "generally limited to smaller markets where there are not enough full-power commercial television stations to accommodate each Big Four network." *Id*. at 9892 ¶ 72. But the Commission said that it would "continue to monitor this issue and take action in the future, if appropriate." *Id*. at 9893 ¶ 72.

During the 2018 Quadrennial Review, parties submitted evidence—and the Commission itself "observed," *Order* ¶ 97 (App.___)—that affiliation acquisitions "are increasingly being used to circumvent the Top-Four Prohibition," with top-four stations acquiring the network-affiliated programming of other top-four stations in their markets and placing that programming "on multicast streams or [low power television] stations to

avoid running afoul of the existing ban." *Id.* ¶ 102 (App.___).  The record indicated that such arrangements were no longer "limited to the smallest markets." *Ibid.* (App.___).

The FCC concluded that the public interest goals of the Top-Four Prohibition are thwarted when "the use of [a low power television] station or multicast stream … to air top-four rated programming acquired from an in-market competitor results in the acquiring party's obtaining the equivalent of a second top-four rated station in terms of audience and revenue share in the local market." *Order* ¶ 100 (App.___).  Consequently, the Commission revised Note 11 "to prohibit such behavior in the future." *Id.* ¶ 97 (App.___).

## SUMMARY OF ARGUMENT

The Communications Act grants the FCC "broad authority to regulate broadcast media in the public interest." *FCC v. Prometheus*, 592 U.S. at 416.  When the FCC decides how—or whether—to regulate broadcasting, its "judgment regarding how the public interest is best served is entitled to substantial judicial deference." *WNCN*, 450 U.S. at 596.  It is well settled that "the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance." *NCCB*, 436 U.S. at 810.

Upon completing its 2018 Quadrennial Review, the FCC reasonably concluded that competition in media markets did not warrant repeal or substantial modification of the broadcast ownership rules. Specifically, the Commission determined that its rules restricting ownership of multiple radio and television stations in local markets remain "necessary in the public interest." *See Order* ¶¶ 32, 72 (App.___, ___). The agency also acted to prevent circumvention of its television ownership limits by modifying Note 11 (a provision restricting affiliation agreements). *Id*. ¶¶ 97-108 (App.___-___).

Although petitioners challenge the FCC's actions on multiple grounds, they have given this Court no good reason to disturb the *Order*. The decisions that the agency made here were well within its congressionally delegated authority. They were also "reasonable and reasonably explained." *FCC v. Prometheus*, 592 U.S. at 426.

I. The Commission reasonably found that its Local Radio Ownership Rule remains necessary to promote the goals of competition, localism, and viewpoint diversity. It explained that "[t]he purpose" of this rule "is to ensure competition among broadcast radio stations within a market" so that station owners "are motivated to provide the highest quality of service to the public." *Order* ¶ 46 (App.___). Such competition is critical to promoting the

public interest because, as the record showed, broadcast "radio programming includes offerings with a community focus" that "other audio services do not provide," featuring "local on-air personalit[ies]," "music by local bands, reporting on local sports teams," "sponsorship of neighborhood festivals," *id*. ¶ 36 (App.___-___), and vital "public safety information during [local] emergencies." *Id*. ¶ 35 (App.___).

The FCC found that "it is primarily" due to "competition among local radio stations" for listeners and "advertising dollars" that "stations are spurred continually to look for ways to improve service to the listening public," *Order* ¶ 34 (App.___), by airing the sort of distinctive local programming that makes broadcast radio "unique within the broader audio landscape." *Id*. ¶ 36 (App.___). The Commission concluded that "[r]educing the number of" radio stations competing "in a local market" by repealing or relaxing ownership limits would likely reduce the "quality" of radio service, "the amount of local programming available," and "viewpoint diversity." *Id*. ¶ 46 (App.___). The agency further observed that the current ownership limits provide "a backstop against further excessive consolidation" after the repeal of the Radio/Television Cross-Ownership Rule. *Id*. ¶ 49 (App.___). For these reasons, the Commission determined that the Local Radio Ownership Rule "remains necessary to promote the Commission's public

interest goals of competition, localism, and viewpoint diversity." *Id*. ¶ 27 (App.\_\_\_).

The radio industry was "deeply divided" on this issue. *Order* ¶ 32 (App.\_\_\_). Some broadcasters (including petitioners) advocated repeal or relaxation of the local radio ownership limits. Other station owners, however, argued that further consolidation in the industry would be counterproductive, "destroying" the "essence of local radio." *Id*. ¶ 43 (App.\_\_\_). The Commission made a reasonable choice between these fairly conflicting views when it decided to retain the current radio ownership limits.

II. The Commission also reasonably decided to retain the Local Television Ownership Rule. It explained that competition among local television stations promotes localism and viewpoint diversity because local news and other local programming are largely unique to broadcast television. *See Order* ¶¶ 71, 74-75, 77-78, 81 (App.\_\_\_-\_\_\_).

In doing so, the Commission reasonably preserved its prohibition on common ownership of more than two television stations in each local market. It explained that raising the ownership limit to three stations per market "would mean the loss of an independent station operator" in each market, "to the detriment of competition, localism, and viewpoint diversity." *Order* ¶ 83 (App.\_\_\_).

The FCC also reasonably decided to retain the prohibition on common ownership of two of the top-four stations in a market. It explained that such combinations are generally "detrimental to competition" because they reduce "incentives for local stations to improve their programming" by "allowing former rivals to combine" to form one entity with "a significantly larger market share than other entities in the market." *Order* ¶ 86 (App.___-___). The Commission also concluded that because top-four stations are "the most likely stations to originate local news," the Top-Four Prohibition promotes viewpoint diversity by ensuring "a diversity of voices" among stations providing "coverage of local issues." *Ibid.* (App.___).

The Commission reasonably applied this prohibition to the top four stations in each market because those stations are typically affiliated with the four major "broadcast television networks," which "have a distinctive ability to attract large primetime audiences on a regular basis." *Order* ¶ 86 (App.___). The agency understood that in certain markets, the largest ratings gap could occur among the top four stations (rather than between the fourth and fifth ranked stations), but it concluded that any unique circumstances presented by proposed top-four combinations in such markets could be addressed through the "case-by-case" review process available to applicants under the current rule. *Id.* ¶¶ 86-87 (App.___).

III.  In response to record evidence that top-four station owners were circumventing the Top-Four Prohibition by acquiring network affiliations from competing top-four stations and placing the newly acquired network programming on multicast streams or low power television stations in the same market, the Commission decided to modify Note 11 to prohibit such conduct in the future.  The Commission's decision was reasonable and reasonably explained.  Moreover, because Note 11 is a content-neutral structural regulation of broadcast television, the Communications Act authorized the FCC's modification of Note 11, and the First Amendment does not forbid it.  *See FCC v. Prometheus*, 592 U.S. at 418; *NCCB*, 436 U.S. at 796, 798-802; *Storer*, 351 U.S. at 201-05.

IV.  In evaluating whether its local ownership rules remained necessary, the Commission reasonably focused its analysis on competition among broadcasters.  The agency recognized that broadcasters face competition from an increasing number of non-broadcast sources of audio and video programming in some product markets.  But the record showed that broadcast radio and television remain virtually the only providers of *local* programming (including local news)—the sort of programming that is essential to promoting the FCC's public interest goals of localism and viewpoint diversity.  The Commission found that competition among

broadcasters spurs local stations to produce high-quality local programming to distinguish themselves from competing stations. Therefore, for purposes of its public interest analysis under section 202(h), the FCC reasonably defined the relevant markets to include only (1) broadcast radio stations (when analyzing the local radio rule) and (2) broadcast television stations (when analyzing the local television rule).

V. Finally, the FCC fully complied with its obligations under section 202(h) to review its ownership rules to determine whether any of them "are necessary in the public interest as the result of competition," and to "repeal or modify any regulation it determines to be no longer in the public interest." In this proceeding, after reviewing its local radio and local television ownership rules, the FCC determined that they should be retained because they remained "necessary in the public interest" for reasons the Commission explained at length. The agency also reasonably exercised its power to "modify" Note 11 to its local television ownership rule to close a loophole that broadcasters had been exploiting to circumvent the local ownership limits. Nothing in the statute required the Commission to deregulate when not warranted by the public interest, or forbade it from tightening an aspect of its rules when the public interest requires.

The petitions for review should be denied.

## STANDARD OF REVIEW

The FCC's *Order* must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This is a highly deferential standard of review, and its scope is narrow." *Iyawe v. Garland*, 28 F.4th 875, 881 (8th Cir. 2022).

A reviewing court does not "ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Citizens Telecomms. Co. v. FCC*, 901 F.3d 991, 1000 (8th Cir. 2018) (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)). Instead, it asks "whether the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ibid.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus*, 592 U.S. at 423. If the FCC's decision "is supportable on any rational basis," this Court "must uphold it." *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018).

"In reviewing" the *Order*, the Court must "accept" the Commission's "findings" if they "are supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *GoJet Airlines, LLC v. FAA*, 743 F.3d 1168, 1170 (8th Cir. 2014). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 523 (1981). Where the record contains "conflicting evidence," the Court "may not preempt the [agency's] choice between two fairly conflicting views of that evidence," *Securitas Critical Infrastructure Servs. v. NLRB*, 817 F.3d 1074, 1078 (8th Cir. 2016), "even if [the Court] would have made a different choice had the matter been before [it] de novo." *Dolgencorp, LLC v. NLRB*, 950 F.3d 540, 550 (8th Cir. 2020). "[T]he FCC may rationally choose which evidence to believe among conflicting evidence in its proceedings, especially when predicting what will happen in the markets under its jurisdiction." *Citizens Telecomms.*, 901 F.3d at 1011.

