# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

ZIMMER RADIO OF MID-MISSOURI INC., ET AL.

*Petitioners*

ABC TELEVISION AFFILIATES ASSOCIATION, ET AL.

*Intervenors*

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.

*Respondents*

NCTA – THE INTERNET & TELEVISION ASSOCIATION, ET AL.

*Intervenors*

---

On Petitions for Review from the
Federal Communications Commission

---

BRIEF OF COMMON CAUSE, FREE PRESS, FUTURE OF MUSIC COALITION, MUSICFIRST COALITION, NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS—COMMUNICATIONS WORKERS OF AMERICA AND UNITED CHURCH OF CHRIST OFFICE OF COMMUNICATION, INC. AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS

---

51439.00001\42645335.15

Rachel Stilwell
**STILWELL LAW**
26565 Agoura Road
Suite 200
Calabasas, CA 20006
(818) 330-6819

*Attorney for Amici musicFIRST
Coalition and Future of Music
Coalition*

Cheryl A. Leanza
**BEST BEST & KRIEGER LLP**
1800 K Street NW
Suite 725
Washington, DC 20006
(202) 785-0600

*Attorney for Amici Common Cause,
Free Press, NABET-CWA and
United Church of Christ Office of
Communication, Inc.*

2

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................. 10

INTERESTS OF AMICI CURIAE ........................................................ 11

INTRODUCTION ................................................................................. 14

ARGUMENT ......................................................................................... 16

    I.    Broadcasting Is Unique and Essential. ............................... 16

        A.    Many people in the U.S. do not benefit from online media. ............................................................. 17

        B.    Music creators and listeners rely on a vibrant, competitive local radio industry. ............................... 20

        C.    Television and radio play unique roles in providing news, covering elections, and during emergencies. ........................................................ 23

            1.    Online sources cannot replace local broadcast news. .................................................. 23

            2.    Local news is critical for elections and civic engagement. ..................................................... 26

            3.    People depend on broadcasting during emergencies. .................................................... 28

    II.    The FCC's Rules and Interpretation of the Law Were Reasonable. ........................................................................ 29

        A.    Section 202(h) does not contain a deregulatory presumption. ........................................................ 29

        B.    The *Order* interpreted viewpoint diversity correctly, recognizing that it is essential to listeners and viewers. ..................................... 32

        C.    The Local Radio Ownership Rule is reasonable. ........ 36

            1.    The 1996 Act eliminated the national radio ownership rule with disastrous results. ............ 36

3

# TABLE OF CONTENTS
### (continued)

**Page**

2.    The Local Radio Rule protects smaller broadcasters committed to localism and the music industry. ................................... 39

D.    The FCC reasonably retained the Local TV Rule and closed loopholes in it. .......................................... 41

1.    The TV ownership rules have been relaxed steadily for decades and were radically relaxed in 2021. .................................... 41

2.    The Local TV rule safeguards competition in local news production. ................................... 42

CONCLUSION ................................................................. 45

CERTIFICATE OF COMPLIANCE ........................................ 46

CERTIFICATE OF SERVICE ............................................... 47

Appellate Case: 24-1380    Page: 4    Date Filed: 09/24/2024 Entry ID: 5439311

# TABLE OF AUTHORITIES

**Page**

## Cases

*Associated Press v. United States,*
    326 U.S. 1 (1945) .................................................................. 33

*Cellco P'ship v. FCC,*
    357 F.3d 88 (D.C. Cir. 2004) ............................................... 31

*FCC v. Nat. Citizens Comm. for Broad.,*
    436 U.S. 775 (1978) .............................................................. 33

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ........................................................ 32, 33

*Fox Television Stations, Inc. v. FCC,*
    280 F.3d 1027, *modified on reh'g,* 293 F.3d 537 (D.C. Cir. 2002)
    ............................................................................................. 30, 33

*Prometheus Radio Project v. FCC,*
    373 F.3d 372 (3rd Cir. 2004) .................................... 30, 31, 32

*Turner Broad. Sys., Inc. v. FCC,*
    520 U.S. 180 (1997) .............................................................. 33

## Administrative Decisions

*2018 Quadrennial Regulatory Review,* Report & Order, MB Docket No.
    18-349, FCC 23-117 (rel. Dec. 26, 2023) ................................. *passim*

*2014 Quadrennial Regulatory Review, Order on Reconsideration and*
    *Notice of Proposed Rulemaking,* 32 FCC Rcd 9802 (2017)
    ............................................................................................. 36

*Review of the Commission's Regulations Governing Television*
    *Broadcasting,* Further Notice, 10 FCC Rcd 3524 (1995) .................. 42

*Review of the Commission's Regulations Governing Television*
    *Broadcasting,* Report and Order, 14 FCC Rcd 12903 (1999) ............. 42

Appellate Case: 24-1380    Page: 5    Date Filed: 09/24/2024    Entry ID: 5439311

**Statutes**

47 U.S.C. § 161 ...................................................................................... 31

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 111-12

   § 202(c)(1), (d).............................................................................. 42

   § 202(c)(2) .................................................................................... 42

   § 202(h)............................................................................. 30, 31, 32

**Other Authorities**

Abernathy, Penelope Muse, *The State of Local News: 2023 Report*, (Nov. 16, 2023), https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/report/#closing-the-digital-divide .................. 25, 26

*AM Radio is Vital to Ensuring Public Safety*, Nat'l Ass'n of Broad. (2024), https://www.nab.org/amtoolkit/TheImportanceOfAMRadio.pdf ...................................................................................................... 27, 29

Barthel, Michael, *et al.*, *Civic Engagement Strongly Tied to Local News Habits*, Pew Research Center (Nov. 3, 2016), https://www.pewresearch.org/journalism/2016/11/03/civic-engagement-strongly-tied-to-local-news-habits/ ................................. 28

Bauder, David, *Facebook says service hindered by lack of local news*, Associated Press (Mar. 18, 2019), https://apnews.com/article/790d194cbec347149be8b598009ad1c4 ...................................................................................................... 25

Cao, Michelle & Goldberg, Rafi, *Switched Off: Why Are One in Five U.S. Households Not Online*, NTIA (Oct. 5, 2022), https://www.ntia.gov/blog/2022/switched-why-are-one-five-us-households-not-online......................................................................... 18

*Country Stars Appeal to FCC*, CBS News (Dec. 12, 2006), https://www.cbsnews.com/news/country-stars-appeal-to-fcc ....... 37, 38

Appellate Case: 24-1380   Page: 6   Date Filed: 09/24/2024   Entry ID: 5439311

DiCola, Peter, *False Premises, False Promises: A Quantitative History of Ownership Consolidation in the Radio Industry*, Future of Music Coal., 12 (Dec. 2006), https://issuelab.org/resources/797/797.pdf 21, 37

Edgerly, Stephanie, *et al.*, The Medill Survey: *How the Chicago Area Gets Its News*, Northwestern Univ. (2024), https://localnewsinitiative.northwestern.edu/assets/research/medill_chicago_news_survey_2024.pdf ..................................................... 25, 26

