**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

ZIMMER RADIO OF MID-MISSOURI INC., ET AL.

*Petitioners*

ABC TELEVISION AFFILIATES ASSOCIATION, ET AL.

*Intervenors*

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.

*Respondents*

NCTA- THE INTERNET & TELEVISION ASSOCIATION, ET AL.

*Intervenors*

On Petitions for Review of an Order of the
Federal Communications Commission

## REPLY BRIEF OF PETITIONERS

Barbara A. Smith
BCLP LLP
3600 One Metropolitan Square
211 N. Broadway
Saint Louis, Mo 63102-2186
(314) 259-2367
barbara.smith@bclplaw.com

*Counsel for Petitioner Zimmer
Radio of Mid-Missouri, Inc.*

Helgi C. Walker
   *Counsel of Record*
Andrew G.I. Kilberg
Cameron J.E. Pritchett
Hadhy Ayaz
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

*Counsel for Petitioner National Association
of Broadcasters*

*Additional counsel on inside cover*

Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
ajohnson@gibsondunn.com

*Counsel for Petitioner Nexstar Media
Group, Inc.*

Eric D. Stolze
Stephen B. Kinnaird
PAUL HASTINGS LLP
1170 Peachtree Street, N.E.
Suite 100
Atlanta, GA 30309
(404) 815-2315
ericstolze@paulhastings.com

*Counsel for Petitioners Beasley Group,
LLC* and *Tri-State Communications,
Inc.*

Rick Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, S.E.
Washington, D.C. 20003
(202) 429-5430
rkaplan@nab.org

*Counsel for Petitioner National
Association of Broadcasters*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................3

I.    The Order Violates Section 202(h)...............................................3

      A.    The Order Flips Section 202(h)'s Burden. ...........................3

      B.    The Order Impermissibly Ignores Competition. ...................5

      C.    Section 202(h) Does Not Authorize Tightening Rules. ........6

II.   The Order Violated The APA By Adopting Flawed Market Definitions. ......8

      A.    The Order Arbitrarily Dismisses Competition From
            Non-Broadcasting Sources.................................................9

      B.    Local Programming And Retransmission Fees Do Not Justify
            Restricting The Market Definition. ....................................11

III.  The Order Failed To Justify Its Retention (And Tightening) Of The
      Local Television And Radio Rules...............................................15

      A.    The Order Fails To Justify Retaining The Local Television
            Rule's Top-Four Prohibition. ............................................15

            1.    The Commission Concedes There Is No Record Basis For
                  The Demarcation Between The Fourth And Fifth Stations......15

            2.    Combinations Among Top-Four Stations Are Often
                  Pro-Competitive. ....................................................16

            3.    The Existence Of Four Major Networks Does Not Justify
                  Retaining The Top-Four Prohibition. .......................17

            4.    The Waiver Process Cannot Save The Top-Four Prohibition. .18

B. The Commission Failed To Justify The Local Television Rule's Two-Station Limit. ...............................................................20

C. The Order's Abrupt Change To Note 11 Of The Local Television Rule Is Likewise Unjustified. .............................................21

D. The Order Fails To Adequately Justify Retention Of The Local Radio Rule. ......................................................................23

  1. The Commission Failed To Justify Geographic Market Caps And AM/FM Subcaps. .....................................................23

  2. The Commission Ignored Record Evidence Showing Benefits Of Consolidation. .........................................................26

IV. The Order Is Unlawful For Additional Reasons. ...........................................28

A. Retaining The Local Television And Radio Rules Undermines The Commission's Stated Goals. .....................................................28

B. The Order's Revisions To Note 11 Contravene The Communications Act And The First Amendment. ...........................31

V. The Court Should Vacate The Local Television And Radio Rules. ..............33

CONCLUSION .........................................................................................................34

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ABL Produce, Inc. v. Dep't of Agric.,*
    25 F.3d 641 (8th Cir. 1994) ........................................................10, 17

*Alenco Commc'ns, Inc. v. FCC,*
    201 F.3d 608 (5th Cir. 2000) ..............................................................19

*Allied-Signal, Inc. v. NRC,*
    988 F.2d 146 (D.C. Cir. 1993) ............................................................33

*ALLTEL Corp. v. FCC,*
    838 F.2d 551 (D.C. Cir. 1988) ......................................................19, 23

*Cellco P'ship v. FCC,*
    357 F.3d 88 (D.C. Cir. 2004) ................................................................4

*Citizens Telecomm. Co. of Minn. v. FCC,*
    901 F.3d 991 (8th Cir. 2018) ..............................................................20

*Dakota Underground v. Sec'y of Lab.,*
    200 F.3d 564 (8th Cir. 2000) ..............................................................17

*Darling v. Bowen,*
    878 F.2d 1069 (8th Cir. 1989) ..............................................................8

*Dolgencorp, LLC v. NLRB,*
    950 F.3d 540 (8th Cir. 2020) ..............................................................28

*Env't Health Tr. v. FCC,*
    9 F.4th 893 (D.C. Cir. 2021) ..............................................................30

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..........................................................................30

*Firearms Regul. Accountability Coal. v. Garland,*
    112 F.4th 507 (8th Cir. 2024) ..............................................10, 25, 31

*Fox Television Stations, Inc. v. FCC,*
    280 F.3d 1027 (D.C. Cir. 2002) ............................3, 4, 7, 28, 32, 33

*Fox Television Stations, Inc. v. FCC,*
   293 F.3d 537 (D.C. Cir. 2002) ............................................................4

*Franciscan All., Inc. v. Becerra,*
   47 F.4th 368 (5th Cir. 2022) ............................................................34

*Fred Meyer Stores, Inc. v. NLRB,*
   865 F.3d 630 (D.C. Cir. 2017) ..........................................................10

*United States ex rel. Harlan v. Bacon,*
   21 F.3d 209 (8th Cir. 1994) ...............................................................7

*Huey v. Sullivan,*
   971 F.2d 1362 (8th Cir. 1992) ...........................................................8

*Loper Bright Enters. v. Raimondo,*
   144 S. Ct. 2244 (2024)....................................................................6, 7

*Menorah Med. Ctr. v. Heckler,*
   768 F.2d 292 (8th Cir. 1985) ............................................................25

*Motion Picture Ass'n v. FCC,*
   309 F.3d 796 (D.C. Cir. 2002)...........................................................31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)............................................................13, 17, 18

*Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.,*
   534 U.S. 327 (2002)...........................................................................5

*Nat'l Fuel Gas Supply Corp. v. FERC,*
   468 F.3d 831 (D.C. Cir. 2006).............................................................16

*NBC v. United States,*
   319 U.S. 190 (1943)..........................................................................33

*Northshore Mining Co. v. Sec'y of Lab.,*
   709 F.3d 706 (8th Cir. 2013) ...............................................................7

*NRDC v. NRC,*
   547 F.2d 633 (D.C. Cir. 1976).............................................................28

