Nos. 24-1380, 24-1480, 24-1493, 24-1516

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

ZIMMER RADIO OF MID-MISSOURI, INC., ET AL.,
*Petitioners*,

ABC TELEVISION AFFILIATES ASSOCIATION, ET AL.,
*Intervenors*,

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
*Respondents*,

NCTA – THE INTERNET AND TELEVISION ASSOCIATION, ET AL.,
*Intervenors*.

Petitions for Review of an Order of the Federal Communications Commission

**REPLY BRIEF FOR INTERVENORS CONNOISSEUR MEDIA, LLC, MID-WEST MANAGEMENT, INC., MIDWEST COMMUNICATIONS, INC., SUN VALLEY RADIO, INC., EAGLE COMMUNICATIONS, INC., AND LEGEND COMMUNICATIONS OF WYOMING, LLC IN SUPPORT OF PETITIONERS**

Jennifer Tatel
   *Counsel of Record*
David Oxenford
Graham Stevenson
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com

*Counsel for Connoisseur Media, LLC, Mid-West Management, Inc., Midwest Communications, Inc., Sun Valley Radio, Inc., Eagle Communications, Inc., and Legend Communications of Wyoming, LLC ("Radio Intervenors")*

October 15, 2024

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eighth Circuit Rule 26.1A:

**Connoisseur Media, LLC** is a Delaware limited liability company. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Mid-West Management, Inc.** is a Wisconsin corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Midwest Communications, Inc.** is a Wisconsin corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Sun Valley Radio, Inc.** is a Utah corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Eagle Communications, Inc.** is a Kansas corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Legend Communications of Wyoming, LLC** is a Wyoming limited liability company. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Appellate Case: 24-1380     Page: 2     Date Filed: 10/16/2024 Entry ID: 5446981

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ........................................................i

TABLE OF AUTHORITIES ............................................................................... iii

ARGUMENT ........................................................................................................ 1

    I.    The Commission Unlawfully Rejects Its Statutory Mandate to Consider All Competition in the Media Marketplace. ........................... 1

    II.    The Commission Fails to Show that Its Conclusions Were "Reasonable and Reasonably Explained." .............................................. 4

        A.    The Local Nature of Radio Does Not Justify Excluding Digital Media from the Market. ............................................................... 4

        B.    The Commission Irrationally Overstates the Harms of Consolidation. .................................................................................. 6

CONCLUSION................................................................................................... 11

# TABLE OF AUTHORITIES

**CASES**

*Alaska Dep't of Env't Conservation v. E.P.A.*,
  540 U.S. 461 (2004) ..................................................................................2

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ...............................................................2, 3, 4, 7, 11

*Ill. Pub. Telecommc'ns Ass'n v. FCC*,
  117 F.3d 555 (D.C. Cir. 1997)..................................................................4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................11

*Sw. Bell Tel. Co. v. FCC*,
  153 F.3d 523 (8th Cir. 1998) ....................................................................4

*Union Pac. R.R. Co. v. Surface Transp. Bd.*,
  113 F.4th 823 (8th Cir. 2024)...................................................................3

*United States v. Lester*,
  92 F.4th 740 (8th Cir. 2024).....................................................................4

**STATUTORY PROVISIONS**

Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) ................................1, 2

**OTHER MATERIALS**

*2014 Quadrennial Regulatory Review*, Order on Reconsideration and Notice of
  Proposed Rulemaking, 32 FCC Rcd 9802 (2017).....................................6

*Communications Marketplace Report*, 37 FCC Rcd 15514 (2022) .........................9

H.R. REP. 104-204 (1995)..............................................................................1, 3

Jay Meyers, *Debunking the Myth of Minot*, RADIO INK (Oct. 25, 2017),
  https://radioink.com/2017/10/25/debunking-myth-minot/ ......................8

Mason Walker, *U.S. Newsroom Employment Has Fallen 26% Since 2008*, PEW RSCH. CTR. (July 13, 2021), https://www.pewresearch.org/short-reads/2021/07/13/u-s-newsroom-employment-has-fallen-26-since-2008/ ............. 7

