---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

ZIMMER RADIO OF MID-MISSOURI INC., ET AL.,

*Petitioners*

ABC TELEVISION AFFILIATES ASSOCIATION, ET AL.,

*Intervenors*

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,

*Respondents*

NCTA – THE INTERNET & TELEVISION ASSOCIATION, ET AL.,

*Intervenors*.

---

On Petitions for Review of an Order of the
Federal Communications Commission

---

## BRIEF OF INTERVENORS NCTA - THE INTERNET & TELEVISION ASSOCIATION AND THE AMERICAN TELEVISION ALLIANCE IN SUPPORT OF RESPONDENTS

---

Michael D. Nilsson
Timothy J. Simeone
Jason Neal
HWG LLP
1919 M St. NW
Eighth Floor
Washington, DC 20036
(202) 730-1300
mnilsson@hwglaw.com

*Counsel for the American
Television Alliance*

Howard J. Symons
Jessica Ring Amunson
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for NCTA – The Internet &
Television Association*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

These consolidated petitions challenge the broadcast ownership rules the Federal Communications Commission (the "Commission") adopted in its 2018 Quadrennial Review, which retained with minor modifications the Local Television Ownership Rule as "necessary in the public interest as a result of competition" under Section 202(h) of the Telecommunications Act of 1996.

Contrary to Petitioners' contentions, the Commission reasonably found, based on the record, that broadcast television remains its own distinct market given broadcasting's unique features. Recognizing the continued need for competition in the broadcast market, the Commission reasonably retained its Two-Station Limit and its Top-Four Prohibition, and appropriately modified the Top-Four Prohibition to prevent broadcasters from skirting the rule by acquiring and placing the network-affiliated programming of another top-four full power station on a co-owned in-market low power station or on the multicast stream of the broadcaster's existing in-market full power station.

NCTA – The Internet & Television Association ("NCTA") and the American Television Alliance ("ATVA") (together, "MVPD Intervenors") believe that oral argument would assist the Court and respectfully request that the Court afford Respondents and their supporting Intervenors the same total amount of time for argument as Petitioners and their supporting Intervenors.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, MVPD Intervenors state as follows:

The American Television Alliance has no parent companies, subsidiaries, or affiliates whose listing is required by Rule 26.1.

NCTA – The Internet & Television Association has no parent companies, subsidiaries, or affiliates whose listing is required by Rule 26.1.

Appellate Case: 24-1380    Page: 3    Date Filed: 11/19/2024 Entry ID: 5458388

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT ..................................................................................... i

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

TABLE OF AUTHORITIES ................................................................................. v

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE CASE .............................................................................. 3

    A.    Legal and Factual Background ......................................................... 3

    B.    The Order Under Review .................................................................. 6

SUMMARY OF ARGUMENT ............................................................................. 8

STANDARD OF REVIEW .................................................................................. 9

ARGUMENT ...................................................................................................... 10

I.    THE ORDER'S MARKET DEFINITION IS NOT ARBITRARY AND CAPRICIOUS. .................................................................................. 10

    A.    Both the Record and Market Realities Support the Commission's Market Definition. ....................................................... 10

    B.    Petitioners' Challenges to the Commission's Market Definition Lack Merit. ........................................................................ 14

II.    THE ORDER JUSTIFIED RETAINING THE TOP-FOUR PROHIBITION AND THE TWO-STATION LIMIT. ................................ 21

    A.    The Record Provides Ample Support for Retaining the Top-Four Prohibition and the Two-Station Limit. ...................................... 21

    B.    Petitioners' Challenges to the Top-Four Prohibition and the Two-Station Limit Lack Merit. ..................................................... 26

III.    THE ORDER JUSTIFIED MODIFYING THE ANTI-CIRCUMVENTION MEASURES IN NOTE 11. ........................................ 32

    A.    The Revision to Note 11 Is Not Arbitrary and Capricious. ............... 32

Appellate Case: 24-1380    Page: 4    Date Filed: 11/19/2024 Entry ID: 5458388

B.   The Revision to Note 11 Accords with the First Amendment and Section 326. ...................................................................41

C.   The Court Should Not Reach Television Affiliates Intervenors' Argument Regarding Audience-Share Methodology. .......................................................................43

CONCLUSION .........................................................................44

iv

# TABLE OF AUTHORITIES

CASES

*Citizens Telecommunications Co. of Minnesota, LLC v. FCC*, 901 F.3d 991 (8th Cir. 2018) ............................................................. 15

*Core Communications, Inc. v. FCC*, 592 F.3d 139 (D.C. Cir. 2010) ..................... 43

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................................... 35

*FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775 (1978) ...................................................................................................... 3

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................. 4, 10, 21

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ............... 10, 14, 26

*Minnesota Public Utilities Commission v. FCC*, 483 F.3d 570 (8th Cir. 2007) ................................................................................................... 15

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .................... 10, 26

*National Broadcasting Co. v. United States*, 319 U.S. 190 (1943) .......................... 3

*Northport Health Services of Arkansas, LLC v. United States Department of Health & Human Services*, 14 F.4th 858 (8th Cir. 2021) .................................................................................................. 35

*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) .................... 34, 42

*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) .................... 34, 42

*Sinclair Broadcast Group, Inc. v. FCC*, 284 F.3d 148 (D.C. Cir. 2002) ............... 42

*Stursberg v. Morrison Sund PLLC*, 112 F.4th 556 (8th Cir. 2024) ........................ 15

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ........................... 42

*United States v. Storer Broadcasting Co.*, 351 U.S. 192 (1956) ............................... 3

STATUTES

5 U.S.C. § 706(2)(A) .................................................................................................. 9

Appellate Case: 24-1380     Page: 6     Date Filed: 11/19/2024 Entry ID: 5458388

47 U.S.C. § 303 ...................................................................................3

47 U.S.C. § 307(a) ...............................................................................3

47 U.S.C. § 309(a) .............................................................................1, 3

47 U.S.C. § 325(b) ...........................................................................2, 11

47 U.S.C. § 326 .................................................................................41

Cable Television Consumer Protection and Competition Act of 1992,
  Pub. L. No. 102-385, §§ 2(a)(10), (11), 106 Stat. 1460, 1462 ...........4

Telecommunications Act of 1996, Pub L. No. 104-104, § 202(h), 110
  Stat. 56, 111-12 ...................................................................1, 4, 14, 15

## ADMINISTRATIVE RULINGS

*2014 Quadrennial Regulatory Review*, Second Report and Order, 31
  FCC Rcd 9864 (2016) ..................................................................7, 34, 35

*In re Amendment of the Commission's Rules Related to Retransmission
  Consent*, Report and Order and Further Notice of Proposed
  Rulemaking, 29 FCC Rcd 3351 (2014) ............................................22

*In re Consent to Assign Certain Licenses from Gray Television
  Licensee, LLC to Marquee Broadcasting West, Inc.*, Memorandum
  Opinion and Order, DA 24-579 (MB rel. June 18, 2024) ..................27

*In re Consent to Assign Certain Licenses from Red River Broadcast
  Co., LLC*, Memorandum Opinion and Order, 34 FCC Rcd 8590 (MB
  2019) ...............................................................................................27

## OTHER AUTHORITIES

47 C.F.R. § 73.3555 ...........................................................................7

Appellate Case: 24-1380    Page: 7    Date Filed: 11/19/2024 Entry ID: 5458388

# INTRODUCTION[1]

For nearly a century, the Federal Communications Commission has regulated broadcasters to ensure that they operate in the service of "public interest, convenience, and necessity." 47 U.S.C. § 309(a). Consistent with that authority, the Commission has long maintained broadcast ownership rules to ensure competition among broadcasters. In Section 202(h) of the Telecommunications Act of 1996, Congress required the Commission to determine periodically whether these rules "are necessary in the public interest as a result of competition" and "repeal or modify any regulation it determines to be no longer in the public interest." Telecommunications Act of 1996, Pub L. No. 104-104, § 202(h), 110 Stat. 56, 111-12. In the 2018 Quadrennial Review Order (the "Order") challenged here, the Commission carefully followed Congress's directive and determined that its Local Television Ownership Rule, with minor modifications, remains necessary under the statutory standard.

The Commission reasonably determined, based on the record, that broadcast television remains a distinct market, while acknowledging and fully considering new online and other non-broadcast video programming options. The Commission thus

---

[1] MVPD Intervenors defer to the Commission with respect to the Jurisdictional Statement and Statement of the Issues. MVPD Intervenors take no position on the Commission's arguments regarding the Local Radio Ownership Rule or on any other issues unaddressed in this brief.

