Gibson, Dunn & Crutcher LLP
1700 M sStreet, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Andrew G.I. Kilberg
Direct: +1 202.887.3759
Fax: +1 202.887.3599
Akilberg@gibsondunn.com

July 11, 2025

VIA CM/ECF

Susan E. Bindler
Clerk of Court
U.S. Court of Appeals for the Eighth Circuit
Thomas F. Eagleton Courthouse
111 South 10th Street
St. Louis, MO  63102

Re:  No. 24-1380, 24-1480, 24-1493, 24-1516, *Zimmer Radio of Mid-Missouri, et al. v. Federal Communications Commission, et al.*—Notice of Supplemental Authority, Pursuant To Federal Rule of Appellate Procedure 28(j)

Dear Ms. Bindler,

Petitioners respectfully submit a recent decision from this Court, *Custom Communications, et al. v. Federal Trade Commission*, No. 24-3137, — F.4th — (July 8, 2025), in which the Court vacated in full the "negative option" rule promulgated by the Federal Trade Commission ("FTC").

*Custom Communications* confirms that "[t]he ordinary practice is to vacate unlawful agency action."  Slip op. at 23 (quotation marks omitted).  Applying the D.C. Circuit's *Allied-Signal* test, the Court concluded that "the procedural deficiencies of the [FTC's] rulemaking process are fatal."  *Id.*

The FCC's errors in the 2024 Order are substantive, and thus even more serious than the fatal procedural violations in *Custom Communications*.  *See* Petitioners' Reply 34.  Indeed, the FCC's Order

violates both Section 202(h) of the Telecommunications Act of 1996 and the Administrative Procedure Act several times over.

Vacatur is all the more warranted in this case due to the FCC's chronic delays in quadrennial review proceedings.  *See* Petitioners' Br. 10, 13-15, 69; Petitioners' Reply 34.  Petitioner National Association of Broadcasters had to file a petition for mandamus (and obtain a court order) to prompt the FCC to complete the 2018 quadrennial review—half a decade late.  *See Order*, *In re NAB*, No. 23-1120 (D.C. Cir. Sept. 28, 2023).  As of today, the FCC has made no discernible progress on the 2022 quadrennial review—it has not even issued a notice of proposed rulemaking—despite the fact that the 2026 review cycle is fast approaching.  Remand-without-vacatur would simply enable the FCC to kick the can further down the road, continuing to deprive broadcasters of regulatory relief that is urgently needed.

*Custom Communications* thus strongly supports vacatur of the rules at issue in this case as well.

Respectfully submitted,

*/s/  Andrew G.I. Kilberg*

Andrew G.I. Kilberg
*Counsel for Petitioner National Association of Broadcasters*

cc:    Counsel of record (via ECF)

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 24-3137

_____

Custom Communications, Inc., doing business as Custom Alarm

*Petitioner*

v.

Federal Trade Commission

*Respondent*

------------------------------

American Property Casualty Insurance Association; Consumer Credit Industry Association; Health & Fitness Association; International Franchise Association; National Association of Spa Franchises; Service Contract Industry Council

*Amici on Behalf of Petitioner*

Internet and Consumer Law Professors; Main Street Alliance; Truth in Advertising, Inc.; Consumer Law and Economic Justice; Consumer Federation of America; Consumer Action; National Consumers League; National Consumer Law Center; National Association of Consumer Advocates

*Amici on Behalf of Respondent*

_____

No. 24-3388

_____

The Chamber of Commerce of the United States of America; The Georgia Chamber of Commerce

*Petitioner*s

v.

Federal Trade Commission

*Respondent*

-------------------------------

American Property Casualty Insurance Association; Consumer Credit Industry Association; Health & Fitness Association; International Franchise Association; National Association of Spa Franchises; Service Contract Industry Council

*Amici on Behalf of Petitioner*

Internet and Consumer Law Professors; Main Street Alliance; Truth in Advertising, Inc.; Consumer Law and Economic Justice; Consumer Federation of America; Consumer Action; National Consumers League; National Consumer Law Center; National Association of Consumer Advocates

*Amici on Behalf of Respondent*
_____

No. 24-3415
_____

Michigan Press Association; National Federation of Independent Business, Inc.

*Petitioner*s

v.

Federal Trade Commission

*Respondent*

-------------------------------

-2-

American Property Casualty Insurance Association; Consumer Credit Industry Association; Health & Fitness Association; International Franchise Association; National Association of Spa Franchises; Service Contract Industry Council

*Amici on Behalf of Petitioner*

Internet and Consumer Law Professors; Main Street Alliance; Truth in Advertising, Inc.; Consumer Law and Economic Justice; Consumer Federation of America; Consumer Action; National Consumers League; National Consumer Law Center; National Association of Consumer Advocates

*Amici on Behalf of Respondent*

_____

No. 24-3442
_____

Electronic Security Association; Interactive Advertising Bureau; NCTA-The Internet & Television Association

*Petitioner*s

v.