The Court reviews constitutional claims de novo. *United States v. Trimble*, 2 F.4th 771, 773 (8th Cir. 2021).

## ARGUMENT

## I. THE COMMISSION REASONABLY DETERMINED THAT THE LOCAL RADIO OWNERSHIP RULE REMAINS NECESSARY IN THE PUBLIC INTEREST

After reviewing the record in this proceeding, the FCC determined that the Local Radio Ownership Rule "remains necessary in the public interest" and should be retained. *Order* ¶ 32 (App.___).  The FCC's decision to keep the rule was "reasonable and reasonably explained." *FCC v. Prometheus*, 592 U.S. at 423.

### A. The Commission Reasonably Explained Why It Retained The Rule.

"The purpose" of the radio ownership rule, the Commission explained, "is to ensure competition among broadcast radio stations within a market" so that station owners "are motivated to provide the highest quality of service to the public." *Order* ¶ 46 (App.___).  Such competition is critical to promoting the public interest because, as the record showed, broadcast "radio programming includes offerings with a community focus" that "other audio services do not provide," featuring "local on-air personalit[ies]," "music by local bands, reporting on local sports teams," "sponsorship of neighborhood festivals," *id.* ¶ 36 (App.___-___), and vital "public safety information during [local] emergencies." *Id.* ¶ 35 (App.___).

The FCC found that "it is primarily" due to "competition among local radio stations" for listeners and "advertising dollars" that "stations are spurred continually to look for ways to improve service to the listening public," *Order* ¶ 34 (App.____), by airing the sort of distinctive local programming that makes broadcast radio "unique within the broader audio landscape." *Id*. ¶ 36 (App.____). The Commission concluded that "[r]educing the number of" radio stations competing "in a local market" by repealing or relaxing ownership limits would likely reduce the "quality" of radio service, "the amount of local programming available," and "viewpoint diversity." *Id*. ¶ 46 (App.____). The agency further observed that the current ownership limits provide "a backstop against further excessive consolidation" after the 2017 repeal of the Radio/Television Cross-Ownership Rule. *Id*. ¶ 49 (App.____).[5] For these reasons, the Commission determined that the Local Radio Ownership Rule "remains necessary to promote the Commission's public interest goals of competition, localism, and viewpoint diversity." *Id*. ¶ 27 (App.____).

---

[5] When it repealed the cross-ownership rule, the FCC found that the rule's elimination would "have only a minimal impact on common ownership" because broadcasters would "continue to be constrained by the applicable ownership limits in the Local Television and Local Radio Ownership Rules." *2017 Order*, 32 FCC Rcd at 9829 ¶ 62.

Petitioners contend that the Commission cannot base its decision to retain the rule on the need to promote competition because there is no record evidence that "broadcasters have undue market power." Pet. Br. 62. This argument misconceives the FCC's public interest inquiry, which has "a different purpose" than the antitrust laws. *See Prometheus I*, 373 F.3d at 414. While market power is an important factor in antitrust analysis, the FCC need not find market power in order to find that competition among local broadcast stations serves the public interest. As the Commission explained, such competition helps promote localism and viewpoint diversity, which benefit the public regardless of whether broadcasters have market power. *See Order* ¶ 36 (App.___-___) (competing local stations distinguish themselves from each other by producing programming tailored to their community's needs and interests); *id*. ¶ 46 (App.___) ("[r]educing the number" of radio stations competing "in a local market" could "reduce the amount of local programming available"); *id*. ¶ 24 (App.___) (competition among multiple

independently owned stations in a local market promotes viewpoint diversity by "fostering a multiplicity of speakers").[6]

The FCC's decision to retain the local radio rule rested in part on "predictions" about "what [would] happen in the market" if broadcasters were permitted to own more radio stations in each local market. *See Citizens Telecomms.*, 901 F.3d at 1010. "[W]hen" the FCC "makes such predictions in choosing how to regulate [a] market," its predictive "judgments" are entitled to "deference." *Ibid.*; *see also NCCB*, 436 U.S. at 813-14; *Sw. Bell Tel. Co. v. FCC*, 153 F.3d 523, 547 (8th Cir. 1998).

The record supported the Commission's predictive judgment that "further consolidation" would likely "lead to radio stations becoming less responsive to the needs and interests of their local communities." *Order* ¶ 51 (App.___). The agency cited "mounting evidence" that since the 1996 Act, and under the current rule, "considerable consolidation" had already "taken

---

[6] Petitioners mistakenly claim that the FCC took the position in the *2017 Order* that the local radio rule does not promote "viewpoint diversity." Pet. Br. 63-64. In that order, the Commission found that the contribution of broadcast radio to viewpoint diversity did not support retention of the Radio/Television Cross-Ownership Rule. *2017 Order*, 32 FCC Rcd at 9827-28 ¶ 57. The agency never made any such finding vis-à-vis the local radio rule. Instead, when the FCC repealed the cross-ownership rule, it made clear that the local radio "ownership limits" would remain in effect. *Id.* at 9829 ¶ 62.

place." *Id*. ¶ 47 (App.___).  For example, the Commission noted, "on average, the largest station group in each Nielsen Audio Metro market" has nearly half of the market's total radio advertising revenue, "with the two largest owners accounting for 73.9% of the revenue," and "the top four station group owners continue to dominate audience share." *Id*. ¶ 48 (App.___).  And there was evidence that the "already … generous amount of common ownership" allowed under the current rule had produced "negative effects for consumers," including "less local programming," "the homogenization of content," and "competitive harm to the smaller station owners striving to remain in the market." *Id*. ¶ 47 (App.___).  In the face of this record, the Commission reasonably rejected petitioners' claims that permitting additional consolidation would best promote competition and localism.  Pet. Br. 63.

The FCC also found that the "incentives associated with consolidation"—including incentives to cut costs by "repurposing content on multiple stations"—tended to "work against the provision of programming responsive to local issues." *Order* ¶ 51 (App.___) (citing *Communications*

*Marketplace Report*, 37 FCC Rcd 15514, 15693 ¶ 305 (2022)).[7]  The

Commission shared the concerns of several station owners that relaxing the

current ownership restrictions "could result in a few national owners buying

all or most of the stations in a market and piping in preset programming from

distant headquarters."  *Id*. ¶ 43 (App.___).[8]

Such concerns were hardly hypothetical.  In 2002, when a train

derailment caused a toxic chemical spill near Minot, North Dakota, the city's

local radio stations did not initially report any news or information on the

spill.  ERIC KLINENBERG, FIGHTING FOR AIR:  THE BATTLE TO CONTROL

AMERICA'S MEDIA 1-11 (2007).  At the time, "all six of Minot's name-brand

stations" were owned by "the San Antonio-based conglomerate Clear

Channel Communications," which had "replaced locally produced news,

music, and talk programs with prepackaged content engineered in remote

studios."  *Id*. at 6-7.  Even as a toxic cloud floated toward Minot, Clear

Channel's stations "continued playing a standard menu of canned music."  *Id*.

---

[7] *See also* musicFirst/FMC Update Reply at 17 (App.___) (owners of
stations in multiple markets are "so focused on cost savings that they have …
replaced locally programmed content with nationally syndicated
programming and products that are increasingly homogenous with other
geographic markets").

[8] *See* King City Comments at 1-2 (App.___-___); Bristol County/SNE
Comments at 1-2 (App.___-___); Urban One Comments at 13 (App.___).

at 6.[9] As this episode demonstrates, unchecked consolidation can harm the listening public—and even endanger listeners—by severing a radio station's connection to its local community.

Petitioners contend that the FCC did not "justify the specific limitations on radio station ownership" it chose to retain. Pet. Br. 56. To the contrary, the Commission specifically found "that the current [ownership] tiers and limits maintain an appropriate level of competition in the local radio markets to the benefit of listeners and the public." *Order* ¶ 42 (App.____). The Commission recognized that while allowing a radio station owner to acquire more stations in a local market "may offer some benefit to the owner, including the ability to reduce costs, it would come at a tradeoff to the public interest." *Id*. ¶ 45 (App.____). The Commission also found that there remains "ample leeway under the current rule for additional consolidation within limits," but emphasized that the current rule "constrain[s] … the further aggregation of market share by an already dominant firm in a local market." *Id*. ¶ 53 (App.____).

---

[9] *See also Elimination of Main Studio Rule*, 32 FCC Rcd 8158, 8202 (2017) (dissenting statement of Commissioner Rosenworcel) (recounting the Minot incident); Matthew Lasar, *Clear Channel still haunted by Minot toxic spill disaster*, ARS TECHNICA, May 24, 2010, available at https://arstechnica.com/tech-policy/2010/05/will-clear-channel-ever-live-down-the-minot-toxic-spill-disaster/.

The Commission also reasonably explained why it retained "subcaps" on the number of AM or FM stations that an entity may own in any market. *Order* ¶¶ 54-57 (App.___-___).  The subcaps are designed "to prevent excessive concentration in a particular [radio] service, to foster market entry, and to promote competition" within the different services.  *Id*. ¶ 54 (App.___).  The Commission found that the subcaps "continue to serve these purposes" by "prevent[ing] excessive common ownership of either AM or FM stations in a local market."  *Id*. ¶ 55 (App.___).  Moreover, the Commission explained, "removing the FM subcaps … could cause AM stations to migrate to the FM band, resulting in a diminished AM band where lower-cost market entry opportunities for small owners, including minorities and women, are most likely."  *Ibid*.   Conversely, "AM deregulation would allow large owners of AM stations to buy up the smaller AM stations in their markets and could lead to excessive concentration within the AM band."  *Id*.