Falcon, Hannah, *More Than 1 Million Missourians Lack Internet But The Issue in Columbia is Reliability*, ABC17 News, KMIZ/KQFX (Aug. 11, 2022), https://abc17news.com/news/special-report/2022/08/11/more-than-1-million-missourians-lack-internet-but-the-issue-in-columbia-is-reliability/ ............................................ 20

Fioroni, Sarah, *Local News Most Trusted in Keeping Americans Informed About Their Communities*, Knight Found. (May 19, 2022), https://knightfoundation.org/articles/local-news-most-trusted-in-keeping-americans-informed-about-their-communities/ ................... 28

Goldberg, Rafi, *New NTIA Data Show 13 Million More Internet Users in the U.S. in 2023 Than 2021,* NTIA (June 6, 2024), https://www.ntia.gov/blog/2024/new-ntia-data-show-13-million-more-internet-users-us-2023-2021 ........................................................ 19, 21

Hansen, Julie, *Local Council Bluffs News with Karla James*, Bluffs Country (Mar. 14, 2024), https://www.bluffscountry.com/2024/03/14/local-council-bluffs-news-with-karla-james ................................................................................ 23

Kim, Dam Hee, *Diversity Policies in the Media Marketplace: A Review of Studies of Minority Ownership, Employment, and Content*, 10 INT'L J. COMMC'N 2201 (2016) .......................................................................... 34

Knopper, Steve, *Radio Consolidation May Spell Changes for Label Promo Departments*, Billboard (Jan. 15, 2021) .................................. 22

Appellate Case: 24-1380    Page: 7    Date Filed: 09/24/2024 Entry ID: 5439311

# TABLE OF AUTHORITIES
(continued)

**Page**

Leeds, Jeff, *Clear Channel's Dominance Obscures Promotion Conduit*, L.A. Times, August 3, 2001, at C4 .................................................. 38

Martin, Gregory & McCrain, Joshua, *Local News and National Politics*, 113 AM. POL. SCI. REV. 372 (Feb. 19, 2019), https://www.cambridge.org/core/journals/american-political-science-review/article/local-news-and-national-politics/C8EEA488A777C37C7987964F8F85AEB5 ......................... 28

Newman, Nic, *et al.*, *Reuters Institute Digital News Report 2024* Reuters 2024 Digital News https://www.reutersagency.com/en/digital-news-report-2024/ .................................................................................... 25

*Peggie's Bluffs Country Concert Connection*, Bluffs Country KXCB 106.5, https://www.bluffscountry.com/peggies-bluffs-country-concert-connection/ (visited Sept. 12, 2024) .................................................. 23

Poon, Linda, *There Are Far More Americans Without Broadband Access than Previously Thought*, Bloomberg (Feb. 19, 2020), https://www.bloomberg.com/news/articles/2020-02-19/where-the-u-s-underestimates-the-digital-divide ...................................................... 19

*Radio Deregulation: Has it Served Musicians and Citizens?*, Future of Music Coalition, (Nov.18, 2002), https://www1.udel.edu/nero/Radio/pdf_files/FMCradiostudy.pdf ...... 37

Rys, Dan, *The Changing World of Radio Promotion*, Billboard (Mar. 2, 2022) .................................................................................................. 21

*Shows*, Bluffs Country KXCB 106.5, https://www.bluffscountry.com/show/ (visited Sept. 12, 2024) .......... 23

*Sports Schedule*, Bluffs Country KXCB 106.5, https://www.bluffscountry.com/sportsschedule/ (visited Sept. 12, 2024) ...................................................................................................... 23

8

# TABLE OF AUTHORITIES
(continued)

Teale, Chris, *New FCC Broadband Standard Increases the Number of 'Underserved' Households in America*, Route Fifty (Apr. 4, 2024), https://www.route-fifty.com/digital-government/2024/04/new-fcc-broadband-standard-increases-number-underserved-households-america/395486/ .................................................................................. 20

*Techsurvey 2023: Radio in The Post-Pandemic Era*, Jacobs Media Strategies (May 10, 2023), https://jacobsmedia.com/download/73427/ ........................................................................................ 22, 39

*Techsurvey 2024: Radio in The AI Era*, Jacobs Media Strategies (Apr. 26, 2024) https://jacobsmedia.com/wp-content/uploads/2024/04/TS-2024-industry-web-deck.pdf ............................................................ 39

*Understand Internet Speeds*, AT&T, https://www.att.com/support/article/u-verse-high-speed-internet/KM1010095/ (visited Sept. 16, 2024) ................................... 18

Vogels, Emily A., *Some Digital Divides Persist Between Rural, Urban and Suburban America*, Pew Research Center (Aug. 19, 2021), https://www.pewresearch.org/short-reads/2021/08/19/some-digital-divides-persist-between-rural-urban-and-suburban-america/ ........................................................................................... 20

Walker, Mason, *U.S. Newsroom Employment Has Fallen 26% Since 2008*, Pew Research Center (Jul. 13, 2021), https://www.pewresearch.org/short-reads/2021/07/13/u-s-newsroom-employment-has-fallen-26-since-2008/ .............................................. 27

Williams, George & Roberts, Scott, *Radio Industry Review 2002: Trends In Ownership, Format, and Finance*, FCC Media Ownership Working Group (Sept. 2002) .............................................................. 38

Winslow, George, *Reuters: Local TV News Remains Most Trusted News Source*, TVTech (July 3, 2024), https://www.tvtechnology.com/news/survey-local-tv-news-remains-most-trusted-news-source-but-only-28-access-it-each-week .............. 28

9

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, 8th Cir. R. 26.1A and Fed. R. App. P. 29(a)(4), amici curiae state they are non-profit organizations that have no parent corporations, and no publicly held corporations own 10% or more of their stock.

Pursuant to Fed. R. App. P. 29(a)(4)(E), amici further state that no party's counsel authored this brief in whole or in part; that no party or party's counsel has contributed money that was intended to fund preparing or submitting this brief; and that no person other than amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

51439.00001\42645335.15

## INTERESTS OF AMICI CURIAE

Amici have been active participants in the Federal Communications Commission's docket considering media ownership rules for two decades.

Common Cause, one of the nation's leading democracy organizations with over 1.5 million members, was founded as a nonpartisan "citizens' lobby" whose primary mission is to protect and defend the democratic process and make government accountable to the interests of ordinary people. Common Cause promotes, on a nonpartisan basis, its members' interest in open, honest, and accountable government and political representation. Common Cause believes our democracy works best when we can access rich and varied information via the media and has participated as a party or amicus in numerous court cases related to voting rights and media consolidation.

Free Press is a non-partisan, nonprofit organization focusing on the media and technology landscape. Its advocacy promotes local journalism, defends press freedom, uplifts diverse voices in media, and challenges old and new media to serve the public interest. It believes positive social change, racial justice, and meaningful engagement in public life require

51439.00001\42645335.15

equitable access to open channels of communication, diverse and independent ownership of media platforms, and journalism that holds leaders accountable.