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004) ...........................................14, 16, 17, 18

*Prometheus Radio Project v. FCC*,
939 F.3d 567 (3d Cir. 2019) ...................................................18

*Red River Valley Sugarbeet Growers Ass'n v. Regan*,
85 F.4th 881 (8th Cir. 2023) ...................................................21

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015).............................................................31

*Rest. L. Ctr. v. DOL*,
115 F.4th 396 (5th Cir. 2024) .................................................14

*Sugule v. Frazier*,
639 F.3d 406 (8th Cir. 2011) ...............................................4, 26

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994).............................................................32

*U.S. Steel Corp. v. EPA*,
649 F.2d 572 (8th Cir. 1981) .................................................34

*United States v. Greene*,
513 F.3d 904 (8th Cir. 2008) ...................................................6

**Statutes**

5 U.S.C. § 706(2) ..............................................................2, 33

47 U.S.C. § 303 note...........................................................3, 5

47 U.S.C. § 303(r)................................................................5

47 U.S.C. § 310(d) ...............................................................20

Telecommunications Act of 1996, Pub. L. No. 104-104,
§ 202(a), 110 Stat. 56, 110..................................................7

Telecommunications Act of 1996, Pub. L. No. 104-104,
§ 202(c)(1)(A), 110 Stat. 56, 111 .........................................7

## Regulatory Materials

47 C.F.R. § 1.3 .........................................................................................19

47 C.F.R. § 73.3555(b)(2) ......................................................................19

*2002 Biennial Regulatory Review*, 18 FCC Rcd 13620 (2003) ...............15

*2006 Quadrennial Regulatory Review*, 23 FCC Rcd 2010 (2008) ..........30

*2014 Quadrennial Regulatory Review—Order on Reconsideration
and Notice of Proposed Rulemaking*, 32 FCC Rcd 9802 (2017) ...............12, 30

*2014 Quadrennial Regulatory Review—Second Report and Order*, 31
FCC Rcd 9864 (2016) ............................................................................15, 22, 23

## Other Authorities

FCC, *Cable Carriage of Broadcast Stations* (Sept. 27, 2021),
https://www.fcc.gov/media/cable-carriage-broadcast-stations ...........................14

Marventano *Ex Parte*, GN Dkt. 10-25 (May 6, 2010),
https://www.fcc.gov/ecfs/document/6015593931/1 ..........................................30

"Red River Broadcast Merger With Forum Communications Falls
Through," *KVRR* (June 7, 2023),
https://www.kvrr.com/2023/06/07/red-river-broadcast-merger-
with-forum-communications-falls-through/ .......................................................19

**INTRODUCTION**

The Federal Communications Commission violated Section 202(h) of the Telecommunications Act of 1996 and the Administrative Procedure Act ("APA") by irrationally insisting that the *only* relevant "competition" to traditional television and radio broadcasting is competition *within and among television and radio stations*. Avoiding the work this deregulatory statute requires, the Commission instead reaffirmed the outdated Local Television and Local Radio Rules—and even *tightened* the Local Television Rule—by shifting the burden to broadcasters to disprove the need for the ownership limits and blatantly ignoring mountains of record evidence documenting the intense competition broadcasters face from new media sources.

In response, the Commission barely engages with Petitioners' arguments— most notably, failing to dispute that Section 202(h) requires consideration of *all* competition, such as online audio and video platforms. Instead, the Commission dismisses Section 202(h) as a mere suggestion to take a cursory look at broadcast ownership restrictions every now and then, and claims the Order did a good enough job under that relaxed interpretation. But Section 202(h) is not a check-the-box exercise: Congress intended it to operate as a mechanism of continuing deregulation, and the plain text instructs the agency to demonstrate *affirmatively* that its rules

1

remain necessary in light of competition and, if not, to modify or repeal them entirely.

The agency also continues to pretend that the world has not changed, diminishing the upheaval in the media marketplace wrought by the Internet and cable and satellite services. Rather than engage with the extensive record evidence on that score, the Commission asks the Court to apply a super-charged version of administrative deference. The Commission's brief uses a form of the word "reasonable" 80 times and "deference" or "deferential" 9 times, and invokes the supposed problem of line-drawing 7 times. But repetition of unsupported conclusory statements without a demonstrated grounding in record evidence is unreasonable and owed no deference.

The Commission's "nothing to see here" approach is the best it can do now, because it failed to do its work in the Order, despite taking many years to produce that document. Instead of analyzing whether the current local ownership rules are warranted given fierce competition and explaining why they are still needed, the Commission sat back and rejected proposals for change.

The Commission failed to do its duty under Section 202(h) and the APA, and the Court should "set aside" the Local Television and Local Radio Rules. 5 U.S.C. § 706(2).

# ARGUMENT

## I.    The Order Violates Section 202(h).

Section 202(h) is a straightforward deregulatory statute. In the 1996 Act, Congress loosened or eliminated several restrictions on broadcast ownership, and then directed the Commission periodically (now, every four years) to determine whether its ownership rules remain "necessary in the public interest as the result of competition." 47 U.S.C. § 303 note. If the Commission does not determine that a rule is necessary in light of "competition," then it must "repeal or modify" that rule. *Id.* The Order deviates from that statutory framework in three fundamental ways, and the Commission's response does not overcome that conclusion.

### A.    The Order Flips Section 202(h)'s Burden.

The Commission violated Section 202(h) by shirking its obligation to demonstrate that all facets of the Local Radio and Television Rules remain necessary. Petitioners Br. 21-22, 31. The Commission does not dispute that Section 202(h) imposes that obligation. Rightly so. Congress designed Section 202(h) as a deregulatory tool—it "carries with it a presumption in favor of repealing or modifying the ownership rules." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002) (*Fox I*).[1] The Commission nevertheless claims that the

---

[1] Amici incorrectly claim that the D.C. Circuit "retracted" its conclusion in *Fox I* that Section 202(h) "'carries with it a presumption in favor of repealing or modifying

Order "made affirmative findings that each rule remains 'necessary in the public interest.'" FCC Br. 74-75. The paragraphs the Commission cites, however, are utterly conclusory. *Id.* (quoting Order ¶¶ 32, 72, (App.__, __)). That is insufficient under basic APA principles, which require agencies to show their work. *See, e.g.*, *Sugule v. Frazier*, 639 F.3d 406, 412 (8th Cir. 2011).

Worse, the Order repeatedly treats the regulatory status quo as the baseline such that *broadcasters* would need to justify *deregulation*. *See, e.g.*, Order ¶ 32 (App.__) (citing lack of "consensus in the record" for relaxing the Local Radio Rule); *id.* ¶ 88 (App.__) (refusing to loosen Local Television Rule's Top-Four Prohibition because broadcasters did not demonstrate benefits for every single market). It is not broadcasters' burden to prove a "consensus" that the ownership rules are unjustified in all their applications; rather, it was the *Commission's* obligation to demonstrate that the rules, including their specific numerical limits, are justified. The Order impermissibly offloaded the Commission's statutory burden onto broadcasters.