Radio World, *Clear Channel, Others Dispute Minot Story* (June 1, 2004), https://www.radioworld.com/news-and-business/clear-channel-others-dispute-minot-story ........................................................................................................ 8

ROGER L. SADLER, ELECTRONIC MEDIA LAW (1st ed. 2005) ....................................... 8

# ARGUMENT

## I. THE COMMISSION UNLAWFULLY REJECTS ITS STATUTORY MANDATE TO CONSIDER ALL COMPETITION IN THE MEDIA MARKETPLACE.

Section 202(h) of the Telecommunications Act of 1996 ("Act") instructs the Federal Communications Commission ("Commission") to regularly review its ownership rules, including the Local Radio Ownership Rule ("Rule"), to "determine whether any of such rules are necessary in the public interest *as the result of competition*." Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) (emphasis added). The statutory language makes plain the intent of this mandate that the Commission assess the impact of new forms of competition on broadcasters and determine whether the rules are necessary *as a result of* that competition. *See* H.R. REP. NO. 104-204, at 54-55 (1995) (discussing the "audio and video marketplace").

True to Congress's expectation, competition for both listenership and advertising has exploded from new digital competitors in ways scarcely imaginable when the Rule was adopted. This competition is siphoning away the listeners and advertisers on which radio broadcasters rely. *See generally* Radio Int. Br. at 8-17. Yet, despite its clear statutory mandate, the Commission maintains that no change in the almost 30-year-old Rule is necessary. Resp. Br. at 30.

Instead, the Order concluded that the relevant market for its analysis was the market for over-the-air radio, not the broader media market. Order ¶ 33 (App.\_\_).

1

The Order justified this conclusion on the grounds that radio stations compete "primarily for listeners with other radio stations," and that radio is "unique" in providing local service. *Id.* ¶¶ 35-36 (App.\_\_-\_\_).

The Commission's singular focus on over-the-air radio as the relevant market precludes it from upholding Section 202(h)'s mandate to assess the impact of competition on the necessity of the existing ownership rules. Indeed, the Commission goes so far as to say that, unless it can be shown that local programming is "no longer largely the exclusive domain of broadcasters," the Commission need never define the competitive market to include digital services. Resp. Br. at 72.

In so doing, the Commission renders superfluous the statutory clause "as the result of competition." *See Alaska Dep't of Env't Conservation v. E.P.A.*, 540 U.S. 461, 489 n.13 (2004) ("It is … a cardinal principle of statutory construction that … no clause, sentence, or word shall be superfluous, void, or insignificant.") (cleaned up). Congress could simply have directed the Commission to assess "whether any of such rules are necessary in the public interest." But it did not: Congress emphasized "competition," Act § 202(h), 110 Stat. at 112, not "diversity" or "localism," the Commission's other traditional public interest factors.[1] Congress

---

[1] *FCC v. Prometheus* addressed whether the Commission's 2017 loosening of the ownership rules was arbitrary and capricious, and the Court did not question the

2

chose to elevate competition, and, as Radio Intervenors have shown, the legislative history buttresses the plain language of the Act: assessing *all* relevant competition must be the primary focus of Commission's analysis. *See* Radio Int. Br. at 4 (quoting H.R. REP. 104-204, at 55).

The Supreme Court agrees. In *FCC v. Prometheus*, the Court stated that Section 202(h) requires "the FCC to keep pace with industry developments and to regularly reassess how its rules function in the marketplace." 592 U.S. at 419. If that requirement were satisfied simply by reassessing the same market for over-the-air broadcasting over and over every four years, there would not be much with which to keep pace. The Commission would just evaluate the competition between radio stations and ignore other media competitors—no matter how many listeners and how many advertising dollars were lost those competitors—until the "market" dwindled to just a single radio station. Even then, given the Commission's concern about ownership concentration in over-the-air radio, *see, e.g.*, Order ¶ 40 (App.__), a change would still not be justified because the remaining station would have 100% of the over-the-air radio audience. The plain language of Section 202(h) demands more. *See Union Pac. R.R. Co. v. Surface Transp. Bd.*, 113 F.4th 823, 833 (8th Cir. 2024) ("If the intent of Congress can be clearly discerned from the statute's

---

plain reading of the statute that elevates competition among the public interest factors. 592 U.S. 414, 417-18 (2021).