1

retained its "Top-Four Prohibition" against acquiring two top-four stations in a geographic market, and its "Two-Station Limit" prohibiting common ownership of more than two full power television stations in a geographic market. The Commission explained that these rules advance its public interest goals of competition, localism, and viewpoint diversity. Finally, the Commission relied on extensive record evidence, including from MVPD Intervenors, to close the loopholes that certain broadcasters had been exploiting to circumvent the Top-Four Prohibition by acquiring a network affiliation and placing network-affiliated programming on a low power station ("LPTV") or multicast stream not previously covered by the Local Television Ownership Rule.

Under Section 325(b) of the Communications Act, 47 U.S.C. § 325(b), MVPD Intervenors and other multichannel video programming distributors ("MVPDs") must obtain the consent of a broadcaster to carry the broadcaster's station on their systems unless a station elects its right to mandatory carriage under a different provision of the Act. Television stations affiliated with the major broadcast networks—*i.e.*, the most popular stations—require such consent and often the payment of a "retransmission consent fee" as a condition of authorizing carriage. As purchasers of carriage rights from television broadcasters, MVPD Intervenors have experienced first-hand broadcasters' ability to demand higher and higher fees for these rights—leverage that results in consumers paying higher prices. That leverage

would only increase if large broadcasters could further consolidate their bargaining power in local markets.  The Order is therefore consistent with Section 202(h) and amply supported by the record.  The Court should deny the petitions for review.

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

Because the government has granted broadcasters cost-free access to a scarce and publicly owned resource, Congress directed nearly a century ago that the Federal Communications Commission grant or renew a broadcaster's license only if the Commission finds that doing so will serve the "public interest, convenience, and necessity." 47 U.S.C. §§ 307(a), 309(a).  Congress further provided the Commission with broad authority to adopt rules regulating broadcast media "as public convenience, interest, or necessity requires."  *Id.* § 303.  Pursuant to this authority, the Commission has for decades maintained broadcast ownership rules in the public interest.  The Supreme Court has repeatedly approved the Commission's exercise of that authority, including to limit local consolidation among broadcasters.  *See, e.g.*, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 208 (1943); *United States v. Storer Broad. Co.*, 351 U.S. 192 (1956); *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 779, 794 (1978).

In 1996, Congress directed the Commission to review its broadcast ownership rules periodically to "determine whether any of such rules are necessary in the public

3

interest as the result of competition," and to "repeal or modify any regulation [the Commission] determines to be no longer in the public interest." § 202(h). In undertaking this process (the "Quadrennial Review"), the Commission has consistently applied its "traditional public interest goals of promoting competition, localism, and viewpoint diversity" to "its Section 202(h) analyses." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 419 (2021) (citations omitted). In the specific context of the Quadrennial Review scheme, the Supreme Court has emphasized that the Commission has "broad authority to regulate broadcast media in the public interest." *Id.* at 416.

Regulation of broadcast media has long been justified by the fact that broadcasters play a distinctive role in the marketplace for video programming. That is still true today. Broadcasters have been and remain a key source for marquee sporting events and other popular programming. Although the media landscape has changed over the years, Congress has not revisited its determination that "[b]roadcast television stations continue to be an important source of local news and public affairs programming," and that "[a] primary objective and benefit of our Nation's system of regulation of television broadcasting is the local origination of programming." Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, § 2(a)(11), (10), 106 Stat. 1460, 1462. Indeed,

broadcasters *themselves* regularly tout their programming as unique and invoke Congress's special concern for preserving broadcast television.[2]

Ensuring adequate competition in the marketplace for broadcast television is particularly significant to MVPDs and their customers. MVPDs pay retransmission consent fees to carry broadcast programming, and the cost of those fees is the subject of periodic negotiation. Broadcasters have considerable bargaining power in these "carriage" negotiations—including by threatening blackouts and other measures to command higher fees from MVPDs. It is an "obvious principle" that local consolidation only increases this leverage. App.2734-35 (ATVA Dec. 6, 2023 *Ex Parte* at 3-4); *see also* App.1513-14 (ATVA Update Comments at 17-18). Because these retransmission consent fees typically are passed through to MVPD subscribers, increased consolidation among broadcasters in local markets results in higher prices for consumers. *See, e.g.*, App.1514-17 (ATVA Update Comments at 18-21).

---

[2] For example, in this very proceeding, one broadcaster explained that although "Big Tech companies churn out oceans of content (mostly produced by others) through the Internet," they "provide practically no local news and create algorithms that de-emphasize local content." App.1926 (Gray Update Reply at 2). The National Association of Broadcasters ("NAB") likewise emphasized the importance of broadcasters' "ability to offer the programming and services, including local news, upon which Americans rely." App.1618 (NAB Update Comments at 6); *see also* App.1619 (NAB Update Comments at 7 n.10) (referencing the "highly specific legislative findings" accompanying the Cable Act, which "reaffirmed the value [Congress] places on local commercial TV stations serving communities throughout the country").

**B.     The Order Under Review**

In this proceeding, the Commission conducted the review mandated by Congress in Section 202(h) and, based on the extensive record before it, concluded that its existing broadcast ownership rules should largely be maintained.  The Commission repeatedly acknowledged that broadcasters face competition for audience and advertising revenue. *See, e.g.*, App.2826-28 (Order ¶¶ 73-75).  But, in defining the relevant market, the Commission "continue[d] to find that broadcast television remains unique and non-substitutable with other sources of video programming, particularly with respect to fulfilling [the] traditional public interest objectives of" competition, localism, and viewpoint diversity.  App.2826 (Order ¶ 73).

The Commission thus retained its Top-Four Prohibition, which bans common ownership of two television stations that are both "ranked in the top four in audience share in a [geographic] market," App.2824 (Order ¶ 67), and its Two-Station Limit, which prohibits common ownership of more than two full power television stations in the same geographic market, App.2831 (Order ¶ 82).  Recognizing that exceptions to the Top-Four Prohibition may be appropriate in "unique circumstances," App.2833 (Order ¶ 87), the Commission also retained its existing "case-by-case" review mechanism to authorize exceptions to the Top-Four Prohibition where doing

6

so "would serve the public interest, convenience, and necessity," App.2825 (Order ¶ 69).

Finally, the Commission closed some loopholes that the record showed certain broadcasters increasingly were using to circumvent the Top-Four Prohibition. In its 2014 Quadrennial Review, the Commission already had closed one loophole by prohibiting broadcast stations from acquiring a network affiliation from another station in the same market when that acquisition would be the "functional equivalent" of an assignment or transfer of authority that would violate the Top-Four Prohibition. *See In re 2014 Quadrennial Regulatory Review*, Second Report and Order, 31 FCC Rcd 9864, 9882-83 ¶¶ 47-48 (2016) ("2016 Order").[3] In the Order under review, the Commission found that broadcasters' "use of an LPTV station or multicast stream … to air top-four rated programming acquired from an in-market competitor" likewise "results in the acquiring party's obtaining the equivalent of a second top-four rated station." App.2840 (Order ¶ 100). The Commission thus expanded Note 11 to 47 C.F.R. § 73.3555 to prohibit broadcasters from acquiring a second major network affiliation for broadcast on an LPTV station or multicast

---

[3] In the 2016 Order, the Commission also considered regulating the use of multicasts to circumvent the Top-Four Prohibition, but deferred action based on its finding that "[m]arketplace incentives, at present, appear to limit the occurrence of dual affiliations via multicasting involving multiple Big Four networks largely to … smaller markets." 31 FCC Rcd at 9892-93 ¶ 72. The Commission vowed to "continue to monitor this issue and take action in the future, if appropriate." *Id.*

Appellate Case: 24-1380     Page: 14     Date Filed: 11/19/2024 Entry ID: 5458388

stream in the same geographic market. *Id.* The Commission explained that this tactic was "inconsistent with the Top-Four Prohibition" because it results in "excessive aggregation of viewers and revenue among top stations in the market, which harms competition and the competitive benefits that flow to consumers." *Id*. The Commission supported that conclusion with extensive evidence from MVPD Intervenors and others showing that certain broadcasters increasingly were taking advantage of these loopholes in the Commission's rules to raise fees and thereby harm consumers in larger markets. *See, e.g.*, App.942-46 (NCTA Comments at 8-12); App.429-36 (ATVA Comments at 14-21); App.1504-11 (ATVA Update Comments at 8-15) (discussing several examples of broadcasters using loopholes to achieve duopolies, triopolies, and even quadropolies in various markets).