Federal Trade Commission

*Respondent*

-------------------------------

American Property Casualty Insurance Association; Consumer Credit Industry Association; Health & Fitness Association; International Franchise Association; National Association of Spa Franchises; Service Contract Industry Council

*Amici on Behalf of Petitioner*

-3-

Internet and Consumer Law Professors; Main Street Alliance; Truth in Advertising, Inc.; Consumer Law and Economic Justice; Consumer Federation of America; Consumer Action; National Consumers League; National Consumer Law Center; National Association of Consumer Advocates

*Amici on Behalf of Respondent*

———————————————

No. 24-3469

———————————————

Custom Communications, Inc., doing business as Custom Alarm; Electronic Security Association; Interactive Advertising Bureau; NCTA-The Internet & Television Association; Michigan Press Association; National Federation of Independent Business, Inc.; The Chamber of Commerce of the United States of America; The Georgia Chamber of Commerce

*Petitioner*s

v.

Federal Trade Commission

*Respondent*

------------------------------

American Property Casualty Insurance Association; Consumer Credit Industry Association; Health & Fitness Association; International Franchise Association; National Association of Spa Franchises; Service Contract Industry Council

*Amici on Behalf of Petitioner*

Internet and Consumer Law Professors; Main Street Alliance; Truth in Advertising, Inc.; Consumer Law and Economic Justice; Consumer Federation of America; Consumer Action; National Consumers League; National Consumer Law Center; National Association of Consumer Advocates

*Amici on Behalf of Respondent*

-4-

_____

Petitions for Review of an Order of the
Federal Trade Commission
_____

Submitted: June 10, 2025
Filed: July 8, 2025
[Published]
_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.
_____

PER CURIAM.

Many American consumers have found themselves unwittingly enrolled in recurring subscription plans, continuing to pay for unwanted products or services because they neglected to cancel their subscriptions. These so-called "negative option" programs take various forms but generally share the key feature of a term or condition allowing sellers to interpret a customer's silence, or failure to take any affirmative action, as acceptance of an offer.

Given the proliferation of negative option plans across economic sectors, the Federal Trade Commission ("FTC" or "Commission") set out to modernize its original negative option rule, promulgated in 1973, which covered only one form of negative option plan. See Regulations Pertaining to the Use of Negative Option Plans, 38 Fed. Reg. 4896 (Feb. 22, 1973) (to be codified at 16 C.F.R. pt. 425) (the "1973 Rule"). In 2023, the Commission proposed extending the scope of the 1973 Rule to cover "all forms of negative option marketing in all media." Negative Option Rule, 88 Fed. Reg. 24716, 24716 (proposed Apr. 24, 2023) (to be codified at 16 C.F.R. pt. 425). In October 2024, the FTC amended the 1973 Rule by a 3-2 vote,

-5-

adding provisions that bar sellers from misrepresenting material facts and require disclosure of material terms, express consumer consent, and a simple cancellation mechanism. 16 C.F.R. § 425 (the "Rule" or "final Rule").

Various industry associations and individual businesses ("Petitioners") sought review of the Rule in four federal circuit courts on the grounds that the FTC exceeded the scope of its statutory authority in promulgating the Rule, failed to satisfy a procedural requirement by declining to conduct a preliminary regulatory analysis during the rulemaking process, and acted arbitrarily and capriciously under the Administrative Procedure Act ("APA") in issuing a rule of this scope. The Judicial Panel on Multidistrict Litigation consolidated the petitions for review in this court. Concluding that the Commission failed to follow procedural requirements under § 22 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 57b-3(b)(1). We grant the petitions for review and vacate the Rule.

## I. Background

**A. Statutory Framework.** We begin by reviewing the relevant provisions of the FTC Act. Section 5 empowers the Commission to "prevent . . . unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The Commission carries out this mandate through its own administrative proceedings, litigation in federal district courts, and rulemaking. Section 5 lays out the process for enforcement through administrative proceedings. If the Commission has "reason to believe" a party "has been or is using any unfair method of competition or unfair or deceptive act or practice," it can initiate a proceeding before an Administrative Law Judge ("ALJ"), who after a hearing can order a party to cease and desist from its unlawful conduct. Id. § 45(b). The party ordered to cease and desist can seek review before the Commission and then a court of appeals. Id. § 45(b)-(c). Section 5(*l*) authorizes district courts to award civil penalties to the United States for violations of cease-and-desist orders, and district courts can "grant mandatory injunctions and

-6-

such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission." Id. § 45(*l*). Alternatively, before a cease-and-desist order is issued, the Commission can go directly to a district court to obtain a temporary restraining order or preliminary injunction, and "in proper cases," a permanent injunction. Id. § 53(b).