¶ 56 (App.___).[10]  The Commission accordingly concluded that "the public

interest benefits of maintaining diffuse ownership within the AM and FM

bands continue to support retaining the AM and FM subcaps." *Id*. ¶ 57

(App.___).

> **B. In Deciding To Retain The Rule, The Commission Made A Reasonable Choice Between Conflicting Record Evidence.**

As this Court has recognized, "the FCC may rationally choose which

evidence to believe among conflicting evidence in its proceedings, especially

when predicting what will happen in the markets under its jurisdiction."

*Citizens Telecomms.*, 901 F.3d at 1011.  The record here reflected a profound

"split … within the radio industry" over whether existing ownership limits

should be loosened or retained.  *Order* ¶ 32 (App.___).  "[A]fter considering

the conflicting arguments in the record," the Commission reasonably

determined that the local radio rule "remains necessary in the public interest."

---

[10] Petitioners assert that the FCC "ignore[d] record evidence illustrating" that "the AM service's particular struggles" warrant elimination of the AM subcaps.  Pet. Br. 57.  Not so.  The agency explained that the AM subcaps remained necessary to prevent undue consolidation because more than 100 AM stations nationwide rank in the top five in their local markets and could be "targets for acquisition if AM restrictions were eliminated." *Order* ¶ 56 (App.___).  This explanation is not "internally inconsistent" (Pet. Br. 58); it draws a reasonable distinction between the general weakness of the AM service and the strong performance of some individual AM stations.

*Ibid*.  In reaching this conclusion, the agency made a reasonable "choice between two fairly conflicting views" of the evidence in the record. *Dolgendorp*, 950 F.3d at 550.  Petitioners "may reasonably disagree with the FCC on what the evidence shows," but "their disagreement is no basis for finding the FCC's interpretation of [the] conflicting record to be arbitrary and capricious." *Citizens Telecomms.*, 901 F.3d at 1010.

Petitioners argue that the FCC's analysis of radio ownership limits failed "to account for the acute problems faced by radio broadcasters in smaller geographic markets," Pet. Br. 56, "as well as the financial relief that relaxing ownership restrictions would bring to radio broadcasters." *Id*. at 59; *see also* Radio Int. Br. 17-20.  That is incorrect.  The Commission took those factors into account.  It simply reached a conclusion with which petitioners disagree.

The FCC recognized that "broadcast radio has experienced declines" in listenership and "advertising revenues in recent years," *Order* ¶ 43 (App.___), and that "smaller owners are increasingly finding it difficult to remain viable in the current radio industry." *Id*. ¶ 53 (App.___).  The agency also understood that some broadcasters believed that "loosening radio ownership limits" to permit "additional consolidation" would provide significant "relief" to the industry.  *Id*. ¶ 43 (App.___).  But radio station

owners were "deeply divided" on this issue, and the FCC carefully weighed

"the conflicting arguments in the record" before concluding that "loosening

the rule would harm competition to the detriment of listeners." *Id.* ¶ 32

(App.___).

The Commission agreed with several commenters that "greater

consolidation" was "unlikely to improve the ability of local radio [station]

owners" to "compete for advertising" revenues with "large technology

companies" like Google or Facebook. *Order* ¶ 45 (App.___).[11] The agency

explained that additional consolidation "would not reverse the overall

downward trend in the amount of time that American consumers spend

listening to broadcast radio or encourage local advertisers to increase their

radio advertising budgets." *Ibid.* (App.___-___).

---

[11] *See* musicFirst/FMC Comments at 10-11 (App.___-___); iHeart Reply at 19-24 (App.___-___); NABOB Comments at 11-12 (App.___-___). Petitioners challenge the "credibility" of iHeart (formerly Clear Channel), "the largest radio broadcaster in the country," which has a financial interest in opposing relaxation of the rule. Pet. Br. 60-61. But iHeart was not the only broadcaster that believed that further consolidation would do little to ease the radio industry's financial difficulties. iHeart's view was shared by NABOB (an association of black owned broadcasters) and a number of smaller broadcasters. *See* musicFirst/FMC Comments at 10-11 (App.___-___) (quoting statements by Ron Stone, CEO of Adams Radio Group, and independent station owners Ronald Gordon and Glenn Cherry).

The agency acknowledged that "further consolidation could have benefits for certain radio [station] owners." *Order* ¶ 51 (App.___).[12] It concluded, however, that "such benefits" were "not worth the cost of the real and likely harms" to the public interest that would ensue "from a further reduction in competition" in local radio markets. *Id*. ¶ 51 (App.___). The agency agreed with a number of station owners that "loosening the current rule would result in the disappearance of smaller stations from the market," *id*. ¶ 53 (App.___), with "a few national owners buying all or most of the stations in a market and piping in preset programming from distant headquarters," effectively "destroying" the "essence of local radio." *Id*. ¶ 43 (App.___).[13] The FCC reasonably declined to make that "tradeoff." *Id*. ¶ 45 (App.___).

---

[12] That acknowledgment undermines petitioners' claim that the FCC ignored the BIA Radio Study's findings regarding the benefits of consolidation. Pet. Br. 59-61. Although the *Order* did not cite that study, the Commission accepted the study's basic premise that "adding more stations to a [station] owner's local holdings" could "offer some benefit to the owner, including the ability to reduce costs." *Order* ¶ 45 (App.___).

[13] *See* King City Comments at 1-2 (App.___-___); Bristol County/SNE Comments at 1-2 (App.___-___); Urban One Comments at 13 (App.___); Sarkes Tarzian Reply at 3 (App.___) ("further consolidation will likely" lead to "the demise of 'the mom and pop radio broadcaster,' a uniquely American feature of the radio industry since its inception").

## II.   THE COMMISSION REASONABLY DETERMINED THAT THE LOCAL TELEVISION OWNERSHIP RULE REMAINS NECESSARY IN THE PUBLIC INTEREST

As with the Local Radio Ownership Rule, the FCC concluded that "the Local Television Ownership Rule remains necessary in the public interest" and should be retained.  *Order* ¶ 72 (App.___).  That decision also was "reasonable and reasonably explained."  *FCC v. Prometheus*, 592 U.S. at 423. Petitioners' claims to the contrary lack merit.

### A.   The Commission Reasonably Explained Why It Retained The Rule.

The FCC found that the local television rule "remains necessary to promote the Commission's public interest goals of competition, localism, and viewpoint diversity."  *Order* ¶ 71 (App.___).  The agency reasonably explained how the rule advances each of those goals.

*Competition.*  The Commission found that the rule "promotes competition among local broadcast television stations."  *Order* ¶ 71 (App.___).  It explained that there are "strong public interest reasons for promoting" such competition.  *Id*. ¶ 77 (App.___).  "No other source of video programming serves local communities as broadcast television does," *id*. ¶ 71 (App.___), and "viewers directly benefit from competition among local broadcast television stations" in "the provision of local programming," which remains "largely unique to broadcast television."  *Id*. ¶ 75 (App.___).  Such

competition "spurs quality improvements" by local stations, such as "expanded programming choices" and "technological innovation." *Id*. ¶ 77 (App.___). It also reduces costs for consumers by "prevent[ing] local broadcasters from demanding higher retransmission consent fees" from cable operators or "charging higher rates for local businesses seeking to purchase advertising time on local stations." *Ibid*.

Petitioners assert that the Commission cannot rely on a competition rationale to justify the local television rule because there is no evidence that "broadcasters have undue market power." Pet. Br. 62. To the contrary, as we explained at pages 32-33 above, the FCC need not find market power in order to find that an ownership rule is "necessary in the public interest" to promote competition among broadcasters. Consumers benefit from competition among local television stations even if no station has market power. *See Order* ¶¶ 75, 77 (App.___, ___).

**Localism.** The Commission determined that the local television rule "promotes localism" by "[s]purring competition among broadcast television stations." *Order* ¶ 78 (App.___). Stations "seek to differentiate themselves" from each other by airing high-quality "programming responsive to the needs and interests of their local communities," including "local news and information programming." *Ibid*.

43

Petitioners contend that the rule is not necessary to promote localism because record evidence shows that "competition from *non*-broadcasting sources catalyzes local programming," and that consolidation "*increases* and *improves* local programming content" by creating cost savings that stations can reinvest in local programming.  Pet. Br. 63.  But it was reasonable for the Commission to conclude that competition among local broadcast television stations provides the most powerful incentive for stations to provide viewers with high-quality local programming, including local news.  The Commission noted that "the record contains numerous assertions from broadcasters that the local programming they provide is unique and unduplicated by any other video programming provider."  *Order* ¶ 78 (App.___).  One important way that television stations distinguish themselves from competing local stations is by producing better local programming.  Stations routinely tout themselves in their own advertisements as providing the best local news coverage or the most accurate local weather forecasts in their market.  *See Communications Marketplace Report*, 33 FCC Rcd 12558, 12616 ¶ 102 (2018) (television stations "typically market themselves based largely on their [network] affiliation, program popularity, and local news"); *id*. at 12617 ¶ 104 ("broadcast television stations differentiate themselves from … other stations

… by offering local news, exclusive news stories, investigative reporting, regional and local sports, and coverage of community events").