The musicFIRST Coalition is a national coalition of musicians, recording artists, singers, producers, engineers, managers, music businesses, musicians' unions, and record labels (big and small) that works to ensure that music creators receive fair compensation for their work on all media platforms. The founding members of musicFIRST include the SoundExchange, Recording Academy, the Latin Recording Academy, American Association of Independent Music, the American Federation of Musicians, the Recording Industry Association of America, the Screen Actors Guild-American Federation of Television and Radio Artists, the Society of Singers, Inc., the Christian Music Trade Association, the Music Managers Forum, Rhythm and Blues Foundation, and the Vocal Group.

Future of Music Coalition is a nonprofit organization supporting a musical ecosystem where artists flourish and are compensated fairly and transparently for their work. FMC promotes strategies, policies, technologies, and educational initiatives that put artists first while

51439.00001\42645335.15

recognizing the role music fans play in shaping the future and works to ensure that diversity, equality, and creativity drive artist engagement with the global music community, and that these values are reflected in laws, licenses, and policies that govern any industry that uses music as raw material for its business.

National Association of Broadcast Employees and Technicians—Communications Workers of America (NABET-CWA) is the largest communications and media labor union in the United States. Its membership consists of workers in the communications and information industries, in news media, airlines, broadcast and cable television, public service, higher education, health care, manufacturing, video games, and high tech. CWA takes an active role advocating for its members, including in litigation as a party or amicus.

The United Church of Christ Office of Communication, Inc. (UCC Media Justice) is the United Church of Christ Media Justice Ministry. The UCC is a faith community rooted in justice that recognizes the unique power of the media and technology to shape public understanding and thus society. Established in 1959, UCC Media Justice established the right of all citizens to participate at the Federal Communications

51439.00001\42645335.15

Commission as part of its efforts to ensure a television broadcaster in Jackson, Mississippi served its African-American viewers during the civil rights movement. It continues to press for media justice and communications rights today. The Cleveland-based denomination has almost 5,000 local congregations across the U.S.

## INTRODUCTION

In their extreme effort to avoid any accountability as licensees of publicly-owned spectrum, Petitioners and their Intervenors (the "Pro-Consolidation Broadcasters") present a vision of the media ecosystem that comes straight out of Hollywood, but does not comport with the lived experience of millions of people who are not online 24 hours per day. The Pro-Consolidation Broadcasters' vision of the relevant law is similarly fictionalized—ignoring the law Congress passed, and the Supreme Court's and other federal appellate courts' interpretation of it.

Broadcasting is a unique service, and its production of local news is critically important for American democracy, government accountability and civic participation. Fierce journalistic and economic competition will maximize the commercial success of broadcasting. People depend on broadcasting for news and information upon which to base their views

51439.00001\42645335.15

and, ultimately, their votes. As many Americans are fundamentally concerned that the media is not accurately presenting facts, Petitioners seek a decision from the Federal Communications Commission (FCC or Commission) to reduce the number of owners and competitors in a local media market. This outcome would deprive viewers and listeners of news sources that could offer different analyses or more aggressive reporting.

Similarly, broadcast cultural entertainment and music are integral parts of the local music industry keeping local culture alive. Local culture maintains vibrancy through music lyrics and live-air talent, on radio stations playing genres like hip-hop, country, Latin, and others, or covering news or sports.

Amici respectfully urge this Court to reject the Pro-Consolidation Broadcasters' arguments and affirm the FCC's decision below. The most recent Quadrennial Review prior to the decision before this court produced a major relaxation of the media ownership rules—as Pro-Consolidation Broadcasters sought. Amici have been active before the FCC for decades, opposing such harmful deregulation and urging the FCC to close loopholes and adopt stronger rules to promote competition, localism and diversity. This Court should uphold the FCC's common-

15

sense decision to ensure that its rules mean what they say, without exceptions. And the Court should heed the millions of people who rely on a competitive, dynamic broadcasting industry, not accede to industry demands to consolidate into monolithic national programming conglomerates.

## ARGUMENT

### I.  Broadcasting Is Unique and Essential.

Petitioners paint a picture of a world where people in the U.S. "have instantaneous access to virtually every song ever recorded through smart phones and in-dashboard platforms like Apple CarPlay and Android Auto." Pet. Br. at 11. They trumpet live sports programming now available on YouTube and AppleTV+. *Id.* But Petitioners leave out of the picture the many Americans who do not fit their vision of a life lived completely online, consuming only national news and culture. They omit those who attempt to watch the weekend's big game on-air, only to learn it is unavailable without an online subscription. Or those who need local emergency weather information on their FM radios while driving, or when the electricity is out but a nine-volt battery-operated radio is on-hand. They even misrepresent the situation for people who rely primarily

16

Appellate Case: 24-1380     Page: 16     Date Filed: 09/24/2024 Entry ID: 5439311

on online sources for local news, because a vast swath of any local news distributed online was originally produced and reported by journalists employed by local TV stations. Millions of Americans continue to rely on broadcasting, whether voluntarily or because they have no choice.

### A.   Many people in the U.S. do not benefit from online media.

Millions of Americans lack both mobile and high-speed internet, whether they live in rural or urban areas where access to infrastructure is insufficient, or simply cannot afford it.[1] While lower-speed internet can be used for applications such as email or web browsing, video streaming requires high-speed internet (called broadband),[2] which is more expensive and difficult to get. Across rural, urban and suburban locations, low-income status predicts limited internet access to broadband. *2018 Quadrennial Regulatory Review,* Report & Order, MB Docket No. 18-349, FCC 23-117, ¶ 35 n.112 (rel. Dec. 26, 2023) (App. __)

---

[1] Cao, Michelle & Goldberg, Rafi, *Switched Off: Why Are One in Five U.S. Households Not Online*, NTIA (Oct. 5, 2022), https://www.ntia.gov/blog/2022/switched-why-are-one-five-us-households-not-online.

[2] *See, e.g.*, *Understand Internet Speeds*, AT&T, https://www.att.com/support/article/u-verse-high-speed-internet/KM1010095/ (visited Sept. 16, 2024).

51439.00001\42645335.15

(*Order*).[3] The administrative record reflects significant disparities in broadband. *E.g.*, Leadership Conference on Civil and Human Rights Comments at 7 (LCCHR Comments) (App. __).[4] Connectivity has improved in recent years, but as of 2023, lower-income households still lag: eighty percent of people in households annually making $100,000 or more had both fixed and mobile connections, whereas only fifty-four percent of households making less than $25,000 had both.[5] Even if a user can afford broadband, non-broadcast content alternatives often require additional subscription fees. *Order* ¶¶ 35, 74 (App. __, __). Lower-income people rely more on local broadcast television than other groups. Free Press Comments at 8 (App. __).

---

[3] Historically, FCC data may have undercounted the problem. *See* Poon, Linda, *There Are Far More Americans Without Broadband Access than Previously Thought*, Bloomberg (Feb. 19, 2020), https://www.bloomberg.com/news/articles/2020-02-19/where-the-u-s-underestimates-the-digital-divide (Arkansas coverage overstated by 23%).