---

the ownership rules.'" Br. 29 (quoting *Fox I*, 280 F.3d at 1048). The court's later decisions examined the precise meaning of the word "necessary" in Sections 202(h) and 11 of the 1996 Act, not whether there is a presumption in favor of deregulation. *Fox Television Stations, Inc. v. FCC*, 293 F.3d 537, 538-40 (D.C. Cir. 2002); *Cellco P'ship v. FCC*, 357 F.3d 88, 98-99 (D.C. Cir. 2004).

Ultimately, the Commission attempts to avoid its statutory burden by dismissing Section 202(h) as a mere suggestion to take a cursory and occasional look at the ownership rules and leave these decades-old limits untouched unless somebody else demonstrates they are not needed. FCC Br. 5, 76-77. The Commission also invokes its general regulatory authority under Section 303(r). *Id.* at 76. But that gets things exactly backwards. Congress directed the Commission every four years to "*determine*" whether any of its rules "*are*"—presently—necessary. Section 303(r) is just a general enabling provision adopted shortly after the original Communications Act of 1934. 47 U.S.C. § 303(r) (authorizing Commission to "[m]ake such rules and regulations … as may be necessary to carry out the provisions of this chapter"). That provision cannot override Section 202(h)'s specific instructions that Congress adopted in 1996. *See Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 336 (2002).

### B.    The Order Impermissibly Ignores Competition.

Section 202(h) directs the Commission to consider competition, full stop. Congress deliberately departed from the standalone "public interest" standard included in other statutes, instead directing the Commission to determine whether rules are "in the public interest *as the result of competition*." 47 U.S.C. § 303 note (emphasis added). This command is unequivocal; the Commission must consider competition in all forms and sources. The agency certainly cannot limit the analysis

to competition within television broadcasting and within radio broadcasting, respectively, and exclude all non-broadcast media.  Petitioners Br. 25-26, 28-30.

The Commission does not even attempt to rebut Petitioners' argument that the *statute* requires consideration of competition beyond broadcasting.  Instead of contesting the meaning of the statutory term "competition," the agency argues that it "satisfied its obligation 'to engage in reasoned decisionmaking'" under the APA by segregating the radio and television markets.  FCC Br. 70 (citation omitted).  That is no answer to Petitioners' *statutory* point.[2]  By failing to address Petitioners' statutory argument, the Commission has waived the issue.  *See, e.g.*, *United States v. Greene*, 513 F.3d 904, 906-07 (8th Cir. 2008) (argument not raised in response brief is waived).  The Order's failure to consider non-broadcast sources of competition—not to mention its failure to recognize even competition *between* television and radio broadcasters—alone justifies striking the regulations.

### C.     Section 202(h) Does Not Authorize Tightening Rules.

Because the Commission failed to show that the ownership rules remain necessary, Section 202(h) left two options: (i) repeal the rules; or (ii) modify them

---

[2] It is also wrong on the merits: the Commission's market definitions are arbitrary and capricious, as well as inconsistent with the statute.  Petitioners Br. 32-41; *infra* 8-14.  Even if the Court were inclined to credit the Commission's arbitrary and capricious response as a statutory response, which it should not, the Commission would receive no deference regarding the meaning of "competition" in Section 202(h).  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

by loosening the restrictions. The Commission, however, not only retained the rules, but *tightened* the Local Television Rule with significant additions to Note 11, claiming the word "modify" allows it to make rules more restrictive. But the text of the statute pairs "modify" with "repeal," providing crucial context, and modification only enters the equation *after* the Commission has determined that a rule is no longer "necessary." In this light, "the best reading" of "modify" is thus to loosen or relax. *Loper Bright*, 144 S. Ct. at 2266; *see* Petitioners Br. 21-23. Congress used "modify" in precisely this manner in the same section of the 1996 Act: Section 202(a) directs the Commission to "*modify* … its regulations … by *eliminating* any provisions limiting the number of AM or FM broadcast stations" that may be owned nationally, and Section 202(c)(1)(A) does the same for television stations. Pub. L. No. 104-104, 110 Stat. 56, 110-11 (emphasis added).

The Commission's contrary interpretation rips "modify" from its "context" and "place in the overall statutory scheme," *Northshore Mining Co. v. Sec'y of Lab.*, 709 F.3d 706, 710 (8th Cir. 2013), and renders the second sentence of Section 202(h) superfluous, *United States ex rel. Harlan v. Bacon*, 21 F.3d 209, 212 (8th Cir. 1994). If Congress did not intend for Section 202(h) to "continue the process of deregulation," *Fox I*, 280 F.3d at 1033, it only would have enacted the first sentence's instruction to periodically review ownership rules.

The logical implications of the Commission's interpretation demonstrate its flaw: if "modify" opens the door to tightening ownership rules, the Commission could use Section 202(h) proceedings to resurrect previously-repealed rules. For example, the Commission could reinstate the national caps on station ownership that Congress specifically eliminated in Sections 202(a) and (c)(1)(A). An interpretation that creates such "absurd results" cannot be the best reading of the statute under *Loper Bright*. *See Darling v. Bowen*, 878 F.2d 1069, 1075-76 (8th Cir. 1989).[3]

## II.  The Order Violated The APA By Adopting Flawed Market Definitions.

The Order's refusal to consider the many non-broadcast sources of competition that broadcasters face not only violates Section 202(h), but also the APA. Petitioners Br. 32-41. The Order ignores substantial record evidence—including the Commission's own recent findings—establishing that broadcasters face substantial competition from other sources for viewers, listeners, and revenue. The Order also illogically relied on supposedly unique characteristics of broadcasting to dismiss all competition from sources other than television/radio

---

[3] *Huey v. Sullivan*, 971 F.2d 1362 (8th Cir. 1992), addresses a wholly inapposite statutory context. *Huey* held that the Equal Access to Justice Act ("EAJA") does not expand the types of expenses recoverable under Title VII, because the EAJA does not "'alter[], modif[y], repeal[], invalidate[], or supersede[] any other provision of Federal law which authorizes an award of such fees and other expenses.'" *Id.* at 1366-67 (emphasis omitted) (quoting Pub. L. No. 96-481, § 206, 94 Stat. 2330 (1980), *amended by* Pub. L. No. 99-80, § 3, 99 Stat. 186 (1985)). Its use of the word "modify" sheds no light on the word's meaning here.

broadcasters within the same geographic area. The Commission's response only reinforces the inadequacy of the Order's reasoning by conspicuously and repeatedly failing to rebut Petitioners' contentions.