3

language, the judicial inquiry must end.") (quoting *United States v. Lester*, 92 F.4th 740, 742 (8th Cir. 2024)). As the *Prometheus* Court observed, Section 202(h) requires that the rules not be kept in place "simply through inertia," which is exactly what the Commission has done. *Prometheus*, 592 U.S. at 419.

II. **THE COMMISSION FAILS TO SHOW THAT ITS CONCLUSIONS WERE "REASONABLE AND REASONABLY EXPLAINED."**

The Commission's choice to restrict the relevant market was not just a violation of Section 202(h). Its patently unreasonable decision—and the impoverished rationale undergirding it—about the relevant market and the effects of relaxing the Rule clearly violate the Administrative Procedure Act. *See id.* at 423 ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."). Factual findings and "predictive judgements" for which the Commission cries "deference" can only be credited when the interpretations and predictive judgments are rational, "based on evidence in the record and adequately explained." *Sw. Bell Tel. Co. v. FCC*, 153 F.3d 523, 537 (8th Cir. 1998); *see also Ill. Pub. Telecommc'ns Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997). The Order does not meet this standard.

A. **The Local Nature of Radio Does Not Justify Excluding Digital Media from the Market.**

The Commission does not dispute that radio competes with digital media for audience and advertisers. But it concludes that, until it can be shown that digital

4

competitors are providing local news and community-oriented programming, it was reasonable for the Commission to conclude that over-the-air radio is a unique market. Resp. Br. at 72.

This approach would define the market not by competition, but by the programming choices of one of the market's participants. Offering local programming may *enable* more effective competition between radio stations and certain digital media competitors. But offering local programming does not *erase* competition between those radio stations and other market participants.

Moreover, the record shows that local service is not unique to broadcast radio. For example, the Borrell Associates report cited the explosion of local media in every marketplace. Borrell explained how the average television market offers "126 individual local media channels for advertisers to choose from, including … newspapers, … radio stations, local TV channels, yellow page books, city magazines, and other locally based media" plus "scores of out-of-market Internet sites and apps." Connoisseur Media, LLC et al. Comments, Ex. B, at B-2 (Apr. 29, 2019) (App.__) ("Joint Comments"). This compares to less than 80 local advertising channels in 2010 and less than 20 in 2000. *Id.* at 17 (App.__). The report also stated that national media, like Facebook, have "mimic[ked] the attributes of radio, giving advertisers access to affinity groups that were once chiefly the domain of radio's music genres." *Id.*, Ex. B, at B-4 (App.__).

5

There is also no paucity of sources for local news and information. The local information formerly the principal domain of radio broadcasters, such as weather and traffic, is now just a tap away on the appropriate app. *See* Connoisseur Media, LLC et al. Reply Comments at 5 (May 30, 2019) (App.__). Information about local events similarly is available through any search engine. Americans can now search online for information about when a school board or city council meeting will occur. Clearly, the Commission's desired "multiplicity of speakers" providing local information is already flourishing in the diverse media marketplace. *Cf.* Order ¶ 24 (App.__).

While properly resourced and scaled radio station clusters do provide local information in a competitive manner, radio is plainly not the sole source of this information that the Commission wills it to be. Indeed, the Order ignores the Commission's previous finding that radio is "not the primary source of viewpoint diversity in local markets." Pet'rs Br. at 63-64 (quoting *2014 Quadrennial Regulatory Review*, Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802, 9827 ¶ 57 (2017)). Ignoring reality and Commission precedent cannot justify excluding digital media from the Order's market analysis.