## SUMMARY OF ARGUMENT

I. The Order reasonably defined the relevant market as the market for broadcast television because broadcast television has several distinguishing features, including network affiliations that result in the provision of popular network programming. The record contains extensive evidence, including from MVPD Intervenors, showing that ensuring competition among broadcasters remains essential because consolidation increases the retransmission consent fees that MVPDs must pay to retransmit broadcasters' unique content. The Order's market definition is consistent with Section 202(h) and the Commission's longstanding

8

authority to regulate broadcast ownership in the public interest, and it adequately acknowledged and addressed competition from non-broadcast sources.

II.   The Order reasonably retained the Top-Four Prohibition and the Two-Station Limit.   MVPD Intervenors submitted record evidence from a variety of sources establishing that these limits are necessary to prevent local consolidation and the resulting increase in retransmission consent fees.   Contrary to Petitioners' arguments, the Order amply justified the lines it drew and adequately explained how these limits further its public interest goals.

III.   The Order reasonably modified Note 11 to prevent broadcasters from exploiting loopholes to the Top-Four Prohibition.   MVPD Intervenors' comments explained and quantified how certain broadcasters were using these loopholes to achieve common control of three or even four network affiliations in a market and thereby command large increases in retransmission consent fees.   The Order's revision was consistent with the agency's prior position and adequately explained. Moreover, because the revision does not impose a content-based restriction, it accords with the First Amendment and the Communications Act.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") authorizes courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   Although courts "must exercise

9

independent judgment in determining the meaning of statutory provisions" and will decide "*all* relevant questions of law," the APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261-62 (2024) (citation omitted). To satisfy the "APA's arbitrary-and-capricious standard," the agency action under review must be "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

## ARGUMENT

## I. THE ORDER'S MARKET DEFINITION IS NOT ARBITRARY AND CAPRICIOUS.

### A. Both the Record and Market Realities Support the Commission's Market Definition.

The challenged Order reasonably found that broadcast television remains "unique and non-substitutable with other sources of video programming." App.2826 (Order ¶ 73); *see also* App.2824 (Order ¶ 67). The Order specifically identified several distinguishing features of broadcast television, including broadcasters' network affiliations, App.2828 (Order ¶ 75 & n.256), which provide consumers with popular network programming and marquee sporting events like the Super Bowl and

10

the Olympics.  Petitioners do not dispute these findings and often tout their uniqueness themselves.  Indeed, the "record contains numerous assertions from broadcasters that the local programming they provide is unique and unduplicated by any other video programming provider."  App.2829 (Order ¶ 78 & n.263) (citing, *inter alia*, NAB Update Comments at 6-7; Network Affiliates Update Reply at 10-11; Gray Update Reply at 2; Nexstar Update Reply at 4).  MVPD Intervenors also pointed the Commission to such attestations from broadcasters.  *See, e.g.*, App.432 (ATVA Comments at 17 n.52) (quoting NAB, *114th Congress Broadcasters Policy Agenda* (Jan. 26, 2015)).  There is thus a strong basis in the record for the Order's observation that "most commenters assert that non-broadcast programming is not a substitute to broadcast programming, which remains unique."  App.2827 (Order ¶ 74).

Of particular significance to MVPD Intervenors, the Order further explained the role of retransmission consent fees for broadcast programming in the marketplace.  App.2827-28 (Order ¶ 75); *see generally* 47 U.S.C. § 325(b)(1).  The Order noted that "the broadcast content for which MVPDs pay retransmission consent fees has special appeal to television viewers in comparison to any other type of video content to the point where viewers do not consider any other video programming to be substitutes for such broadcast content."  App.2828 (Order ¶ 75 n.256); *see also, e.g.* App.1799 (NCTA Update Comments at 1) (observing that

11

"[b]roadcast programming remains particularly important to consumers"). Accordingly, broadcasters have significant market power with respect to their ability to demand retransmission consent fees for their programming.

Before the Commission, MVPD Intervenors argued that ensuring competition among broadcasters is essential because ongoing consolidation among broadcasters increases the retransmission consent fees that cable operators and other MVPDs must pay to retransmit broadcasters' unique content. For example, NCTA explained that if the Commission did not treat broadcasters as a discrete market, "broadcasters would be free to amass greater leverage in retransmission consent negotiations," which would "place upward pressure on retransmission consent fees, burdening consumers who would bear the brunt of these increased costs." App.936 (NCTA Comments at 2).

The continued growth of retransmission consent fees provides critical evidence of broadcasters' continued market power despite the emergence of online video and other non-broadcast programming. MVPD Intervenors provided extensive evidence on the record showing that retransmission consent fees have increased substantially over the past two decades. For example, NCTA noted that "[r]etransmission consent revenue has skyrocketed, up 1,084% since 2010 and 85% over the last six years," a "rise [that] has substantially outpaced inflation." App.2739 (NCTA Dec. 6, 2023 *Ex Parte* at 2). And the record further establishes that these

12

increases are likely to continue. NCTA explained that "retransmission consent fees are expected to continue to increase," citing an estimate that "average retransmission consent fee/subscriber/month/TV station will increase at a Compound Annual Growth Rate of 9.5% through 2028." App.2740 (NCTA Dec. 6, 2023 *Ex Parte* at 3). The Order therefore reasonably recognized that "[r]etransmission consent fees remain a significant source of station revenue and one that, at least for now, is expected to continue growing." App.2834 (Order ¶ 87 & n.291) (citing ATVA Update Reply at 5-6).

Finally, the record also shows that these higher retransmission consent fees create public-interest harms by imposing additional costs on consumers, to whom such fees are passed through. *See, e.g.*, App.418 (ATVA Comments at 3). MVPD Intervenors provided extensive evidence on this score, including by referencing an academic study showing that such pass-throughs are expected as a matter of economic logic; submitting data showing the "strong relationship between rising retransmission consent rates and rising prices paid by consumers for the cable basic tier, which by law consists principally of broadcast programming"; and attaching consumer bills expressly listing consumer charges for retransmission consent fees. *See* App.1514-17, 1568-84 (ATVA Update Comments 18-21, Exhs. C-E); *see also* App.2735 (ATVA Dec. 6, 2023 *Ex Parte* at 4); App.423-24 (ATVA Comments at 8-9).

13

Recognizing these downstream consequences, the Order justifiably concluded that "[p]romoting competition among local television stations prevents local broadcasters from demanding higher retransmission consent fees…, costs that may be passed on to consumers." App.2829 (Order ¶ 77). By identifying the unique features of broadcast television and the downstream consequences of broadcast consolidation, the Order reasonably defined the relevant market as the market for broadcast television.

### B. Petitioners' Challenges to the Commission's Market Definition Lack Merit.

Petitioners offer several objections to the Order's market definition, all of which ultimately relate to Petitioners' contention that the Commission impermissibly ignored competition from non-broadcast sources. These objections lack merit.

First, Petitioners argue that Section 202(h) "requires that the Commission consider competition in all forms and from all sources, without limitation." Pet. Br. 25; *see also id.* at 32. But Petitioners do not explain why mere use of the word "competition" necessarily refers to all competition from any source. The Commission has long been concerned with regulating broadcast ownership in the public interest to ensure competition *among* broadcasters, and Section 202(h) reiterates that the Commission is to adopt ownership rules that are necessary "*in the public interest* as a result of competition." § 202(h) (emphasis added). This

14

language is best read—without the need for any deference to the Commission, *see Loper Bright*, 144 S. Ct. at 2262—to require the Commission to consider competition as part of its assessment of the public interest, but not to elevate competition above all other considerations. *Cf.* App.2796-98 (Order ¶¶ 20-21). Indeed, Petitioners entirely ignore the additional language in Section 202(h) stating that the Commission must determine whether its rules are "no longer in the public interest" without any reference to competition at all. § 202(h).[4]

Moreover, as discussed below, the Commission *did* "consider" competition "in all forms and from all sources," including from non-broadcast sources, before determining *which* forms of competition were salient for purposes of Section 202(h) and its public interest goals. *See Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1000-01 (8th Cir. 2018); *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 577 (8th Cir. 2007). Thus, the Commission acknowledged that "broadcasters may be seen as participating in various markets or competing along various

---

[4] This focus on the text and broader statutory context of Section 202(h) is far more pertinent than Petitioners' references to isolated legislative findings made in unrelated contexts. *Cf.* Pet. Br. 25-26 (citing §§ 230, 551, 110 Stat. 56, 138, 139). And it is plainly more relevant than Petitioners' references to fragments of legislative history from the Telecommunications Act. *Cf.* Pet. Br. 26 (citing S. Rep. No. 104-23, at 1-5 (1995); H.R. Rep. No. 104-204, at 54-55 (1995)). This Court "seldom rel[ies] on legislative history and never when it is contrary to the plain meaning of the statute." *Stursberg v. Morrison Sund PLLC*, 112 F.4th 556, 564 (8th Cir. 2024).