The Commission's formal rulemaking authority is found in § 18 of the FTC Act. Section 18 authorizes the Commission to adopt "rules which define *with specificity* acts or practices which are unfair or deceptive acts or practices in or affecting commerce" within the meaning of § 5, as well as "requirements prescribed for the purpose of preventing such acts or practices." 15 U.S.C. § 57a(a)(1)(B) (emphasis added). Once a rule is promulgated, the Commission can enforce it directly against a regulated party by commencing an action in district court seeking civil penalties. Id. § 45(m)(1)(A). The FTC can also seek injunctive relief pursuant to § 53(b) and monetary redress for injured consumers. See id. § 57b(a)-(b). In addition to the "specificity" requirement, § 18 provides that the Commission can issue proposed rules "only where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are *prevalent*." Id. § 57a(b)(3) (emphasis added).

Besides the specificity and prevalence requirements, § 18 requires a number of procedural steps, some of which go beyond those required for APA notice-and-comment rulemaking. The FTC must first publish an "advance notice of proposed rulemaking" containing "a brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives under consideration." 15 U.S.C. § 57a(b)(2)(A). Also required is a notice of proposed rulemaking "stating with particularity the text of the rule, including any alternatives, which the Commission proposes to promulgate, and the reason for the proposed rule." Id. § 57a(b)(1)(A). Interested parties must be

Appellate Case: 24-3137    Page: 7    Date Filed: 07/08/2025 Entry ID: 5534686

afforded the opportunity for "an informal hearing" and to "to submit written data, views, and arguments" on the proposed rule. Id. § 57a(b)(1)(B)-(C), (c).

Congress further required the Commission to conduct regulatory analyses of proposed and final rules, or amendments to rules, at two stages of the rulemaking process. First, when the Commission publishes a notice of proposed rulemaking, it also must issue a "preliminary regulatory analysis" containing "a description of any reasonable alternatives to the proposed rule which may accomplish the stated objective of the rule" and for the proposed rule and each alternative, "a preliminary analysis of the projected benefits and any adverse economic effects and any other effects, and of the effectiveness of the proposed rule and each alternative in meeting the stated objectives of the proposed rule." 15 U.S.C. § 57b-3(b)(1)(B)-(C).

Second, the Commission must issue a "final regulatory analysis" when it promulgates a final rule. 15 U.S.C. § 57b-3(b)(2). Similar to the preliminary regulatory analysis, the final regulatory analysis must include a description of alternatives considered by the Commission and an analysis of projected benefits and adverse economic and other effects. The Commission must also provide "an explanation of the reasons for the determination of the Commission that the final rule will attain its objectives" and a "summary of any significant issues raised by the comments submitted . . . in response to the preliminary regulatory analysis." Id. § 57b-3(b)(2)(B)-(E). Importantly, the preliminary and final regulatory analysis requirements do not apply to "any amendment to a rule" unless the FTC estimates that the amendment "will have an annual effect on the national economy of $100,000,000 or more." Id. § 57b-3(a)(1)(A).

**B. The Rulemaking Process.** The 1973 Rule covered only one type of negative option strategy, so-called prenotification plans, through which sellers provide periodic notices offering goods to consumers and then send and charge for those goods if the consumer does not decline the offer. The periodic notices and

-8-

shipments can continue indefinitely. Once popular book-of-the-month clubs typify this type of negative option plan. Negative Option Rule, 89 Fed. Reg. 90476, 90476-77 (Nov. 15, 2024) (to be codified at 16 C.F.R. pt. 425). The 1973 Rule required sellers to clearly and conspicuously disclose seven categories of material terms: (i) how subscribers must notify the seller to indicate they do not want to make a purchase; (ii) any minimum purchase obligations; (iii) the subscriber's right to cancel; (iv) whether billing charges include postage and handling; (v) disclosure confirming subscribers have ten days to mail a rejection; (vi) disclosure that the seller will credit the return of the selection if the subscriber did not have ten day to reject the selection; and (vii) the frequency with which announcements and forms would be sent. 16 C.F.R. § 425.1(a)(1)(i)-(vii) (1974). Sellers were also required to disclose the specific periods during which they would send introductory merchandise, provide instructions for rejecting merchandise, and promptly honor cancellation requests. Id. § 425.1(a)(2)-(3), (b).

The Commission's effort to modernize the 1973 Rule began in 2019 with an advance notice of proposed rulemaking (the "ANPRM"), which posed a series of general questions about the 1973 Rule and current negative option practices. These included whether there was "a continuing need for the [1973] Rule as currently promulgated," what modifications the Commission should make to increase benefits to consumers, and whether there are "potentially unfair or deceptive practices concerning the marketing of negative option plans, not covered by the [1973] Rule, occurring in the marketplace." Rule Concerning the Use of Prenotification Negative Option Plans, 84 Fed. Reg. 52393, 52397 (Oct. 2, 2019).