Moreover, the record supported the Commission's rejection of "broadcasters' assertions" that "greater consolidation" was needed to "preserve localism." *Order* ¶ 79 (App.___).  Nielsen data and studies by the Radio Television Digital News Association indicated that "the number of stations airing local news actually increased slightly" from 2017 to 2021. *Ibid*. (App.___-___).  Even in the smaller markets "where broadcasters argue the need to consolidate is particularly acute," the record showed that "the number of markets that saw increases in stations airing local news" from 2017 to 2021 "outnumbered those that saw decreases."  *Ibid*. (App.___).

**Viewpoint Diversity.**  The Commission found that the local television rule promotes "viewpoint diversity" because it "serves to maintain diffuse ownership" of local stations "among a wide variety of owners," "increasing the likelihood of a variety of viewpoints" on local issues.  *Order* ¶ 81 (App.___).  In reaching this conclusion, the agency expressly disavowed its determination in a prior Quadrennial Review that the rule was "not necessary to promote viewpoint diversity due to the presence of 'other types of media.'" *Ibid*. (citing *2006 Quadrennial Regulatory Review*, 23 FCC Rcd 2010, 2065-66 ¶ 100 (2008)).

The Commission explained that it had changed its view on this issue because it found that media other than broadcast television do not significantly contribute to viewpoint diversity in local video programming. The record reflected that local television stations remain by far the primary source of original local programming, including local news. *See Order* ¶ 78 (App.___). Broadcasters themselves have repeatedly asserted that "the local programming they provide is unique and unduplicated by any other video programming provider." *Ibid*. And the amount of local programming aired by television stations "has grown" while the amount of original local content produced by non-broadcast sources has declined. *Id*. ¶ 81 (App.___).[14] Given broadcasters' predominant role in producing local video programming, the FCC reasonably concluded that the local television rule remains necessary

---

[14] Intervenors make much of the FCC's observation in the *2017 Order* that many "independent digital-only news outlets with no print or broadcast affiliation" have "a local or hyperlocal focus." Television Int. Br. 15 (quoting *2017 Order*, 32 FCC Rcd at 9812 ¶ 19). But the record casts serious doubt on whether online outlets are a reliable and independent source of local news. As the Commission noted in the *Order*, some non-broadcast "sources of local content have disappeared," while others have merely "repurposed local television content for their own platforms." *Order* ¶ 81 (App.___); *see also* KNIGHT FOUNDATION, LOCAL TV NEWS AND THE NEW MEDIA LANDSCAPE: PART 1, THE STATE OF THE INDUSTRY 17 (2018) ("few online-only information websites … generate enough traffic to stand much chance of being self-supporting"), available at https://knightfoundation.org/wp-content/uploads/2020/03/TVNews_bundle-v5.pdf; *id*. at 18 (stand-alone news websites are "a long way from" becoming "a major factor in local news").

to promote the public interest in "a multiplicity of speakers" on "local issues and the needs and interests of local communities."  *Ibid*.

Petitioners argue that the Commission ignored evidence "that consolidation *increased* viewpoint diversity on television or, at worst, had no effect."  Pet. Br. 64.  Other evidence, however, suggested that "the presence of more independently owned outlets can increase viewpoint diversity in a market."  *Order* n.279 (App.___).  In view of this conflicting evidence, it was reasonable for the FCC to conclude that a diversity of viewpoints among stations is more likely if each station has different owners (as opposed to a single entity owning multiple stations).

## B.  The Commission Reasonably Explained Why It Retained The Two-Station Limit.

Under the local television rule, no entity may own more than two stations in a local market.  *See* 47 C.F.R. § 73.3555(b)(1)(i)-(ii).  The Commission found that this two-station limit "continues to strike the appropriate competitive balance" by "enabling some efficiencies of common ownership while maintaining a level of competition amongst broadcast television stations to ensure that they continue to serve the public interest." *Order* ¶ 82 (App.___).

Although some commenters asserted that "permitting ownership of a third … in-market station would enable broadcasters to compete more

effectively," the FCC concluded that any "efficiencies" gained through such consolidation would not "outweigh the countervailing harms" to the agency's public interest goals. *Order* ¶ 83 (App.___-___). It explained that raising the ownership limit to three stations "would mean the loss of an independent station operator" in a local market, "to the detriment of competition, localism, and viewpoint diversity." *Ibid*. (App.___). Citing record evidence that "the majority of television markets are already highly concentrated," the FCC saw no reason "to loosen the existing numerical limits." *Id*. ¶ 84 (App.___).

Petitioners also argue that the FCC "ignored the possibility" of raising the limit to three stations in smaller markets to account for "the substantial variability between markets." Pet. Br. 50-51. That is incorrect. The Commission considered proposals that the two-station limit "should not be uniformly applied in all markets." *Order* n.294 (App.___). It simply declined to loosen the limit for any subset of markets.

The Commission's decision to maintain a two-station limit in each market "is exactly the kind of line-drawing, where any line drawn may not be perfect, to which courts are the most deferential." *See Prometheus IV*, 939 F.3d at 582 (rejecting an argument that the FCC "wrongly ignored the variation in market structures" by "treating all top-four stations the same"). Lines drawn by the Commission will generally be upheld unless they are

"patently unreasonable." *Prometheus I*, 373 F.3d at 390.[15] "The relevant question" in reviewing FCC line-drawing "is whether the agency's numbers are within a zone of reasonableness, not whether its numbers are precisely right." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001); *see also Citizens Telecomms.*, 901 F.3d at 1010-11 (in performing cost-benefit analysis, the FCC may select "a cost figure within a broad zone of reasonable estimate" and "need not quantify all costs with rigorous exactitude").

The two-station limit easily passes muster under this deferential standard. The Commission had "wide discretion" to set a limit on the number of stations an entity could own in a market, and petitioners "point to nothing suggesting that the agency abused its discretion in drawing the line" at two stations per market. *See AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C. Cir. 2000). The Commission kept this limit in place in all local markets because it reasonably found that further consolidation in any market could adversely affect consumers by allowing "small and mid-sized broadcasters" to be "bought out by larger competitors instead of … enabling them to combine to

---

[15] *See also Alliance for Cmty. Media v. FCC*, 529 F.3d 763, 780 (6th Cir. 2008); *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1242 (D.C. Cir. 2007).

become more effective competitors to the larger stations."  *Order* ¶ 83

(App.___).

### C.   The Commission Reasonably Explained Why It Retained The Top-Four Prohibition.

The local television rule generally bars any entity from owning two

stations ranked among the top four stations in a market.  47 C.F.R.

§ 73.3555(b)(1)(ii).  This Top-Four Prohibition does not apply in cases

where, at an applicant's request, the Commission finds that permitting the

applicant to own two top-four stations in a particular market would "serve the

public interest."  *Id*. § 73.3555(b)(2).

The FCC reasonably decided to retain the Top-Four Prohibition after

finding that "a combination involving two of the top-four stations in a market

would be the most detrimental to competition" and "the public interest."

*Order* ¶ 86 (App.___).  The agency explained that such combinations

generally "should be prohibited" because in most cases, they reduce

"incentives for local stations to improve their programming" by reducing

competition among stations, "allowing former rivals to combine" to form a

single entity with "a significantly larger market share than other entities in the

market."  *Ibid*. (App.___-___).

The Commission also found that top-four stations are "the most likely stations to originate local news." *Order* ¶ 86 (App.___).[16] Consequently, the Top-Four Prohibition promotes viewpoint diversity by helping to "ensure a diversity of voices" among stations that provide "coverage of local issues." *Ibid*.

The FCC acknowledged that it had previously cited the "gap in ratings between the fourth and fifth ranked stations in a market as supporting the Top-Four Prohibition." *Order* ¶ 86 (App.___). In this proceeding, however, NAB submitted evidence that "the largest ratings gaps in most markets are found among the top-four stations, not between the fourth- and fifth-ranked stations." *Id*. n.288 (App.___). Petitioners maintain that in light of this evidence, the FCC could not reasonably have retained the Top-Four Prohibition as is. Pet. Br. 43-44.

As the FCC stated, however, it "has never based" the Top-Four Prohibition "solely on the existence of" a "ratings cushion" between the

_____

[16] Petitioners dismiss this conclusion as "speculation." Pet. Br. 45, but they offer no evidence to rebut it. The Commission's predictive judgment on this matter is entitled to deference. *See NCCB*, 436 U.S. at 813-14; *Citizens Telecomms.*, 901 F.3d at 1010; *Sw. Bell*, 153 F.3d at 547. Record evidence of "significant demand for local television news," *Order* ¶ 79 (App.___), gave the FCC a reasonable basis for finding that the top-ranked stations in a market are most likely to provide local news coverage.

fourth and fifth ranked stations in local markets. *2016 Order*, 31 FCC Rcd at 9880 n.104. It has long understood that such a cushion does not exist "in all markets." *2017 Order*, 32 FCC Rcd at 9837 ¶ 79; *see 2002 Biennial Regulatory Review*, 18 FCC Rcd 13620, 13694-95 ¶ 195 (2003). Instead, the Commission explained that even if the largest ratings gap in certain markets occurs among the top four stations (rather than between the fourth and fifth ranked stations), "the fact remains that there is substantial concentration of audience share among the top-ranked stations in most markets." *Order* ¶ 86 (App.___). The agency also observed that "generally the top-four stations in any market are affiliated with" the "four major broadcast networks," which "have a distinctive ability to attract large primetime audiences on a regular basis." *Ibid*. Given these facts, the FCC reasonably concluded that the Top-Four Prohibition remains necessary to prevent top-ranked stations from reducing competition in their local markets by entering into combinations that allow them to "increase their" already large "market shares" "even more." *Ibid*.