[4] Unless otherwise noted, all Comments were filed on Apr. 29, 2019, Reply Comments on May 29, 2019, Refresh Comments on Sept. 2, 2021, and Refresh Replies on Oct. 1, 2021 in FCC MB Docket No. 18-349.

[5] Goldberg, Rafi, *New NTIA Data Show 13 Million More Internet Users in the U.S. in 2023 Than 2021*, NTIA (June 6, 2024), https://www.ntia.gov/blog/2024/new-ntia-data-show-13-million-more-internet-users-us-2023-2021 (*NTIA Usage Statistics*).

18

Rural areas also disproportionately lack access to reliable internet and rely on local broadcasting. Using updated benchmarks for high-speed internet and a national comprehensive map, the FCC estimated this year that 24 million Americans still lack access to broadband.[6] For example, 1.26 million Missourians do not have access—twenty percent of the state's population.[7] "[T]hree-in-ten or more urban (37%) and suburban (30%) residents say they are online almost constantly while about a quarter of rural residents (23%) say the same."[8] And twenty-four percent of rural residents said access to high-speed internet was a major problem in their local community.[9]

_____

[6] Teale, Chris, *New FCC Broadband Standard Increases the Number of 'Underserved' Households in America*, Route Fifty (Apr. 4, 2024), https://www.route-fifty.com/digital-government/2024/04/new-fcc-broadband-standard-increases-number-underserved-households-america/395486/.
[7] Falcon, Hannah, *More Than 1 Million Missourians Lack Internet But The Issue in Columbia is Reliability*, ABC17 News, KMIZ/KQFX (Aug. 11, 2022), https://abc17news.com/news/special-report/2022/08/11/more-than-1-million-missourians-lack-internet-but-the-issue-in-columbia-is-reliability/.
[8] Vogels, Emily A., *Some Digital Divides Persist Between Rural, Urban and Suburban America*, Pew Research Center (Aug. 19, 2021), https://www.pewresearch.org/short-reads/2021/08/19/some-digital-divides-persist-between-rural-urban-and-suburban-america/.
[9] *Id.*

51439.00001\42645335.15

Other demographic disparities in the record persist in the most recent data: sixteen percent of African-Americans, twenty-two percent of American Indians and Alaska Natives, and twenty-five percent of Hispanics rely exclusively on smartphones (a substandard technology) for internet access, compared with twelve percent of White non-Hispanics and Asians.[10] LCCHR Comments at 7-8 (App. __); National Hispanic Media Coalition Comments *et al.* (NHMC) Comments at 9-11 (App. __). Communities of color also rely more heavily on broadcasting. *E.g.*, Free Press Comments at 8 (App. __).

### B. Music creators and listeners rely on a vibrant, competitive local radio industry.

Broadcasters regularly tout the role AM/FM radio stations still play in promoting recorded music to fans, even though control of radio playlists has consolidated among fewer radio programmers and radio conglomerates' severe programming staff cuts present challenges for new artists.[11]

---

[10] *NTIA Usage Statistics, supra.*
[11] DiCola, Peter, *False Premises, False Promises: A Quantitative History of Ownership Consolidation in the Radio Industry*, Future of Music Coal., 12 (Dec. 2006), https://issuelab.org/resources/797/797.pdf; Rys, Dan, *The Changing World of Radio Promotion*, Billboard (Mar. 2, 2022);

20

While music listeners are exposed to new music through a variety of different delivery platforms, AM/FM radio provides a means for music creators to promote local concerts and local bands to listeners in communities. According to Techsurvey 2023, thirty-seven percent of those who listen to radio say that a main reason they do is to hear about what is going on locally, while twenty-six percent say a main reason is to discover new music/artists.[12]

Radio listeners also rely on a vibrant, competitive local radio industry to provide free local information, diverse viewpoints, and music. *E.g.*, Mt. Wilson Broadcasters, Inc. (Mt. Wilson) Reply at 4 (App. __); Urban One Comments at 6-7 (App. __). Most local radio stations use recorded music to draw audience and advertisers. Independently-owned local AM/FM stations usually remain locally-programmed; as such, they are often key parts of local communities that keep local culture alive by airing locally-originated content. *See* Redrock Refresh Comments at 1 (App. __). For example, independently-owned country music station

---

Knopper, Steve, *Radio Consolidation May Spell Changes for Label Promo Departments*, Billboard (Jan. 15, 2021).

[12] *See Techsurvey 2023: Radio in The Post-Pandemic Era*, Jacobs Media Strategies, 4 (May 10, 2023), https://jacobsmedia.com/download/73427/.

21

KXCB-FM 106.5 in Council Bluffs, Iowa airs locally-produced high school sports,[13] local news,[14] live and local morning and afternoon drive shows,[15] and promotes local country music concerts.[16]

Independently-owned local radio stations compete for audience and revenue with larger clusters of commonly-owned stations in the markets they serve. Yet these stations that want to remain competitive locally (rather than selling to larger competitors) cannot continue to compete successfully with these clusters if the FCC permits even more consolidation. Taxi Productions, Inc., Reply at 2 (Taxi Reply) (App. __); Redrock Refresh Comments (App. __); Sarkes Tarzian Reply at 2-5 (App. __); Urban One Comments at 6, 13 (App. __, __).

---

[13] *Sports Schedule*, Bluffs Country KXCB 106.5, https://www.bluffscountry.com/sportsschedule/ (visited Sept. 12, 2024).
[14] Hansen, Julie, *Local Council Bluffs News with Karla James*, Bluffs Country (Mar. 14, 2024), https://www.bluffscountry.com/2024/03/14/local-council-bluffs-news-with-karla-james.
[15] *Shows*, Bluffs Country KXCB 106.5, https://www.bluffscountry.com/show/ (visited Sept. 12, 2024).
[16] *Peggie's Bluffs Country Concert Connection*, Bluffs Country KXCB 106.5, https://www.bluffscountry.com/peggies-bluffs-country-concert-connection/ (visited Sept. 12, 2024).

22

51439.00001\42645335.15

### C. Television and radio play unique roles in providing news, covering elections, and during emergencies.

Pro-Consolidation Broadcasters' picture of the media marketplace ignores two key elements of the Commission's legal mandate: localism and diversity. Localism is served by locally responsive programming, particularly locally-created news programming, which is "unique" and a "hallmark" of local broadcasting. *Order* ¶¶ 71, 75, 78 (App. __, __, __). Diversity, particularly viewpoint diversity, is served when multiple owners compete against each other economically and journalistically. *Order*, ¶¶ 80, 81 (App. __, __). Local news also can mean life or death during an emergency.