A. **The Order Arbitrarily Dismisses Competition From Non-Broadcasting Sources.**

During the Section 202(h) proceeding, Petitioners and others provided copious evidence demonstrating the formidable competition broadcasters face from myriad audio and video sources, which the Commission's Communications Marketplace Reports reflected. Petitioners Br. 32-38. The Department of Justice submitted an extensive study from NERA concluding that digital platforms compete with television stations for local advertising and that the relevant market for analyzing combinations between local television broadcasters should include advertising on digital platforms. Petitioners Br. 36. Similarly, NAB submitted a BIA study illustrating significant declines in radio stations' average quarter-hour audiences, which is the metric upon which radio advertising is sold. NAB Comments, Attachment A at 5 (BIA Advisory Services, *Local Radio Station Viability in the New Media Marketplace* (BIA Radio Study)) (App.__); *see id.*, Attachment B at 3-18 (BIA Advisory Services, *The Economic Irrationality of the Top-4 Restriction* (BIA TV Study)) (App.__-__) (documenting declining television station viewing and ad revenue due to competition from non-broadcast sources). And Connoisseur submitted a Borrell Associates report demonstrating radio

stations' competition with digital platforms for local advertising. Petitioners Br. 37-38.

The Order effectively ignored those sophisticated studies. The Commission's response brief similarly fails to even mention the NERA Study, the BIA TV Study, the Borrell report, and the agency's own findings in its Communications Marketplace Reports. The Commission begrudgingly admits that the Order "did not cite" the BIA Radio Study, claiming that the Order "accepted the study's basic premise" regarding the benefits of consolidation. FCC Br. 41 n.12. But the BIA Radio Study also analyzed competition from other audio sources, resulting in declining radio listenership, rapidly eroding advertising revenues, and serious struggles of stations in small and mid-sized markets. BIA Radio Study 3-18 (App.__-__).

In any event, the APA "require[s] 'contemporaneous explanations,' and not just post hoc justifications 'raised in court.'" *Firearms Regul. Accountability Coal. v. Garland*, 112 F.4th 507, 525 n.15 (8th Cir. 2024) (citation omitted). The Commission's belated acknowledgment of one aspect of one study addressing only radio cannot cure its failure to "grapple with contrary evidence"—including its own previous findings. *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017); *see also, e.g.*, *ABL Produce, Inc. v. Dep't of Agric.*, 25 F.3d 641, 646 (8th Cir. 1994) (failure to consider record evidence violates APA).

**B.     Local Programming And Retransmission Fees Do Not Justify Restricting The Market Definition.**

Instead of grappling with the record, the Order contends that only competition among radio broadcasters and among television broadcasters is relevant because broadcasting is purportedly "unique."  Order ¶¶ 33, 73 (App.__, ___).  In particular, the Commission argues that broadcasters are distinguished by their ability to: (i) provide local content; and (ii) charge retransmission consent fees for their content.  FCC Br. 67-71.  To be sure, broadcasters provide valuable information, including local news, to their listeners and viewers, which is one way many broadcasters attempt to differentiate themselves and survive in an ever-more challenging competitive environment.  But the value of that programming is no excuse for the Commission to stick its head in the sand on the state of competition in the modern media marketplace.

To begin, the Commission has never explained why promoting competition among television stations and among radio stations justifies ignoring competition from other sources.  Even if it were true that there are "distinct" television and radio broadcast markets based on special characteristics of broadcasting, Order ¶¶ 34, 73

(App.__, __), that by itself does not warrant refusing to consider competition from other sources, as the Commission previously concluded.[4]

Indeed, the Commission's reasoning is circular and illogical. Petitioners Br. 29-30, 40-41. The Order argues that because broadcasting is more likely than other services to provide local programming, competition from those other services is irrelevant. The implication of that circularity is that broadcasters' viewership and listenership could fall to microscopic levels, but regulatory relief would *still* be inappropriate because broadcasters would *still* offer different products than their Internet, cable, and satellite competitors. That illogic, whereby ownership limits apply no matter how inconsequential broadcasting becomes, is arbitrary and capricious.

The Commission's brief (at 72) claims that threats to broadcasting's viability are a "purely hypothetical" "doomsday scenario." But even setting aside uncontroverted evidence showing massive advertising and audience share increases for non-broadcast competitors at broadcasting's expense—much less local stations'

---

[4] *2014 Quadrennial Regulatory Review—Order on Reconsideration and Notice of Proposed Rulemaking*, ¶ 72, 32 FCC Rcd 9802, 9833-34 (2017) (2017 Order). The Commission asserts that intra-broadcast competition incentivizes "high-quality local programming," FCC Br. 44, but points to no evidence supporting that conclusion, much less explain why the agency may ignore competition from non-broadcast sources.

on-the-ground experiences—the Commission has not explained why regulatory relief is only warranted when it is too late.

The Commission also contends (at 72) that it "could revise its market definitions" in a later quadrennial "if the record reveals that local programming is no longer largely the exclusive domain of broadcasters." That not only kicks the can down the road, further delaying any prospect of regulatory relief needed today, it doubles down on the Order's refusal to engage with "an important aspect of the problem": broadcasters' supposedly unique characteristics do not eliminate the competition they face from other sources. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In any event, broadcasters' local programming and retransmission consent fees do not magically erase market competition. Those facets of broadcasting actually underscore that broadcasters engage in fierce competition with non-broadcasters. Broadcasters that continue to invest in local content—and the record illustrates that some stations cannot provide much or any local programming due to its significant expense, *see* NAB Ex Parte 34, 45 (Feb. 16, 2022) (App.__, __); NAB Refresh Comments 29-36 (App.__-__)—do so to help them compete with Internet streaming, cable, and satellite services. *Id*. 93-94 (App.__).[5]

_____

[5] Moreover, the Commission ignored significant record evidence that ownership consolidation *spurs* vibrant local programming. *See infra* 29.

Retransmission consent fees similarly demonstrate that broadcasting is not hermetically sealed from other competing sources. Retransmission fees are television stations' charges for the right to repackage and redistribute their content. *See, e.g.*, Nexstar Refresh Reply Comments 8-10 (App.__-__). But other market participants sell content—cable and satellite companies charge subscription fees (the growth of which has outpaced inflation), Internet streaming services charge monthly subscription fees, and television networks sell their programming to distributors. NAB *Ex Parte* (Mar. 26, 2021) (App.__-__); Television Affiliates 2021 Reply Comments 4-5 (App.__-__); FCC, *Cable Carriage of Broadcast Stations* (Sept. 27, 2021), https://www.fcc.gov/media/cable-carriage-broadcast-stations ("allowing broadcasters to receive compensation for carriage of their content … treats broadcasters the same as non-broadcast programming services"). Cable associations' intervention in this proceeding to support broadcast restrictions demonstrates they compete with television broadcasters. Yet the Commission continues to irrationally place significant weight on retransmission fees, while ignoring non-broadcasters' similar and far more diverse revenue streams. *See, e.g.*, *Rest. L. Ctr. v. DOL*, 115 F.4th 396, 409 (5th Cir. 2024).[6]

---

[6] The Order also cites DOJ's positions in antitrust cases, but the Commission now walks that back, stating that its "public interest inquiry … has 'a different purpose' than the antitrust laws." FCC Br. 32 (quoting *Prometheus Radio Project v. FCC*, 373 F.3d 372, 415 (3d Cir. 2004) (*Prometheus I*)).