### B. The Commission Irrationally Overstates the Harms of Consolidation.

The Commission argues that consolidation of radio ownership allowed under the current rules has led to negative impact on audiences. Resp. Br. at 34. In

6

support, it cites a single paragraph of the Order stating that "there is mounting evidence that [consolidation] has not been without at least some negative effects for consumers." Order ¶ 47 (App.___); *see also* Resp. Br. at 33-34. To support this premise, the Order cites comments that prioritize factors outside the scope of the Section 202(h) analysis, arguing that the Commission should develop a means to increase ownership by women and minorities, and that "[c]ompetition-based regulatory philosophy is largely anti-governmental intervention[ and the] FCC's use of it as a proxy for diversity is not only unhealthy, it is also illogical for a policy area that by its very nature relies on government intervention." Christopher Terry & Caitlin Ring Carlson Comments at 4, 6 (Aug. 26, 2021) (App.___); *contra Prometheus*, 592 U.S. at 428 (Thomas, J., concurring) ("The FCC ha[s] no obligation to consider minority and female ownership."). These commenters provide ancient surveys of broadcast programming changes between 1994 and 2010, which have no bearing on the modern media marketplace. *See* Christopher Terry & Caitlin Ring Carlson Reply Comments at 5-14 (Sept. 30, 2021) (App.___).

  The Order also cites a Pew Research report stating that the number of newsroom employees in the United States has fallen from 2008 to 2020. Order ¶ 47 n.158 (App.___) (citing Mason Walker, *U.S. Newsroom Employment Has Fallen 26% Since 2008*, PEW RSCH. CTR. (July 13, 2021), https://www.pewresearch.org/short-reads/2021/07/13/u-s-newsroom-employment-has-fallen-26-since-2008/.

Those numbers are meaningless without analysis of why such changes occurred. Actually, the Pew report shows that 96.8% of the jobs lost in that period were from newspaper publishers, while digital newsroom jobs *increased* by 143.6%.[2] Rather than support the Commission's conclusion, the Pew report shows that digital media is a competitor for which the Commission must account.

The Commission, seemingly grasping for support for the Order's finding of harm from ownership consolidation, also reaches for an anecdote—not mentioned in the Order—recounting a supposedly empty radio studio in Minot, North Dakota, in the middle of the night, that did not report on a toxic chemical spill. Resp. Br. at 35-36. The facts of this situation have been called into question by subsequent reporting. *See* ROGER L. SADLER, ELECTRONIC MEDIA LAW 110-11 (1st ed. 2005); Radio World, *Clear Channel, Others Dispute Minot Story* (June 1, 2004), https://www.radioworld.com/news-and-business/clear-channel-others-dispute-minot-story; Jay Meyers, *Debunking the Myth of Minot*, RADIO INK (Oct. 25, 2017), https://radioink.com/2017/10/25/debunking-myth-minot/. This desperate attempt to backfill the Commission's lack of reasoned, evidence-based analysis underscores the Order's lack of foundation.

---

[2] Notably, while total radio news employment decreased between 2008 and 2020, employment *increased* in the two years following the Commission's repeal of the cross-ownership rules in 2017. *Id.*

8

The Order's other supposedly "reasonable" factual inferences or predictive judgments about the harms of consolidation fall short. The Commission concludes that further consolidation would lead to repurposing content on multiple stations, with stations becoming less responsive to community needs. Resp. Br. at 15, 34-35. Here again, the Order fails to grapple with the record. Order ¶ 51 (App.__-__).[3] It would be foolhardy for broadcasters to offer less choice and worse programming as a response to their digital competitors. *See* Radio Int. Br. at 7-8, 17-18. As stated in several declarations ignored by the Commission, in markets where the Radio Intervenors have been able to expand under the existing rules, they have innovated and provided more local service, not less.[4]

The Commission also references conclusions in the Order that preserving the current rules was necessary to preserve the local nature of radio and small station

---

[3] The Order cites the Commission's *2022 Communications Marketplace Report*, which states that "some stakeholders have argued" that non-locally owned stations "may be less sensitive to the needs and interests of that market"—a non-conclusion supported by a single comment. 37 FCC Rcd 15514, 15693 ¶ 305 (2022).