15

dimensions (including, among others, the sale of local or non-local advertising; the creation, acquisition, and provision of local, syndicated, or national programming; and the acquisition of on-air talent)," App.2828 (Order ¶ 75), but reasonably concluded that "viewers directly benefit from competition *among* local broadcast television stations," *id.* (emphasis added). That conclusion is consistent with the statute and well within the Commission's longstanding discretion in undertaking the public-interest analysis under Section 202(h). *Cf.* App.2826 (Order ¶ 71) (explaining that the rule "promotes competition *among* local broadcast television stations that, to this day, remain the only entities in the video marketplace that are licensed by the Commission with use of the airwaves to provide a broadcast television service, in exchange for a unique obligation to serve the public interest") (emphasis added); App.2824 (Order ¶ 66) (similar).

Second, Petitioners argue that the Order's market definition is arbitrary and capricious because the Commission supposedly "repeatedly and egregiously" ignored evidence that broadcasters face substantial competition from non-broadcast sources. Pet. Br. 32; *see also id.* at 18, 38. But, as Petitioners concede, the "Commission acknowledged that broadcasters face competition from non-broadcast sources." *Id.* at 29 (citing App.2827-28 (Order ¶ 75)). Indeed, the Commission expressly sought comment on this very issue. App.2825 (Order ¶ 70) (citing *In re 2018 Quadrennial Regulatory Review*, Notice of Proposed Rulemaking, 33 FCC Rcd

16

12111, 12133, ¶ 55 (2018)).   And the Order stated that the "Commission has acknowledged for some time the availability of other forms of video programming, even while continuing to find that broadcast television remains its own distinct market." App.2826-27 (Order ¶ 73).

Thus, the Commission did not "disregard" competition from non-broadcast sources like online video.  Pet. Br. 39.  It simply evaluated the record before it and concluded that such competition did not alter the fact that broadcast television remains a distinct market.  The Order observed that there have long been "other forms of video programming" in addition to broadcast television, ranging "from video cassette recorders and DVDs, to subscription cable television services, to on-demand streaming services."  App.2826-27 (Order ¶ 73).  The Commission found that, like those other sources, "online video still largely complements, rather than competes with, broadcast television."  App.2827 (Order ¶ 75); *see also* App.2833-34 (Order ¶ 87).  Further, such "non-broadcast sources of video programming do not compete with broadcasters" in the relevant sense, namely "for retransmission consent fees, network affiliations, or the provision of local programming, which continue to remain largely unique to broadcast television."  App.2828 (Order ¶ 75). Thus, the Commission reasonably concluded that "[d]espite the proliferation of new forms and sources of programming, broadcast television … remain[s] essential to

17

achieving the Commission's goals of competition, localism, and viewpoint diversity." App.2787 (Order ¶ 1).

For similar reasons, the Commission did not act arbitrarily in adopting its market definition despite Petitioners' evidence regarding the competition broadcast television purportedly faces from non-broadcast sources with respect to viewers and advertising revenue. *See* Pet. Br. 32-36, 39-40; Television Affiliates Br. 10. The Commission considered and distinguished those claims in the specific context of determining the relevant market for its Local Television Ownership Rule. *See, e.g.*, App.2827-28 (Order ¶ 75) (concluding advertising revenue is "but one of the facets of competition among local broadcast television stations"); *see also* App.1888 (ATVA Update Reply Comments at 2) (noting that "[b]roadcasters once again argue that the market for local television advertising is competitive," but "whatever the merits of this argument, it fails to address the entirely separate product market for retransmission consent," in which "consolidation will reduce competition").

Third, Petitioners claim that it is arbitrary and capricious for the Order to focus on the unique features of broadcasting. Pet. Br. 32, 39-41. Petitioners argue that the Order "used supposedly distinguishing features of broadcasting to permanently close off the relevant market to any non-broadcast sources," Pet. Br. 32, and further contend that products can be "unique" yet also compete, Pet. Br. 40; *see also* Television Affiliates Br. 12.

Appellate Case: 24-1380     Page: 25     Date Filed: 11/19/2024 Entry ID: 5458388

These arguments lack merit.  Petitioners themselves claim that broadcasters have distinctive features—namely, that "[broadcasting] is free, that broadcasters are locally licensed and focus to some extent on local programming, and that television broadcasters can receive retransmission consent fees"—and concede that "it is true that broadcasting bears the features described by the Order."  Pet. Br. 39-40. Petitioners cite no authority for their claim that focusing on these features is an attempt to "*permanently* exclude any consideration of competition from non-broadcast sources."  Pet. Br. 39.  Rather, as required in the Quadrennial Review process, the Commission here examined the market afresh to determine whether the referenced features *still* distinguish broadcasters.  *See, e.g.*, App.2827 (Order ¶ 74) (noting only that broadcast programming "*remains* unique"); App.2828 (Order ¶ 75) (finding that retransmission consent fees, network affiliations, and local programming "*continue to remain* largely unique to broadcast television").  Nothing in the Order forecloses the Commission from adopting a different market definition in a future proceeding if the record shows the market actually is different. Accordingly, the Commission did more than "merely describe" broadcasting's features in reaching its conclusions.  Pet. Br. 39.  As noted above, the Order explained how broadcasting's features make it necessary to ensure competition *among* broadcasters so as to avoid harmful downstream consequences for the purchasers of broadcast services and (ultimately) for consumers.

19

Finally, Television Affiliates Intervenors argue that the Order's focus on "substitutes" is arbitrary because the relevant question is whether "reasonable interchangeability exists," and broadcast and non-broadcast video program offerings are reasonably interchangeable. Television Affiliates Br. 9-10. But given the unique salience of broadcast programming to consumers, there is no plausible argument for interchangeability with respect to retransmission consent fees. Any fees that cable operators pay other video program providers for non-broadcast programming do not hold down the price of the retransmission consent fees that cable operators must pay for broadcast programming.[5] Similarly, the Commission found that there is no interchangeability with respect to the production of local programming, network affiliations, or the other attributes of broadcasting the Commission determined were relevant to the market definition question. App.2828 (Order ¶ 75).

---

[5] Television Affiliates Intervenors attempt to overcome this fundamental disconnect by suggesting that competition for viewers places "marketplace pressure" on retransmission consent fees because "the amounts distributors pay to broadcasters 'are keyed to the number of subscribers in a station's market,' and subscriber count decreases when viewers opt for alternative distribution platforms." Television Affiliates Br. 13 (citation omitted). Even if that description of how retransmission consent fees are "keyed" were accurate, that marketplace pressure has not materialized. The Order correctly observed that "retransmission consent fee revenue continues to grow, in spite of predictions that they may flatten out or decrease at some point in the future." App.2834 (Order ¶ 87 n.291); *see also* App.1891-92 (ATVA Update Reply Comments at 5-6). And even if streaming services also transmit major network programming, *cf.* Television Affiliates Br. 14, there is no dispute that these platforms "do not compete for affiliations," *id.*

20

In short, Petitioners' challenge is merely an effort to second-guess the Commission's decision to exclude non-broadcast sources from its market definition. But the Commission's decision was "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. It is not for Petitioners to dictate what competition must count when the Commission has provided a reasoned explanation well supported by the record.[6]

## II. THE ORDER JUSTIFIED RETAINING THE TOP-FOUR PROHIBITION AND THE TWO-STATION LIMIT.

### A. The Record Provides Ample Support for Retaining the Top-Four Prohibition and the Two-Station Limit.

Petitioners object to the Order's retention of the Top-Four Prohibition and the Two-Station Limit. Pet. Br. 42-51. As MVPD Intervenors' record evidence overwhelmingly shows, however, regulating local consolidation is necessary to prevent broadcasters from leveraging market power to win higher retransmission consent fees. Indeed, it is an "obvious principle that a broadcaster controlling two, three, or even four major networks in a market has more leverage (and can thus

---

[6] Petitioners also briefly argue that the Order should not have relied on antitrust analyses from the Department of Justice ("DOJ"). Pet. Br. 41 (citing Order ¶¶ 34, 76). But the Commission simply found that its "market definition is *also consistent with* [DOJ's] approach, which considers local broadcast television to be its own market in antitrust analysis," acknowledging that "DOJ's analysis has focused historically on competition for advertising" and stating only that it "find[s] DOJ's approach *further supports, and is consistent with*, our own." App.2828 (Order ¶ 76) (emphases added).