The ANPRM identified three other variants of negative option programs not covered by the 1973 Rule. The first is continuity plans, under which consumers agree in advance to periodic shipments of goods or provision of services, to continue until the consumer cancels the agreement. A bottled water delivery service exemplifies this type of agreement. The second is automatic renewal plans. As the name

-9-

suggests, sellers, like magazine publishers, automatically renew customers' subscriptions when they expire unless the customer takes the affirmative step of cancelling the subscription. The third is free-to-pay plans, in which consumers receive free goods or services (or pay only a nominal fee), typically for a free trial period, and are automatically charged a fee at the end of that period unless they affirmatively cancel or return the goods to the seller. Rule Concerning the Use of Prenotification Negative Option Plans, 84 Fed. Reg at 52394. Because the 1973 Rule "does not reach most modern negative option marketing" and "[t]he existing patchwork of laws and regulations does not provide industry and consumers with a consistent legal framework across different media and types of plans," the Commission sought public comment on how to improve the existing regulatory framework. Id. at 52394, 52396.

The Commission received only seventeen comments in response to the ANPRM. After reviewing public comments, the Commission published an enforcement policy statement reiterating various principles from FTC guidance and case law, as well as statutes addressing recurring subscriptions, like the Restore Online Shoppers' Confidence Act of 2010, 15 U.S.C. § 8403. The policy statement emphasized the importance of clear and conspicuous disclosure of material terms before purchase, obtaining consumers' express, informed consent, and marketers' honoring cancellation requests and not "erect[ing] unreasonable barriers to cancellation." Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60822, 60823 (Nov. 4, 2021).

Over three years after the publication of the ANPRM, the Commission issued a notice of proposed rulemaking in April 2023 (the "NPRM") with proposed requirements that "would be applicable to all forms of negative option marketing in all media." Negative Option Rule, 88 Fed. Reg. at 24716. Based on evidence received in response to the ANPRM, including "complaint data, studies, survey results, and law enforcement actions," the Commission determined that deceptive

-10-

negative option marketing practices had become prevalent across industries. Id. at 24725. The NPRM proposed a number of amendments to the 1973 Rule that would broaden its scope and introduce new requirements regarding disclosures, advance consent, and cancellation mechanisms. Id. at 24726-30.

As for the preliminary regulatory analysis, the NPRM explained that the Commission had "preliminarily determined" that the proposed amendments to the 1973 Rule would not have the requisite $100 million effect on the national economy that would trigger the requirement for that analysis. Compliance with the proposed requirements "should not create any substantial added burden" on sellers because most already provide some forms of disclosures, consent procedures, and cancellation mechanisms to consumers. In addition, the Commission had "sought to minimize prescriptive requirements and provide flexibility to sellers." It therefore declined to provide a preliminary regulatory analysis. Negative Option Rule, 88 Fed. Reg. at 24731.

In January and February 2024, the Commission held informal hearing sessions before an ALJ to resolve disputed issues of material fact about costs of the proposed rule. Five interested parties and the FTC Bureau of Consumer Protection appeared at the hearing sessions and offered submissions and experts reports on the costs of the proposed rule. Based on the FTC's estimate that 106,000 entities currently offer negative option features and estimated average hourly rates for professionals such as lawyers, website developers, and data scientists whose services would be required by many businesses to comply with the new requirements, the ALJ observed that unless each business used fewer than twenty-three hours of professional services at the lowest end of the spectrum of estimated hourly rates, the Rule's compliance costs would exceed $100 million. Such an estimate was "clearly unrealistically low inasmuch as there are several new requirements proposed that would require changes in existing practices and/or disclosure forms." The Internet and Television Association, which appeared before the ALJ, submitted an estimate that achieving

-11-

compliance with the proposed rule would cost major cable operators alone between $12 and $25 million per company. Negative Option Rule, Project No. P064202 (Apr. 12, 2024) (Recommended Decision).

Weighing the estimated costs and benefits to consumers, the ALJ found that the proposed rule would have an annual effect on the national economy surpassing the $100 million threshold. The ALJ noted that even though it was "conceivable that the practices of almost all businesses that would be affected by the proposed Negative Option Rule amendments already comply with the proposal, this would be inconsistent with the widespread problems and abuses that the NPRM describes." Id. After the ALJ's decision, the Commission did not issue a preliminary regulatory analysis. Instead, it proceeded to finalize the Rule.