In the Commission's judgment, the best way to address markets with no large ratings gap "between the top-four rated stations and the rest of the stations in a market" was not by "eliminating" or modifying the Top-Four Prohibition, but by employing the existing rule's "case-by-case approach to

consider" proposed "combinations of top-four stations" upon an applicant's request. *Order* ¶ 86 (App.___); *see* 47 C.F.R. § 73.3555(b)(2). This "case-by-case approach" gives the FCC the "flexibility" to "consider combinations of highly ranked stations in unique circumstances" where permitting such combinations would serve the public interest. *Order* ¶ 87 (App.___). The agency found that this approach struck "the proper balance," "ensuring that no market is excessively concentrated" while "allowing flexibility in particular circumstances." *Id*. ¶ 89 (App.___).

In rejecting proposals for repeal or relaxation of the Top-Four Prohibition, the Commission reasoned that even if "the top three" (rather than the top four) stations "dominate audience share in some markets," it "does not follow that one of those three stations categorically should be permitted to acquire the fourth ranked station and increase its market share even more." *Order* ¶ 86 (App.___). Instead, the Commission reasonably found that the current rule's "case-by-case" review procedure was "better suited to address" individual cases where proposed combinations might help preserve "the viability of stations in smaller markets," *ibid*., or other cases involving

"unique circumstances" that might warrant an exemption from the Top-Four Prohibition.  *Id.* ¶ 87 (App.\_\_\_).[17]

Petitioners maintain that this "case-by-case" procedure is indistinguishable from the waiver process that is generally available under FCC rules.  Pet. Br. 49 (citing 47 C.F.R. § 1.3).  Unlike other FCC rules, however, the local television rule expressly provides for case-by-case review of proposed top-four combinations upon request.  *See* 47 C.F.R. § 73.3555(b)(2).  In 2017, the Commission amended the rule to "allow applicants to request a case-by-case examination of a proposed combination that would otherwise be prohibited by the Top-Four Prohibition."  *2017 Order*, 32 FCC Rcd at 9837-38 ¶ 81.  Broadcasters welcomed this change. Indeed, a number of broadcasters—including petitioners NAB and Nexstar— intervened to support the FCC's defense of the amended rule in court.[18]

---

[17] Petitioners are wrong when they assert that the FCC "disregarded the possibility of relaxing" the Top-Four Prohibition in "smaller markets."  Pet. Br. 45.  Rather than modify the rule, the agency reasonably decided that it could best "address broadcasters' concerns about the viability of stations in smaller markets" through case-by-case review of proposed combinations under the procedure prescribed by the current rule.  *Order* ¶ 86 (App.\_\_\_).

[18] *See* Final Brief of Industry Intervenors in Support of Respondents, *Prometheus Radio Project v. FCC*, 3d Cir. No. 18-3335 (and consolidated cases), at 10-11 (filed May 3, 2019).

Petitioners now contend that the availability of relief under the amended rule is "illusory." Pet. Br. 48-50. That claim does not withstand scrutiny. Shortly after the amended rule took effect, "the Commission granted three case-by-case" exemptions "affecting five" markets before the rule "was temporarily vacated" by the Third Circuit in 2019. *See Order* ¶ 89 & n.299 (App.___). The rule was not reinstated until after the Supreme Court reversed the Third Circuit in 2021. *Reinstatement Order*, 36 FCC Rcd 9354. Petitioners say that they are "aware of only one case-by-case exemption granted" since then. Pet. Br. 49 n.9. During that time, however, the Commission received only two other exemption requests, which were withdrawn before the agency could act on them. Petitioners cannot reasonably complain about the adequacy of a case-by-case procedure that (by their own admission) broadcasters have "rarely used." *Id*. at 43.

In any event, in crafting a ban on combinations of top-ranked stations, the FCC made a "sensible" choice to draw the line at the top four stations in a market because those stations are often affiliated with "the four major national networks." *Prometheus IV*, 939 F.3d at 582. But "each market's contours will be slightly different, and no single bright-line rule can capture all this complexity." *Ibid*.

Recognizing that any "bright-line prohibition" is "over-inclusive" to some extent, the Commission adopted a "case-by-case" review procedure that allows the agency to grant exemptions to the ban in cases where an applicant demonstrates that a proposed top-four combination would serve the public interest. *2017 Order*, 32 FCC Rcd at 9837 ¶ 79. This procedure is reasonably designed to "help mitigate the potential drawbacks associated with strict application of the Top-Four Prohibition, while still preserving the ease and efficiency of applying the rule." *Id*. at 9838 ¶ 81. If a broadcaster believes that the prohibition should not apply to a certain combination of stations in a particular market, the FCC's "case-by-case" procedure gives the broadcaster an opportunity to persuade the agency that permitting the combination would serve the public interest.

As with the two-station limit, petitioners' objection to the Top-Four Prohibition boils down to a challenge to agency line-drawing. In this context, given the inherent difficulty in drawing lines that are "precisely right," the FCC "is not required" to set ownership limits "with pinpoint precision." *WorldCom*, 238 F.3d at 461-62. Its ownership restrictions need only fall "within a zone of reasonableness." *Id*. at 462. The Top-Four Prohibition easily satisfies that "deferential" standard. *See Prometheus IV*, 939 F.3d at 582. To the extent the prohibition is overinclusive, the "case-by-case" review

process reinforces the reasonableness of the restriction by enabling

broadcasters to obtain exemptions in appropriate cases.[19]

## III. THE COMMISSION REASONABLY DECIDED TO MODIFY NOTE 11

Note 11 to section 73.3555 of the FCC's rules prohibits a television

station from acquiring a network affiliation from another station "if the

change in network affiliations would result in" a single entity "owning,

operating, or controlling two of the top-four rated television stations" in a

local market.  47 C.F.R. § 73.3555 Note 11.  The Commission adopted Note

11 in 2016 to prevent broadcasters from circumventing the Top-Four

Prohibition by obtaining another station's network affiliation.  *See 2016*

*Order*, 31 FCC Rcd at 9882-83 ¶¶ 47-48.

---

[19] Intervenors—but not petitioners—challenge the FCC's decision to "incorporate the ratings of a station's multicast streams, to the extent such streams have measurable ratings," when determining "a station's in-market ranking" for purposes of the Top-Four Prohibition.  *Order* ¶ 85 (App.___). Intervenors argue that this "new methodology" is "arbitrary."  Television Int. Br. 23.  This argument is procedurally barred for two reasons.  First, no party raised this issue before the Commission.  *See Minn. Pub. Util. Comm'n v. FCC*, 483 F.3d 570, 581 (8th Cir. 2007) (the Communications Act requires a party to "file a petition for agency reconsideration before it may seek judicial review of an issue over which the FCC has had no 'opportunity to pass'") (quoting 47 U.S.C. § 405(a)).  Second, petitioners did not raise the issue before this Court, and "[a]n intervening party may join issue only on a matter that has been brought before the court by another party."  *Ill. Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990) (citing *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944)).

Originally, Note 11 applied only in cases where newly acquired network-affiliated programming was aired on a second full power television station. The placement of such programming on a multicast stream or low power television station had not been widespread or problematic, and a multicast stream or low power station was not "counted for purposes of" the local television rule. *Order* ¶ 97 (App.___). The record here, however, revealed that owners of top-four stations were increasingly "acquiring the network-affiliated programming" of competing top-four stations "and then placing that programming" on a multicast stream or low power station in the same market. *Ibid.* In doing so, the acquiring party thereby "obtain[ed] the equivalent of a second top-four rated station in terms of audience and revenue share in the local market." *Id.* ¶ 100 (App.___). The Commission believed that such actions were "undermining" the local television rule by "circumventing" the Top-Four Prohibition. *Id.* ¶ 97 (App.___). Accordingly, it decided to amend Note 11 to prohibit these "other means of circumventing the Top-Four Prohibition." *Ibid.* (App.___).

Petitioners argue that the agency failed to justify this revision to Note 11. Pet. Br. 51-54. They also contend that the revision violates the Communications Act and the First Amendment. *Id.* at 65-69. These claims are baseless.

### A. The Commission Reasonably Explained Why It Modified Note 11.

The Commission explained that it revised Note 11 "to preserve the efficacy of the Top-Four Prohibition" by "prevent[ing] further exploitation of unintended ambiguities or gaps in the rule." *Order* ¶ 98 (App.___).  Based on its finding that the use of multicast streams and low power stations to evade the Top-Four Prohibition "denies consumers the benefits of competition," the FCC reasonably concluded that its modification of Note 11 was "consistent with the statutory mandate of section 202(h) to modify a rule so that the rule continues to serve the public interest." *Ibid.*

Petitioners complain that the FCC "failed to adequately consider the benefits of airing popular network programming" on multicast streams or low power stations "in 'short' markets" (Pet. Br. 52)—*i.e.*, "markets that do not have enough full power commercial stations to accommodate all [four] major networks." *Order* ¶ 102 (App.___).  But Note 11 does not preclude a station from adding a new network affiliation that had previously been absent from a "short" market.  When a station seeks to air programming from a network with no existing affiliate in a market, it typically acquires the programming directly from the network.  Note 11 does not prohibit such transactions.

Furthermore, the record contained evidence that "the number of instances where top-four rated programming appears" on "multicast streams

or low power stations now vastly" exceeds the number of "actual 'short markets.'" *Order* ¶ 102 (App.___). A survey by the American Television Alliance found 121 such instances, only "46 of which" occurred in short markets. *Ibid*. (App.___-___); *see* ATVA Update Comments at 11, Exhibit B (App.___, ___-___).