#### 1. *Online sources cannot replace local broadcast news.*

Petitioners err, as they did before the FCC, by "mistakenly characteriz[ing] the availability of content *distributed* through the Internet as content *created* by online-only sources." LCCHR Comments at 5 (App. __); *see also* Free Press Comments at 7 (App. __). Local news is created by journalists, who are not employed by platforms such as

51439.00001\42645335.15

Appellate Case: 24-1380    Page: 23    Date Filed: 09/24/2024 Entry ID: 5439311

Facebook or Google.[17] In fact, when Facebook attempted to feature local news stories in 2018, it found that "40 percent of Americans live in places where there weren't enough local news stories to support it." LCCHR Comments at 6 (App. __).[18] Today major social media platforms are "actively reducing" the role of news on their platforms.[19] Digital-only news is nascent and limited: more than eighty percent of digital news sites serve large metro areas with more than 250,000 residents.[20] It is also fragile—many digital-first news sites laid off journalists in 2024.[21]

---

[17] *See, e.g.*, Edgerly, Stephanie, *et al.*, The Medill Survey: *How the Chicago Area Gets Its News*, Northwestern Univ., 44 (2024), https://localnewsinitiative.northwestern.edu/assets/research/medill_chic ago_news_survey_2024.pdf.

[18] A community lacked sufficient news stories if Facebook could not find "a single day in a month with at least five news items." Bauder, David, *Facebook says service hindered by lack of local news*, Associated Press (Mar. 18, 2019), https://apnews.com/article/790d194cbec347149be8b598009ad1c4.

[19] Newman, Nic, *et al.*, *Reuters Institute Digital News Report 2024* Reuters 2024 Digital News, 5, https://www.reutersagency.com/en/digital-news-report-2024/.

[20] Abernathy, Penelope Muse, *The State of Local News: 2023 Report*, (Nov. 16, 2023), https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/report/#closing-the-digital-divide.

[21] Newman*, supra* at 115.

24

A news story covering a school board decision, traffic or local transportation, or local graft is most likely to have been created by a local reporter. The record showed, "[e]ighty-six percent of Americans get local news from local TV stations [and] 79 percent from radio stations . . . . while only 23 percent of all Americans get their local news from 'online only' sources." LCCHR Comments at 5 (App. __) (citation omitted). Global surveys show local news continues to be most important to users.[22] A recent in-depth study of Chicago residents found that twenty-one percent consume TV news multiple times per day, regardless of whether the news is disseminated online or not.[23] "Smaller and rural markets are often the most in need of quality local coverage, as major broadcasters have increasingly consolidated operations and news production in cities far from the localities they claim to serve." Free Press Comments at 5 (App. __). Further broadcast consolidation, as sought by Petitioners here, would only lead to further abandonment of local operations in such areas.

_____

[22] *Id.* at 29.

[23] Edgerly, *supra* at 19 (85% consume Local TV news at least once per month, 61% once per week, 42% once per day).

51439.00001\42645335.15

A report by Petitioner National Association of Broadcasters (NAB) explains, "[i]n rural America, where reliable cellular or broadband access can be scarce, AM radio is an essential lifeline. . . . [R]adio remains one of the primary sources of daily agricultural news year-round, with listeners dedicating substantial time to stay informed."[24] Local TV is in a position to pick up slack for declining newspapers: between 2008 and 2020 broadcast journalist jobs remained relatively steady, while newspaper journalism jobs plummeted fifty-seven percent.[25] If the FCC were to accede to Pro-Consolidation Broadcasters' arguments, local journalism would only weaken further.

### 2. *Local news is critical for elections and civic engagement.*

Trusted local journalism plays a particularly important role in local elections. Local journalism is more trusted than national journalism: a Reuters 2024 study found sixty-two percent of those surveyed trusting it,

---

[24] *AM Radio is Vital to Ensuring Public Safety*, Nat'l Ass'n of Broad. (2024), https://www.nab.org/amtoolkit/TheImportanceOfAMRadio.pdf (*AM Radio is Vital*).
[25] Walker, Mason, *U.S. Newsroom Employment Has Fallen 26% Since 2008*, Pew Research Center (Jul. 13, 2021), https://www.pewresearch.org/short-reads/2021/07/13/u-s-newsroom-employment-has-fallen-26-since-2008/.

26

"the highest score of any . . . online or TV source."[26] Scholarly research demonstrates that increased news consumption—in particular, reporting that connected the news to a consumer's specific lived experience—corresponds to increased civic participation and voting. UCC Media Justice *et al.* Refresh Comments at 11 (App. __).[27] Citing an empirical study contrasting stations acquired by a single large owner with control stations in the same markets, Free Press explained when local broadcasters consolidate, "national political coverage increases at the expense of local coverage." Free Press Comments at 9 (App. __).[28]

---

[26] Winslow, George, *Reuters: Local TV News Remains Most Trusted News Source*, TVTech (July 3, 2024), https://www.tvtechnology.com/news/survey-local-tv-news-remains-most-trusted-news-source-but-only-28-access-it-each-week; Fioroni, Sarah, *Local News Most Trusted in Keeping Americans Informed About Their Communities*, Knight Found. (May 19, 2022), https://knightfoundation.org/articles/local-news-most-trusted-in-keeping-americans-informed-about-their-communities/.

[27] *E.g.*, Barthel, Michael, *et al.*, *Civic Engagement Strongly Tied to Local News Habits*, Pew Research Center (Nov. 3, 2016), https://www.pewresearch.org/journalism/2016/11/03/civic-engagement-strongly-tied-to-local-news-habits/.

[28] The study is now published: Martin, Gregory & McCrain, Joshua, *Local News and National Politics*, 113 Am. Pol. Sci. Rev. 372, 372–384 (Feb. 19, 2019), https://www.cambridge.org/core/journals/american-political-science-review/article/local-news-and-national-politics/C8EEA488A777C37C7987964F8F85AEB5.

27

### 3. People depend on broadcasting during emergencies.

"During power outages, broadcast is often the only way to communicate safety warnings and critical information about ongoing emergencies." LCCHR Reply at 6 (App. \_\_). "A news team production manager from WORA-TV explained the lesson Hurricane Maria taught her, which was 'when the power goes out, a \$5 transistor radio is more valuable than a smartphone.'" *Id.* Indeed, broadcasters often tout such service to communities during these times. *Order* ¶ 36, n.115 (App. \_\_). In NAB's own words:

> [T]here is no substitute for AM radio – especially not cell phones. Cell towers can fail, the power can go out and internet access is often compromised during these emergencies, leaving AM radio as one of the few communication tools that can consistently deliver critical updates to local communities.[29]

The same report, pressing Congress to mandate AM radio in cars, highlights the irreplaceable role of local staff working for KWYN-AM responding to a tornado in Wynne, Arkansas, among other stories.[30] *See also Order* ¶ 35 n.115, ¶ 57 n.199 (App \_\_, \_\_).

---

[29] *AM Radio is Vital, supra* at 2.
[30] *Id.* at 6.