**III.    The Order Failed To Justify Its Retention (And Tightening) Of The Local Television And Radio Rules.**

Petitioners demonstrated that the Order wholly fails to support leaving the Local Radio Rule unchanged and maintaining—even tightening—the Local Television Rule.   The Order fails to provide any specific justification for the numerical limits adopted and ignores reams of contrary evidence without explanation. Petitioners Br. 42-61.  The Commission offers little in response beyond reciting the Order's conclusory statements, and pleas for deference.   That is insufficient.

**A.    The Order Fails To Justify Retaining The Local Television Rule's Top-Four Prohibition.**

Each of the three justifications the Commission offered for the Top-Four Prohibition is fatally flawed, and the waiver process cannot cure the invalid rule. *See* Petitioners Br. 42-50.

**1.    *The Commission Concedes There Is No Record Basis For The Demarcation Between The Fourth And Fifth Stations.***

The Order relies on a purported "typical gap in ratings between the fourth and fifth ranked stations in a market," as the Commission has for decades.  Order ¶ 86 (App.__); *2014 Quadrennial Regulatory Review—Second Report and Order*, ¶ 43, 31 FCC Rcd 9864, 9880 (2016) (2016 Order); *2002 Biennial Regulatory Review*, ¶ 195, 18 FCC Rcd 13620, 13694-95 (2003).   But the record conclusively shows that: (i) in two-thirds of geographic markets, the largest gap is *not* between the fourth

and fifth ranked stations; (ii) the top-ranked station far outstrips all other stations in many smaller markets; and (iii) smaller markets have greater need for the economies of scale that ownership consolidation allows. Petitioners Br. 43-45.

The Commission's brief disputes none of this, instead relying on other reasons for the Top-Four Prohibition. But when multiple reasons are given for agency action, a defect in any one reason warrants vacating the rule. *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839-40 (D.C. Cir. 2006) (Kavanaugh, J.). Retention of the Top-Four Prohibition is thus arbitrary and capricious.

### 2. Combinations Among Top-Four Stations Are Often Pro-Competitive.

The Order also contends that top-four ranked stations are the most likely to originate local news and that combinations would disincentivize improvements in local programming. Order ¶ 86 (App.__). But the Order's citations do not support those propositions; rather, empirical record evidence and Commission precedent show that station combinations *enhance* programming, as the Third Circuit recognized twenty years ago. Petitioners Br. 45-46; *see also Prometheus I*, 373 F.3d at 415.

If anything, the fact that the largest ratings drop-offs occur *within* the top four in most geographic markets illustrates that top-four combinations will often be pro-competitive and strengthen localism. Petitioners Br. 43-44. For example, where one station's ratings far exceed others in a market, a combination among lower-rated top-

four stations would create a stronger competitor. *See* BIA TV Study 19-22 nn.20-22 (App.__-__) (in close to half of markets with at least four full-power commercial stations, third- and fourth-ranked stations' combined audience share is less than the top-ranked station's share, and large ratings gaps consistently exist between first- and second-ranked stations).

In response, the Commission repeats its conclusory statements, faults *Petitioners* for not identifying record evidence disputing that top-four stations are the most likely to originate local news, and pleads for deference. FCC Br. 42-45, 50-51, 56. No deference is due where the Commission has *not identified evidence* to support its conclusions, much less explained *why* that evidence supports its conclusions. *See Prometheus I*, 373 F.3d at 420; *Dakota Underground v. Sec'y of Lab.*, 200 F.3d 564, 568 (8th Cir. 2000). The Commission has entirely ignored studies, its own prior findings, and the Third Circuit's contrary conclusion, and also has neglected to seriously consider alternative approaches. That is arbitrary and capricious. *See, e.g.*, *State Farm.*, 463 U.S. at 43, 50-51; *ABL Produce*, 25 F.3d at 646.

### 3. The Existence Of Four Major Networks Does Not Justify Retaining The Top-Four Prohibition.

The Order's third rationale for retaining the prohibition is that top-four stations are often affiliated with the "Big Four" English-language networks. Order ¶ 86 (App.__). This conflation of *stations* with *networks* is unsupported by any

citation to record evidence.  In fact, *non*-Big-Four networks are often affiliated with top-four stations (e.g., Spanish-language networks), and the Commission's emphasis on *national* programming of *national* networks undermines its contention that the Top-Four Prohibition is needed to protect *local* programming.  Petitioners Br. 47-48.

The Commission—again—responds to none of these arguments and demands deference, citing the Third Circuit's prior conclusion that the Top-Four Prohibition is "'sensible'" because there are "'four major national networks.'"  FCC Br. 52, 55 (quoting *Prometheus Radio Project v. FCC*, 939 F.3d 567, 582 (3d Cir. 2019)).  But that Third Circuit decision relied on *additional* evidence showing consolidation among top-four stations would be harmful—there is no such evidence here—and the question was exactly where to draw the line.  939 F.3d at 581-82.  Regardless, the Commission cannot simply transmogrify the national Big Four into a local ownership restriction without addressing contrary arguments and evidence.  *State Farm*, 463 U.S. at 43.  As the Third Circuit itself explained in *Prometheus I*, "line-drawing decisions" cannot be upheld if based on "assumption" rather than "evidence."  373 F.3d at 420.

### 4.      *The Waiver Process Cannot Save The Top-Four Prohibition.*

As a last-ditch effort, the Commission relies on its purported "case-by-case" waiver process to defend the prohibition.  FCC Br. 52-56.  But "[t]he FCC cannot

save an irrational rule by tacking on a waiver procedure." *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988); *see also Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 622 (5th Cir. 2000) ("a waiver provision … cannot save a rule that on its own has no rational basis").

Regardless, the waiver process is a red herring for two reasons. *First*, the Commission's regulations allow waivers of *any* rule—not just the Top-Four Prohibition. 47 C.F.R. § 1.3 (permitting "waive[r] for good cause shown" of "[a]ny provision of the [Commission's] rules"). The theoretical availability of waivers of the Top-Four Prohibition is thus not special. At best, the Top-Four Prohibition waiver provision merely clarifies what qualifies as good cause, and in less-than-pellucid language: a transaction that "would serve the public interest, convenience, and necessity." *Id.* § 73.3555(b)(2). *Second*, few, if any, broadcasting groups would undertake the arduous and expensive process of executing a transaction hoping that the Commission might eventually grant leniency from its *per se* rule on the back end. *See* NAB Comments 70 n.269 (App.__). The Commission claims it received only three (unidentified) requests for waiving the Top-Four prohibition in the past few years, two of "which were withdrawn before the agency could act on them." FCC Br. 55. It fails to mention that at least one of those requests was withdrawn because the Commission sat on it for 18 months without acting. "Red River Broadcast Merger With Forum Communications Falls Through," *KVRR* (June 7,

2023), https://www.kvrr.com/2023/06/07/red-river-broadcast-merger-with-forum-communications-falls-through/. *That* explains why only a handful of broadcasters have ever applied for an exemption.[7]

### B. The Commission Failed To Justify The Local Television Rule's Two-Station Limit.

As with the Top-Four Prohibition, the two-station limit is a *per se* restriction without any justification. The Order does not explain why it forbids *anyone* from purchasing a third television station in *every* geographic market in America. The two-station limit absurdly applies equally to New York City, Hermann, Missouri, and Glendive, Montana. Petitioners Br. 51.