[4] *See, e.g.*, Joint Comments, Ex. C, Decl. of Michael Wright, at 2 (App.__) ("[With] more stations, we could do more to promote the events and organizations that are essential to making our town a better place to live."); *id.*, Ex. C, Decl. of Thomas A. Walker, at 2 (App.__) (explaining that added resources from scale enabled employment of "a six person news team who actively creates radio and online content"); Connoisseur Media, LLC et al. Letter, Ex. B to Attach. B, at 1 (Nov. 9, 2023) (App.__) ("Joint Letter") (explaining how scale enabled "two full-time news persons along with a live morning talk show host on KODI which features live, in-studio guests every weekday"); *See* Nat'l Ass'n Broadcasters *Ex Parte* at 36-46 (Feb. 16, 2022) (App.__-__) (describing radio's competitive benefits from scale).

9

owners. Resp. Br. at 41. But preserving the status quo does nothing to address the concerns of smaller owners. The Commission highlights the Order's finding that "smaller owners are increasingly finding it difficult to remain viable in the current radio industry." *Id.* at 39 (quoting Order ¶ 53 (App.\_\_-\_\_)). Yet the Commission retains the rules that threaten the viability of these small owners. In a marketplace where digital competitors are siphoning listeners and revenue, relaxing the ownership rules to allow these stations to scale will not kill these stations.

Finally, the Commission returns to the canard that consolidation will not allow broadcasters to outdo Google or Facebook. *Id.* at 40. The Radio Intervenors have already explained that a change in the rules is not meant to allow radio to become something that it is not. Radio Int. Br. at 18-19. Rule changes would give radio a stable economic base and the scale to compete with digital giants that now siphon two-thirds of local advertising revenue. Joint Letter, Ex. F to Attach. A, at B-2 (App.\_\_). The revenues of each of these digital giants dwarfs the revenues of the entire radio industry. *See* Nat'l Ass'n Broadcasters Comments at 25 (Sept. 2, 2021) (App.\_\_). Allowing room to grow for radio companies with at most a 1% share of the local advertising revenue in their markets[5] does not imperil localism.

The one thing the Commission gets right is that the Quadrennial Review is about radio's survival. The Radio Intervenors are simply seeking a fighting chance

---

[5] Joint Letter, Ex. F to Attach. A, at B-2 (App.\_\_).

to compete with new media sources that have arisen since the current ownership rules were adopted in 1996. Any plausible, "reasonable[,] and reasonably explained" analysis of competition that is grounded in the evidence before the Commission would have found that the Rule must be relaxed or eliminated. *See Prometheus*, 592 U.S. at 417; *see also See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## CONCLUSION

For the foregoing reasons, the Radio Intervenors reiterate their request for this Court to vacate the Order.

Respectfully submitted,

Jennifer Tatel
   *Counsel of Record*
David Oxenford
Graham Stevenson
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
doxenford@wbklaw.com
gstevenson@wbklaw.com

*Counsel for Connoisseur Media, LLC, Mid-West Management, Inc., Midwest Communications, Inc., Sun Valley Radio, Inc., Eagle Communications, Inc., and Legend Communications of Wyoming, LLC*

October 15, 2024

11

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 2499 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

3. This brief complies with the electronic-filing requirements of Local Rule 28A(h)(2) because it was scanned for viruses and is virus-free.

/s/ Jennifer Tatel
Jennifer Tatel
   *Counsel of Record*
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com

*Counsel for Connoisseur Media, LLC, Mid-West Management, Inc., Midwest Communications, Inc., Sun Valley Radio, Inc., Eagle Communications, Inc., and Legend Communications of Wyoming, LLC*

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 15, 2024, I electronically filed the foregoing Reply Brief for Intervenors Connoisseur Media, LLC, Mid-West Management, Inc., Midwest Communications, Inc., Sun Valley Radio, Inc., Eagle Communications, Inc., and Legend Communications of Wyoming, LLC in Support of Petitioners with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jennifer Tatel*
Jennifer Tatel