Appellate Case: 24-1380    Page: 28    Date Filed: 11/19/2024 Entry ID: 5458388

command higher prices) than a broadcaster controlling only one such network." App.2734-35 (ATVA Dec. 6, 2023 *Ex Parte* at 3-4); *see also* App.935-36 (NCTA Comments at 1-2). Because rapidly increasing retransmission consent fees increase costs for consumers, ensuring competition among broadcasters has a direct public-interest benefit. MVPD Intervenors presented extensive evidence from a variety of sources establishing that competition in the market for broadcast television is essential to limit retransmission consent fees and avoid downstream public-interest harms to consumers. This evidence includes:

(1) **Prior Commission Precedent.** MVPD Intervenors cited prior Commission findings that joint negotiations by top-four stations in the same market increase retransmission consent fees, often by 20% or more. *See* App.424 (ATVA Comments at 9); App.937 (NCTA Comments at 3); App.1800 (NCTA Update Comments at 2). *See generally In re Amendment of the Commission's Rules Related to Retransmission Consent*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 3351, 3358-59, 3362-63 ¶¶ 13, 16 n.66 (2014).

(2) **DOJ Antitrust Analyses.** MVPD Intervenors also identified several instances in which DOJ reviewed mergers in light of their likely consequences on retransmission consent fees in particular markets. For example, in the Nexstar-Tribune merger, Nexstar agreed to divest several stations after DOJ concluded that the proposed merger would "substantially lessen competition" by allowing Nexstar

to acquire multiple Big Four stations in the same market.  App.1512 (ATVA Update Comments at 16) (citing Competitive Impact Statement at 1, *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-02295 (D.D.C. Aug. 1, 2019), ECF No. 6); *see also* App.938-39 (NCTA Comments at 4-5).   Similarly, DOJ challenged a merger between Gray Television and Raycom that would have created top-four duopolies in nine markets, citing "an increase in retransmission consent fees … much of which would be passed through to subscribers."  App.1505 (ATVA Update Comments at 9) (quoting Competitive Impact Statement at 2, *United States v. Gray Television, Inc.*, No. 1:18-cv-02951 (D.D.C. Dec. 14, 2018), ECF No. 3).   And in reviewing Gray's acquisition of Quincy Media, Inc., which would have resulted in Gray owning multiple Big Four stations in seven additional markets, DOJ again assessed that this merger likely "would result in an increase in retransmission consent fees charged to MVPDs, much of which would be passed through to MVPD subscribers."  App.1512 (ATVA Update Comments at 16) (quoting Competitive Impact Statement at 2, *United States v. Gray Television, Inc.*, No. 1:21-cv-02041 (D.D.C July 28, 2021), ECF No. 3); *see also* App.1801 (NCTA Update Comments at 3).

**(3) Marketplace and Analyst Reports.**  MVPD Intervenors also relied on the Commission's marketplace reports to establish that these fees have increased dramatically.  ATVA explained that "fees continue to skyrocket: Retransmission consent fees per-subscriber increased by 20% from 2018-2019, while from 2013-

2019, the compound average annual increase was 32.3%." App.1892 (ATVA Update Reply Comments at 6) (citing *In re Communications Marketplace Report*, 36 FCC Rcd 2945, 3086 ¶ 236 (2020)). Similarly, NCTA noted that the Commission's 2020 Marketplace Competition Report found that "[a]lthough traditional MVPD subscribers declined during the first half of 2020 … retransmission consent revenue earned by major station groups increased in both the first and second quarters of 2020 by nearly 20% compared to the first and second quarters of 2019." App.1802 (NCTA Update Comments at 4) (quoting 36 FCC Rcd. 2945, 3076 ¶ 217). And NCTA noted that the 2018 Marketplace Competition Report similarly found that "'[f]rom 2015 to 2016, total retransmission consent fees paid by cable systems to television broadcast stations increased, on average, by 31.8% per year.'" *See* App.939 (NCTA Comments at 5) (quoting *In re Communications Marketplace Report*, 33 FCC Rcd 12558, 12605 ¶ 75 (2018)). Multiple analysts have also "confirm[ed] that the creation of top-four duopolies increases consumer prices." App.426 (ATVA Comments at 11).

**(4) Broadcaster Conduct.** MVPD Intervenors also referenced broadcasters' own conduct and statements to establish that consolidation among broadcasters would lead to higher retransmission consent fees. *See* App.426 (ATVA Comments at 11) ("Perhaps the best evidence that top-four duopolies lead to higher consumer prices is the conduct of broadcasters themselves."). For example, Sinclair Broadcast

24

Group's filings before the Securities and Exchange Commission warn that the Commission's "prohibition on certain joint retransmission consent negotiations … may affect the Company's ability to sustain its current level of retransmission consent revenues or grow such revenues in the future and could have an adverse effect on the Company's business, financial condition, and results of operations." App.1513 (ATVA Update Comments at 17) (citation omitted). Similarly, Nexstar and Gray have "touted higher retransmission consent fees as a key 'benefit' of recent mergers and acquisitions." App.936 (NCTA Comments at 2). For example, Nexstar said that its acquisition of Tribune would result in a $75 million retransmission consent windfall, "reflecting nearly half of the merger's $160 million in anticipated first-year synergies." App.936 (NCTA Comments at 2).

**(5) Real-World Experience.** Finally, MVPD Intervenors identified examples of broadcasters controlling multiple major networks in a particular geographic market, including some markets where a single owner controls as many as four networks. *See infra* Part III. MVPD Intervenors also described the actual experiences of their members in such markets, noting that "ATVA members report that, where broadcasters control two, three, or all four major networks in a market, they possess considerably more leverage in retransmission consent negotiations. … [W]here broadcasters control more than one major network in a local market, they are able to extract higher prices and/or impose more onerous non-price terms in

Appellate Case: 24-1380    Page: 32    Date Filed: 11/19/2024 Entry ID: 5458388

retransmission consent agreements." App.1513-14 (ATVA Update Comments at 17-18).

In light of this extensive evidence, the Commission reasonably retained the Top-Four Prohibition and the Two-Station Limit to address local consolidation in the market for broadcast television.

## B. Petitioners' Challenges to the Top-Four Prohibition and the Two-Station Limit Lack Merit.

Petitioners' objections primarily raise line-drawing questions about how the Commission has chosen to implement its broadcast television ownership restrictions. Those objections lack merit. On APA review, an agency's determination is not arbitrary and capricious so long as the agency has examined the relevant considerations and adequately explained its actions. *Loper Bright Enters.*, 144 S. Ct. at 2262; *State Farm*, 463 U.S. at 43. The Commission did so here.

First, Petitioners argue that the Order "presents a false choice" of either preserving the Top-Four Prohibition in all markets or removing it in all markets. Pet. Br. 42. But given the Commission's longstanding experience specifically with the broadcast ownership rules, the Commission reasonably concluded that a general rule combined with case-by-case exceptions best accomplished the goal of allowing deviations from the Top-Four Prohibition when circumstances warrant. *Cf.* App.2835 (Order ¶ 89) (noting that in the context of the broadcast ownership rules, the "case-by-case approach has allowed the Commission to maintain the proper

26

balance between ensuring that no market is excessively concentrated and allowing flexibility in particular circumstances"). The Commission has thereby "already addressed any over-inclusiveness that the previous bright-line may have yielded, while recognizing that the rule itself remains necessary." App.417 (ATVA Comments at 2).