The Commission issued the final Rule by a 3-2 vote on November 15, 2024, imposing new requirements "related to any form of negative option program in any media." 16 C.F.R. § 425.1. First, the Rule bars sellers from misrepresenting "any [m]aterial fact," including but not limited to cost, negative option feature terms, and other information about the underlying good or service. Id. § 425.3. Second, the Rule requires "[c]lear and [c]onspicuous" disclosure, "immediately adjacent" to the means of recording the consumer's consent to the recurring subscription, of all material terms, "regardless of whether those terms directly relate to the Negative Option Feature." Id. § 425.4(a), (b)(1)-(2). Third, the Rule requires sellers to obtain the consumer's "unambiguously affirmative consent to the Negative Option Feature separately from any other portion of the transaction." Id. § 425.5(a)(1). Fourth, the Rule introduces an "equal dignities" requirement for cancellation of negative option contracts. Sellers must provide "a simple mechanism" for cancellation that allows consumers to immediately stop all recurring charges and is "at least as easy to use as the mechanism the consumer used to consent" to the subscription initially. Id. § 425.6(a)-(b). Acknowledging the ALJ's finding that the Rule would have an annual effect on the national economy of $100 million or more, the Commission issued a

-12-

final regulatory analysis in conjunction with the final Rule as required by § 22 of the FTC Act, 15 U.S.C. § 57b-3(b)(2). Negative Option Rule, 89 Fed. Reg. at 90517-34.

FTC Commissioner Holyoak and now-Chairman Ferguson dissented. Questioning the majority's "race to cross the finish line," Commissioner Holyoak argued that the Rule was much broader than the "area of inquiry" proposed by the ANPRM; it failed to satisfy § 18's specificity requirement by "improperly generalizing from narrow industry-specific complaints and evidence to the entire American economy"; and the Commission did not demonstrate that unfair or deceptive negative option practices are actually "prevalent." She also warned that the breadth of the Rule "incentivizes companies to avoid negative option features that honest businesses and consumers find valuable" and characterized the Rule as "a missed opportunity to make useful amendments to the preexisting negative option rule within the scope of the Commission's authority." Negative Option Rule, 89 Fed. Reg. at 90540.

**C. Petitioners' Challenges.** Petitioners filed petitions for review shortly after the Rule was issued in four circuit courts of appeals, which have jurisdiction to review FTC rules pursuant to 15 U.S.C. § 57a(e)(1)(A). The Commission transmitted the petitions to the Judicial Panel on Multidistrict Litigation, which, by means of random selection, designated this court as the one in which to consolidate the petitions. 28 U.S.C. § 2112(a).

Petitioners challenge the Rule on three grounds and request that the court vacate the Rule in its entirety. First, they argue the Rule exceeds the scope of the FTC's statutory authority under § 18 of the FTC Act because it does not satisfy the specificity and prevalence requirements. In Petitioners' view, this "one-size-fits-all regulation of all recurring subscriptions everywhere" using general requirements such as disclosure of "any [m]aterial fact" and "easy" cancellation mechanisms is far from specific. And the Commission did not provide sufficient evidence regarding the

-13-

existence of unfair or deceptive recurring subscriptions practices across industries to demonstrate prevalence. Congress would also not have authorized a Rule of this breadth when it already has passed legislation addressing specific recurring subscription practices and classes in specific industries. The Commission responds that the Rule satisfies the specificity requirement because it targets clearly defined types of contracts and particular unfair or deceptive acts or practices. In addition, nothing in § 18 precludes the Commission from regulating across industries; the FTC can reach conduct "in or affecting commerce." 15 U.S.C. § 57a(a)(1)(B). As for the prevalence requirement, the Commission states that the Rule is based on "copious evidence" of unfair and deceptive negative options practices, including dozens of enforcement actions, consumer complaints, economic studies, and comments from industry and consumer groups.

Second, Petitioners contend the Rule must be set aside because the Commission never issued the statutorily required preliminary regulatory analysis, and reviewing courts "may set aside such rule if the Commission has failed entirely to prepare a regulatory analysis." 15 U.S.C. § 57b-3(c)(1). The Commission responds that it was not required to prepare that analysis because its initial estimate of the annual economic impact did not surpass the statutory threshold of $100 million, and the FTC Act did not require the Commission to conduct the preliminary regulatory analysis later in the rulemaking process after the informal hearing. In addition, any alleged error was harmless because the NPRM addressed alternatives to the proposed amendments to the 1973 Rule and analyzed recordkeeping and compliance costs.

Third, Petitioners argue that the Rule is arbitrary and capricious under the APA, see 15 U.S.C. § 57a(e)(3) (incorporating 5 U.S.C. § 706(2)), because it is overbroad and creates unworkable, sometimes impossible-to-meet standards for sellers by treating all recurring subscriptions the same. The Commission takes the position that the Rule was appropriately tailored to prevent specific unfair and

-14-

deceptive practices, and the need for its chosen approach was supported by substantial evidence.