By contrast, when the FCC adopted Note 11 in 2016, "dual affiliations involving two Big Four networks via multicasting" were "generally limited to" short markets. *2016 Order*, 31 FCC Rcd at 9892 ¶ 72. For that reason, the Commission initially declined to regulate such multicasting arrangements, but it said that it would "continue to monitor this issue and take action in the future, if appropriate." *Id*. at 9893 ¶ 72. By the time the FCC conducted its 2018 Quadrennial Review, "circumstances [had] changed," with broadcasters in larger markets "increasingly" placing network programming "on multicast streams or [low power] stations" in an effort "to circumvent the Top-Four Prohibition." *Order* ¶ 102 (App.___). In light of that development, the FCC reasonably decided to amend Note 11 "to prohibit such behavior in the future." *Id*. ¶ 97 (App.___).

In making this change, the Commission did not adopt an "adversarial approach to low-power stations and multicasting." Pet. Br. 53. The amendment to Note 11 "narrowly targets" only the use of multicasting and

low power stations by broadcasters seeking "to circumvent" the Top-Four Prohibition. *Order* ¶ 105 (App.___). When the FCC adopted this amendment, it made clear that it would "continu[e] to support legitimate uses of both [low power television] and multicast streams." *Ibid*. Thus, even after the rule change, broadcasters remain free to air network programming on multicast streams or low power stations in any market, so long as the programming is not acquired from a top-four station by another top-four station in that market. For example, in cases involving "affiliation changes initiated by a network itself," broadcasters may place newly acquired network programming on multicast streams or low power stations in any market they wish. *Ibid*.

The Commission also pointed out that "if an entity believes" that Note 11 "should not apply to its plan" to use "a low power station or multicast stream" in a manner prohibited by the amendment to Note 11, the entity can "seek case-by-case consideration" of its proposal under the local television rule. *Order* ¶ 108 (App.___); *see also id*. n.348 (App.___). The availability of this procedure undercuts petitioners' assertion that the Commission "effectively prohibited" the placement "of top-four rated programming on low-power stations and multicast streams." Pet. Br. 54. In addressing requests for case-by-case review, the Commission will "examine real-world

markets," *ibid*., to assess whether any "unique circumstances" presented by the proposed use of multicasting or low power stations in particular markets would justify an exemption from Note 11.  *See Order* ¶ 87 (App.___).  For instance, the Commission has indicated that it "may look favorably" on exemption requests "[i]n small markets" where the application of Note 11 "would result in the loss of an existing top four stream from the market."  *Id*. n.348 (App.___).

Ultimately, petitioners have no basis for claiming that the Commission's modification of Note 11 is "unreasoned."  Pet. Br. 51.  Courts have long recognized that the FCC may reasonably take action to guard against circumvention of its rules.[20]  In this case, after finding substantial evidence that broadcasters were circumventing the local television rule, the

---

[20] *See, e.g., Mt. Mansfield Television, Inc. v. FCC*, 442 F.2d 470, 476, 481-87 (2d Cir. 1971) (upholding financial interest and syndication rules that the FCC adopted "to prevent indirect circumvention" of its prime time access rule); *Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235, 243-44, 251-53 (3d Cir. 2010) (upholding an attribution rule that the FCC adopted to prevent spectrum auction participants from circumventing eligibility requirements for benefits available only to small businesses); *Great Lakes Commc'n Corp. v. FCC*, 3 F.4th 470, 473-74, 479 (D.C. Cir. 2021) (upholding rules designed to prevent circumvention of FCC restrictions on access stimulation); *Wide Voice, LLC v. FCC*, 61 F.4th 1018, 1028-30 (9th Cir. 2023) (affirming the FCC's finding that a company violated section 201(b) of the Communications Act by circumventing the agency's access stimulation rules).

Commission modified Note 11 to foreclose future evasion. That reasonable anti-circumvention measure should be upheld.

### B. The Modification Of Note 11 Does Not Violate The Communications Act Or The First Amendment.

Petitioners argue that the amendment of Note 11 was unlawful because "the Communications Act does not authorize it, and the First Amendment forbids it." Pet. Br. 65. They base these arguments on the notion that the amended Note 11 is a content-based restriction on speech. As the Commission explained, however, Note 11's "prohibition on affiliation acquisitions involving two top-four stations does not consider content but rather market concentration." *Order* n.336 (App.___). And courts have repeatedly rejected the premise that the FCC's media ownership rules regulate the content of broadcasters' speech.

It is well settled that the FCC "possesses broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires,'" and that the agency has exercised this authority to promulgate rules limiting the number of broadcast stations "that a single entity may own in a given market." *FCC v. Prometheus*, 592 U.S. at 418 (quoting 47 U.S.C. § 303). It is also well established that FCC regulations restricting media

ownership "are not content related," *NCCB*, 436 U.S. at 801,[21] and that these content-neutral structural regulations are "generally subject only to rational basis scrutiny" under the First Amendment. *Am. Family Ass'n, Inc. v. FCC*, 365 F.3d 1156, 1168 (D.C. Cir. 2004). Broadcasting's "unique physical limitations" due to the "scarcity of broadcast frequencies" justify this deferential standard. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994); *see also Prometheus I*, 373 F.3d at 401-02.

The Supreme Court has held that FCC regulations restricting media ownership "do not violate the First Amendment" if they "are a reasonable means of promoting the public interest in diversified mass communications." *NCCB*, 436 U.S. at 802. Applying this deferential standard of review more than 80 years ago, the Court rejected statutory and constitutional challenges to the FCC's "chain broadcasting" regulations, which imposed restrictions on network affiliation agreements. *Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943). Similarly, courts have repeatedly rejected First Amendment challenges to the Local Television Ownership Rule. *See Prometheus II*, 652

---

[21] *See also Prometheus Radio Project v. FCC*, 652 F.3d 431, 465 (3d Cir. 2011) (*Prometheus II*) (the media ownership rules "apply regardless of the content of programming"); *Fox*, 280 F.3d at 1046 (a rule limiting ownership of multiple television stations "is not a content-based regulation; it is a regulation of industry structure").

F.3d at 464 (the rule is "rationally related to substantial government interests in promoting competition and protecting viewpoint diversity"); *Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148, 167-69 (D.C. Cir. 2002) (this "structural rule … is consistent with the First Amendment" under "a rational basis standard of review").

Note 11, which is an "extension" of the local television rule, is "subject to the same constitutional analysis" that courts have applied in upholding that rule. *2016 Order*, 31 FCC Rcd at 9884 ¶ 50. Like the rule, the amended Note 11 "is rationally related to the substantial government interests in promoting competition and diversity." *Ibid*. Therefore, it does not "raise serious First Amendment issues." Pet. Br. 67. Nor does it violate section 326 of the Communications Act, 47 U.S.C. § 326, which prohibits "government censorship." Pet. Br. 68 (quoting *Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1428 (D.C. Cir. 1983)). "The protection of the public interest" through the regulation of media ownership "does not amount to 'censorship' within the meaning of Section 326." *Carter Mountain Transmission Corp. v. FCC*, 321 F.2d 359, 364 (D.C. Cir. 1963).

There is also no question that the Communications Act authorized the revision to Note 11. The Supreme Court has consistently held that the FCC has broad authority under the Act to adopt structural rules limiting ownership

of broadcast stations.  *See FCC v. Prometheus*, 592 U.S. at 418; *NCCB*, 436 U.S. at 796; *Storer*, 351 U.S. at 201-05.  Such rules "fall within the [FCC's] general rulemaking authority" so long as they "are not an unreasonable means for seeking to achieve [permissible public interest] goals."  *NCCB*, 436 U.S. at 796.  The amendment to Note 11 easily passes that test.  It is reasonably designed to protect the public interest in competition among local television stations by preventing circumvention of the Top-Four Prohibition.  *See Order* ¶¶ 97-108 (App.___-___).

Petitioners contend that the amendment to Note 11 is "unlawful" because the Communications Act does not authorize the FCC to "regulate broadcasters' programming choices."  Pet. Br. 65.  But Note 11 does not regulate programming content.  It targets transactions involving network affiliations that may be used to evade the local television rule, and it applies "regardless of the content of programming."  *Prometheus II*, 652 F.3d at 465.  Specifically, Note 11 bars affiliation agreements that produce the functional equivalent of prohibited top-four combinations.

Petitioners' claim that Note 11 regulates programming content relies heavily on the D.C. Circuit's decision in *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002) (*MPAA*), but that case is readily distinguished.  In *MPAA*, the D.C. Circuit held that the FCC lacked authority

to adopt "rules mandating television programming with video descriptions," 309 F.3d at 798, because the Communications Act did not authorize the agency "to promulgate regulations that significantly regulate programming content." *Id*. at 804. But unlike the video description rules, which constituted "a direct and significant regulation of program content," *id*. at 803, Note 11 is a structural regulation that "only incidentally and minimally affects program content." *See ibid*. It applies only when owners of top-four stations acquire network-affiliated programming from competing top-four stations and air the programming in the same market. Broadcasters remain free to acquire the programming and to air it in another market. And if a broadcaster acquires an affiliation directly and independently from a network, Note 11 imposes no restrictions at all; the broadcaster may air the newly acquired programming as it chooses.

In sum, the Communications Act authorized the modification of Note 11, and the First Amendment does not forbid it.