28

51439.00001\42645335.15

Appellate Case: 24-1380     Page: 28     Date Filed: 09/24/2024 Entry ID: 5439311

## II. The FCC's Rules and Interpretation of the Law Were Reasonable.

### A. Section 202(h) does not contain a deregulatory presumption.

Petitioners press for an incorrect interpretation of Section 202(h), Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 111-12 (1996 Act). Petitioners quote *Fox I*, saying "Section 202(h) carries with it a presumption in favor of repealing or modifying the ownership rules." Pet. Br. at 9, 23-24 (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (*Fox I*), *modified on reh'g*, 293 F.3d 537, 540 (D.C. Cir. 2002) (*Fox II*)). *This quote is misleading*. The quoted excerpt concluded that, under 202(h), court review was more searching than if the agency had merely denied a petition for rulemaking: the court *could* vacate an improperly retained rule. *Fox I,* 280 F.3d at 1048.

But "*Fox I*'s suggestion of a heightened standard was expressly retracted by *Fox II*." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 393 (3rd Cir. 2004) (*Prometheus I*). On rehearing, the *Fox II* panel explained, "[t]he court's decision did not turn at all upon interpreting 'necessary in the public interest' to mean more than 'in the public interest'. . . ." *Fox II*, 293 F.3d at 540.

51439.00001\42645335.15

Appellate Case: 24-1380     Page: 29     Date Filed: 09/24/2024 Entry ID: 5439311

In fact, the Third Circuit's interpretation of 202(h), followed by the FCC below, relied on a subsequent decision of the D.C. Circuit. *Cellco P'ship v. FCC*, 357 F.3d 88 (D.C. Cir. 2004), built on *Fox I* and *Fox II* to interpret another 1996 Act provision paralleling 202(h).[31] Based on careful review of all relevant D.C. Circuit precedent, the Third Circuit "[did] not accept that the 'repeal or modify in the public interest' instruction must therefore operate only as a one-way ratchet." *Prometheus I,* 373 F.3d at 394. *It did not defer* to the 2003 FCC's conclusions:

> Misguided by the *Fox* and *Sinclair* Courts' "deregulatory presumption" characterization and lacking the benefit of *Cellco*'s subsequent clarification, the Commission concluded that § 202(h) "appears to upend traditional administrative law principles" by not requiring it to justify affirmatively a rule's repeal or modification.

*Id.* at 395.[32] "Rather than 'upending' the reasoned analysis requirement, that under the APA ordinarily applies to an agency's decision to

---

[31] The *Cellco* court considered "47 U.S.C. § 161—which, like § 202(h), requires the Commission periodically to review its telecommunications regulations and determine whether they 'remain necessary in the public interest'." *Prometheus I*, 373 F.3d at 391.

[32] The D.C. Circuit concluded in *Cellco*: "neither *Fox I* nor *Sinclair* . . . [took] the position that § 11 embodies a presumption in favor of deregulation." 357 F.3d at 98.

51439.00001\42645335.15

promulgate new regulations (or modify or repeal existing regulations), § 202(h) *extends* this requirement to the Commission's decision to retain its existing regulations." *Id.* The Third Circuit panel was not divided on this point, *contra* Pet. Br. at 23: "the statute does not foreclose the possibility of increased regulation under the [Section 202(h)] review if the Commission finds such action in the public interest." *Prometheus I*, 373 F.3d at 444 (Scirica, J., concurring). Because the FCC's decision below followed the Third Circuit's statutory interpretation of 202(h), the end of *Chevron* deference does not help Petitioners here. *Contra* Pet. Br. at 26.

Moreover, Petitioners' proposed interpretation has been rejected "to avoid absurd results." *Prometheus I*, 373 F.3d at 392. If the Section 202(h) public interest standard required a stronger showing than the "ordinary" public interest standard, "the Commission could promulgate any rule that is useful, but then, at the next periodic review, would have to revoke any of those rules that do not also meet [the] higher standard . . . ." *Id.*

Nor does competition take precedence over the other parts of the public interest standard under 202(h). *Contra* Pet. Br. at 25. Even though NAB made the same arguments before the Supreme Court as it does here, Opening Br. of Industry Pet. at 25, 27, *FCC v. Prometheus Radio Project*,

31

592 U.S. 414 (2021) (No. 19-1231), the Supreme Court's opinion in *Prometheus* refers repeatedly to "competition, localism and diversity" as a trio, and never elevates competition above the other elements. *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021); *accord Fox I,* 280 F.3d at 1042 (FCC can justify a rule using diversity or localism alone) (citing *FCC v. Nat. Citizens Comm. for Broad.*, 436 U.S. 775, 795 (1978)).

### B. The *Order* interpreted viewpoint diversity correctly, recognizing that it is essential to listeners and viewers.

Petitioners counter-intuitively and absurdly claim "consolidation leads to greater programming diversity . . . ." Pet. Br. at 64. As the Supreme Court has explained, the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). "Federal policy . . . has long favored preserving a multiplicity of broadcast outlets. . . ." NHMC *et al.* Comments at 18 (citing *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 193 (1997)). "The local TV and radio ownership rules provide the Commission a content-neutral way to promote greater viewpoint

32

diversity by requiring that different entities own licenses in local markets." LCCHR Reply at 3-4.

Moreover, while the ownership rules do not regulate broadcaster content choices, the FCC has ample evidence supporting a link between ownership, content, and viewpoint diversity. *Contra* TV Industry Int. Br. at 14-15. For example, a meta-analysis of 42 studies concluded that owners of color were more likely to employ a more diverse group, provide content tailored to communities of color, and provide more varied content. UCC Media Justice *et al.* Refresh Comments, Attachment 2 at 8 (citing Kim, Dam Hee, *Diversity Policies in the Media Marketplace: A Review of Studies of Minority Ownership, Employment, and Content*, 10 INT'L J. COMMC'N 2201 (2016)) (App. __).

Similarly, a multitude of stakeholders from a broad array of political and cultural viewpoints explained in the record that AM/FM radio stations still provide an important source of viewpoint diversity. They also agreed that if the Local Radio Ownership Rule were loosened, smaller AM/FM stations might cease to do business, thereby reducing viewpoint diversity. For example, in 2018, former Reagan Administration official and conservative radio host Hugh Hewitt explained AM

33

ownership caps prevented monopolies, spurred competition and helped conservative talk radio to thrive. Salem Media Grp. *Ex Parte* Notice, Attachment (May 16, 2019) (App. \_\_). *See also* Mt. Wilson Comments at 1-2 (App. \_\_); Redrock Refresh Comments (App. \_\_); CRC Broadcasting Corp. and CRC Media West *Ex Parte* Notice (May 14, 2019) (App. \_\_). Taxi Productions, Inc., owner of radio station KJLH, stated:

> More industry consolidation will not help small independent radio operators like KJLH. We are constantly playing the role of David, challenging the Goliath of well-funded mega corporations that own a half dozen or more radio stations in our local market. Ownership limits go at least part way to prevent large companies from having such an overwhelming market share that they can price some of their advertising products below cost, leaving smaller operators unable to compete and survive, and they can pressure advertisers to deal exclusively with only them.

Taxi Reply at 2 (App. \_\_). The Commission reasonably relied on this record to find that further consolidation would sacrifice "smaller and independent radio stations . . . needlessly based on an unrealistic premise that ever larger radio owners are the answer to compete for advertising on a level playing field with large technology companies." *Order* ¶ 45 (App. \_\_).