The Commission defends by quoting the Order's conclusion that concentration is generally bad and—again—asking for deference to its supposed "line-drawing." FCC Br. 47-50 (citing *Citizens Telecomm. Co. of Minn. v. FCC*, 901 F.3d 991 (8th Cir. 2018)). But the Commission did none of the rigorous analysis required to constitute "line-drawing" worthy of deference. In *Citizens Telecommunications*, the Commission "analyz[ed] competition in the market" and then established a "Competitive Market Test" to further examine the competition dynamics in specific markets. 901 F.3d at 998-99. Here, in contrast, the

---

[7] If anything, case-by-case review is better suited for blocking particular transactions that would lead to undue concentration in a specific geographic market. *See* 47 U.S.C. § 310(d) (requiring Commission review of transfers of station licenses and appurtenant rights).

Commission ignored competition and performed *zero* analysis, simply keeping two stations as the limit because that was already the limit. The Commission nowhere considered, for example, the public interest *benefits* of permitting the purchase of a third television station in certain markets—such as where the combined stations would still lag significantly behind a market leader in viewership and advertising revenue. The Commission's superficial effort is insufficient. *See, e.g.*, *Red River Valley Sugarbeet Growers Ass'n v. Regan*, 85 F.4th 881, 888-90 (8th Cir. 2023).

### C. The Order's Abrupt Change To Note 11 Of The Local Television Rule Is Likewise Unjustified.

Faced with uncontroverted record evidence showing that broadcasters face unprecedented marketplace competition, the Commission responded by agreeing with the cable and satellite industry to further restrict the Local Television Rule by bringing multicasting and low-power television ("LPTV") stations within Note 11's coverage. That action violates Section 202(h) because, as explained *supra* 6-8, the Commission has no authority to tighten rules under this statute.

The Commission's change in position is also arbitrary and capricious. Petitioners Br. 51-54. The Commission did not adequately explain its decision to— for the first time—subject multicasting and LPTV stations to ownership limitations. The agency failed to engage with record evidence demonstrating the benefits, recognized previously by the Commission, of top-four rated programming on multicast streams and LPTV stations, particularly in "short" markets—the quarter of

all geographic markets lacking four full-power commercial television stations. NAB Refresh Reply Comments 53-57 (App.__-__) (citing BIA Media Access Pro data); 2016 Order ¶ 72, 31 FCC Rcd at 9892. That decision is particularly egregious for multicasting, which does not even involve separate stations with separate licenses. *See* NAB *Ex Parte* 3-7 (Oct. 30, 2023) (App.__-__).

In response, the Commission essentially concedes that the revised Note 11 is overbroad with respect to short markets. It nevertheless claims "that 'the number of instances where top-four rated programming appears' on 'multicast streams or low power stations" outstrips "'actual "short markets,"'" citing a comment from cable-intervenor ATVA. FCC Br. 59-60 (quoting Order ¶ 102 (App.__)). But the Order itself recognizes that ATVA's analysis was significantly flawed, as ATVA later admitted. *See* Order ¶ 102 n.332 (App.__).

Regardless, the Commission cites no *evidence* documenting competitive or consumer harms from carrying top-four rated programming on multicast streams or LPTV stations. Nor has the Commission explained why a broadcaster may acquire a second Big-Four network affiliation directly from a network but not from a top-four station, given that control of two top-four rated stations/streams is supposedly the competitive problem to be remedied by the stricter Note 11. Order ¶¶ 98, 105 (App.__, __). Mere conclusory invocations of "circumvention" of the Top-Four Prohibition are insufficient. *See* FCC Br. 58-63.

The Commission again seeks refuge in the Top-Four Prohibition's case-by-case waiver process. Again, "[t]he FCC cannot save an irrational rule by tacking on a waiver," *ALLTEL Corp.*, 838 F.2d at 561, and few broadcasters would bank a deal on an expensive, time-consuming, and likely futile waiver process. *See supra* 18-20. Reliance on waivers is particularly unreasonable for the revised Note 11, given the Commission's acknowledgment of the benefits of multicast streams and LPTV stations providing network programming—especially in the quarter of geographic markets that are short. *See, e.g.*, 2016 Order ¶ 72, 31 FCC Rcd at 9892-93.

### D. The Order Fails To Adequately Justify Retention Of The Local Radio Rule.

The audio marketplace has changed dramatically since the 1996 Act, yet the Local Radio Rule remains unchanged. The Order lacks even a perfunctory justification for keeping its overall numerical limits and subcaps for AM and FM stations and ignores the mountain of record evidence highlighting the substantial benefits of common ownership of radio stations. Petitioners Br. 54-61. The Commission's response rebuts none of these serious problems.

#### 1. *The Commission Failed To Justify Geographic Market Caps And AM/FM Subcaps.*

Section 202(h) requires the Commission to articulate why its rules are *currently* justified. Petitioners Br. 21, 31; *supra* 3-5. The Order instead defaults to

decades-old limitations rather than working to determine what limits are necessary *today,* given the deluge of new sources of audio content.

**Overall numerical limits.** Neither the Order nor the Commission's brief contains any justification for the specific limits the Order imposes on all geographic markets. The Order irrationally concludes, for example, that the same limit of 8 stations is necessary for both the Chicago market (over 130 stations) and for the Kansas City market (only 45 stations). Petitioners Br. 55-56.

Rather than affirmatively explaining why the current numerical limits *are* justified, the Order flips the burden to commenters to explain why they are *not* justified, which conveniently served as the basis of the conclusion "that the current [ownership] tiers and limits maintain an appropriate level of competition." Order ¶¶ 41-43 (App.__-__); *see also* FCC Br. 36. Now, the Commission just repeats its view that consolidation generally is harmful, that the largest station groups in each market dominate *broadcast radio-only* ad revenue, and that "'the top four station group owners continue to dominate [broadcast radio-only] audience share.'" FCC Br. 31-35 (quoting Order ¶ 48 (App.__)). It makes no effort to connect those observations to the limits the Order adopts or to cite any evidence supporting the rule's specific limits—because there is none. Indeed, audience and revenue share are *irrelevant* under the rule, which is based on the *number* of stations.