Petitioners claim that the "case-by-case" approach is illusory because waivers in this context are rarely granted. Pet. Br. 48-49. But, as Petitioners concede, Pet. Br. 49 n.9, the Commission has in fact granted waivers of the Top-Four Prohibition in certain circumstances. *See, e.g.*, *In re Consent to Assign Certain Licenses from Gray Television Licensee, LLC to Marquee Broadcasting West, Inc.*, Memorandum Opinion and Order, DA 24-579 ¶ 1 (MB rel. June 18, 2024); *In re Consent to Assign Certain Licenses from Red River Broadcast Co., LLC*, Memorandum Opinion and Order, 34 FCC Rcd 8590, 8590 ¶ 1 (MB 2019). And the Commission has stated that it will "continue to monitor transactions and the marketplace in the course of further reviews and identify additional factors as it is useful to do so." App.2836 (Order ¶ 89).

Second, Petitioners object to the Commission's purported "magical dividing line" between the fourth and fifth top stations. Pet. Br. 43. But the Commission acknowledged potential variation while explaining why that dividing line is reasonable. The Commission explained that "[t]o the extent there are situations

27

where, for instance, a large gap in ratings occurs between the third and fourth ranked stations in a market (rather than between the fourth and fifth ranked stations), the fact remains that there is substantial concentration of audience share among the top-ranked stations in most markets and such situations may be indicative of the largest stations in a market exploiting loopholes in our rule (which we address today) to increase their market shares." App.2833 (Order ¶ 86). The Commission further noted that the "top-four ranked stations are also still the most likely stations to originate local news." *Id.*

Petitioners claim that, in many markets, the first-ranked station dwarfs the others, such that combinations among top-four stations could enhance competition, and that the Commission purportedly "ignored" data establishing that "smaller markets have a greater need to achieve economies of scale through consolidation." Pet. Br. 44-45 (citing NAB *Ex Parte* Attachment F (Mar. 8, 2023)). But the Commission addressed both concerns directly by retaining the possibility of a case-by-case exception. Thus, the Order reasonably concluded, under the Commission's longstanding authority with respect to broadcast ownership rules, that the "flexibility of the case-by-case approach to consider combinations of top-four rated stations is better suited to address broadcasters' concerns about the viability of stations in smaller markets or situations in which there may no longer be a clear-cut distinction

28

between the top-four rated stations and the rest of the stations in a market." App.2833 (Order ¶ 86).

Similarly, Petitioners object to the Commission's reliance on the existence of four major networks to provide further justification for the Top-Four Prohibition. *Cf.* Pet. Br. 47-48; *see* App.2833 (Order ¶ 86 & n.287); *see also* App.1799-1800 (NCTA Update Comments at 1-2). But there appears to be little daylight between Petitioners and the Commission in this respect. Petitioners concede that the "top-four *stations* are often affiliated with the 'Big Four' English-language *networks*." Pet. Br. 47. That is essentially all the Commission said as well. *See* App.2833 (Order ¶ 86) ("[*G*]*enerally* the top-four stations in any market are affiliated with these [top-four] highly-viewed networks."). The Commission reasonably relied on this correlation as one of several justifications for the Top-Four Prohibition.

Third, Petitioners argue that the Commission incorrectly concluded that combinations among top-four stations would not enhance programming. Pet. Br. 45-47. In particular, Petitioners claim that merged stations actually increase viewership and local news programming, and suggest that these entities would continue to be incentivized to create local programming for profit reasons. Pet. Br. 46-47. But the record contains extensive evidence to the contrary. For example, as ATVA summarized, Professor Thomas Hubbard of Northwestern University found that the "record contains no evidence that consolidation is necessary for local news

29

operations to enjoy efficiencies of scope and scale." App.2733 (ATVA Dec. 6, 2023 *Ex Parte* at 2); *see also* App.1501-04, 1524-45 (ATVA Update Comments at 5-8 & Exh. A) (finding total hours of local news increased regardless of consolidation in recent years). Moreover, ATVA explained that because consolidation will lead to increased retransmission consent fees and increased consumer prices, "subscribers will be more likely to cut the cord and the funding base will shrink over time." App.1504 (ATVA Update Comments at 8). The Commission therefore reasonably concluded that to ensure a viable market for local programming, multiple broadcasters with competing news operations generally are required. App.2829-30 (Order ¶¶ 78-79).

Finally, Petitioners argue that the Top-Four Prohibition does not serve the Commission's public interest goals of competition, localism, and viewpoint diversity. Pet. Br. 62-65. With respect to competition—and contrary to Petitioners' assertion that the "record here provides no support for the suggestion that broadcasters have undue market power," Pet. Br. 62—the record contains voluminous evidence that broadcasters have significant market power due to their unique programming, which allows them to demand ever-higher retransmission consent fees from the purchasers of their services. And, as noted, these increases have continued even as competition in the broader video marketplace has grown. *See* Part I, *supra*.

30

As for localism, the Commission explained that, although it was "primarily focused on competition," the "rule continues to promote localism, as broadcasters have a unique obligation to supply programming of interest to their local communities and stations are likely to be more responsive to those local interests where there are other local competitors." App.2826 (Order ¶ 71). That follows straightforwardly from the nature of the programming that broadcasters offer, as well as their obligation to provide programming of relevance to the communities for which they are licensed. And, as noted above, the Commission reasonably rejected broadcasters' claim that consolidation would enhance local news programming. App.2829-30 (Order ¶¶ 78-79).

As for viewpoint diversity, the Order found that the Local Television Ownership Rule advances that goal as well. *See* App.2812, 2830-31 (Order ¶¶ 46, 80-81). Petitioners argue that the Commission did not offer a reasoned explanation for its departure from its 2014 Review, which did not reach that conclusion. But the Commission squarely acknowledged that departure and explained its position. *See* App.2831 (Order ¶ 81). In particular, the Commission explained that, because the "provision of local programming remains a defining characteristic of television stations," the Rule "serves to maintain diffuse ownership of this key platform—a local television station—among a wide variety of owners and types of owners, thereby promoting the interest in a multiplicity of speakers." *Id.* Petitioners argue

31

that the Commission ignored various other studies in support of Petitioners' position, but the Commission relied on a variety of sources in addition to the "theoretical" analysis to which Petitioners object. Pet. Br. 64 (citing Order ¶ 81 n.279). Indeed, the Commission's conclusion was supported by "[n]umerous commenters." App.2831 (Order ¶ 81 & n.277) (citing eight sets of comments).[7]

## III. THE ORDER JUSTIFIED MODIFYING THE ANTI-CIRCUMVENTION MEASURES IN NOTE 11.

### A. The Revision to Note 11 Is Not Arbitrary and Capricious.

The Commission reasonably closed loopholes in Note 11 to prevent broadcasters from circumventing the Top-Four Prohibition by acquiring and placing the network-affiliated programming of another top-four full power station on the multicast stream of an existing in-market full power station or a low power station. MVPD Intervenors have first-hand experience of the harm caused by certain broadcasters' end-runs around the rule. Those end-runs cause the same public-interest harms that the Top-Four Prohibition was meant to prevent and should therefore be prohibited for the same reasons.

---

[7] Petitioners' primary argument regarding the Two-Station Limit is that the Commission did not address the possibility that the Two-Station Limit might be unwarranted in *some* markets. Pet. Br. 50-51. But the Commission addressed these concerns, App.2831-32 (Order ¶ 83), and, more broadly, the Commission explained why it favors a general rule to Petitioners' ad hoc approach, App.2835 (Order ¶ 89).

Appellate Case: 24-1380    Page: 39    Date Filed: 11/19/2024 Entry ID: 5458388

MVPD Intervenors submitted extensive evidence to the Commission explaining why the loopholes should be closed. NCTA explained that "[c]ontrolling two or more top-four stations in the same market using a multicast stream or through ownership of a low power station confers the same market power and leverage as the ownership of more than one full power station," and that "[c]ontrary to the intent of the Top-Four rule, these loopholes grant broadcasters unwarranted and anticompetitive leverage in retransmission consent negotiations." App.2739 (NCTA Dec. 6, 2023 *Ex Parte* at 2); *see also* App.942, 945-46 (NCTA Comments at 8, 11-12) (similar). ATVA explained that, by using these loopholes, broadcasters achieved "dramatic increases in retransmission consent rates and therefore consumer prices." App.431 (ATVA Comments at 16).