The Commission originally set a compliance date of May 14, 2025, for all regulated entities. This court denied Petitioners' motion for a stay of the Rule pending judicial review. On May 9, the Commission opted to defer the compliance deadline until July 14, 2025, exercising its "enforcement discretion" to "ensure ample time for companies to conform their conduct to the Rule." FTC, Statement of the Commission Regarding the Negative Option Rule, Matter No. P064202 (May 9, 2025).

## II. Discussion

Section 18 of the FTC Act provides that reviewing courts "shall hold unlawful and set aside the rule on any ground specified in subparagraphs (A), (B), (C), or (D) of section 706(2) of [the APA]." 15 U.S.C. § 57a(e)(3). Those incorporated provisions of APA § 706(2) authorize courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D). "If a petitioner challenges the agency's compliance with the [APA's] procedural requirements, then *de novo* review is required because compliance is not a matter that Congress has committed to the agency's discretion." Citizens Telecomms. Co. of Minn., LLC v. FCC, 901 F.3d 991, 1001 (8th Cir. 2018) (quotation omitted). We begin with Petitioners' procedural challenge based on the Commission's failure to provide a preliminary regulatory analysis.

**A. The Preliminary Regulatory Analysis Requirement.** In issuing the Rule, the Commission acknowledged the ALJ's finding that the Rule's annual effect on the

-15-

national economy would exceed $100 million: "Although the Commission preliminarily determined the proposed amendments to the Rule would not have such effects on the national economy . . . [u]ltimately, the presiding officer determined . . . the proposed amendments would have such effect." Negative Option Rule, 89 Fed. Reg. at 90517. Rather than conducting the preliminary regulatory analysis, the Commission proceeded to issue only the final regulatory analysis alongside the final Rule.

The plain text of the FTC Act explains when a regulatory analysis is required and to what extent it is subject to judicial review. Section 22 states that "[i]n any case in which the Commission publishes notice of a proposed rulemaking, the Commission shall issue a preliminary regulatory analysis relating to the proposed rule involved." 15 U.S.C. § 57b-3(b)(1). As previously noted, the scope of this requirement is limited by the exclusion from the definition of "rule" amendments with an estimated annual economic effect under $100 million. Id. § 57b-3(a)(1)(A). In addition, § 22 limits the scope of judicial review of the substance of the preliminary and final regulatory analyses when they are required: "The contents and adequacy of any regulatory analysis prepared or issued by the Commission under this section, including the adequacy of any procedure involved in such preparation or issuance, shall not be subject to any judicial review in any court." Id. § 57b-3(c)(1). This circumscribed judicial review provision, however, contains an exception -- "a court . . . may set aside such rule if the Commission has failed entirely to prepare a regulatory analysis." Id.

Despite this exception and the Commission's acknowledged failure to prepare a preliminary regulatory analysis, the FTC argues on appeal that "nothing in the FTC Act requires a preliminary regulatory analysis at that late stage" of rulemaking. The Commission points out that the ALJ issued her decision on the costs of the Rule one year after the NPRM, contending that the statute did not require the Commission to

-16-

conduct a preliminary analysis just six months before the Rule was ultimately promulgated to account for its initial underestimate.

But the statutory language, "shall issue," mandates a separate preliminary analysis for public review and comment "in any case" where the Commission issues a notice of proposed rulemaking and the $100 million threshold is surpassed. 15 U.S.C. § 57b-3(b)(1). We do not read § 22 to require the Commission to issue the preliminary regulatory analysis contemporaneously with the notice of proposed rulemaking. While that is the typical order of operations, deviating from this sequence of events is not statutorily prohibited. Likewise, § 22 does not excuse the Commission from having to prepare the analysis in the event that its initial economic estimate is later deemed inaccurate. After the ALJ's decision, the Commission could have reissued the NPRM with the required preliminary analysis. It is not uncommon for administrative agencies, including the FTC, to issue supplemental notices of proposed rulemaking as the scope of a proposed rule changes in response to comments or to ensure statutory compliance. See, e.g., Business Opportunity Rule, 76 Fed. Reg. 76816, 76818-19 (Dec. 8, 2011) (to be codified at 16 C.F.R. pt. 437); Regulations Under the Fur Products Labeling Act, 79 Fed. Reg. 30445, 30447 (May 28, 2014) (to be codified at 16 C.F.R. pt. 301).

The final regulatory analysis provision also supports Petitioners' view that the Commission was not excused from issuing the preliminary regulatory analysis. Section 22 requires, as a component of the final regulatory analysis, "a summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues." 15 U.S.C. § 57b-3(b)(2)(E). The fact that Congress requires the Commission to consider issues raised in the preliminary analysis at this later stage of rulemaking suggests that a preliminary analysis would still have been required, even if well after the NPRM. Without it, the Commission

-17-

cannot provide any responses to comments on its earlier analysis in the final regulatory analysis.