## IV. IN ASSESSING WHETHER ITS OWNERSHIP RULES SHOULD BE RETAINED, THE COMMISSION ADOPTED REASONABLE DEFINITIONS OF THE RELEVANT MARKETS

In determining whether to retain its local radio and television ownership rules, the Commission adhered to its conclusion that "the relevant market to consider for purposes of the Local Radio Ownership Rule is the

radio listening market," and that "due to the unique characteristics of broadcast radio, it would not be appropriate to include satellite or non-broadcast audio sources, such as Internet streaming services, in that market at this time." *Order* ¶ 33 (App.___)  The Commission likewise determined that "broadcast television remains unique and non-substitutable with other sources of video programming," *id*. ¶ 73 (App.___), even though "there are far more sources" of such programming "than there were when the Local Television Ownership Rule was first adopted." *Id*. ¶ 74 (App.___).  Those conclusions were reasonable.

The record showed that despite the proliferation of non-broadcast sources of audio and video programming, broadcast radio and television remain virtually the only providers of *local* programming.  "[O]ther audio services do not provide" the sort of community-focused programming offered by broadcast radio, which features "local on-air personalit[ies]," "music by local bands, reporting on local sports teams," "sponsorship of neighborhood festivals," *Order* ¶ 36 (App.___-___), and vital "public safety information during [local] emergencies." *Id*. ¶ 35 (App.___).  *See id*. ¶ 36 (App.___) ("there is evidence that being local is *the* defining value proposition that many radio stations see themselves as providing to consumers").  In addition,

"only terrestrial broadcast radio both is available without a paid subscription and does not require access to Internet service." *Id*. ¶ 35 (App.\_\_\_-\_\_\_).

Similarly, broadcast television stations continue to be the dominant providers of local news and other video "programming responsive to the needs and interests" of "local communities." *Order* ¶ 78 (App.\_\_\_). *See id*. ¶ 75 (App.\_\_\_) ("the provision of local programming remains a hallmark of broadcast television"). "[T]he record contains numerous assertions from broadcasters"—including petitioners NAB and Nexstar—"that the local programming they provide is unique and unduplicated by any other video programming provider." *Id*. ¶ 78 (App.\_\_\_). Furthermore, "in contrast to broadcast media, which consumers can access freely over the air," "cable, satellite, and streaming media all have higher consumer fees as they require an additional service, … as well as, often times, a subscription fee"—a distinction that makes a difference to "price conscious consumers." *Id*. ¶ 74 (App.\_\_\_). Finally, "the record reflects that despite its growing prevalence, online video still largely complements, rather than competes with, broadcast television." *Id*. ¶ 75 (App.\_\_\_).

As the Commission observed, its market definitions are consistent with, and supported by, the approach adopted by the Department of Justice (DOJ) in antitrust litigation involving advertising on broadcast radio and

television.[22]  While "DOJ's antitrust analysis does not consider competition for audience share," DOJ's views are hardly "irrelevant" to the FCC's review of its rules under section 202(h).  Pet. Br. 41.  Because the FCC agreed with DOJ that "broadcast radio advertising" is "a distinct product market," it concluded that its "existing [radio ownership] rule promotes competition among local radio stations through competition for advertising dollars." *Order* ¶ 34 (App.___-___).  Similarly, the FCC's finding that "non-broadcast sources of video programming do not compete with broadcasters for retransmission consent fees, network affiliations, or the provision of local programming," *id.* ¶ 75 (App.___), was consistent with DOJ's position that "broadcast television uniquely competes" for "retransmission consent and broadcast spot advertising."  *Id.* n.258 (App.___) (citing Complaint, *United States v. Gray Television, Inc. and Quincy Media, Inc.*, No. 1:21-cv-02041, ¶¶ 15-46 (D.D.C. July 28, 2021)).

    In defining the relevant markets, the FCC satisfied its obligation "to engage in reasoned decisionmaking."  *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of Interior*, 95 F.4th 573, 579 (8th Cir. 2024).  Some "fuzziness" is

---

    [22] *See Order* ¶ 34 (App.___) (DOJ "consistently has found" that "broadcast radio advertising" is "a distinct product market"); *id.* ¶ 76 (App.___) (DOJ considers "the spot advertising product market" for local broadcast television "to be its own market in antitrust analysis").

"inherent in any attempt to define the relevant … market."  *See United States*

*v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963).[23]  As petitioners point

out, record evidence and other factors could have supported a broader market

definition that included non-broadcast providers of audio and video

programming.  Pet. Br. 32-41.  But given the fact that broadcast radio and

television continue to provide the vast majority of locally oriented audio and

video programming, it was reasonable for the Commission to define the

relevant markets to include only (1) broadcast radio stations (when analyzing

the need for the radio rule) and (2) broadcast television stations (when

analyzing the need for the television rule).  Local radio and television stations

provide the lion's share of the local news and community-oriented

programming that is essential to achieving the FCC's goals of promoting

localism and viewpoint diversity.  The Commission reasonably found that

competition among local stations spurs them to distinguish themselves from

each other by improving the quality of their local programming and their

efforts to address the needs and interests of the communities they serve.  *See*

*Order* ¶¶ 36, 46, 77-78 (App.___-___, ___-___, ___).

---

[23] *See also United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974)
(geographic "markets need not—indeed cannot—be defined with scientific
precision"); *JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011, 1016
(9th Cir. 1983) ("market definitions are inherently imprecise").

Petitioners assert that the market definitions adopted in the *Order* permanently preclude "any consideration of competition from non-broadcast sources." Pet. Br. 39. That claim is unfounded. In future Quadrennial Review proceedings, if the record reveals that local programming is no longer largely the exclusive domain of broadcasters—*i.e.*, if non-broadcast providers of audio and video services start offering more of their own local news and community-oriented programs in competition with the local programming of broadcast stations—the FCC could revise its market definitions to account for any such developments.

Petitioners also speculate that under the approach adopted in the *Order*, broadcasters could obtain "no relief" from the FCC's ownership restrictions even if competition from non-broadcast sources drove the broadcast industry to the brink of "death." Pet. Br. 30. This doomsday scenario is purely hypothetical. Neither broadcast radio nor broadcast television is currently in such dire straits. "[D]espite declines in radio's popularity," the record showed that "the total number of broadcast radio stations remained fairly steady, and actually increased slightly, between 2015 and 2020." *Order* ¶ 44 (App.___). The Commission likewise found that "the record does not demonstrate an imminent threat to the viability of broadcast television" that would warrant a loosening of its rules. *Order* ¶ 88 (App.___); *see id.* ¶ 87

(App.___) (rejecting "sweeping claims that for the broadcast television industry to remain viable, broadcasters must be given greater opportunities to consolidate").

## V.    THE COMMISSION COMPLIED WITH SECTION 202(H)

Apart from their other objections, petitioners contend that the Commission's decision to retain its local radio and television rules and to close the Note 11 loophole violated section 202(h).  Pet. Br. 20-31.  That contention flies in the face of the statute.

Section 202(h) directs the FCC to review its media ownership rules quadrennially to "determine whether any of such rules are necessary in the public interest as the result of competition" and to "repeal or modify any regulation it determines to be no longer in the public interest."  47 U.S.C. § 303 note.  The Commission fulfilled that statutory mandate.  After examining extensive record evidence concerning current competitive conditions in the media marketplace, the FCC reasonably concluded that its Local Radio Ownership Rule and Local Television Ownership Rule remain necessary to promote the agency's longstanding public interest goals of competition, localism, and viewpoint diversity.  *See* Sections I and II above; *Order* ¶¶ 32-65, 71-96 (App.___- ___, ___-___).  It also reasonably concluded that a targeted modification of Note 11 was needed to close a

loophole that had undermined the efficacy of the Local Television Ownership

Rule's Top-Four Prohibition.  *See* Section III above; *Order* ¶¶ 97-108

(App.___-___).

### A. Section 202(h) Does Not Require Deregulation When Not In The Public Interest.

Petitioners assert that section 202 creates a deregulatory "presumption

in favor of repealing or modifying the ownership rules."  Pet. Br. 23 (quoting

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002)).

But section 202(h) expressly permits the FCC to "retain a rule" if the

Commission "reasonably determines that the rule is 'necessary in the public

interest'" notwithstanding changes in the competitive media landscape.  *Fox*,

280 F.3d at 1048 (quoting § 202(h)); *see* Pet. Br. 22 ("If the Commission

determines that a rule is still necessary, that is the end of the matter—the rule

remains.").  The Commission did so here.

Petitioners also argue that the agency improperly shifted the burden to

broadcasters to "demonstrate (to the Commission's satisfaction) that the rules

are *not* necessary."  Pet. Br. 31.  To be sure, the FCC considered and rejected

a number of proposals by broadcasters to repeal or modify the rules.  In

deciding to retain the rules, however, the agency made affirmative findings

that each rule remains "necessary in the public interest."[24] *See Order* ¶¶ 32, 72 (App.___, ___).

Petitioners also contend that section 202(h) requires the FCC to justify its rules based on "a current understanding of the relevant market—rather than a static understanding ported over from prior proceedings." Pet. Br. 31. If petitioners mean to suggest that the FCC cannot retain a rule based on policy rationales cited in previous Quadrennial Reviews, the Third Circuit rightly rejected that notion. "Section 202(h) requires only that the Commission think about whether its rules remain necessary every four years. It does not imply that the policy justifications for each regulation have a shelf-life of only four years, after which they expire and must be replaced." *Prometheus IV*, 939 F.3d at 582.