Petitioners incorrectly claim that the Commission violated the APA by purportedly not acknowledging a previous Commission conclusion

that "radio stations are not a primary source of viewpoint diversity in local markets." Pet. Br. at 64 (citing *2014 Quadrennial Regulatory Review, Order on Reconsideration and Notice of Proposed Rulemaking*, 32 FCC Rcd 9802, 9827, ¶ 57 (2017) (*2017 Order*). The Commission's conclusion at that time was confined to its analysis of a rule limiting common ownership of radio and television stations, yet still found that "broadcast radio stations may contribute to viewpoint diversity in local markets to a certain degree." *2017 Order* at 9827, ¶ 57. The FCC also relied on the Local Radio rule as a "backstop" to prevent further harm to diversity when it repealed the Radio/TV Rule. *Order* ¶ 49 (App. __).

The filings of pro-competition owners of music-driven AM/FM radio stations further supported the Commission's finding that their stations are an important source of local viewpoint diversity and that retaining the Local Radio Ownership Rule is key to preserving it. *See, e.g.*, Mt. Wilson Reply at 4 (App. __); Urban One Comments at 3-7 (App. __), Redrock Refresh Comments (App. __), Sarkes Tarzian Reply at 2-3 (App. __). The musicFIRST Coalition and Future of Music Coalition likewise explained how music-driven AM/FM stations still provide an important outlet for viewpoint diversity through music lyrics in multiple

35

Appellate Case: 24-1380     Page: 35     Date Filed: 09/24/2024 Entry ID: 5439311

genres. musicFIRST Coalition *et al.* Comments at 19-23 (App. __); musicFIRST *et al.* Reply at 21-25 (musicFIRST Reply) (App. __).

## C.    The Local Radio Ownership Rule is reasonable.

Ownership consolidation in the wake of Congress' repeal of the National Radio Ownership Rule harmed music creators and music listeners as well as local commercial independent broadcasters who had to compete with newly consolidated national conglomerates.[33] Those harms demonstrate that the FCC loosening or eliminating the Local Radio Ownership Rule would harm competition between AM/FM radio station owners at local market levels, viewpoint diversity and localism.

### 1.    *The 1996 Act eliminated the national radio ownership rule with disastrous results.*

The 1996 Act radically changed the AM/FM broadcasting marketplace, causing rapid consolidation of radio station ownership

---

[33] *Radio Deregulation: Has it Served Musicians and Citizens?*, Future of Music Coalition, (Nov. 18, 2002), https://www1.udel.edu/nero/Radio/pdf_files/FMCradiostudy.pdf; DiCola, *supra* at 50-81; Future of Music 2006 Reply Comments, Attachment 2, MB Docket No. 06-121, https://www.fcc.gov/ecfs/document/5513872913/1; *Country Stars Appeal to FCC*, CBS News (Dec. 12, 2006), https://www.cbsnews.com/news/country-stars-appeal-to-fcc/.

36

Appellate Case: 24-1380     Page: 36     Date Filed: 09/24/2024 Entry ID: 5439311

immediately and over subsequent years. In 1997, 4,000 of the country's 11,000 radio stations changed hands.[34] Between 1996 and 2002, the number of radio owners in the U.S. decreased by thirty-four percent.[35] In 1996, the two largest radio group owners owned fewer than sixty-five radio stations each.[36] By 2002, the two largest radio group owners owned a combined 1,407 stations, while the third, fourth, and fifth largest owned a combined 490 stations nationwide.[37] In the fifty largest markets, the four largest radio groups reaped 86% of the radio industry's total revenue.[38] The effect of consolidation on revenue distribution in small markets was even more pronounced: in 2002, in the smallest 100 markets, the four largest radio conglomerates collectively earned ninety-six percent of all revenues in radio.[39]

---

[34] Leeds, Jeff, *Clear Channel's Dominance Obscures Promotion Conduit*, L.A. TIMES, Aug. 3, 2001, at C4.
[35] Williams, George & Roberts, Scott, *Radio Industry Review 2002: Trends In Ownership, Format, and Finance,* FCC Media Ownership Working Group, 3 (Sept. 2002).
[36] *Id.* at 3.
[37] *Id.* at 4.
[38] *Id.* at 6.
[39] *Id.*

51439.00001\42645335.15

Radio listeners have become frustrated with their local radio stations eliminating the jobs of live and local on-air talent, as consolidated radio owners replaced those positions with syndicated programming piped in from locations far from the communities served by local radio stations. musicFIRST Coalition Refresh Reply at 13 (App. __). The 2024 Jacobs Media Strategies' Techsurvey poll of over 30,000 commercial radio listeners in the U.S. and Canada showed that, among those listening to less radio than in prior years, twenty-two percent indicated a main reason for the change was a "Personality/Show no longer on local radio," while thirty-one percent stated it was because "[m]usic is too predictable."[40]

These cost-saving measures reduced locally-produced content that previously distinguished those stations from their competitors. *E.g.,* Howard Reynolds Comments (App. __); Sarkes Tarzian Reply at 4 (App. __); Mt. Wilson Reply at 4 (App. __); Mt. Wilson *Ex Parte* Notice at 4 (May 10, 2017) (App. __). Music playlists around the country further

---

[40] *See Techsurvey 2023*, *supra* at 2; *Techsurvey 2024: Radio in The AI Era*, Jacobs Media Strategies, 2, 26 (Apr. 26, 2024) https://jacobsmedia.com/wp-content/uploads/2024/04/TS-2024-industry-web-deck.pdf.

51439.00001\42645335.15

homogenized and an increasing proportion of remaining radio programmers became geographically distant from the local communities that stations are licensed to serve. musicFIRST Reply at 13, 17 (App. __).

While broadcast ownership deregulation has lessened viewpoint diversity and localism on commercial radio airwaves, AM/FM radio continues to be an irreplaceable source of viewpoint diversity and local culture, recognized by the Commission as worthy of preservation. Further deregulation would be a death knell for that diversity and localism.

### 2. *The Local Radio Rule protects smaller broadcasters committed to localism and the music industry.*

The *Order* correctly concluded that promoting competition, localism, and viewpoint diversity required retaining the Local Radio Ownership Rule and the AM/FM subcaps. *Order* ¶¶ 27, 54 (App. __, __). Midwest-based Sarkes Tarzian, Inc. aptly commented:

> [I]f the Commission loosens the current ownership limits to permit a large media conglomerate to expand broadcasting control to the majority of a single market's limited frequencies, the incentive to create more particularized local programming dissipates in favor of maximizing revenue potential across the conglomerate's full complement of stations. Industry employment numbers will continue to fall, consumers' choices will shrink, localism will suffer, the lack of

39

> meaningful competition will promote homogeneity and stave
> off the innovation that is desperately needed for radio to co-
> exist with other 21st-century forms of media and advertising.