The Commission also conspicuously fails to respond to Petitioners' argument that it defies common sense not to even *consider* higher limits for at least some markets or stations. For example, greater common ownership of lower-rated or lesser-earning stations in local markets would enhance competition with larger radio broadcasters. This is not hypothetical. The BIA Radio Study (at 19-20, App.__-__)—which the Order ignores—found 404 existing local station combinations in 217 different markets, especially small ones, were constrained by the ownership caps, belying claims that the current rule offers "ample leeway" for additional consolidation, Order ¶ 53 (App__.). The Commission's slipshod job is arbitrary and capricious. *See, e.g.*, *Firearms Regul.*, 112 F.4th at 519; *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 295-96 (8th Cir. 1985).

**FM and AM subcaps.** The Order similarly fails to justify the subcaps on AM and FM station ownership and to address the alternative of eliminating the subcaps in particular markets. As the record illustrates, declines in listenership are especially pronounced for AM stations, therefore necessitating elimination (or at least loosening) of the subcaps for that service in particular. Petitioners Br. 57-58.

The Commission's half-hearted rebuttal again parrots threadbare conclusions from the Order, including that the subcaps "continue to serve" public interest purposes and their elimination "could cause AM stations to migrate to the FM band." FCC Br. 37 (quoting Order ¶ 55 (App.__)). The *only* record evidence the

Commission's brief cites is that "more than 100 AM stations nationwide rank in the top five in their local markets," which the Commission speculates "could be 'targets for acquisition if AM restrictions were eliminated.'" *Id.* 38 n.10 (quoting Order ¶ 56 (App.__)). But "the strong performance of some individual AM stations" is the exception; the Commission concedes "the general weakness" of the AM band. *Id.*; *see* BIA Radio Study 15, 18 (App.__, __) (showing that 4.5% of commercial AM stations were top-five ranked and AM stations' combined audience shares declined 50% from 1996-2018). The Commission cites no evidence supporting its conclusion that subcaps are needed to protect the AM band generally. That is arbitrary and capricious. *Sugule*, 639 F.3d at 412.

### 2. *The Commission Ignored Record Evidence Showing Benefits Of Consolidation.*

Beyond the failure to provide any support for its specific numerical limits on radio station ownership, the Order ignores uncontroverted record evidence demonstrating the benefits consolidation can yield, including the Commission's own Communications Marketplace Report. Petitioners Br. 59-61; Radio Intervenors Br. 8-18. Instead, the agency highlights a handful of commenters who opposed loosening the Local Radio Rule, then claims its crediting of those comments is enough because it is owed deference. FCC Br. 38-41.

But all comments are not equal; that some commenters supported the existing limits does not justify the Order's disregard and distortion of substantial record

evidence.  None of the comments relied upon in the Commission's brief provided significant empirical evidence.  In fact, key pieces of "evidence" are simply the opinions of three radio and trade press executives quoted without empirical support, which NAB had expressly refuted.  *See* FCC Br. 40 n.11; Order ¶ 45 nn.152-53 (App.__); NAB *Ex Parte* 36-44 (Feb. 16, 2022) (App. __-__).

On the other side of the ledger, the Order entirely ignores the robust BIA Radio Study, which (among other things):  (i) identified the number of local radio combinations "constrained" from growth under the existing ownership limits and measured the populations they reached; (ii) quantified cash flow improvements stemming from relaxed rules; and (iii) found that per station revenues also would likely increase following ownership reform because larger local combinations are better at turning populations reached into actual revenues.  BIA Radio Study 19-31, 37-39 (App.__-__, __-__).  The Order similarly collapses hundreds of pages of data and analysis from Borrell into two sentences in a footnote.  *See* Order ¶ 34 & n.104 (App.__-__).  It further whistles past other record evidence in which broadcasters recounted their experiences struggling to survive under the Commission's restrictions.  *See* Connoisseur Comments 22-23 & Exh. C (declarations) (App.__-__, __-__).  "Boilerplate generalities brushing aside detailed criticism on the basis of agency 'judgment' or 'expertise' avail nothing."  *NRDC v. NRC*, 547 F.2d 633,

646 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978).[8]

## IV. The Order Is Unlawful For Additional Reasons.

The Commission's retention of the Local Television and Radio Rules is also unlawful because the rules undermine the agency's stated goals and the revision to Note 11 contravenes the First Amendment and the Communications Act.

### A. Retaining The Local Television And Radio Rules Undermines The Commission's Stated Goals.

The Order purports to further competition, localism, and viewpoint diversity, but the Commission has failed to "provide an adequate basis for believing the Rule would in fact further" those goals. *Fox I*, 280 F.3d at 1043; *see* Petitioners Br. 62-65.

**Competition.** As explained above, the Commission's myopic treatment of competition keeps a boot on the neck of broadcasters struggling to compete with Internet streaming, cable, and satellite, and the Order fails even to demonstrate that the rules are necessary to promote competition *among* local television and radio stations. The Commission's brief largely repeats the Order's conclusory assertions, without explaining *how* retaining ancient rules furthers competition at any level.

---

[8] The Commission's case citations are readily distinguishable. In *Dolgencorp, LLC v. NLRB*, this Court declined to disturb the NLRB's credibility determinations about highly fact-specific issues, such as whether an employee was bribed for a union vote. 950 F.3d 540, 550 (8th Cir. 2020). There are no similar credibility determinations or factual findings at issue here. *See also supra* 20-21 (discussing *Citizens Telecommunications*).

FCC Br. 31-32, 42-43. On the contrary, the great weight of record evidence shows that retaining the rules will make it harder for broadcasters to compete in today's marketplace and that loosening ownership restrictions will promote competition across the board.

**Localism.** The Commission's contention that retaining the rules is necessary to promote localism is similarly divorced from record evidence. FCC Br. 31-35, 43-45. As to the Local Television Rule, the Commission (at 45) notes evidence that the number of stations airing local news has recently increased modestly, but does not refute Petitioners' evidence that consolidation would lead to *greater* increases in local programming. With respect to the Local Radio Rule, the Commission claims (at 34) that record evidence showed loosening the rule would reduce local programming, but points to no actual data substantiating that assertion. Instead, it cites non-record materials to argue that consolidation of Minot, North Dakota's local radio stations prevented quick dissemination of news about a toxic chemical spill caused by a train derailment in 2002. *Id.* 35-36. Apart from the fact that the Commission is limited to the record, that is fiction. As detailed in earlier Commission proceedings, multiple employees of the local station designated to disseminate emergency messages to other stations worked through the night to ascertain what had occurred. But they could not reach first responders, who failed

to activate the Emergency Alert System. *See* Marventano *Ex Parte*, GN Dkt. 10-25 (May 6, 2010), https://www.fcc.gov/ecfs/document/6015593931/1.

Regardless, the Commission has not even acknowledged its prior position that it "has never found that the local radio ownership rule significantly advances [the] interest in localism." *2006 Quadrennial Regulatory Review*, ¶ 124, 23 FCC Rcd 2010, 2075 (2008). The lack of an explanation for changing its position also renders this justification invalid. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 524 (2009).