The record further reflects that this phenomenon has led to common control of three or even four network affiliations in a market by a single broadcaster. For example, in Harrisonburg, Virginia, "Gray operates a quadropoly … transmitting all four major networks using a combination of full power and low power stations and multicast streams." App.2739 (NCTA Dec. 6, 2023 *Ex Parte* at 2 n.5). In Greenwood-Greenville, Mississippi, "all four major networks are transmitted by one owner … by means of a full power station, two low power stations, and a multicast stream." *Id.* And in the Santa Barbara-Santa Maria-San Luis Obispo, California market and the Palm Springs, California market, the News-Press and Gazette

Appellate Case: 24-1380     Page: 40     Date Filed: 11/19/2024 Entry ID: 5458388

Company transmits three major networks via a combination of a full power station, low power stations, and multicast streams. *Id.*

Petitioners largely ignore this record evidence and instead argue that the Commission's revision to Note 11 is contrary to Section 202(h)'s purported deregulatory mandate. But the Commission correctly stated that its action was "consistent with the statutory mandate … to modify a rule so that the rule continues to serve the public interest." App.2840 (Order ¶ 98); *see also* App.2842-44 (Order ¶¶ 104-105). And courts already have interpreted Section 202(h) as permitting the Commission to make its rules "'more or less stringent' after reviewing and considering the state of competition in the media marketplace." App.2794 (Order ¶ 17) (quoting *Prometheus Radio Project v. FCC*, 652 F.3d 431, 445 (3d Cir. 2011) ("*Prometheus II*")); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 394 (3d Cir. 2004) ("*Prometheus I*") (rejecting Petitioners' "one-way ratchet" reading of Section 202(h)). After all, "it would be counter to the public interest to deregulate by either repeal, relaxation, or inaction (e.g., by ignoring competitive developments that run counter to the public interest) to the point that a few entities may dominate a media market." App.2794 (Order ¶ 17); *see also* App.2797-98 (Order ¶ 21).

Next, Petitioners and Television Affiliates Intervenors argue that the Commission's revision to Note 11 is arbitrary and capricious because it is a "sudden about-face" from the Commission's 2016 Order, which adopted Note 11 to prohibit

34

affiliate swaps and declined at that time to address dual affiliations via multicast. *See* Pet. Br. 19, 52-54; Television Affiliates Br. 16. *See generally* 2016 Order, 31 FCC Rcd at 9892-93 ¶ 72. But the Order under review is not a change in position at all. The 2016 Order put broadcasters on notice that additional action to prevent dual affiliations via multicasting was possible. The 2016 Order merely declined to address the issue "at this time" and "based on the record," which showed that "[m]arketplace incentives, *at present*, appear to limit the occurrence of dual affiliations via multicasting involving multiple Big Four networks largely to … smaller markets." 2016 Order, 31 FCC Rcd at 9892-93 ¶ 72 (emphasis added). The Commission expressly stated that it would "continue to monitor this issue and take action in the future, if appropriate." *Id.* That is precisely what the Commission did in the Order under review.

Even if this were an actual change in the Commission's position (and it is not), the Commission adequately explained its action. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009); *see also, e.g.*, *Northport Health Servs. of Ark., LLC v. U.S. Dep't of Health & Hum. Servs.*, 14 F.4th 858, 875 (8th Cir. 2021) (rejecting challenge because "[t]o the extent the Revised Rule departs from [] prior policies," the agency "has provided a sufficiently reasonable explanation for doing so"). Specifically, the Order stated: "We take this action to preserve the efficacy of the Top-Four Prohibition because we find it necessary to prevent further

35

exploitation of unintended ambiguities or gaps in the rule." App.2840 (Order ¶ 98). The Order further explained that the Commission "has encountered similar circumvention of the Top-Four Prohibition in the past and adopted Note 11 in response," App.2842 (Order ¶ 103), and that the Commission had "previously … expressed its intent to monitor the issue," App.2841 (Order ¶ 102). And the Order noted that certain broadcasters' use of the loopholes had become more common outside of the smaller markets that the 2016 Order discussed. App.2841-42 (Order ¶ 102).

MVPD Intervenors' comments provided detailed evidence supporting the conclusion that the situation had changed since the 2016 Order. As ATVA commented to the Commission, "[t]imes have changed" because today "retransmission consent fees account for tens of billions of dollars in revenue" and "[b]roadcasters thus now have a powerful incentive to employ these loopholes to maximize retransmission consent revenue." App.431 (ATVA Comments at 16). ATVA explained that certain broadcasters intentionally exploit these loopholes to earn higher retransmission consent fees. *Id.*

MVPD Intervenors also showed that the Commission's 2016 conclusion that dual affiliations were primarily limited to "smaller markets" is no longer accurate. As ATVA explained:

> When the Commission first adopted local ownership limits, there was no need to worry about a "multicast loophole" because at that time it was not possible

36

for a single station to broadcast content from more than one network simultaneously. After the digital transition and advances in compression technology made multicasting possible on the same 6 MHz channel, the Commission declined to close the loophole because it believed that multicast duopolies would occur primarily or exclusively in smaller markets that had fewer than four full-power stations. Yet that prediction turned out to be incorrect: Multicast duopolies occur in a substantial number of markets with at least four full-power stations.

App.429-30 (ATVA Comments at 14-15). These changed circumstances plainly support the Commission's refinement of Note 11.

MVPD Intervenors' comments also quantified certain broadcasters' increased use of the loopholes. As of 2018, NCTA identified 103 instances where broadcasters formed duopolies, triopolies, or quadropolies using the loopholes for multicast and LPTV and noted that the "biggest beneficiaries of the current loopholes are the largest broadcasters in the country." App.943-44 (NCTA Comments at 9-10). In 2019, ATVA identified 110 such instances. App.431 (ATVA Comments at 16); *see also* App.442-54 (ATVA Comments, Exh. A) (listing all 110 instances). In 2021, ATVA identified 121 instances and specifically described how broadcasters like Gray and Sinclair used loopholes to circumvent the Top-Four Prohibition. App.1507-10, 1546-67 (ATVA Update Comments at 11-14 & Exh. B) (listing all 121 instances).

Finally, in 2023, NCTA reported that "[t]here are 114 instances, across 92 markets, in which a broadcaster controls the programming of two or more top-four networks using an LPTV station or multicast stream even though the Top Four rules

37

would bar the same broadcaster from outright owning two full-power top-four stations in those markets." App.2739 (NCTA Dec. 6, 2023 *Ex Parte* at 2). NCTA further noted that in 17 of those markets, "broadcasters have used the loopholes to operate three or even *all four* major network affiliated stations," and that the "biggest beneficiaries of the loopholes are the largest affiliate station groups in the country," with Gray alone accounting for 30% of the examples. *Id.*

Moreover, MVPD Intervenors submitted record evidence establishing that certain broadcasters were primarily using these loopholes outside of smaller markets. ATVA cited examples from Albuquerque-Santa Fe, Chattanooga, Honolulu, South Bend-Elkhart, Dayton, Indianapolis, Jacksonville, Raleigh-Durham, and San Antonio. *See* App.431 (ATVA Comments at 16); App.1507 (ATVA Update Comments at 11). ATVA and NCTA also quantified the limited number of instances in which loopholes actually were being used in "short" markets, where there are not an adequate number of full power stations to host each major network. ATVA established that only about a third of the 121 cases were in short markets. App.1507 (ATVA Update Comments at 11) (identifying 46 instances). Relying on these data,[8] the Order explicitly found that "circumstances have

---

[8] In its filings before the Commission, NAB attempted to argue that MVPD Intervenors' market count was overinclusive because it contained some markets with three or fewer commercial TV stations. *See* App.2842 (Order ¶ 102 n.332) (summarizing these filings). But the Commission credited ATVA's data despite the

changed," and "agree[d] with ATVA and NCTA that the number of instances where top-four rated programming appears on nonprimary multicast streams or low power stations now vastly outnumber the occurrence of actual 'short markets' where there are an inadequate number of full power stations to host each major network on its own full power station."  App.2842 (Order ¶ 102).