The Commission emphasizes that § 22 directs it to address comments from "the public comment period" responding to the preliminary regulatory analysis and that the only statutorily required public comment periods follow the advance notice of proposed rulemaking and notice of proposed rulemaking. But § 22's reference to "public comment period" is not specifically tied to or limited by any procedural requirements of § 18 or the APA. And if no preliminary regulatory analysis is issued, it is impossible for interested parties to submit comments "in response to the preliminary regulatory analysis." The Commission's interpretation allows it to sidestep the requirement that the final regulatory analysis respond to comments responding to the preliminary regulatory analysis by simply not publishing a preliminary analysis and cutting off the ability of regulated parties to respond to the preliminary analysis in the first place. We conclude that § 22 required the Commission to issue a preliminary regulatory analysis after the ALJ found the Rule would meet the $100 million economic impact threshold, even though the Commission initially estimated it would not.

**B. Harmless Error.** Even if a preliminary regulatory analysis was required, the Commission responds that any procedural error committed in not preparing one was ultimately harmless. The APA instructs reviewing courts to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. Section 18 of the FTC Act incorporates this APA provision. 15 U.S.C. § 57a(e)(3). APA § 706 creates "the same kind of 'harmless-error' rule that courts ordinarily apply in civil cases" and "seeks to prevent appellate courts from becoming impregnable citadels of technicality." Shinseki v. Sanders, 556 U.S. 396, 406-07 (2009) (quotation omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Id. at 409. Petitioners have met that burden.

-18-

When required, a preliminary regulatory analysis must include a description of reasonable alternatives to the proposed rule, a cost-benefit analysis of each alternative, and an assessment of the effectiveness of the proposed rule and each alternative in achieving the Commission's stated objectives in promulgating the rule. 15 U.S.C. § 57b-3(b). Petitioners claim that they suffered prejudice because the Commission never provided this analysis of alternatives to the Rule or addressed comments explaining how less burdensome alternatives could provide comparable benefits. Petitioners could have attempted to show the Commission that their industries do not engage in the allegedly prevalent unfair and deceptive practices the Rule sought to root out.

The Commission suggests that Petitioners actually did have the opportunities for comment they claim to have been deprived of. The NPRM sought comment on "several alternatives" and analyzed recordkeeping and compliance costs associated with the proposed rule. Negative Option Rule, 88 Fed. Reg. at 24732-34. And during the informal hearing process before the ALJ, interested parties submitted their own briefs and expert reports addressing the Rule's costs and benefits, which the Commission considered in promulgating the final Rule. In the Commission's view, "tweaks to the cost-benefit analysis would not have made any difference when the low-end assessment of the Rule's benefits is seven times greater than the high-end assessment of its costs," citing the Commission's final regulatory analysis estimates. See Negative Option Rule, 89 Fed. Reg. at 90519.

In Citizens Telecommunications, we considered the Federal Communications Commission's ("FCC") failure to provide adequate notice that it was completely ending *ex ante* regulation of one type of communications line, despite stating in its notice of proposed rulemaking that it sought to regulate both types of services at issue the same way. The FCC never proposed "complete deregulation" or requested public comment on treating the two services differently, which "did not allow for informed participation by interested parties in that portion of the rulemaking." Citizens

-19-

Telecomms., 901 F.3d at 1004-05. The early release of a draft of the final rule three weeks before it was adopted was insufficient to cure the harm from inadequate notice. Id. at 1005. In addition, even though commenters in prior submissions to the administrative record may have already addressed "everything that needed to be said" regarding the regulated transport services, in assessing whether the regulated entities challenging the final rule had suffered prejudice, we explained that "the law regarding prejudice under the APA ensures procedural integrity. Losing the opportunity to dissuade an agency from adopting a particular rule is prejudicial." Id. at 1006.

Citizens Telecommunications does not authorize us to presume prejudice based on the loss of any opportunity to respond to an agency's rulemaking process, as Petitioners suggested at oral argument; the APA's harmless error provision would be rendered meaningless otherwise. But Petitioners "do not have a high burden in demonstrating prejudice in notice-and-comment cases. In general, an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." Am. Pub. Gas Ass'n v. United States Dep't of Energy, 72 F.4th 1324, 1338 (D.C. Cir. 2023) (quotations and citation omitted).

Applying these principles, we agree with Petitioners that they lost a notable opportunity to dissuade the FTC from adopting the Rule as proposed in the NPRM. The NPRM's discussion of "significant alternatives," which the Commission argues provided Petitioners an opportunity to convince the FTC to change course, referenced only "provisions related to consent requirements (additional consent for free trials) and reminder requirements (narrowing the scope of product types requiring reminders)." Negative Option Rule, 88 Fed. Reg. at 24732-33. Neither the informal hearing nor the final regulatory analysis made up for the lack of discussion of alternatives and Petitioners' inability to engage with the Commission's cost-benefit estimates at an earlier stage of rulemaking.