_____

[24] In assessing whether a rule is "necessary in the public interest" under section 202(h), the Commission has consistently construed the word "necessary" to mean "'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable.'" *Order* ¶ 16 (App.___) (quoting *Prometheus I*, 373 F.3d at 394). Petitioners do not appear to contest that reading of section 202(h), which "is the most reasonable and logical interpretation" of the statute. *Ibid.*; *see Prometheus I*, 373 F.3d at 391-94; *Cellco P'ship v. FCC*, 357 F.3d 88, 95-99 (D.C. Cir. 2004) (upholding the FCC's similar interpretation of 47 U.S.C. § 161, which requires the agency to review its telecommunications regulations biennially to determine whether they are "no longer necessary in the public interest").

Nor does section 202(h) take away any of the FCC's "broad statutory authority" under the Communications Act "to regulate broadcast media 'as public convenience, interest, or necessity requires.'" *FCC v. Prometheus*, 592 U.S. at 418 (quoting 47 U.S.C. § 303). This public interest standard is "a supple instrument for the exercise of discretion by" the FCC, "the expert body which Congress has charged to carry out its legislative policy." *WNCN*, 450 U.S. at 593 (quoting *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940)). By granting the agency "broad power to regulate" broadcasting "in the public interest," the Act "permits the Commission" to promulgate rules that "implement [the FCC's] view" of how best to promote the public interest, "'so long as that view is based on consideration of permissible factors and is otherwise reasonable.'" *Id*. at 594 (quoting *NCCB*, 436 U.S. at 793).

"Exercising that authority," the FCC adopted its local broadcast ownership rules "to promote competition, localism, and viewpoint diversity by ensuring that a small number of entities do not dominate a particular media market." *FCC v. Prometheus*, 592 U.S. at 418. The Commission's task under section 202(h) is to "determine whether" those rules remain "necessary in the public interest as the result of competition." 47 U.S.C. § 303 note. Given the statute's reference to the public interest—"a term or

phrase" that the Supreme Court has construed to give the FCC "flexibility" in how it regulates broadcasting—"the best reading" of section 202(h) "is that it delegates discretionary authority to [the] agency." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024). The Supreme Court has long understood that "the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance." *NCCB*, 436 U.S. at 810.

Petitioners argue that section 202(h) "[p]lac[es] competition front and center in the public interest analysis." Pet. Br. 25; *see also* Radio Int. Br. 3 (asserting that section 202(h) has a "competition-centric mandate"). But section 202(h) does not require the FCC to abandon any of the public interest objectives of its ownership rules merely because competition has increased in media markets. The "traditional public interest goals" of those rules— "promoting competition, localism, and viewpoint diversity"—"inform" the agency's analysis under section 202(h). *FCC v. Prometheus*, 592 U.S. at 419. The statute simply requires the Commission to "monitor the effect" of "competition" on its pursuit of those goals and to "make appropriate adjustments to its regulations." *Prometheus I*, 373 F.3d at 391; *see FCC v. Prometheus*, 592 U.S. at 421 (the FCC determined under section 202(h) that "[a]s a result of … market changes," some "ownership rules no longer served

the agency's public interest goals of fostering competition, localism, and viewpoint diversity").  The Commission fully complied with section 202(h) when it determined that its local broadcast ownership rules remain necessary to promote the public interest goals of competition, localism, and viewpoint diversity.

### B. The Commission Did Not Violate Section 202(h) By Modifying Note 11.

When the Commission modified Note 11 to prevent circumvention of the Top-Four Prohibition, it concluded that its amendment of Note 11 was "consistent with the statutory mandate of section 202(h) to modify a rule" to ensure that it "continues to serve the public interest."  *Order* ¶ 98 (App.___).  Petitioners maintain, however, that "the Commission lacks statutory authority to make the broadcast ownership rules more restrictive as part of its statutorily-mandated ownership review."  Pet. Br. 28.  This argument has no grounding in the statute.

Section 202(h) provides that after the FCC completes its quadrennial review of its ownership rules, it "shall repeal *or modify* any regulation it determines to be no longer in the public interest."  47 U.S.C. § 303 note (emphasis added).  Claiming that "modification runs in one direction" in this context, petitioners assert that the word "modify" in section 202(h) "means loosening" a rule.  Pet. Br. 22.  But the term "modify" simply "means to

change or make different." *See Huey v. Sullivan*, 971 F.2d 1362, 1367 (8th Cir. 1992) (citing WEBSTER'S II DICTIONARY 762 (1984)).[25] If Congress had intended to limit the Commission to deregulatory measures, it presumably would have used a word like "loosen" or "relax" or "reduce," as it has in other statutes.[26] Where (as here) a statute "in no way qualifies the type of change" to which the term "modify" refers, that term is best understood to mean "either narrowing or broadening" an existing rule. *Huey*, 971 F.2d at 1367.

_____

[25] Accord BLACK'S LAW DICTIONARY (5th ed. 1979) ("To alter; to change in incidental or subordinate features; enlarge, extend; amend; limit; reduce"); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1130 (4th ed. 2000) ("to change in form or character; alter"); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE SECOND ED. UNABRIDGED 1236 (1987) ("to change somewhat the form or qualities of; alter partially; amend").

[26] *See, e.g.*, 7 U.S.C. § 5674(b) (the Secretary of Agriculture "shall consult with the United States Trade Representative prior to *relaxing or removing* any restriction on the importation of any agricultural commodity" into the United States) (emphasis added); 44 U.S.C. § 2108(a) (if "a Federal agency is terminated and there is no successor in function, the Archivist" of the United States "is authorized to *relax, remove,* or impose restrictions on such agency's records" upon determining "that such action is in the public interest") (emphasis added); 42 U.S.C. § 8144(e) (the Secretary of Housing and Urban Development "may *reduce or waive*" matching fund requirements for certain federal grants) (emphasis added); 49 U.S.C. § 31137(d)(1) (in prescribing regulations requiring commercial motor vehicles to use electronic logging devices, the Secretary of Transportation shall consider how such regulations may "*reduce or eliminate* requirements for drivers and motor carriers to retain supporting documentation associated with paper-based records") (emphasis added).

Here, as in *Huey*, the term "modify" does not transform the Commission's quadrennial review into "a one-way ratchet." *Prometheus I*, 373 F.3d at 394. The agency can modify a rule that no longer serves the public interest by making the rule more restrictive if it "reasonably determines that the public interest calls for a more stringent regulation." *See Prometheus I*, 373 F.3d at 394-95. That is precisely what the Commission did when it modified Note 11. And section 202(h) expressly authorizes the FCC to "modify any regulation it determines to be no longer in the public interest." 47 U.S.C. § 303 note.

Petitioners purport to find support for their contrary reading of section 202(h) in the statute's "purpose." Pet. Br. 24. They point to portions of the legislative history indicating that Congress expected to promote deregulation by enacting section 202(h). As petitioners acknowledge, however, "legislative history cannot contradict the plain text of the statute." *Ibid*. Regardless of Congress's motivation in adopting section 202(h), "it is the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 664 (2020). Section 202(h) plainly authorizes the FCC to "modify any regulation it determines to be no longer in the public interest." 47 U.S.C. § 303 note. Once the FCC determined that Note 11, as originally adopted, was no longer

in the public interest, the agency properly exercised its authority under section 202(h) to modify Note 11 to ensure that "the rule continues to serve the public interest." *Order* ¶ 98 (App.___).

# CONCLUSION

The petitions for review should be denied.[27]

---

[27] In the unlikely event that the Court grants the petitions for review (in whole or in part), it should decline petitioners' request for vacatur. Pet. Br. 69. "The decision whether to vacate depends on [(1)] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [(2)] the disruptive consequences of an interim change that may itself be changed." *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 853 (D.C. Cir. 2021) (quoting *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Here, the FCC could decide on remand to (1) modify the rules rather than repeal them, or (2) retain the rules after providing a further explanation that relaxing the rules would not serve the public interest. Given these prospects, vacatur could result in nothing more than "an interim change that may itself be changed" by the Commission on remand. *Allied-Signal*, 988 F.2d at 150-51. To avoid the "disruptive consequences" of such a scenario, the Court should not vacate the rules (which, after all, have been in place for decades) even if it orders a remand. *Id*. at 150.

Respectfully submitted,

JONATHAN S. KANTER                     P. MICHELE ELLISON
ASSISTANT ATTORNEY GENERAL             GENERAL COUNSEL

ROBERT B. NICHOLSON                    JACOB M. LEWIS
ROBERT J. WIGGERS                      DEPUTY GENERAL COUNSEL
ATTORNEYS
                                       /s/ James M. Carr
UNITED STATES
   DEPARTMENT OF JUSTICE               JAMES M. CARR
WASHINGTON, D.C. 20530                 COUNSEL


                                       FEDERAL COMMUNICATIONS
                                          COMMISSION
                                       WASHINGTON, D.C. 20554
                                       (202) 418-1740

September 13, 2024

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the Court's order, issued May 3, 2024, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Eighth Circuit Rule 32A(b):

    ☒  this document contains 17,172 words, *or*

    ☐  this document uses a monospaced typeface and contains _ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this document has been prepared in a proportionally spaced typeface using Microsoft Word in Office 365 in 14-point Times New Roman, *or*

    ☐  this document has been prepared in a monospaced spaced typeface using _____ with _____.

*/s/ James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

**CERTIFICATE OF DIGITAL SUBMISSION**

I, James M. Carr, hereby certify that with respect to the foregoing:

(1) All required privacy redactions have been made;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of Microsoft Windows 11 Security, last updated on September 13, 2024, and according to the program are free of viruses.

*/s/ James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

**CERTIFICATE OF FILING AND SERVICE**

I, James M. Carr, hereby certify that on September 13, 2024, I filed the foregoing Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740