Sarkes Tarzian Reply at 4-5 (App. __). It concluded that the Local Radio
Ownership Rule does "more to promote competition and localism than
further deregulation will." *Id.* at 5.

Moreover, if the Local Radio Ownership Rule were eliminated or
loosened, then the only remaining radio owners who could benefit would
be those few conglomerates previously at the cap in local markets.
musicFIRST *et al.* Refresh Comments at 15 (App. __); MMTC Comments
at 5-6 (App. __). These potential benefits afforded to maxed-out AM/FM
clusters would necessarily come at the expense of smaller, sometimes
rural, broadcasters competing against the largest clusters in their local
markets. musicFIRST Reply at 7 (App. __); MMTC Comments at 5-6
(App. __). The Local Radio Ownership Rule protects smaller broadcasters
against being undercut by their largest competitors in local markets.
Salem Media Refresh Reply at 6 (App. __); Nat'l Ass'n Black Owned
Broad.'s Comments at 8-13 (App. __).

51439.00001\42645335.15

### D. The FCC reasonably retained the Local TV Rule and closed loopholes in it.

#### 1. *The TV ownership rules have been relaxed steadily for decades and were radically relaxed in 2021.*

Petitioners ignore long-term deregulation over decades when complaining that retaining any Local TV rules subjects them to rules "first imposed before the attack on Pearl Harbor" Pet. Br. at 1. Broadcast rules have been reviewed and relaxed since the 1940s and 1950s, with massive changes in the 1980s and 1990s. *See, e.g.*, *Review of the Commission's Regulations Governing Television Broadcasting*, Further Notice, 10 FCC Rcd 3524, 3526-29 (1995). Congress changed several major TV rules in 1996, eliminating national TV ownership limits, waiving the one-to-a-market rule in the top fifty U.S. markets, and setting the national TV audience reach cap at thirty-five percent. 1996 Act, § 202(c)(1), (d) 110 Stat. 111. It also mandated a one-time FCC review of television ownership rules which produced significant deregulation. *Id.*, § 202(c)(2); *Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 14 FCC Rcd 12903, 12907-08 (1999). The most recent prior Quadrennial Review,

51439.00001\42645335.15

Appellate Case: 24-1380    Page: 41    Date Filed: 09/24/2024 Entry ID: 5439311

which took effect in 2021, gave broadcasters many changes they sought, removing several critical rules. There, the FCC:

- Repealed entirely the Newspaper/Broadcast Cross-Ownership Rule;
- Repealed entirely the Radio/Television Cross-Ownership Rule;
- Relaxed the Local Television Ownership Rule;
- Repealed entirely the Joint Sales Agreement Attribution Rule, treating TV stations that jointly sell advertising as if they are separately controlled.

*Order* ¶ 5 (App. __).

"The . . . Commission's [relaxation of the Local TV rule] has already spurred a new wave of onerous broadcast consolidation, the full harms of which communities are still awaiting. Abandoning the case-by-case approach, scarcely a year after its invention, to spawn a new bright-line rule greenlighting certain top four combinations would be a baffling choice given the Commission's prior conclusions. . . ." Free Press Comments at 5-6 (App. __).

## 2. *The Local TV rule safeguards competition in local news production.*

Because the Local TV Rule is necessary to promote local journalism, viewpoint diversity and vigorous competition, *Order* ¶¶ 79, 81, 86 (App. __, __, __), the FCC retained it, including the Top-Four Prohibition.

42

*Order* ¶ 67 (App. __). The Commission modified the Top-Four Prohibition—which prevents a broadcaster from acquiring two of a local market's top four stations in audience share, subject to case-by-case review—to prevent broadcasters' previously successful efforts to end-run the rules. It thus heeded Section 202(h)'s mandate that Commission rules continue to serve the public interest. *Order* ¶ 98 (App. __). These anti-circumvention measures are needed to prevent licensees from impermissibly obtaining control of "a competing, in-market full power television station . . . without the need or opportunity for any review by the Commission . . . ." *Order* ¶100 (App. __).

Petitioners wrongly argue that consolidation among stations, not competition, will enhance programming. Pet. Br. at 46. The record shows otherwise. "Management arrangements that consolidate two or more separately licensed television stations into a single operating unit—regardless of the nomenclature used by the parties . . . are designed to circumvent media ownership rules and result in the same or substantially identical news produced by one station on one or more other stations in the same market." LCCHR Comments at 9 (App. __); *see also* Free Press Comments at 9 (App. __). "NABET-CWA has documented

51439.00001\42645335.15

how . . . joint service agreements (JSAs), lead to job loss." LCCHR Comments at 9 (App. __). In one example, a sharing arrangement between Barrington and Granite cost forty jobs in Syracuse and thirty in Peoria. *Id.* More deregulation would "create the appearance of competition in local news production where none actually exists." Free Press Comments at 13 (App. __). Local news was increasing under the current rule. *Order* ¶ 79 (App. __).

A regulated entity's antagonism toward a rule cannot justify flouting it. Amici have supplied ample record evidence demonstrating that stations often developed techniques to circumvent rules like the Top-Four Prohibition. The *Order* rightly moved to close loopholes and enforce existing rules. *E.g.,* Free Press Refresh Comments at 11-13 (App. __); UCC Media Justice *et al.* Refresh Comments at 2 (App. __). Amici praised the FCC for individual enforcement decisions, but explained "the underlying practice of broadcasters' evading the multiple ownership rules with acquisitions that acquire everything but the license then resorting to operating agreements, remains unchecked by a proper, consistent, and reality-based interpretation of the rules subject to the

51439.00001\42645335.15

quadrennial." Free Press Refresh Comments at 19 (App. \_\_).[41] The FCC properly ensured it could stop circumvention of its rules.

## CONCLUSION

Amici urge denial of the Petition.

Dated: September 20, 2024

STILWELL LAW                         BEST BEST & KRIEGER LLP

By: */s/ Cheryl A. Leanza*

RACHEL STILWELL                      CHERYL A. LEANZA
rachel@rmslawoffices.com             cheryl.leanza@bbklaw.com
*Attorney for Amici musicFIRST and*  *Attorneys for Amici*
*Future of Music*                    *Common Cause, Free Press,*
                                     *NABET-CWA and United*
                                     *Church of Christ Office of*
                                     *Communication, Inc.*

---

[41] Amicus Free Press conducted extensive research and compiled evidence of local TV stations' abuse of Local Marketing and Shared Service agreements to circumvent existing rules. Free Press Refresh Comments at 9-20 (App. \_\_).

45

51439.00001\42645335.15

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,405 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that the foregoing brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook.

I further certify, pursuant to 8th Cir. R. 28A(h), that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Cheryl A. Leanza*
Cheryl A. Leanza

51439.00001\42645335.15

Appellate Case: 24-1380    Page: 46    Date Filed: 09/24/2024 Entry ID: 5439311

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2024, I caused the foregoing brief to be electronically filed using the CM/ECF system. I certify that counsel for the parties are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Cheryl A. Leanza*
Cheryl A. Leanza

51439.00001\42645335.15