**Viewpoint diversity.** The Commission similarly has reversed course from prior quadrennials and now claims that the Local Television and Local Radio Rules are necessary to protect viewpoint diversity. *See, e.g.*, 2017 Order, ¶¶ 57, 76, 32 FCC Rcd at 9827, 9835 (taking opposite position). In defending its newfound position, the Commission's brief and the Order arbitrarily ignore significant evidence that loosening the rules would *promote* viewpoint diversity. *Compare* FCC Br. 31-33, 46-47, *with* Petitioners Br. 64; *see Env't Health Tr. v. FCC*, 9 F.4th 893, 908-09 (D.C. Cir. 2021). The agency even denies its explicit prior finding "that broadcast radio stations are not a primary source of viewpoint diversity in local markets," 2017 Order ¶ 57, 32 FCC Rcd at 9827, thereby deepening the APA error, *FCC v. Fox*, 556 U.S. at 524.

**B.    The Order's Revisions To Note 11 Contravene The Communications Act And The First Amendment.**

The Order's revision of Note 11 violates Section 202(h) by tightening the Local Television Rule, and the Commission failed to adequately justify its change in position.  *See supra* 6-8, 21-23.  That action also violates the First Amendment and the Communications Act because it is a content-based regulation of broadcasters' programming choices.  Petitioners Br. 65-69.

The revised Note 11 dictates which network programming a station can air. For example, it would generally forbid many broadcasters from airing NBC, but not the CW, on multicast streams or commonly-owned LPTV stations.  That is straightforward content-based regulation, which is "presumptively unconstitutional."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  And the Communications Act does not "allow the FCC to regulate programming content" without a "scrupulously clear" congressional delegation of authority, which is lacking here.  *Motion Picture Ass'n v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002).

The Order in a conclusory footnote asserts that Note 11 "does not consider content" and thus does not violate the First Amendment—without even mentioning NAB's argument regarding the Communications Act.  Order ¶ 104 n.336 (App.___). The Commission's post-hoc attempt in its brief (at 63-67) to put meat on this footnote's bones is too little, too late.  *See Firearms Regul.*, 112 F.4th at 525 n.15.

Regardless, the agency's response misses the mark. Five pages of its brief boil down to one argument: the Note 11 revision is supposedly not based on programming content because "[i]t applies only when owners of top-four stations acquire network-affiliated programming from competing top-four stations and air the programming in the same market." FCC Br. 67. That proves Petitioners' point: the Note 11 revision is triggered only by *particular* programming choices.

Contrary to the Commission's claim, the Note 11 revision does not regulate station ownership or have anything to do with the "'scarcity of broadcast frequencies.'" FCC Br. 64 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994)). The revised Note 11 is not triggered by a station purchase. A broadcaster can air its newly-acquired programming on its full-power station's multicast stream or its LPTV station—in both circumstances under an existing license. *See supra* 22. There need be no change in the number of stations owned by either the purchaser or seller of the relevant programming.

The cases the Commission relies on are unavailing. *Fox I* concerned a rule prohibiting an entity from owning stations when their combined audience reach would exceed 35% of television households nationwide. 280 F.3d at 1034. That

rule said nothing about the *programming* any station could acquire; it was tied to a content-neutral measure—a 35% threshold for audience reach. *Id.* at 1046.[9]

*NBC v. United States* is equally inapposite. There, the Supreme Court upheld the FCC's "chain broadcasting" regulations, which prohibited certain provisions in network affiliation agreements that the Commission viewed as deleterious to the public interest (e.g., radio networks forcing stations to accept exclusive affiliation and years-long exclusivity provisions). 319 U.S. 190, 199-202 (1943). Those rules regulated *tools* that networks would place in agreements; they applied irrespective of a radio broadcast's content.

In contrast, the revised Note 11 applies only to the acquisition of certain programming. That is content-based and, thus, presumptively violative of both the First Amendment and the Communications Act.

## V. The Court Should Vacate The Local Television And Radio Rules.

The Commission (at 81 n.27) asks this Court to remand rather than vacate the Local Television and Radio Rules, invoking the D.C. Circuit's 1993 decision in *Allied-Signal, Inc. v. NRC*, 988 F.2d 146. But the APA directs courts to "set aside" unlawful agency rules. 5 U.S.C. § 706(2). "Vacatur is the only statutorily prescribed

---

[9] The *Prometheus* cases are likewise distinguishable because the changes to Note 11 are nothing like the traditional ownership rules.

remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022).

Even under *Allied-Signal*, vacatur is warranted given the seriousness of the Commission's substantive violations. Petitioners are aware of only one case from this Court granting remand-without-vacatur, and the APA violation there was procedural: the agency had acted without first providing notice and comment to affected companies. *See U.S. Steel Corp. v. EPA*, 649 F.2d 572, 574-77 (8th Cir. 1981). Here, by contrast, the Commission's many errors are substantive and serious. Moreover, it would be highly unjust to allow the rules to remain, likely for many more years given the Commission's immense delay in issuing the Order and its abysmal track record of belated reviews. Petitioners Br. 13-15, 69.

## CONCLUSION

The Court should vacate: (1) the Local Television Rule in its entirety (including Note 11); and (2) the Local Radio Rule (including the AM/FM subcaps).

Dated: October 15, 2024

Respectfully submitted,

 /s/ Helgi C. Walker

Barbara A. Smith
BCLP LLP
3600 One Metropolitan Square
211 N. Broadway
Saint Louis, Mo 63102-2186
(314) 259-2367
barbara.smith@bclplaw.com

*Counsel for Petitioner Zimmer Radio of Mid-Missouri, Inc.*

Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100
ajohnson@gibsondunn.com

*Counsel for Petitioner Nexstar Media Group, Inc.*

Eric D. Stolze
Stephen B. Kinnaird
PAUL HASTINGS LLP
1170 Peachtree Street, N.E.
Suite 100
Atlanta, GA 30309
(404) 815-2315
ericstolze@paulhastings.com

*Counsel for Petitioners Beasley Group, LLC* and *Tri-State Communications, Inc.*

Helgi C. Walker
  *Counsel of Record*
Andrew G.I. Kilberg
Cameron J.E. Pritchett
Hadhy Ayaz
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com

Rick Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street, S.E.
Washington, D.C. 20003
(202) 429-5430
rkaplan@nab.org

*Counsel for Petitioner National Association of Broadcasters*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Local Rule 32(a)(7) because it contains 7,491 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 (Version 2404) in 14-point, Times New Roman font.

3.     This brief has been scanned for viruses and is virus free.


Dated:  October 15, 2024                       */s/ Helgi C. Walker*
                                                          Helgi C. Walker

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 15, 2024, I caused the foregoing brief to be electronically filed and served on all counsel of record via this Court's CM/ECF system.

*/s/ Helgi C. Walker*
Helgi C. Walker