Petitioners also argue that the record does not support the revision to Note 11 because the Commission "failed to adequately consider the benefits of airing popular network programming on a multicast stream or via a low-power station."  Pet. Br. 52; *see also* Pet. Br. 16, 54.  Similarly, Petitioners claim that the Commission simultaneously noted the benefits of multicasting to bring network programming to smaller geographic markets, but then tightened Note 11 nonetheless.  Pet. Br. 53 (citing Order ¶ 107).  But there is nothing arbitrary about the Commission's reasoning.  The Commission recognized that these benefits still existed in short markets yet concluded that situations in which those benefits were actually realized were less common than situations intended to effectuate an acquisition of another top-four station's affiliated programming.  App.2842 (Order ¶ 102); *see also*

---

issues NAB identified, App.2842 (Order ¶ 102), and the identified issues do not provide any reason to doubt the general proposition that broadcasters were using the loopholes beyond the smaller markets the Commission contemplated in the 2016 Order.  In any event, broadcasters were invited to provide a "more official and updated list for the record, as they have more ready access to the relevant information," App.2735 (ATVA Dec. 6, 2023 *Ex Parte* at 4), but they did not do so.

Appellate Case: 24-1380      Page: 46      Date Filed: 11/19/2024 Entry ID: 5458388

App.2844-45 (Order ¶ 107). And the Order made accommodations for situations where such arrangements may be beneficial: "[I]f an entity believes that the Top-Four Prohibition and Note 11 should not apply to its plan to place on a low power station or multicast stream an affiliation or affiliated programming acquired from another top-four station in the same market, the entity may seek case-by-case considerations under the Local Television Ownership Rule." App.2845 (Order ¶ 108); *see also, e.g.*, App.2733 (ATVA Dec. 6, 2023 *Ex Parte* at 2) (agreeing that case-by-case review for appropriate use of the loopholes is warranted).

For their part, Television Affiliates Intervenors argue that it was contradictory for the Commission to rely on broadcasters' "steady revenues" to justify the Local Television Ownership Rule while tightening Note 11 to close loopholes that permit broadcasters to "retain revenues and viewers." Television Affiliates Br. 18. But there is nothing contradictory about this: the record establishes that broadcasters can demand increased retransmission consent fees through local consolidation. In any case, the Commission's justification of the Local Television Ownership Rule did not rest on broadcasters' steady revenue; to the contrary, the Commission expressly acknowledged that "broadcasters assert" that "they have lost advertising dollars to other sources of video programming." App.2834 (Order ¶ 87).

Television Affiliates Intervenors also argue that the Commission incorrectly treated an LPTV station or multicast stream as the "equivalent" of a second top-four

station, App.2840 (Order ¶ 100), when in fact such stations and streams generate far less revenue and do not qualify for "must carry" on cable or satellite. Television Affiliates Br. 19. But that claim is inapposite: An LPTV station serving as a network affiliate does not rely on mandatory carriage rights, meaning MVPDs still must negotiate to obtain consent to retransmit it. Thus, from the perspective of the Top-Four Prohibition's aim to ensure local competition—and in terms of the consequence for retransmission consent fees—the effect of using the loopholes is in fact "equivalent" to acquiring a top-four station, and it was reasonable for the Commission to treat it as such. App.2739 (NCTA Dec. 6, 2023 *Ex Parte* at 2).

Finally, Television Affiliates Intervenors argue that competition does not justify the revision to Note 11 because the conduct now prohibited was not prohibited before, so the "Commission cannot rest on the proposition that the status quo is justified by competition; it must show that its *modification* of that status quo is justified by competition." Television Affiliates Br. 23. But the Commission's conclusion follows directly from the fact that the Top-Four Prohibition is itself justified by competition: closing loopholes that interfere with the underlying rule's efficacy necessarily furthers the same ends that justify the rule itself.

## B. The Revision to Note 11 Accords with the First Amendment and Section 326.

Finally, Petitioners briefly argue that the revisions to Note 11 violate the First Amendment and that the Commission lacks statutory authority to restrict program

41

content that broadcasters can air on their own stations. Pet. Br. 65-69. *See generally* 47 U.S.C. § 326 (prohibiting the government from "interfer[ing] with the right of free speech by means of radio communication").

The revision to Note 11 does not violate the First Amendment. As the Commission explained, "[o]ur revision of Note 11 to prevent other means of circumventing the Top-Four Prohibition is not a content-based restriction on speech," because it "does not consider content but rather market concentration." App.2843 (Order ¶ 104 n.336). The restriction does not limit a licensee's discretion to air content of its choosing; it simply addresses the mechanism by which licensees were circumventing the Commission's broadcast ownership rules. Indeed, the revision does not regulate content any more than the Top-Four Prohibition and Local Television Ownership Rule do. *Cf. Prometheus II,* 652 F.3d at 465; *Prometheus I*, 373 F.3d at 401-402; *Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148, 168-69 (D.C. Cir. 2002) (all concluding that the Commission's broadcast ownership rules do not violate the First Amendment). No heightened scrutiny applies, and the restriction is rationally related to the government's substantial interest in promoting competition. *Cf. Prometheus II*, 652 F.3d at 464.

Even if the revision to Note 11 were to implicate the First Amendment— which it does not—it would trigger only intermediate scrutiny. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 637-38 (1994). And intermediate scrutiny would be

42

satisfied because the Commission's approach advances the government's interest in competition by "narrowly target[ing] actions by which broadcast stations effectively seek to circumvent application of the Top-Four Prohibition." App.2843 (Order ¶ 105).

Finally, with respect to Section 326, Petitioners' argument fails for the same reason that the First Amendment argument does: the revision to Note 11 does not regulate program content, and so Section 326 presents no bar to the Commission's longstanding bases for authority to promulgate broadcast ownership rules.

### C. The Court Should Not Reach Television Affiliates Intervenors' Argument Regarding Audience-Share Methodology.

Finally, Television Affiliates Intervenors alone argue that it was arbitrary and capricious for the Commission to revise its audience share methodology. Television Affiliates Br. 17, 23-24. The Court should not reach this argument because it was raised only by an intervenor to the proceeding. *Cf. Core Commc'ns, Inc. v. FCC*, 592 F.3d 139, 145-46 (D.C. Cir. 2010) ("An intervening party may join issue only on a matter that has been brought before the court by another party." (citation omitted)).

In any case, the argument fails on the merits. The Commission stated it would "aggregate the audience share of all free-to-consumer non-simulcast multicast programming airing on streams owned, operated, or controlled by a single station to determine the station's audience share and ranking in a market." App.2838 (Order

43

¶ 94).  Television Affiliates Intervenors argue that this methodology is arbitrary and capricious because it treats measurable multicast streams as "part of the *same* station" while the Commission treats multicast streams as a different station under the revised Note 11.  Television Affiliates Br. 23.  But the audience share methodology simply reflects the Commission's modification to Note 11 and is justified for the same reasons.  As the Commission explained, this change in audience share was necessary in part to reflect the fact that "some stations are … placing programming affiliated with major broadcast networks on nonprimary multicast streams," and that the Commission needed to "consider [this practice] in [its] analysis when possible."  App.2839 (Order ¶ 94).  In any event, the Commission took reasonable steps to ensure that it was not overestimating audience shares under the new methodology.  *See* App.2839 (Order ¶ 95) (describing efforts to "avoid double counting ratings already attributed to another station").

## CONCLUSION

The petitions for review of the Commission's retention of the Local Television Rule and revisions to Note 11 should be denied.

Appellate Case: 24-1380    Page: 51    Date Filed: 11/19/2024 Entry ID: 5458388

Dated:  November 18, 2024

Michael D. Nilsson
Timothy J. Simeone
Jason Neal
HWG LLP
1919 M St. NW
Eighth Floor
Washington, DC 20036
(202) 730-1300
mnilsson@hwglaw.com

*Counsel for the American
Television Alliance*

Respectfully submitted,

*/s/ Jessica Ring Amunson*

Howard J. Symons
Jessica Ring Amunson
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for NCTA – The Internet &
Television Association*

45

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit set by the Court's May 3, 2024 Order and by Fed. R. App. P. 32(a)(7) because it contains 9,995 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Microsoft Word using a proportionally spaced typeface of 14-point Times New Roman font.

This brief has been scanned for viruses pursuant to Eighth Circuit Local Rule 28A(h)(2) and is virus-free.

Dated: November 18, 2024         */s/ Jessica Ring Amunson*
                                       Jessica Ring Amunson

Appellate Case: 24-1380    Page: 53    Date Filed: 11/19/2024 Entry ID: 5458388

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2024, this brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 18, 2024

*/s/ Jessica Ring Amunson*
Jessica Ring Amunson

Appellate Case: 24-1380     Page: 54     Date Filed: 11/19/2024 Entry ID: 5458388