-20-

The informal hearing addressed the Rule's annual effect on the national economy and the Rule's recordkeeping and disclosure costs but not the costs and benefits of any alternatives. By the time the final regulatory analysis was issued, Petitioners still did not have the opportunity to assess the Commission's cost-benefit analysis of alternatives, an element of the preliminary regulatory analysis not required in the final analysis. See 15 U.S.C. § 57b-3(b)(1)-(2). And the Commission's discussion of alternatives in the final regulatory analysis was perfunctory. It briefly mentioned two alternatives to the final Rule, either terminating the rulemaking altogether and continuing to rely on the existing regulatory framework or limiting the Rule's scope to negative option plans marketed in-person or through the mail. Negative Option Rule, 89 Fed. Reg. at 90518. While the Commission's decision to bypass the preliminary regulatory analysis requirement was certainly not made in bad faith or an "outright dodge of APA procedures," Petitioners have raised "enough uncertainty whether [their] comments would have had some effect if they had been considered," especially in the context of a closely divided Commission vote that elicited a lengthy dissenting statement. Chamber of Com. of U.S. v. SEC, 443 F.3d 890, 904 (D.C. Cir. 2006) (cleaned up).

The Fifth Circuit's recent decision in National Automobile Dealers Ass'n v. FTC provides additional support for Petitioners' claim of prejudice. 127 F.4th 549 (5th Cir. 2025). There, automobile dealers associations sought review of the Commission's rule, Combating Auto Retail Scams Trade Regulation, targeting dealer misrepresentations like "bait-and-switch tactics" and "hidden or junk fees." Id. at 554. Invoking a provision of the Dodd-Frank Act that relaxes the required statutory procedures for FTC rulemaking, the Commission promulgated the rule without first issuing an advance notice of proposed rulemaking. The court vacated the rule, concluding that the Commission's rulemaking authority actually derived from § 18(a)(1)(B) of the FTC Act and its failure to publish an advance notice of proposed rulemaking, required under that section, was sufficiently prejudicial. Id. at 553, 556, 560-61.

-21-

Even though the petitioners in <u>National Automobile Dealers</u> "took full advantage of every opportunity to participate" in the rulemaking process, "there [was] reason to believe that petitioners would have used the advanced notice to participate earlier and more extensively than they were otherwise able to." 127 F.4th at 560. That reasoning applies to Petitioners here as well. The opportunity to be heard earlier on in the rulemaking process may well have impacted the Commission's decision-making on the scope of the final Rule and on whether alternatives, which would have received more substantive consideration by the Commission and regulated entities, were indeed viable. Petitioners have shown that "it is far from clear that the failure to issue a[] [preliminary regulatory analysis] had no bearing on the procedure used or the substance of decision reached." <u>Id.</u> at 561 (quotation omitted).

Excusing the Commission's noncompliance with § 22 could open the door to future manipulation of the rulemaking process. Furnishing an initially unrealistically low estimate of the economic impacts of a proposed rule would avail the Commission of a procedural shortcut that limits the need for additional public engagement and more substantive analysis of the potential effects of the rule on the front end. More fundamentally, the Commission has attempted to import § 5's general standards prohibiting unfair or deceptive acts or practices into § 18's more circumscribed rulemaking process. This would allow the FTC to commence civil actions for monetary penalties directly against regulated entities, rather than following the administrative cease-and-desist process (with potential judicial review) laid out in § 5. Although this is important context for Petitioners' arguments about the Commission's compliance with the specificity and prevalence requirements in § 18, because we hold the Commission's rulemaking process was procedurally insufficient and Petitioners demonstrated prejudicial error, we need not address Petitioners' other substantive challenges to the Rule.

**C. Remedy.** Section 18 of the FTC Act directs that a reviewing court "shall hold unlawful and set aside the rule" if it finds agency action to be "without

-22-

observance of procedure required by law." 15 U.S.C. § 57a(e)(3); 5 U.S.C. § 706(2)(D). "The ordinary practice is to vacate unlawful agency action." United Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019). Nevertheless, "the decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002) (cleaned up).

While we certainly do not endorse the use of unfair and deceptive practices in negative option marketing, the procedural deficiencies of the Commission's rulemaking process are fatal here. The Rule does contain a severability provision which keeps the remaining provisions in effect if any provisions are stayed or determined to be invalid. 16 C.F.R. § 425.9. But vacatur of the entire Rule is appropriate in this case because of the prejudice suffered by Petitioners as a result of the Commission's procedural error. Given the breadth of the Rule's coverage, the party-specific vacatur requested by the Commission is not feasible. Accordingly, we grant the petitions for review and vacate the Rule.

_____

-23-